**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 08 CIV. 5971

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

GREYWOLF HOLDINGS LP, ACM ATM, LLC, and
CASPIAN OPPORTUNITIES, INC.,

                                 Plaintiffs,

                 v.

ROBERT ONG,

                                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF

08 Civ. ___

**JURY TRIAL DEMANDED**

**JUDGE ROBINSON**

Plaintiffs Greywolf Holdings LP, ACM ATM, LLC, and Caspian Opportunities, Inc. (collectively, "Plaintiffs"), by and through their attorneys, Meiselman, Denlea, Packman, Carton & Eberz P.C., as and for their Complaint against Defendant Robert Ong ("Ong"), with knowledge as to their own actions and upon information and belief concerning the acts of others, allege as follows:

<u>**NATURE OF THE CASE**</u>

1.       This action seeks to redress the duplicitous and reckless course of conduct by which defendant Ong purposefully misled Plaintiffs into investing approximately twenty-nine million dollars ($29,000,000) into an automated teller machine ("ATMs") business for what turned out to be solely Ong's personal economic self-interest and gain. Without actually conducting a kernel of due diligence, misrepresenting to Plaintiffs he had actually performed due diligence, and by deliberately concealing from Plaintiffs his prior business dealings with the very same unscrupulous characters with whom Ong encouraged Plaintiffs to do business, Ong fraudulently induced Plaintiffs to invest in a Ponzi scheme in exchange for Ong's "promise" that he would personally manage the investment. In doing so, Ong secured a

lucrative management agreement for himself and has been paid approximately three million dollars ($3,000,000) for mismanaging an investment that was doomed from its inception. Unbeknownst to Plaintiffs, the entire investment scheme brought to Plaintiffs by Ong was a scam and an artifice intended to defraud investors. By this action, Plaintiffs seek to recover the financial losses they have sustained as a result of Ong's gross negligence, malfeasance and breaches of the trust and confidence Plaintiffs unfortunately reposed in him.

2.      In particular, Ong fraudulently induced Plaintiffs to execute Management Agreements, whereby Ong would sell ATMs to Plaintiffs for a significant mark-up, and whereby Ong would manage the ATM investments on Plaintiffs' behalf.  To induce Plaintiffs' investment, Ong falsely represented that he had located and brought together two knowledgeable and credible individuals in the ATM industry, and that he had personally performed extensive due diligence on these individuals.  Ong falsely represented that he had thoroughly researched Walter Netschi ("Netschi"), whom Ong presented as "well known" in the ATM industry for locating valuable ATM machines, and Vance Moore, II ("Moore"), whom Ong presented as "well known" within the ATM industry for servicing such machines.  These very same individuals are currently subjects of Grand Jury investigations being conducted by the Federal Bureau of Investigations and the United States Attorney's Office for the Southern District of New York for their involvement with these and similar investments.

3.      Importantly, Ong falsely represented that Netschi and Moore were completely independent from each other and would serve as "independent checks" on

2

one another.  In addition, Ong stated that he would purchase the ATMs from Netschi's company, 36 Main Street LLC ("36 Main Street"), which Ong represented as having purchased the machines from independent third parties with a confirmed history of excellent cash flows.

4.      Based on these false and dishonest representations, Plaintiffs entered into various Management Agreements with Ong, which specified that Plaintiffs would purchase the ATMs from 36 Main Street, and that the machines would then be serviced by Moore.

5.      Only recently, however, have Plaintiffs discovered that Ong falsely misrepresented his purported due diligence on both Netschi and Moore, that Netschi and Moore were not in fact independent from each other or even Ong for that matter, that Netschi had purchased the ATMs from Moore instead of independent third parties, that Moore did not own and/or lacked good title to sell the majority of these machines, and that Moore's prior ATM company had filed for bankruptcy in the Middle District of Florida under almost the exact same circumstances.  Accordingly, Plaintiffs seek to redress their collective loss of approximately thirty-two million dollars ($32,000,000) as a direct result of Ong's wrongdoing.

## **THE PARTIES**

6.      Plaintiff Greywolf Holdings LP ("Greywolf") is a Delaware limited partnership, located at 4 Manhattanville Road, Purchase, New York 10577.

7.      Plaintiff ACM ATM, LLC ("ACM") is a Delaware limited liability company, located at 570 Lexington Avenue, New York, New York 10022.

3

8.      Plaintiff Caspian Opportunities, Inc. ("Caspian") is a Delaware corporation, located at 500 Mamaroneck Avenue, Suite 101, Harrison, New York 10528.

9.      Defendant Robert Ong ("Ong"), a former managing director of Bear Stearns, is currently the sole owner and employee of Jade Capital Investments.  At the time of the transaction, Ong lived in New York, but is currently a Florida resident.

## VENUE AND JURISDICTION

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has personal jurisdiction over Ong, who conducted significant business in the State of New York pursuant to the Management Agreements with Plaintiffs.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 (c) because defendant is subject to personal jurisdiction in this District.

## FACTS

13.     In October 2005, Ong, a personal friend since 2003 of one of the principals of Greywolf, approached Plaintiffs with a business concept that he was developing.  Relying on his personal friendship and the credibility of his twenty-five years as a Managing Director of Bear Stearns to lend him credibility, Ong represented that he had created an investing platform that would facilitate Plaintiffs' purchase of thoroughly diligenced ATM machines that were, or would be, placed in various locations throughout the United States.

4

14.    During their initial meetings with Plaintiffs, Ong represented that he had completed extensive due diligence on both of these individuals and vouched for their reputations, expertise, and trustworthiness.

15.    In his marketing materials, Ong boast that he was the "architect" of this business model and had conducted extensive due diligence on these purported "experts" in the ATMs industry.  In return for creating this investment platform and conducting this extensive due diligence, Ong requested and received $2,970,391 in the form of an ongoing ATM management fee.

16.    Ong's fee, which was based on these false and dishonest representations, was divided into two parts:  (a) a percentage of the net asset value of the machines on a quarterly basis, and (b) an incentive fee tied to the income derived from the machines.

17.    Pursuant to the Management Agreements and the facts and circumstances under which Ong brought this investment to Plaintiffs, Ong owed Plaintiffs both contractual and fiduciary duties.

**ONG'S FALSE REPRESENTATIONS REGARDING HIS
PURPORTED DUE DILIGENCE ON HIS BUSINESS PARTNERS**

18.    To ensure that this deal would be consummated and that Ong would receive his large fee, Ong explicitly stated to Plaintiffs that he had conducted extensive due diligence on both Netschi and Moore.

19.    Ong represented that his due diligence on Netschi revealed that he was an experienced businessman with great knowledge of the ATM business.

5

20.    Ong further represented that, based on his extensive due diligence, Plaintiffs should hire ATM Financial Services, LLC ("AFS"), a company owned and operated by Moore, to audit all of the ATMs that Ong would purchase from Netschi on Plaintiffs' behalf.  Ong falsely represented that AFS would provide Plaintiffs with accurate, disinterested data regarding the performance of the ATMs.

21.    Ong falsely represented that Moore would serve as an independent check of Netschi and would verify the existence, location and income of the machines.  In particular, according to Ong, Moore would audit the machines, verify their serial numbers, and verify their locations.  Ong falsely represented that Moore was extremely well qualified to perform these audit tasks.

22.    Ong further represented that Netschi and Moore were completely independent, that Netschi would purchase the ATMs from independent dealers, and that Moore was not in the business of selling ATMs, but rather only verifying the existence of the ATMs and servicing the ATMs.

23.    Ong also falsely represented that Moore would service the ATMs by ensuring that each ATM was loaded with sufficient cash at all times, that the ATMs would work properly, and that Plaintiffs would be provided with sufficient information to accurately determine their income pursuant to their agreements with Ong.

24.    In order to ensure that Plaintiffs went forward with this investment, Ong deliberately misrepresented his due diligence.  Plaintiffs have recently discovered that Netschi, was, and is, a close business associate of Moore.  Thus, as set forth below, by auditing the machines themselves, Moore and Netschi were able to "sell" ATMs to

Plaintiffs that did not exist, and Ong was able to collect management fees for managing ATMs that never existed.

## ONG FAILED TO ADVISE PLAINTIFFS OF MOORE'S PRIOR MISCONDUCT AND BANKRUPTCY FILINGS

25.    In addition to misrepresenting his due diligence, Ong failed to inform Plaintiffs of Moore's prior misconduct, specifically in the ATM business.

26.    Plaintiffs have recently discovered that in or around 1997 to 2000, Moore previously sold ATMs and acted as a management agent of ATMs using a company called International Technology Systems ("ITS").

27.    ITS was the defendant in numerous state court actions commenced by investors who had purchased ATMs, but did not receive monthly reporting or the net cash revenues of the machines themselves.

28.    In *Wacker et al v. International Technology Systems, Inc.*, No. 00-360-CA01 (Lake County Fl., Feb. 7, 2000), for example, the plaintiffs were a putative class of ATM owners who alleged that ITS failed to furnish the ATMs they allegedly sold to the class.  According to the complaint, "ITS misrepresented to these Class members the existence of these machines, the locations of these machines, the gross revenues of these machines, the express location of these machines, and the net revenue generated at these machines, as these machines do not exist."

29.    In an ensuing bankruptcy proceeding, it was divulged that Moore had been engaged in the sale of ATMs since at least 1992, through various corporate entities, and these entities had sold machines that they did not own or never existed.

30.     Ong represented to Plaintiffs that he had fully "vetted" Moore, that he had conducted an extensive background search, and had spoken to a variety of leaders of the ATM industry, and that Moore's reputation was impeccable.  These representations were false.

31.     If Ong had divulged this information to Plaintiffs concerning Moore's prior transgressions in the ATM business, Plaintiffs would not have invested tens of millions of dollars with Ong.

**ONG FAILS TO INFORM PLAINTIFFS THAT HE HAD PREVIOUSLY INVESTED IN A SIMILAR PONZI SCHEME INVOLVING A SIMILAR PRODUCT**

32.     During his meetings with Plaintiffs in October 2005, Ong failed to disclose that he had previously invested in a similar product, and had lost hundreds of thousands of dollars in that investment due to fraud.

33.     In 2003, Ong invested $348,000 with Tom Foley ("Foley") to purchase Point of Service machines – machines that afford customers the opportunity to purchase goods, while also offering customers the opportunity to make additional withdrawals from their bank account in return for cash.

34.     Similar to Plaintiffs' investments herein, Ong began receiving monthly payments on his investments for several months and then the payments stopped. When the monthly payments stopped, Ong contacted the other investors and learned that different investors had "purchased" the same exact machines from Foley.  Foley, like Moore and Netschi in this action, was selling the same machines to more than one investor and/or was selling machines that did not exist.

8

35.    When the FBI learned of Foley's Ponzi scheme, it closed the business and the investors stopped receiving any further payments.

36.    Ong intentionally decided not to inform Plaintiffs of his previous links with a fraudulent investment scheme based on a similar product.  He knew that if he had made such a disclosure, he would have lost his opportunity to obtain a lucrative deal with Plaintiffs.

## ONG FAILS TO INFORM PLAINTIFFS ABOUT HIS BUSINESS DEALINGS WITH MOORE AND MOORE'S FAMILY

37.    Pursuant to the Management Agreements with Plaintiffs, Ong had a duty to disclose any potential conflicts of interest to Plaintiffs.

38.    Specifically, paragraph 2(e) of the Management Agreement states:  "The Manager agrees that it shall have an on-going duty during the Term of this Agreement to promptly advise the Company of any conflicts or potential conflicts of interest involving the Manager, the Manager's Agents, the Manager's Affiliates or the Agents of such Affiliates, including conflicts of the types described in Section 2(b)(iv), whenever such conflicts arise, may reasonably be expected to arise and, in any event, prior to the Company entering into any transaction involving such conflict or potential conflict."

39.    Plaintiffs have recently discovered that Ong had a prior business relationship with Moore and at least one member of Moore's family.

40.    Indeed, Plaintiffs have recently learned that Moore owes Ong approximately $300,000 from this prior business relationship.

9

41.    Ong therefore breached the Management Agreement by failing to disclose this relationship to Plaintiffs.

## PLAINTIFFS ENTER MANAGEMENT AGREEMENTS BASED ON ONG'S FALSE REPRESENTATIONS

42.    Ong also falsely represented that the ATMs he was selling to Plaintiffs existed, were subject to location leases, and generated certain revenue streams.  In reliance on these false statements and material omissions, Plaintiffs executed purchase and sale agreements with 36 Main Street through which:  (a) they purchased the ATMs, (b) entered into Management Agreements with AFS (Moore's alleged "audit" company), and (c) entered into Management Agreements with Ong.  The Management Agreements contained numerous representations concerning the truth and completeness of the information provided to Plaintiffs.

43.    Pursuant to the Management Agreements, Ong agreed to render the following services:

a.    manage, operate and administer the day to day operations of the Business;

b.    identify, analyze, acquire, operate, maintain and manage ATMs in a manner consistent with the Investment Policy;

c.    conduct due diligence concerning ATMs suitable for purchase by the Company in accordance with the Investment Policy;

d.    (i)  negotiate with third parties on behalf of the Company concerning the acquisition of ATMs, (ii)  assist with the preparation and negotiation of any relevant transaction documents, including, without limitation, confidentiality agreements, term sheets, letters of intent, exclusivity letters, definitive transaction documents and other

10

relevant documents, and (iii) assist with the closing and consummating such acquisitions on behalf of the Company (ATMs required by the Company that were sourced by the Manager under this Agreement are referred to herein as "ATM Investments");

e.    (i) evaluate existing ATM Investments and (ii) seek, identify, analyze, screen and recommend to the Company technical, commercial and/or financial enhancements for existing ATM Investments, including opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs in the Investment Portfolio;

f.    (i) seek disposition opportunities for ATM Investments consistent with the Investment Policy, (ii) conduct due diligence concerning dispositions of ATM Investments, (iii) negotiate with third parties on behalf of the Company concerning such dispositions, (iv) close and consummate such dispositions on behalf of the Company, and (v) perform the foregoing services set forth in this Section 1(b)(vi) so as to efficiently and optimally liquidate or otherwise dispose of the Investment Portfolio on or prior to the Termination Date;

g.    provide such reports on the activities of the Manager under this Agreement as the Company may from time to time request;

h.    keep financial and accounting records of the Company, including the preparation of financial statements; and

I.    oversee any audits that may be required by the Company.

44.    As set forth herein, Ong breached the above-referenced representations.

45.    Pursuant to these Management Agreements, Greywolf paid $2,447,700, Caspian paid $408,236, and ACM paid $104,455 to Ong as management fees. In addition, Greywolf invested $22,704,000, Caspian invested $4,681,200, and ACM

invested $1,678,800 to purchase the ATMs.

46.    In addition to inducing Plaintiffs into investing approximately $29 million in ATMs that did not exist, by providing Plaintiffs with false information, Ong induced Plaintiffs to execute contracts with Moore, through the corporate entity that Moore controls, AFS, and enter into service agreements with Moore.

47.    Each of the Plaintiffs is now the owner (in the case of Greywolf, both originally and by assignment from its affiliate Greywolf Holdings II, Inc.), of ATMs that are supposedly located throughout the United States.  Greywolf holds title to a total of 1381 ATMs.  ACM holds title to a total of 112 ATMs.  Caspian purchased a total of 489 ATMs, but subsequently sold 207 ATMs, and now currently holds title to 282 ATMs.

48.    Under each of the service agreements Plaintiffs entered into with AFS based on Ong's misrepresentations and omissions of material facts, AFS undertook to manage and operate the ATMs owned by Plaintiffs in return for substantial management fees.  The agreements are substantially identical in their non-economic terms.

49.    Specifically, pursuant to the agreements between AFS and Plaintiffs, AFS was responsible for, among other things, (a) contracting with merchants for the right to place ATMs in their establishments; (b) transporting and placing the ATMs in specific locations; (c) servicing the ATMs, including replenishing the cash dispensed by the machines; and (d) coordinating and collecting the ATM fees.

50.    Ong failed to ensure that AFS was dutifully performing the contractual obligation to which AFS had agreed, because Ong was aware that if he did so his cover

would be blown, and the fact that he had induced Plaintiffs to invest in and pay Ong management fees for phantom ATMs that either never existed or were actually owned by others would come to light.

## ONG'S FALSE REPRESENTATIONS REGARDING THE OPERATIONS OF THE ATMS

51.     Starting in October 2005, Ong conspired with Moore to make false representations concerning the vitality of the investment and to defraud Plaintiffs of their net revenues from the ATMs.  Those false representations included preparation of false monthly statements that (a) identified non-existent ATMs as belonging to Plaintiffs, and (b) set forth fictitious amounts of revenues.

52.     In October 2007 and thereafter, AFS stopped performing under its agreements with Plaintiffs.  AFS stopped producing the required monthly statements and paying the net revenues.  Plaintiffs began demanding payment of their net revenues and issuance of the statements.

53.     In response to Plaintiffs' demands for payment, Moore (on behalf of AFS) made numerous false statements, including (a) blaming AFS's failure to issue the statements and pay the revenues on the failed integration of a new software package, (b) continually promising that the money would be paid, first in mid to late December and then by January 31, 2008, (c) claiming that the Plaintiffs' net revenues were segregated and maintained at third party processors, and (d) stating that the ATMs were at the claimed locations and being maintained and earning money.

13

54.    On several occasions throughout 2007, Plaintiffs asked Ong to intervene and contact Moore to determine the status of the net revenues. Ong falsely confirmed to Plaintiffs that he had verified Moore's statements. In truth, however, the software was not to blame, the money was never paid, and indeed many of the ATMs did not exist and the revenue streams were fictitious.

55.    Despite several requests from Plaintiffs, Moore refused to turn over any of the net revenues from Plaintiffs' ATMs, to provide monthly statements, or to proffer any other information about the ATMs.

56.    At no point during this period did Ong take any steps to actually intervene with Moore to assist Plaintiffs with access to their payments. Such inaction was a breach of Ong's Management Agreements with Plaintiffs.

57.    Specifically, the Management Agreement required Ong to do all such things as may reasonably be required by the Company or otherwise take all necessary steps to remedy or prevent such a breach.

58.    From October 2007 to the present, Plaintiffs have been denied access to the vital information contained in the monthly statements.

59.    Further, throughout this period, Ong repeatedly assured Plaintiffs that Netschi and the entities that he controlled (including 36 Main Street) were financially independent from Moore and AFS, that there was "no economic relationship" between 36 Main Street and AFS, and that AFS was providing accurate, disinterested data regarding the ATMs that Plaintiffs acquired.

14

60.    Ong failed to notify Plaintiffs that the machines that they purchased from 36 Main Street were not the result of Netschi "pounding the pavement" to locate profitable machines, but rather were rehypothecated directly from AFS and Moore.

61.    As a result of Ong's complicity with Moore, Ong facilitated the concealment of the conversion of Plaintiffs' ATMs and facilitated the conversion of the revenues from Plaintiffs to Ong, Netschi and Moore.

62.    The price that Plaintiffs paid for the ATMs was purportedly determined by a formula based on the ATM's financial performance, which in turn was based upon data that AFS and Moore provided and were responsible for auditing.  Ong breached his contractual and fiduciary duties to Plaintiffs by failing to inform Plaintiffs that Netschi had purchased the machines not from third parties, but directly from Moore himself. Ong's misconduct directly resulted in AFS and Netschi having the opportunity to misrepresent the historical performance of the ATMs, which Plaintiffs purchased from 36 Main Street at inflated purchase prices, and which in turn served in part as the basis for Ong's management fee.

63.    From the time Ong introduced this investment to Plaintiffs, Ong knew of the economic relationship between Netschi, and the companies that he controlled, and AFS.  Ong breached his contractual and fiduciary duties by inducing Plaintiffs to believe that AFS was an independent, third-party servicer whose sole role was to verify the performance of ATMs, which were purportedly purchased from independent entities.

**PLAINTIFFS TERMINATE MOORE AND AFS**

64.    Due to Ong's material and substantial breaches of the Management

15

Agreements, Greywolf and Caspian terminated their Management Agreements with Ong on February 4, 2008, and February 27 2008, respectively. Both terminations were effective as of December 31, 2007. ACM terminated Ong on April 7, 2008.

## OTHER PENDING LITIGATIONS

### The Temporary Restraining Order

65.    On February 6, 2008, ATM Equity LLP ("ATM Equity"), another ATM purchaser not party to this dispute, filed a complaint in North Carolina state court against Moore and AFS, alleging, among other things, a widespread fraud similar to that alleged herein.

66.    On or about February 8, 2008, ATM Equity sought and obtained a temporary restraining order against Moore and AFS. The TRO found it likely that Moore and AFS had caused "permanent and irreparable harm" to ATM Equity.

67.    The TRO ordered Moore and AFS to provide ATM Equity with certain information, including the location and serial number of every ATM it administered on behalf of ATM Equity, documents relating to ownership of the ATMs, copies of leases, and the location of the ATM revenue to which ATM Equity was entitled.

68.    The TRO also forbade Moore and AFS from moving, altering, or disposing of any of the ATMs outside of the ordinary course of business.

69.    Pursuant to Ong's Management Agreement with ACM, Ong was required to notify ACM about this TRO proceeding. Specifically, the Management Agreement states that: "The Manager undertakes promptly to notify the Company of any event which affects the Manager's ability to perform his Duties or obligations under this

Agreement or which may result in the Manager's ability being so affected, or if a breach of any material provision of this Agreement occurs or is likely to occur." Ong failed to comply with this provision and did not inform ACM or any of the Plaintiffs about the ATM Equity suit or the TRO against Moore and AFS.

**The ATM Financial Services, LLC Bankruptcy**

70.     On or about February 12, 2008, AFS voluntarily filed for bankruptcy under Chapter 11 of Title 11 of the U.S. Bankruptcy Code in United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

71.     The bankruptcy case is currently pending before the Honorable Karen S. Jennemann captioned as *In re ATM Financial Services, LLC*, Case No. 6:08-bk-00969-KSJ.

72.     Pursuant to Ong's Management Agreement with ACM, Ong was required to notify ACM about this bankruptcy proceeding.  Ong further breached the Management Agreement by failing to inform ACM of the bankruptcy proceeding.

**Pending Criminal Investigation**

73.     The Federal Bureau of Investigation ("FBI") is currently investigating Ong, Netschi, and Moore in connection with the fraudulent conduct alleged herein.

74.     Ong, Netschi, and Moore are also subjects of a pending grand jury investigation originating in the United States District Court for the Southern District of New York in connection with the fraudulent conduct alleged herein.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

75.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

76.    Plaintiffs fully performed their obligations pursuant to the Management Agreements and paid Ong the full price set forth in those agreements.

77.    Ong breached the Management Agreements by failing to "manage, operate and administer the day to day operations" and to "identify, analyze, acquire, operate, maintain, and manage ATMs in a manner consistent" with the agreed upon investment policies by Plaintiffs and Ong.

78.    Ong further breached the Management Agreements by failing to "conduct due diligence concerning ATMs suitable for purchase" by Plaintiffs.

79.    Ong further breached the Management Agreements by failing to "negotiate with third parties" on behalf of Plaintiffs.

80.    Ong further breached the Management Agreements by failing to "evaluate existing ATM investments."

81.    Ong further breached the Management Agreements by failing "to promptly advise [Plaintiffs] of any conflicts or potential conflicts of interest."

82.    Ong further breached the Management Agreements by failing to notify Plaintiffs "of any event which affects [Ong's] ability to perform his Duties or obligations under" the Management Agreements.

18

83.    Ong further breached the Management Agreements by failing "to do all such things as may reasonably be required by [Plaintiffs] or otherwise take all necessary steps to remedy or prevent such a breach."

84.    Ong further breached the Management Agreements by failing to "pursue all appropriate legal remedies against [any] third party to settle the transaction or recover compensation."

85.    Accordingly, given Ong's substantial breach of his obligations to Plaintiffs pursuant to the Management Agreements, as well as the duty of good faith and fair dealing that attaches to the Agreements, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses in this action.

## SECOND CAUSE OF ACTION
### (Intentional Fraud)

86.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

87.    Ong, by conducting due diligence on Netschi and Moore and discovering the true nature of their business relationship and failing to disclose such relationship to Plaintiffs, intentionally defrauded Plaintiffs.

88.    Ong, by conducting due diligence on Moore and discovering Moore's prior litigation history and failing to disclosure such litigation history to Plaintiffs, intentionally defrauded Plaintiffs.

89.    Further, by conducting due diligence on Netschi and learning that Netschi was purchasing the subject ATMs from Moore and not independent third-parties and

97.    Ong further breached his duty to Plaintiffs by failing to "evaluate existing ATM investments."

98.    Ong further breached his duty to Plaintiffs by failing "to promptly advise" [Plaintiffs] of any conflicts or potential conflicts of interest."

99.    Ong further breached his duty to Plaintiffs by failing to notify Plaintiffs "of any event which affects [Ong's] ability to perform his Duties or obligations under" the Management Agreements.

100.    Ong further breached his duty to Plaintiffs by failing "to do all such things as may reasonably be required by [Plaintiffs] or otherwise take all necessary steps to remedy or prevent such a breach."

101.    Ong further breached his duty to Plaintiffs by failing to "pursue all appropriate legal remedies against [any] third party to settle the transaction or recover compensation."

102.    Ong further breached his duty to Plaintiffs by failing to inform Plaintiffs about his prior experience with Point of Service machines and the losses he sustained in that fraudulent investment.

103.    Accordingly, given Ong's failure to comport with his duties pursuant to the Management Agreements and the fact that such breach caused significant harm to Plaintiffs, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses in this action.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

104.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

105.    Plaintiffs fully performed their obligations pursuant to the Management Agreements and paid Ong the full price set forth in those agreements.

106.    Ong received approximately three million dollars pursuant to the Management Agreements, and it would be unfair for Ong to retain this amount pursuant to the Management Agreements, in light of the substantial and material breaches referenced above as well as Ong's negligence in performing his duties as Manager of Plaintiff's investments.

107.    In light of Plaintiffs' loss of approximately $32 million due to Ong's breach of contract, negligence and or intentional fraud, if Ong were permitted to retain any part of the compensation he received pursuant to the Management Agreements, he would be unjustly enriched at Plaintiffs' expense.

108.    Given the inherent inequity of allowing Ong to retain any amount of the millions of dollars he received pursuant to the Management Agreements, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses of this action.

## FIFTH CAUSE OF ACTION
### (Breach of Common Law Duty of Good Faith and Fair Dealing)

109.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs

1 to 74.

110.    Ong had an obligation to fulfil his contractual commitments pursuant to the Management Agreements as part of Ong's duty of good faith and fair dealing recognized by applicable law.

111.    Ong did not act in good faith or in the best interests of Plaintiffs when he failed to disclose his prior experience with Point of Service machines and the losses he sustained in that fraudulent investment.

112.    Ong did not act in good faith or in the best interests of Plaintiffs when he: (a) induced Plaintiffs to purchase ATMs based on false representations; (b) misrepresented the true nature of the ATM investment; (c) failed to disclose the close business relationship between Netschi and Moore; and (d) knowingly forwarded fraudulent monthly net revenue reports from Moore to Plaintiffs.

113.    Ong's failure to meet his obligations and duties as herein set forth was arbitrary, capricious and unreasonable under the circumstances and caused substantial damages to Plaintiffs.

114.    By virtue of Ong's breach of duty of good faith and fair dealing with Plaintiffs, Plaintiffs have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

115.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

23

116.    Ong, as an agent of Plaintiffs and as Manager of the various Management Agreements, had a duty to his principals to act in good faith and in Plaintiffs' best interests.  Ong also owed Plaintiffs his undivided and unqualified loyalty and was prohibited from acting in any manner contrary to Plaintiffs' interests.

117.    As a fiduciary to Plaintiffs, Ong was required to make truthful and complete disclosures to Plaintiffs and was forbidden to act to his own benefit and/or to Plaintiffs' detriment.  Ong was also required to exert his best efforts on behalf of Plaintiffs and not compete with or profit at Plaintiffs' expense, or place his private interests in conflict with Plaintiffs' interests.

118.    Ong did not act in good faith or in the best interests of Plaintiffs when he failed to disclose his prior experience with Point of Service machines and the losses he sustained in that fraudulent investment.

119.    Ong did not act in good faith or in the best interests of Plaintiffs when he: (a) induced Plaintiffs to purchase ATMs based on false representations; (b) misrepresented the true nature of the ATM investment; (c) failed to disclose the close business relationship between Netschi and Moore; and (d) knowingly forwarded fraudulent monthly net revenue reports from Moore to Plaintiffs.

120.    Ong's failure to meet his obligations and duties as herein set forth were unreasonable under the circumstances and caused substantial damages to Plaintiffs.

### SEVENTH CAUSE OF ACTION
### (Punitive Damages)

121.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs

24

1 to 74.

122.    Ong's conduct was in bad faith, intentional, wanton, malicious, extreme and outrageous so that punitive damages should be awarded to Plaintiffs in an amount sufficient to punish Ong for his conduct and to deter Ong and others from engaging in such conduct in the future, said amount of punitive damages to be determined at trial.

### JURY DEMAND

123.    Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs request the entry of an award in favor of Plaintiffs and against Ong as follows:

1.    On Plaintiffs' First Cause of Action for breach of contract, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

2.    On Plaintiffs' Second Cause of Action for intentional fraud, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

3.    On Plaintiffs' Third Cause of Action for negligence, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

4.    On Plaintiffs' Fourth Cause of Action for unjust enrichment, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

5.    On Plaintiffs' Fifth Cause of Action for breach of duty of good faith and fair dealing, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

6.    On Plaintiffs' Sixth Cause of Action for breach of fiduciary duty, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

7.    On Plaintiffs' Seventh Cause of Action for punitive damages, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

8.    Award to Plaintiffs interest, costs, and expenses in this proceeding, including reasonable attorney's fees.

9.    Award to Plaintiffs such other and further relief as is deemed just and proper.

Dated:     White Plains, New York
           July 1, 2008

                          MEISELMAN, DENLEA, PACKMAN,
                          CARTON & EBERZ P.C.

           By:    _____
                          Russell M. Yankwitt
                          1311 Mamaroneck Avenue
                          White Plains, New York 10605
                          (914) 517-5000
                          Attorneys for Plaintiffs
                          GREYWOLF HOLDINGS LP,
                          ACM ATM, LLC, and
                          CASPIAN OPPORTUNITIES, INC.

00205487.WPD