UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREYWOLF HOLDINGS LP, ACM ATM, LLC,
and CASPIAN OPPORTUNITIES, INC.,

Plaintiffs,

-against-

ROBERT ONG,

Defendant.

**Case No. 08 Civ. 5971 (SCR)**

**DECLARATION OF BRIAN T. BELOWICH
IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS**

BRIAN T. BELOWICH HEREBY DECLARES UNDER PENALTIES OF PERJURY AS FOLLOWS:

1. I am a member of the firm of DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, attorneys for defendant Robert Ong ("Ong").

2. I respectfully submit this Declaration in support of Ong's motion to dismiss the Complaint herein pursuant to Rules 12(b)(6), 9(b), 12(b)(7) and 19 of the Federal Rules of Civil Procedure.

3. I am fully familiar with the facts set forth herein based upon my own personal knowledge and from a review of my files relating to this lawsuit.

4. Annexed hereto as Exhibit A is a true and correct copy of the Complaint in the above-referenced action dated July 1, 2008.

5. Annexed hereto as Exhibit B is a true and correct copy of Due Diligence Report dated September 29, 2004.

6. Annexed hereto as Exhibit C is a true and correct copy of a Management Agreement dated as of January 1, 2005 between Greywolf Holdings, LP and Robert Ong.

7.     Annexed hereto as Exhibit D is a true and correct copy of a Management Agreement dated as of May 25, 2006 between ACM ATM, LLC and Robert Ong.

8.     Annexed hereto as Exhibit E is a true and correct copy of a Management Agreement dated as of January 1, 2006 between Caspian Opportunities, Inc. and Robert Ong.

9.     Annexed hereto as Exhibit F is a true and correct copy of an Asset Purchase Agreement dated as of April 1, 2006 between Greywolf Holdings, LP and 36 Main Street, LLC, together with a Bill of Sale.

10.     Annexed hereto as Exhibit G is a true and correct copy of an Asset Purchase Agreement dated as of February 1, 2006 between Caspian Opportunities, Inc. and 36 Main Street, LLC, together with a Bill of Sale.

11.     Annexed hereto as Exhibit H is a true and correct copy of an Asset Purchase Agreement dated as of June 15, 2006 between ACM ATM, LLC and 36 Main Street, LLC, together with a Bill of Sale.

12.     Annexed hereto as Exhibit I is a true and correct copy of an ATM Equipment Management Agreement dated as of April 1, 2006 between Greywolf Holdings, LP and ATM Financial Services LLC.

13.     Annexed hereto as Exhibit J is a true and correct copy of an ATM Equipment Management Agreement dated as of February 1, 2006 between Caspian Opportunities, Inc. and ATM Financial Services LLC.

14.     Annexed hereto as Exhibit K is a true and correct copy of an ATM Equipment Management Agreement dated as of June 15, 2006 between ACM ATM, LLC and ATM Financial Services LLC.

15.     Annexed hereto as Exhibit L is a true and correct copy of the docket sheet in the bankruptcy proceeding entitled *In re ATM Financial Services, LLC*, Case No. 6:08-bk-00969, currently pending in the U.S. Bankruptcy Court for the Middle District of Florida.

16.     Annexed hereto as Exhibit M is a true and correct copy of an Amended Complaint in the action entitled *Automated Teller Machine Advantage LLC v. Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance Moore, Exclusive Properties Group, Inc., Walter Netschi, 36 Main Street LLC, ATM Capital Inc., Danielle Jones, Alain Brossman a/k/a Harry Brossman, and William Munier*, Case No. 08 Civ. 3340 (RMB)(FM), currently pending in the U.S. District Court for the Southern District of New York.


I HEREBY DECLARE PURSUANT TO 28 U.S.C. § 1746, UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.


Dated:  September 5, 2008
        White Plains, New York


                                                    _____
                                                    BRIAN T. BELOWICH

3

# EXHIBIT A

**☐ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 08 CIV. 5971

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GREYWOLF HOLDINGS LP, ACM ATM, LLC, and      :
CASPIAN OPPORTUNITIES, INC.,
:
ECF
Plaintiffs,      :
08 Civ. __
:
v.      :
:
ROBERT ONG,      :     **JURY TRIAL DEMANDED**
:
Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x     **JUDGE ROBINSON**

Plaintiffs Greywolf Holdings LP, ACM ATM, LLC, and Caspian Opportunities, Inc.

(collectively, "Plaintiffs"), by and through their attorneys, Meiselman, Denlea, Packman,

Carton & Eberz P.C., as and for their Complaint against Defendant Robert Ong ("Ong"),

with knowledge as to their own actions and upon information and belief concerning the

acts of others, allege as follows:

## NATURE OF THE CASE

1.      This action seeks to redress the duplicitous and reckless course of

conduct by which defendant Ong purposefully misled Plaintiffs into investing

approximately twenty-nine million dollars ($29,000,000) into an automated teller

machine ("ATMs") business for what turned out to be solely Ong's personal economic

self-interest and gain. Without actually conducting a kernel of due diligence,

misrepresenting to Plaintiffs he had actually performed due diligence, and by

deliberately concealing from Plaintiffs his prior business dealings with the very same

unscrupulous characters with whom Ong encouraged Plaintiffs to do business, Ong

fraudulently induced Plaintiffs to invest in a Ponzi scheme in exchange for Ong's

"promise" that he would personally manage the investment. In doing so, Ong secured a

lucrative management agreement for himself and has been paid approximately three million dollars ($3,000,000) for mismanaging an investment that was doomed from its inception. Unbeknownst to Plaintiffs, the entire investment scheme brought to Plaintiffs by Ong was a scam and an artifice intended to defraud investors. By this action, Plaintiffs seek to recover the financial losses they have sustained as a result of Ong's gross negligence, malfeasance and breaches of the trust and confidence Plaintiffs unfortunately reposed in him.

2.      In particular, Ong fraudulently induced Plaintiffs to execute Management Agreements, whereby Ong would sell ATMs to Plaintiffs for a significant mark-up, and whereby Ong would manage the ATM investments on Plaintiffs' behalf. To induce Plaintiffs' investment, Ong falsely represented that he had located and brought together two knowledgeable and credible individuals in the ATM industry, and that he had personally performed extensive due diligence on these individuals. Ong falsely represented that he had thoroughly researched Walter Netschi ("Netschi"), whom Ong presented as "well known" in the ATM industry for locating valuable ATM machines, and Vance Moore, II ("Moore"), whom Ong presented as "well known" within the ATM industry for servicing such machines. These very same individuals are currently subjects of Grand Jury investigations being conducted by the Federal Bureau of Investigations and the United States Attorney's Office for the Southern District of New York for their involvement with these and similar investments.

3.      Importantly, Ong falsely represented that Netschi and Moore were completely independent from each other and would serve as "independent checks" on

2

one another. In addition, Ong stated that he would purchase the ATMs from Netschi's company, 36 Main Street LLC ("36 Main Street"), which Ong represented as having purchased the machines from independent third parties with a confirmed history of excellent cash flows.

4.    Based on these false and dishonest representations, Plaintiffs entered into various Management Agreements with Ong, which specified that Plaintiffs would purchase the ATMs from 36 Main Street, and that the machines would then be serviced by Moore.

5.    Only recently, however, have Plaintiffs discovered that Ong falsely misrepresented his purported due diligence on both Netschi and Moore, that Netschi and Moore were not in fact independent from each other or even Ong for that matter, that Netschi had purchased the ATMs from Moore instead of independent third parties, that Moore did not own and/or lacked good title to sell the majority of these machines, and that Moore's prior ATM company had filed for bankruptcy in the Middle District of Florida under almost the exact same circumstances. Accordingly, Plaintiffs seek to redress their collective loss of approximately thirty-two million dollars ($32,000,000) as a direct result of Ong's wrongdoing.

**THE PARTIES**

6.    Plaintiff Greywolf Holdings LP ("Greywolf") is a Delaware limited partnership, located at 4 Manhattanville Road, Purchase, New York 10577.

7.    Plaintiff ACM ATM, LLC ("ACM") is a Delaware limited liability company, located at 570 Lexington Avenue, New York, New York 10022.

3

8.    Plaintiff Caspian Opportunities, Inc. ("Caspian") is a Delaware corporation, located at 500 Mamaroneck Avenue, Suite 101, Harrison, New York 10528.

9.    Defendant Robert Ong ("Ong"), a former managing director of Bear Stearns, is currently the sole owner and employee of Jade Capital Investments. At the time of the transaction, Ong lived in New York, but is currently a Florida resident.

## VENUE AND JURISDICTION

10.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over Ong, who conducted significant business in the State of New York pursuant to the Management Agreements with Plaintiffs.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (c) because defendant is subject to personal jurisdiction in this District.

## FACTS

13.    In October 2005, Ong, a personal friend since 2003 of one of the principals of Greywolf, approached Plaintiffs with a business concept that he was developing. Relying on his personal friendship and the credibility of his twenty-five years as a Managing Director of Bear Stearns to lend him credibility, Ong represented that he had created an investing platform that would facilitate Plaintiffs' purchase of thoroughly diligenced ATM machines that were, or would be, placed in various locations throughout the United States.

4

14.    During their initial meetings with Plaintiffs, Ong represented that he had completed extensive due diligence on both of these individuals and vouched for their reputations, expertise, and trustworthiness.

15.    In his marketing materials, Ong boast that he was the "architect" of this business model and had conducted extensive due diligence on these purported "experts" in the ATMs industry. In return for creating this investment platform and conducting this extensive due diligence, Ong requested and received $2,970,391 in the form of an ongoing ATM management fee.

16.    Ong's fee, which was based on these false and dishonest representations, was divided into two parts: (a) a percentage of the net asset value of the machines on a quarterly basis, and (b) an incentive fee tied to the income derived from the machines.

17.    Pursuant to the Management Agreements and the facts and circumstances under which Ong brought this investment to Plaintiffs, Ong owed Plaintiffs both contractual and fiduciary duties.

## ONG'S FALSE REPRESENTATIONS REGARDING HIS PURPORTED DUE DILIGENCE ON HIS BUSINESS PARTNERS

18.    To ensure that this deal would be consummated and that Ong would receive his large fee, Ong explicitly stated to Plaintiffs that he had conducted extensive due diligence on both Netschi and Moore.

19.    Ong represented that his due diligence on Netschi revealed that he was an experienced businessman with great knowledge of the ATM business.

5

20.    Ong further represented that, based on his extensive due diligence, Plaintiffs should hire ATM Financial Services, LLC ("AFS"), a company owned and operated by Moore, to audit all of the ATMs that Ong would purchase from Netschi on Plaintiffs' behalf.  Ong falsely represented that AFS would provide Plaintiffs with accurate, disinterested data regarding the performance of the ATMs.

21.    Ong falsely represented that Moore would serve as an independent check of Netschi and would verify the existence, location and income of the machines.  In particular, according to Ong, Moore would audit the machines, verify their serial numbers, and verify their locations.  Ong falsely represented that Moore was extremely well qualified to perform these audit tasks.

22.    Ong further represented that Netschi and Moore were completely independent, that Netschi would purchase the ATMs from independent dealers, and that Moore was not in the business of selling ATMs, but rather only verifying the existence of the ATMs and servicing the ATMs.

23.    Ong also falsely represented that Moore would service the ATMs by ensuring that each ATM was loaded with sufficient cash at all times, that the ATMs would work properly, and that Plaintiffs would be provided with sufficient information to accurately determine their income pursuant to their agreements with Ong.

24.    In order to ensure that Plaintiffs went forward with this investment, Ong deliberately misrepresented his due diligence.  Plaintiffs have recently discovered that Netschi, was, and is, a close business associate of Moore.  Thus, as set forth below, by auditing the machines themselves, Moore and Netschi were able to "sell" ATMs to

Plaintiffs that did not exist, and Ong was able to collect management fees for managing ATMs that never existed.

## ONG FAILED TO ADVISE PLAINTIFFS OF MOORE'S PRIOR MISCONDUCT AND BANKRUPTCY FILINGS

25.    In addition to misrepresenting his due diligence, Ong failed to inform Plaintiffs of Moore's prior misconduct, specifically in the ATM business.

26.    Plaintiffs have recently discovered that in or around 1997 to 2000, Moore previously sold ATMs and acted as a management agent of ATMs using a company called International Technology Systems ("ITS").

27.    ITS was the defendant in numerous state court actions commenced by investors who had purchased ATMs, but did not receive monthly reporting or the net cash revenues of the machines themselves.

28.    In *Wacker et al v. International Technology Systems, Inc.*, No. 00-360-CA01 (Lake County Fl., Feb. 7, 2000), for example, the plaintiffs were a putative class of ATM owners who alleged that ITS failed to furnish the ATMs they allegedly sold to the class. According to the complaint, "ITS misrepresented to these Class members the existence of these machines, the locations of these machines, the gross revenues of these machines, the express location of these machines, and the net revenue generated at these machines, as these machines do not exist."

29.    In an ensuing bankruptcy proceeding, it was divulged that Moore had been engaged in the sale of ATMs since at least 1992, through various corporate entities, and these entities had sold machines that they did not own or never existed.

7

30.    Ong represented to Plaintiffs that he had fully "vetted" Moore, that he had conducted an extensive background search, and had spoken to a variety of leaders of the ATM industry, and that Moore's reputation was impeccable.  These representations were false.

31.    If Ong had divulged this information to Plaintiffs concerning Moore's prior transgressions in the ATM business, Plaintiffs would not have invested tens of millions of dollars with Ong.

**ONG FAILS TO INFORM PLAINTIFFS THAT HE HAD
PREVIOUSLY INVESTED IN A SIMILAR PONZI SCHEME
INVOLVING A SIMILAR PRODUCT**

32.    During his meetings with Plaintiffs in October 2005, Ong failed to disclose that he had previously invested in a similar product, and had lost hundreds of thousands of dollars in that investment due to fraud.

33.    In 2003, Ong invested $348,000 with Tom Foley ("Foley") to purchase Point of Service machines – machines that afford customers the opportunity to purchase goods, while also offering customers the opportunity to make additional withdrawals from their bank account in return for cash.

34.    Similar to Plaintiffs' investments herein, Ong began receiving monthly payments on his investments for several months and then the payments stopped. When the monthly payments stopped, Ong contacted the other investors and learned that different investors had "purchased" the same exact machines from Foley. Foley, like Moore and Netschi in this action, was selling the same machines to more than one investor and/or was selling machines that did not exist.

8

35.    When the FBI learned of Foley's Ponzi scheme, it closed the business and the investors stopped receiving any further payments.

36.    Ong intentionally decided not to inform Plaintiffs of his previous links with a fraudulent investment scheme based on a similar product. He knew that if he had made such a disclosure, he would have lost his opportunity to obtain a lucrative deal with Plaintiffs.

## ONG FAILS TO INFORM PLAINTIFFS ABOUT HIS BUSINESS DEALINGS WITH MOORE AND MOORE'S FAMILY

37.    Pursuant to the Management Agreements with Plaintiffs, Ong had a duty to disclose any potential conflicts of interest to Plaintiffs.

38.    Specifically, paragraph 2(e) of the Management Agreement states: "The Manager agrees that it shall have an on-going duty during the Term of this Agreement to promptly advise the Company of any conflicts or potential conflicts of interest involving the Manager, the Manager's Agents, the Manager's Affiliates or the Agents of such Affiliates, including conflicts of the types described in Section 2(b)(iv), whenever such conflicts arise, may reasonably be expected to arise and, in any event, prior to the Company entering into any transaction involving such conflict or potential conflict."

39.    Plaintiffs have recently discovered that Ong had a prior business relationship with Moore and at least one member of Moore's family.

40.    Indeed, Plaintiffs have recently learned that Moore owes Ong approximately $300,000 from this prior business relationship.

9

41.    Ong therefore breached the Management Agreement by failing to disclose this relationship to Plaintiffs.

## PLAINTIFFS ENTER MANAGEMENT AGREEMENTS BASED ON ONG'S FALSE REPRESENTATIONS

42.    Ong also falsely represented that the ATMs he was selling to Plaintiffs existed, were subject to location leases, and generated certain revenue streams.  In reliance on these false statements and material omissions, Plaintiffs executed purchase and sale agreements with 36 Main Street through which:  (a) they purchased the ATMs, (b) entered into Management Agreements with AFS (Moore's alleged "audit" company), and (c) entered into Management Agreements with Ong.  The Management Agreements contained numerous representations concerning the truth and completeness of the information provided to Plaintiffs.

43.    Pursuant to the Management Agreements, Ong agreed to render the following services:

        a.      manage, operate and administer the day to day operations of the Business;

        b.      identify, analyze, acquire, operate, maintain and manage ATMs in a manner consistent with the Investment Policy;

        c.      conduct due diligence concerning ATMs suitable for purchase by the Company in accordance with the Investment Policy;

        d.      (i) negotiate with third parties on behalf of the Company concerning the acquisition of ATMs, (ii) assist with the preparation and negotiation of any relevant transaction documents, including, without limitation, confidentiality agreements, term sheets, letters of intent, exclusivity letters, definitive transaction documents and other

relevant documents, and (iii) assist with the closing and consummating such acquisitions on behalf of the Company (ATMs required by the Company that were sourced by the Manager under this Agreement are referred to herein as "ATM Investments");

e.    (i) evaluate existing ATM Investments and (ii) seek, identify, analyze, screen and recommend to the Company technical, commercial and/or financial enhancements for existing ATM Investments, including opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs in the Investment Portfolio;

f.    (i) seek disposition opportunities for ATM Investments consistent with the Investment Policy, (ii) conduct due diligence concerning dispositions of ATM Investments, (iii) negotiate with third parties on behalf of the Company concerning such dispositions, (iv) close and consummate such dispositions on behalf of the Company, and (v) perform the foregoing services set forth in this Section 1(b)(vi) so as to efficiently and optimally liquidate or otherwise dispose of the Investment Portfolio on or prior to the Termination Date;

g.    provide such reports on the activities of the Manager under this Agreement as the Company may from time to time request;

h.    keep financial and accounting records of the Company, including the preparation of financial statements; and

I.    oversee any audits that may be required by the Company.

44.    As set forth herein, Ong breached the above-referenced representations.

45.    Pursuant to these Management Agreements, Greywolf paid $2,447,700, Caspian paid $408,236, and ACM paid $104,455 to Ong as management fees. In addition, Greywolf invested $22,704,000, Caspian invested $4,681,200, and ACM

11

invested $1,678,800 to purchase the ATMs.

46.     In addition to inducing Plaintiffs into investing approximately $29 million in

ATMs that did not exist, by providing Plaintiffs with false information, Ong induced

Plaintiffs to execute contracts with Moore, through the corporate entity that Moore

controls, AFS, and enter into service agreements with Moore.

47.     Each of the Plaintiffs is now the owner (in the case of Greywolf, both

originally and by assignment from its affiliate Greywolf Holdings II, Inc.), of ATMs that

are supposedly located throughout the United States.  Greywolf holds title to a total of

1381 ATMs.  ACM holds title to a total of 112 ATMs.  Caspian purchased a total of 489

ATMs, but subsequently sold 207 ATMs, and now currently holds title to 282 ATMs.

48.     Under each of the service agreements Plaintiffs entered into with AFS

based on Ong's misrepresentations and omissions of material facts, AFS undertook to

manage and operate the ATMs owned by Plaintiffs in return for substantial

management fees.  The agreements are substantially identical in their non-economic

terms.

49.     Specifically, pursuant to the agreements between AFS and Plaintiffs, AFS

was responsible for, among other things, (a) contracting with merchants for the right to

place ATMs in their establishments; (b) transporting and placing the ATMs in specific

locations; (c) servicing the ATMs, including replenishing the cash dispensed by the

machines; and (d) coordinating and collecting the ATM fees.

50.     Ong failed to ensure that AFS was dutifully performing the contractual

obligation to which AFS had agreed, because Ong was aware that if he did so his cover

12

would be blown, and the fact that he had induced Plaintiffs to invest in and pay Ong management fees for phantom ATMs that either never existed or were actually owned by others would come to light.

## ONG'S FALSE REPRESENTATIONS REGARDING THE OPERATIONS OF THE ATMS

51.    Starting in October 2005, Ong conspired with Moore to make false representations concerning the vitality of the investment and to defraud Plaintiffs of their net revenues from the ATMs.  Those false representations included preparation of false monthly statements that (a) identified non-existent ATMs as belonging to Plaintiffs, and (b) set forth fictitious amounts of revenues.

52.    In October 2007 and thereafter, AFS stopped performing under its agreements with Plaintiffs.  AFS stopped producing the required monthly statements and paying the net revenues.  Plaintiffs began demanding payment of their net revenues and issuance of the statements.

53.    In response to Plaintiffs' demands for payment, Moore (on behalf of AFS) made numerous false statements, including (a) blaming AFS's failure to issue the statements and pay the revenues on the failed integration of a new software package, (b) continually promising that the money would be paid, first in mid to late December and then by January 31, 2008, (c) claiming that the Plaintiffs' net revenues were segregated and maintained at third party processors, and (d) stating that the ATMs were at the claimed locations and being maintained and earning money.

13

54.     On several occasions throughout 2007, Plaintiffs asked Ong to intervene and contact Moore to determine the status of the net revenues. Ong falsely confirmed to Plaintiffs that he had verified Moore's statements. In truth, however, the software was not to blame, the money was never paid, and indeed many of the ATMs did not exist and the revenue streams were fictitious.

55.     Despite several requests from Plaintiffs, Moore refused to turn over any of the net revenues from Plaintiffs' ATMs, to provide monthly statements, or to proffer any other information about the ATMs.

56.     At no point during this period did Ong take any steps to actually intervene with Moore to assist Plaintiffs with access to their payments. Such inaction was a breach of Ong's Management Agreements with Plaintiffs.

57.     Specifically, the Management Agreement required Ong to do all such things as may reasonably be required by the Company or otherwise take all necessary steps to remedy or prevent such a breach.

58.     From October 2007 to the present, Plaintiffs have been denied access to the vital information contained in the monthly statements.

59.     Further, throughout this period, Ong repeatedly assured Plaintiffs that Netschi and the entities that he controlled (including 36 Main Street) were financially independent from Moore and AFS, that there was "no economic relationship" between 36 Main Street and AFS, and that AFS was providing accurate, disinterested data regarding the ATMs that Plaintiffs acquired.

14

60.    Ong failed to notify Plaintiffs that the machines that they purchased from 36 Main Street were not the result of Netschi "pounding the pavement" to locate profitable machines, but rather were rehypothecated directly from AFS and Moore.

61.    As a result of Ong's complicity with Moore, Ong facilitated the concealment of the conversion of Plaintiffs' ATMs and facilitated the conversion of the revenues from Plaintiffs to Ong, Netschi and Moore.

62.    The price that Plaintiffs paid for the ATMs was purportedly determined by a formula based on the ATM's financial performance, which in turn was based upon data that AFS and Moore provided and were responsible for auditing. Ong breached his contractual and fiduciary duties to Plaintiffs by failing to inform Plaintiffs that Netschi had purchased the machines not from third parties, but directly from Moore himself. Ong's misconduct directly resulted in AFS and Netschi having the opportunity to misrepresent the historical performance of the ATMs, which Plaintiffs purchased from 36 Main Street at inflated purchase prices, and which in turn served in part as the basis for Ong's management fee.

63.    From the time Ong introduced this investment to Plaintiffs, Ong knew of the economic relationship between Netschi, and the companies that he controlled, and AFS. Ong breached his contractual and fiduciary duties by inducing Plaintiffs to believe that AFS was an independent, third-party servicer whose sole role was to verify the performance of ATMs, which were purportedly purchased from independent entities.

**PLAINTIFFS TERMINATE MOORE AND AFS**

64.    Due to Ong's material and substantial breaches of the Management

15

Agreements, Greywolf and Caspian terminated their Management Agreements with

Ong on February 4, 2008, and February 27 2008, respectively. Both terminations were

effective as of December 31, 2007. ACM terminated Ong on April 7, 2008.

**OTHER PENDING LITIGATIONS**

### The Temporary Restraining Order

65.    On February 6, 2008, ATM Equity LLP ("ATM Equity"), another ATM

purchaser not party to this dispute, filed a complaint in North Carolina state court

against Moore and AFS, alleging, among other things, a widespread fraud similar to

that alleged herein.

66.    On or about February 8, 2008, ATM Equity sought and obtained a

temporary restraining order against Moore and AFS. The TRO found it likely that

Moore and AFS had caused "permanent and irreparable harm" to ATM Equity.

67.    The TRO ordered Moore and AFS to provide ATM Equity with certain

information, including the location and serial number of every ATM it administered on

behalf of ATM Equity, documents relating to ownership of the ATMs, copies of leases,

and the location of the ATM revenue to which ATM Equity was entitled.

68.    The TRO also forbade Moore and AFS from moving, altering, or disposing

of any of the ATMs outside of the ordinary course of business.

69.    Pursuant to Ong's Management Agreement with ACM, Ong was required

to notify ACM about this TRO proceeding. Specifically, the Management Agreement

states that: "The Manager undertakes promptly to notify the Company of any event

which affects the Manager's ability to perform his Duties or obligations under this

16

Agreement or which may result in the Manager's ability being so affected, or if a breach of any material provision of this Agreement occurs or is likely to occur." Ong failed to comply with this provision and did not inform ACM or any of the Plaintiffs about the ATM Equity suit or the TRO against Moore and AFS.

### The ATM Financial Services, LLC Bankruptcy

70.    On or about February 12, 2008, AFS voluntarily filed for bankruptcy under Chapter 11 of Title 11 of the U.S. Bankruptcy Code in United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

71.    The bankruptcy case is currently pending before the Honorable Karen S. Jennemann captioned as *In re ATM Financial Services, LLC*, Case No. 6:08-bk-00969-KSJ.

72.    Pursuant to Ong's Management Agreement with ACM, Ong was required to notify ACM about this bankruptcy proceeding. Ong further breached the Management Agreement by failing to inform ACM of the bankruptcy proceeding.

### Pending Criminal Investigation

73.    The Federal Bureau of Investigation ("FBI") is currently investigating Ong, Netschi, and Moore in connection with the fraudulent conduct alleged herein.

74.    Ong, Netschi, and Moore are also subjects of a pending grand jury investigation originating in the United States District Court for the Southern District of New York in connection with the fraudulent conduct alleged herein.

17

## FIRST CAUSE OF ACTION
### (Breach of Contract)

75.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

76.    Plaintiffs fully performed their obligations pursuant to the Management Agreements and paid Ong the full price set forth in those agreements.

77.    Ong breached the Management Agreements by failing to "manage, operate and administer the day to day operations" and to "identify, analyze, acquire, operate, maintain, and manage ATMs in a manner consistent" with the agreed upon investment policies by Plaintiffs and Ong.

78.    Ong further breached the Management Agreements by failing to "conduct due diligence concerning ATMs suitable for purchase" by Plaintiffs.

79.    Ong further breached the Management Agreements by failing to "negotiate with third parties" on behalf of Plaintiffs.

80.    Ong further breached the Management Agreements by failing to "evaluate existing ATM investments."

81.    Ong further breached the Management Agreements by failing "to promptly advise [Plaintiffs] of any conflicts or potential conflicts of interest."

82.    Ong further breached the Management Agreements by failing to notify Plaintiffs "of any event which affects [Ong's] ability to perform his Duties or obligations under" the Management Agreements.

18

83.    Ong further breached the Management Agreements by failing "to do all such things as may reasonably be required by [Plaintiffs] or otherwise take all necessary steps to remedy or prevent such a breach."

84.    Ong further breached the Management Agreements by failing to "pursue all appropriate legal remedies against [any] third party to settle the transaction or recover compensation."

85.    Accordingly, given Ong's substantial breach of his obligations to Plaintiffs pursuant to the Management Agreements, as well as the duty of good faith and fair dealing that attaches to the Agreements, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses in this action.

## SECOND CAUSE OF ACTION
### (Intentional Fraud)

86.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

87.    Ong, by conducting due diligence on Netschi and Moore and discovering the true nature of their business relationship and failing to disclose such relationship to Plaintiffs, intentionally defrauded Plaintiffs.

88.    Ong, by conducting due diligence on Moore and discovering Moore's prior litigation history and failing to disclosure such litigation history to Plaintiffs, intentionally defrauded Plaintiffs.

89.    Further, by conducting due diligence on Netschi and learning that Netschi was purchasing the subject ATMs from Moore and not independent third-parties and

failing to disclose such information to Plaintiffs, Ong intentionally defrauded Plaintiffs.

90.     In addition, by verifying the false sales receipts from Netschi, and by verifying Moore's blatantly false statements regarding the investments, Ong intentionally defrauded Plaintiffs.

91.     Accordingly, given Ong's intentional defrauding of Plaintiffs, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses in this action.

### THIRD CAUSE OF ACTION
### (Negligence)

92.     Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

93.     As manager of the investments between Plaintiffs and Netschi and Moore, Ong owed a duty to Plaintiffs to manage the investments with reasonable care.

94.     Ong breached his duty to Plaintiffs by failing to conduct proper due diligence on Netschi and Moore.

95.     Ong further breached his duty to Plaintiffs by failing to "manage, operate and administer the day to day operations" and to "identify, analyze, acquire, operate, maintain, and manage ATMs in a manner consistent" with the investment policy discussed by Plaintiffs and Ong.

96.     Ong further breached his duty to Plaintiffs by failing to "conduct due diligence concerning ATMs suitable for purchase" by Plaintiffs.

20

97.    Ong further breached his duty to Plaintiffs by failing to "evaluate existing ATM investments."

98.    Ong further breached his duty to Plaintiffs by failing "to promptly advise" [Plaintiffs] of any conflicts or potential conflicts of interest."

99.    Ong further breached his duty to Plaintiffs by failing to notify Plaintiffs "of any event which affects [Ong's] ability to perform his Duties or obligations under" the Management Agreements.

100.    Ong further breached his duty to Plaintiffs by failing "to do all such things as may reasonably be required by [Plaintiffs] or otherwise take all necessary steps to remedy or prevent such a breach."

101.    Ong further breached his duty to Plaintiffs by failing to "pursue all appropriate legal remedies against [any] third party to settle the transaction or recover compensation."

102.    Ong further breached his duty to Plaintiffs by failing to inform Plaintiffs about his prior experience with Point of Service machines and the losses he sustained in that fraudulent investment.

103.    Accordingly, given Ong's failure to comport with his duties pursuant to the Management Agreements and the fact that such breach caused significant harm to Plaintiffs, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses in this action.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

104.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

105.    Plaintiffs fully performed their obligations pursuant to the Management Agreements and paid Ong the full price set forth in those agreements.

106.    Ong received approximately three million dollars pursuant to the Management Agreements, and it would be unfair for Ong to retain this amount pursuant to the Management Agreements, in light of the substantial and material breaches referenced above as well as Ong's negligence in performing his duties as Manager of Plaintiff's investments.

107.    In light of Plaintiffs' loss of approximately $32 million due to Ong's breach of contract, negligence and or intentional fraud, if Ong were permitted to retain any part of the compensation he received pursuant to the Management Agreements, he would be unjustly enriched at Plaintiffs' expense.

108.    Given the inherent inequity of allowing Ong to retain any amount of the millions of dollars he received pursuant to the Management Agreements, Ong is liable to Plaintiffs in an amount to be determined at trial, plus interest and costs and expenses of this action.

## FIFTH CAUSE OF ACTION
### (Breach of Common Law Duty of Good Faith and Fair Dealing)

109.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs

22

1 to 74.

110.    Ong had an obligation to fulfil his contractual commitments pursuant to the Management Agreements as part of Ong's duty of good faith and fair dealing recognized by applicable law.

111.    Ong did not act in good faith or in the best interests of Plaintiffs when he failed to disclose his prior experience with Point of Service machines and the losses he sustained in that fraudulent investment.

112.    Ong did not act in good faith or in the best interests of Plaintiffs when he: (a) induced Plaintiffs to purchase ATMs based on false representations; (b) misrepresented the true nature of the ATM investment; (c) failed to disclose the close business relationship between Netschi and Moore; and (d) knowingly forwarded fraudulent monthly net revenue reports from Moore to Plaintiffs.

113.    Ong's failure to meet his obligations and duties as herein set forth was arbitrary, capricious and unreasonable under the circumstances and caused substantial damages to Plaintiffs.

114.    By virtue of Ong's breach of duty of good faith and fair dealing with Plaintiffs, Plaintiffs have been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

115.    Plaintiffs repeat and reallege the allegations set forth above in Paragraphs 1 to 74.

23

116.   Ong, as an agent of Plaintiffs and as Manager of the various Management Agreements, had a duty to his principals to act in good faith and in Plaintiffs' best interests. Ong also owed Plaintiffs his undivided and unqualified loyalty and was prohibited from acting in any manner contrary to Plaintiffs' interests.

117.   As a fiduciary to Plaintiffs, Ong was required to make truthful and complete disclosures to Plaintiffs and was forbidden to act to his own benefit and/or to Plaintiffs' detriment. Ong was also required to exert his best efforts on behalf of Plaintiffs and not compete with or profit at Plaintiffs' expense, or place his private interests in conflict with Plaintiffs' interests.

118.   Ong did not act in good faith or in the best interests of Plaintiffs when he failed to disclose his prior experience with Point of Service machines and the losses he sustained in that fraudulent investment.

119.   Ong did not act in good faith or in the best interests of Plaintiffs when he: (a) induced Plaintiffs to purchase ATMs based on false representations; (b) misrepresented the true nature of the ATM investment; (c) failed to disclose the close business relationship between Netschi and Moore; and (d) knowingly forwarded fraudulent monthly net revenue reports from Moore to Plaintiffs.

120.   Ong's failure to meet his obligations and duties as herein set forth were unreasonable under the circumstances and caused substantial damages to Plaintiffs.

### SEVENTH CAUSE OF ACTION
### (Punitive Damages)

121.   Plaintiffs repeat and reallege the allegations set forth above in Paragraphs

24

1 to 74.

122.    Ong's conduct was in bad faith, intentional, wanton, malicious, extreme and outrageous so that punitive damages should be awarded to Plaintiffs in an amount sufficient to punish Ong for his conduct and to deter Ong and others from engaging in such conduct in the future, said amount of punitive damages to be determined at trial.

## JURY DEMAND

123.    Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs request the entry of an award in favor of Plaintiffs and against Ong as follows:

1.    On Plaintiffs' First Cause of Action for breach of contract, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

2.    On Plaintiffs' Second Cause of Action for intentional fraud, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

3.    On Plaintiffs' Third Cause of Action for negligence, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

4.    On Plaintiffs' Fourth Cause of Action for unjust enrichment, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

5.    On Plaintiffs' Fifth Cause of Action for breach of duty of good faith and fair dealing, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

6.    On Plaintiffs' Sixth Cause of Action for breach of fiduciary duty, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

7.    On Plaintiffs' Seventh Cause of Action for punitive damages, awarding against Ong the damages that Plaintiffs have suffered as a result of Ong's actions, such amount to be determined at trial.

8.    Award to Plaintiffs interest, costs, and expenses in this proceeding, including reasonable attorney's fees.

9.    Award to Plaintiffs such other and further relief as is deemed just and proper.

Dated:    White Plains, New York
         July 1, 2008

                              MEISELMAN, DENLEA, PACKMAN,
                              CARTON & EBERZ P.C.

                    By:       _____
                              Russell M. Yankwitt
                              1311 Mamaroneck Avenue
                              White Plains, New York 10605
                              (914) 517-5000
                              Attorneys for Plaintiffs
                              GREYWOLF HOLDINGS LP,
                              ACM ATM, LLC, and
                              CASPIAN OPPORTUNITIES, INC.

00205487.WPD

26

# EXHIBIT B

*Bobong*  *Vance Moore  Accu report  due diligence*

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified.

## Comprehensive Report

**Comprehensive Report**
**Date: 09/29/04**

**Report Legend:**
**S** - Shared Address
**D** - Deceased
✔ - Verified Address

**Report processed by:**
Check Watchers Inc
301 S Richey Rd, Suite 101
Leesburg, FL 34748
(352) 314-2214 Main Phone
(352) 315-0758 Fax

---

| **Subject Information** | **AKAs** (Names Associated with Subject) | **Indicators** |
|---|---|---|
| Name: VANCE R MOORE<br>Date of Birth: **05/03/1954**<br>Age: **50**<br>SSN: 125-46-***** issued in **New York** between **01/01/1969** and **12/31/1971**<br><br>Others Associated with SSN:<br>(DOES NOT usually indicate any type of fraud or deception)<br>DARCY MOORE JR | VANCE R MOORE JR<br>  DOB: **05/03/1954** Age: **50**  SSN: 125-46-xxxx<br>VANCE R MOORE III<br>  DOB: **05/03/1954** Age: **50**  SSN: 125-46-xxxx<br>VANCE R MOORE II<br>  SSN: 125-46-xxxx<br>VANCE R MOORE<br>  DOB: **05/03/1954** Age: **50**  SSN:<br>VANCE R MOORE JR<br>  DOB: **05/03/1954** Age: **50**  SSN: | Bankruptcy: **No**<br>Property: **Yes**<br>Corporate Affiliations: **Yes** |

## Address Summary

PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Nov 1994 - Aug 2004)
Neighborhood Profile (2000 Census)
Average Age: **35**    Median Household Income: **$39,659**    Median Home Value: **$66,300**    Average Years of Education: **12**

301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY (May 1995 - May 2004)
Phone at address:
Neighborhood Profile (2000 Census)
Average Age: **54**    Median Household Income: **$27,545**    Median Home Value: **$53,200**    Average Years of Education: **12**

35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Apr 1996 - Aug 2002)
Neighborhood Profile (2000 Census)
Average Age: **46**    Median Household Income: **$38,625**    Median Home Value: **$396,600**    Average Years of Education: **17**

PO BOX 490510, LEESBURG FL 34749-0510, LAKE COUNTY (Oct 2001 - Jan 2002)
Neighborhood Profile (2000 Census)
Average Age: **42**    Median Household Income: **$31,534**    Median Home Value: **$63,400**    Average Years of Education: **12**

490510 POB 490510, LEESBURG FL 34749, LAKE COUNTY (Mar 2001 - Sep 2001)
Neighborhood Profile (2000 Census)
Average Age: **42**    Median Household Income: **$31,534**    Median Home Value: **$63,400**    Average Years of Education: **12**

PO BOX 490283, LEESBURG FL 34749-0283, LAKE COUNTY (Feb 2000 - Oct 2000)
Neighborhood Profile (2000 Census)
Average Age: **42**    Median Household Income: **$31,534**    Median Home Value: **$63,400**    Average Years of Education: **12**

PO BOX 1295, CLARKSTON MI 48347-0295, OAKLAND COUNTY (Mar 1994 - Oct 2000)

Neighborhood Profile (2000 Census)
Average Age: 37    Median Household Income: $74,211    Median Home Value: $179,300    Average Years of
Education: 14

35414 OLD LAKE UNITY RD, LADY LAKE FL 32159, LAKE COUNTY (Sep  1998)
Neighborhood Profile (2000 Census)
Average Age: 69    Median Household Income: $33,405    Median Home Value: $381,800    Average Years of
Education: 17

35415 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6232, LAKE COUNTY (Jan  1998)
Phone at address: (352) 638-9074  **MOUNCE BUEY JR**
Neighborhood Profile (2000 Census)
Average Age: 46    Median Household Income: $38,625    Median Home Value: $96,600    Average Years of
Education: 13

6815 TUSCAWILLA DR, LEESBURG FL 34748-9112, LAKE COUNTY (Sep  1991 - Jan  1998)
Neighborhood Profile (2000 Census)
Average Age: 39    Median Household Income: $49,489    Median Home Value: $101,000    Average Years of
Education: 13

7740 LAVON DR R 2, CLARKSTON MI 48348-4330, OAKLAND COUNTY (Feb  1982 - Dec  1998)
Phone at address: (248) 625-9590  **SHEFFIELD PHILIP V**
Neighborhood Profile (2000 Census)
Average Age: 34    Median Household Income: $90,824    Median Home Value: $288,800    Average Years of
Education: 14

## Others Associated With Subjects SSN:
(DOES NOT usually indicate any type of fraud or deception)
    DARCY MOORE JR Age:
    125-46-xxxx issued in New York between 01/01/1969 and 12/31/1971

## Comprehensive Report Summary: (Click on Link to see detail)
    Bankruptcies:
      None Found
    UCC Filings:
      3 Found
    Corporate Affiliations:
      13 Found
    Driver's License:
      1 Found
    Address(es) Found:
      0 Verified and 14 Non-Verified Found
    Possible Properties Owned:
      2 Found
    Motor Vehicles Registered:
      6 Found
    Merchant Vessels:
      None Found
    FAA Certifications:
      None Found
    FAA Aircrafts:
      None Found
    Possible Criminal Records:
      None Found
    Sexual Offenses:
      None Found
    Accidents:
      2 Found
    Professional Licenses:
      None Found
    Voter Registration:
      None Found
    Hunting/Fishing Permit:
      None Found

Concealed Weapons Permit:
  1 Found
Possible Associates:
  4 Found
Possible Relatives:
    1st Degree - 8 Found
    2nd Degree - 3 Found
    3rd Degree - 11 Found
Neighbors:
    1st Neighborhood - 4 Found
    2nd Neighborhood - 6 Found
    3rd Neighborhood - 5 Found
    4th Neighborhood - None Found

## Bankruptcies:
[None Found]

## UCC Filings:
Debtor Name: MOORE VANCE R JR
Debtor Address: PO BOX 490510, LEESBURG FL 34749-0510
Secured Name: PEOPLES STATE BANK OF GROVELAND
Secured Address: PO BOX 38, GROVELAND FL 34736-0038
Original Date: May 31, 2001
Date Filed: May 31, 2001
Filing State: FL
Document Number: 200100118763
Legal Type: UCC FINANCE STATEMENT FILED
Collateral List: EQUIPMENT
Number of Filings: 1
Document Count: 1
Number of Debtor Parties: 1
Number of Secured Parties: 1

Debtor Name: MOORE VANCE
Debtor Address: 3650 STEPHEN RD, LADY LAKE FL 32159-5327
Secured Name: FIRST BANK OF THE VILLAGES
Secured Address: 903 AVENIDA CENTRAL, LADY LAKE FL 32159-5705
Original Date: Oct 05, 1994
Date Filed: Oct 05, 1994
Filing State: FL
Document Number: 940000203013
Legal Type: UCC FINANCE STATEMENT FILED
Collateral List: EQUIPMENT
Number of Filings: 1
Document Count: 1
Number of Debtor Parties: 1
Number of Secured Parties: 1

Debtor Name: MOORE V
Debtor Address: 3650 STEPHEN RD, LADY LAKE FL 32159-5327
Secured Name: FIRST BANK OF THE VILLAGES
Secured Address: 903 AVENIDA CENTRAL, LADY LAKE FL 32159-5705
Original Date: Jul 13, 1995
Date Filed: Jul 13, 1995
Filing State: FL
Document Number: 950000139637
Legal Type: UCC FINANCE STATEMENT FILED
Collateral List: ACCOUNTS RECEIVABLE, UNDEFINED
Number of Filings: 2
Document Count: 2
Number of Debtor Parties: 1
Number of Secured Parties: 1

## Corporate Affiliations:
Corporation Name: ATM FINANCIAL SERVICES, INC. OF DELAWARE
Corporation Status: INACTIVE
Charter Number: F98000001995

Corporation Name: ATM FINANCIAL SERVICES, INC. OF DELAWARE
Corporation Status: INACTIVE
Charter Number: F98000001995
State of Origin: FL
Filing Date: 04/07/1998
Affiliation: REGISTERED AGENT, MOORE VANCE
Address:  PO BOX 490510, LEESBURG FL 34749-0510
Address Type: MAILING ADDRESS

Corporation Name: ATM FINANCIAL SERVICES, LLC
Corporation Status: ACTIVE
Charter Number: M01000001001
State of Origin: FL
Filing Date: 05/04/2001
Affiliation: REGISTERED AGENT, MOORE VANCE
Address:  PO BOX 490510, LEESBURG FL 34749-0510
Address Type: MAILING ADDRESS

Corporation Name: BEST LAB DEALS, INC.
Corporation Status: ACTIVE
Charter Number: P03000125402
State of Origin: FL
Filing Date: 11/04/2003
Affiliation: PRESIDENT, VANCE R MOORE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582
Address Type: MAILING ADDRESS

Corporation Name: ELECTRONIC TRANSFER SERVICES, INC.
Corporation Status: INACTIVE
Charter Number: P96000015012
State of Origin: FL
Filing Date: 02/14/1996
Affiliation: DIRECTOR, VANCE R MOORE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582
Address Type: MAILING ADDRESS

Corporation Name: GREAT LAB DEALS, INC.
Corporation Status: ACTIVE
Charter Number: P03000116344
State of Origin: FL
Filing Date: 10/20/2003
Affiliation: PRESIDENT, VANCE R MOORE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582
Address Type: MAILING ADDRESS

Corporation Name: LEESBURG ANSWERING SERVICE, INC.
Corporation Status: INACTIVE
Charter Number: P99000081616
State of Origin: FL
Filing Date: 09/09/1999
Affiliation: REGISTERED AGENT, VANCE R MOORE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582
Address Type: MAILING ADDRESS

Corporation Name: MED-TEC SYSTEMS, INC.
Corporation Status: INACTIVE
Charter Number: P98000071106
State of Origin: FL
Filing Date: 08/12/1998
Affiliation: REGISTERED AGENT, VANCE R MOORE
Address:  PO BOX 490283, LEESBURG FL 34749-0283
Address Type: MAILING ADDRESS

Corporation Name: SAVE-U-SYSTEMS, INC.
Corporation Status: INACTIVE
Charter Number: V70156

State of Origin: FL
Filing Date: 10/07/1992
Affiliation: PRESIDENT, VANCE R MOORE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582
Address Type: MAILING ADDRESS

Corporation Name: EXCLUSIVE PROPERTIES GROUP, INC.
Corporation Status: ACTIVE
Charter Number: F98000001058
State of Origin: FL
Filing Date: 02/24/1998
Affiliation: PRESIDENT, MOORE VANCE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582
Address Type: MAILING ADDRESS

Corporation Name: EXCLUSIVE PROPERTIES GROUP, INC.
Corporation Status: ACTIVE
Charter Number: F98000001058
State of Origin: FL
Filing Date: 02/24/1998
Affiliation: PRESIDENT, MOORE VANCE
Address: PO BOX 490283, LEESBURG FL 34749-0283
Address Type: MAILING ADDRESS

Corporation Name: EXCLUSIVE PROPERTIES GROUP, INC.
Corporation Status: ACTIVE
Charter Number: F98000001058
State of Origin: FL
Filing Date: 02/24/1998
Affiliation: PRESIDENT, MOORE VANCE
Address: PO BOX 492722, LEESBURG FL 34749-2722
Address Type: MAILING ADDRESS

## Driver's License Information:

Name: VANCE R MOORE
DL Number: M600-876-54-163-0
State: Florida
License Address: PO BOX 279, FRUITLAND PK FL 34731-0279, LAKE COUNTY
DOB: 05/03/1954
Sex: M
Race: W
Attention Flags: ORGAN DONOR
Expiration Date: 05/03/2005
Issue Date: 04/29/1999
License Type: Non-Commercial - Any Single Vehicle less than 8000 pounds
Height: 5'10

## Address Summary:

PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Nov 1994 - Aug 2004)
301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY (May 1996 - May 2004)
35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Apr 1996 - Aug 2002)
PO BOX 490510, LEESBURG FL 34749-0510, LAKE COUNTY (Oct 2001 - Jan 2002)
3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY (Sep 1992 - Dec 2001)
490510 POB 490510, LEESBURG FL 34749, LAKE COUNTY (Mar 2001 - Sep 2001)
PO BOX 490283, LEESBURG FL 34749-0283, LAKE COUNTY (Feb 2000 - Oct 2000)
PO BOX 295, CLARKSTON MI 48347-0295, OAKLAND COUNTY (Mar 1994 - Oct 2000)
35414 OLD LAKE UNITY RD, LADY LAKE FL 32159, LAKE COUNTY (Sep 1998)
35415 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6232, LAKE COUNTY (Jan 1998)
6815 TUSCAWILLA DR, LEESBURG FL 34748-9112, LAKE COUNTY (Sep 1991 - Jan 1998)

7740 LAVON DR R 2, CLARKSTON MI 48348-4330, OAKLAND COUNTY (Feb 1982 - Dec 1990)

## Previous And Non-Verified Address(es):

VANCE MOORE - PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Nov 1994 - Aug 2004)
    Neighborhood Profile (2000 Census)
        Average Age: 35
        Median Household Income: $39,659

Median Owner Occupied Home Value: $66,300
Average Years of Education: 12

VANCE MOORE - 301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY (May 1996 - May 2004)
    **Current phones listed at this address:**
        ATM FINANCIAL SERVICES  (352) 314-2214
        BEST LAB DEALS INC  (352) 728-1115
        CHECK WATCHERS INC  (352) 360-2638
        FAMILY KARATE CENTER  (352) 365-0744
        FIRST AMERICA FUNDING  (352) 315-0773
        HARVEST TECHNOLOGIES LLC  (352) 326-5333
        MULTI TECH PRODUCTIONS  (352) 326-4002

    **Property Ownership Information for this Address**
        **Property:**
            Parcel Number - 28-19-24-0002-000-075
            Book - 001623
            Page - 000226
            Lot Number - 7
            Name Owner 1 - EXCLUSIVE PROPERTIES GROUP INC
            Address - 301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY
            Owner's Address - 301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY
            Land Usage - WAREHOUSE
            Subdivision Name - ACREAGE OR UNREC
            Total Value - $209,837
            Land Value - $32,318
            Improvement Value - $177,519
            Land Size - 33,318
            Year Built - 1982
            Sale Date - 02/26/1998
            Sale Price - $236,900
            Name of Seller - HANSARD ELBERT L
            Legal Description - BEG 137.03 FT N OF SE COR OF NE 1/4 OF NW 1/4, RUN N 89DEG 48MIN
05SEC W 237.14 FT, N 0DEG 25MIN 10SEC E 141.48 FT, S 89DEG 17MIN 26SEC E 237.14 FT, S TO POB--LESS CO
RD-- ORB 1623 PG 0226
        **Neighborhood Profile (2000 Census)**
            Average Age: 54
            Median Household Income: $27,545
            Median Owner Occupied Home Value: $53,200
            Average Years of Education: 12

VANCE R MOORE III - 35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY
(Apr 1996 - Aug 2002)
        **Property Ownership Information for this Address**
        **Property:**
            Parcel Number - 02-19-24-0003-000-010.01
            Book - 001431
            Page - 000799
            Name Owner 1 - MOORE VANCE R JR & DARCY JO
            Address - 35414 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6215, LAKE COUNTY
            Owner's Address -  PO BOX 279, FRUITLAND PK FL 34731-0279, LAKE COUNTY
            Land Usage - SFR
            Subdivision Name - ACREAGE OR UNREC
            Total Value - $118,603
            Land Value - $16,243
            Improvement Value - $102,360
            Land Size - 34,500
            Year Built - 1989
            Sale Date - 04/18/1996
            Sale Price - $223,000
            Name of Seller - NEWMAN THOMAS A
            Legal Description - FROM SW COR OF NE 1/4 OF SW 1/4 RUN N ALONG W LINE OF NW 1/4 OF
SW 1/4 A DIST OF 906.5 FT TO POB, CONT N ALONG THE W LINE OF NE 1/4 OF SW 1/4 A DIST OF 115 FT, N
88DEG 27MIN E 300 FT S 03DEG 30MIN E 115 FT, W TO POB ORB 1431 PGS 799, 801
        **Neighborhood Profile (2000 Census)**
            Average Age: 46
            Median Household Income: $38,625
            Median Owner Occupied Home Value: $96,600
            Average Years of Education: 13

VANCE MOORE -  PO BOX 490510, LEESBURG FL 34749-0510, LAKE COUNTY (Oct 2001 - Jan 2002)
**Neighborhood Profile (2000 Census)**
Average Age: 42
Median Household Income: $31,534
Median Owner Occupied Home Value: $63,400
Average Years of Education: 12

VANCE R MOORE - 3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY (Sep 1992 - Dec 2001)
**Current phones listed at this address:**
THEODOROPOULOS PAUL  (352) 750-5019

**Property Ownership Information for this Address**
Property:
Parcel Number - 27-18-24-0050-000-007
Book - 002044
Page - 002015
Lot Number - 7
Name Owner 1 - THEODOROPOULOS PAUL S
Address - 3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY
Owner's Address - 3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY
Land Usage - SFR
Subdivision Name - GLENN HILLS
Total Value - $88,439
Land Value - $17,500
Improvement Value - $70,939
Year Built - 1991
Sale Date - 12/12/2001
Sale Price - $90,000
Name of Seller - MOORE VANCE R
Legal Description - GLENN HILLS SUB LOT 7 PB 31 PGS 51-52 ORB 2044 PG 2015
**Neighborhood Profile (2000 Census)**
Average Age: 48
Median Household Income: $26,250
Median Owner Occupied Home Value: $52,500
Average Years of Education: 12

VANCE MOORE - 490510 POB 490510, LEESBURG FL 34749, LAKE COUNTY (Mar 2001 - Sep 2001)
**Neighborhood Profile (2000 Census)**
Average Age: 42
Median Household Income: $31,534
Median Owner Occupied Home Value: $63,400
Average Years of Education: 12

VANCE R MOORE II -  PO BOX 490283, LEESBURG FL 34749-0283, LAKE COUNTY (Feb 2000 - Oct 2000)
**Neighborhood Profile (2000 Census)**
Average Age: 42
Median Household Income: $31,534
Median Owner Occupied Home Value: $63,400
Average Years of Education: 12

VANCE R MOORE JR -  PO BOX 295, CLARKSTON MI 48347-0295, OAKLAND COUNTY (Mar 1994 - Oct 2000)
**Neighborhood Profile (2000 Census)**
Average Age: 37
Median Household Income: $74,211
Median Owner Occupied Home Value: $179,300
Average Years of Education: 14

VANCE MOORE - 35414 OLD LAKE UNITY RD, LADY LAKE FL 32159, LAKE COUNTY (Sep 1998)
**Neighborhood Profile (2000 Census)**
Average Age: 69
Median Household Income: $33,405
Median Owner Occupied Home Value: $81,800
Average Years of Education: 13

VANCE R MOORE - 35415 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6232, LAKE COUNTY (Jan 1998)
**Current phones listed at this address:**
MOUNCE BUEY JR  (352) 638-9074

**Property Ownership Information for this Address**
Property:

Parcel Number - 02-19-24-0100-000-020
Book - 002142
Page - 000097
Lot Number - 20
Name Owner 1 - FARLING RICHARD L & REBECCA G
Address - 35415 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6232, LAKE COUNTY
Owner's Address - 35246 W GRIFFIN DR, FRUITLAND PK FL 34731-6014, LAKE COUNTY
Land Usage - SFR
Subdivision Name - CRESCENT COVE
Total Value - $64,998
Land Value - $14,040
Improvement Value - $50,958
Land Size - 10,125
Year Built - 1983
Sale Date - 06/28/2002
Sale Price - $73,500
Name of Seller - SENDER WILFRIED
Legal Description - CRESCENT COVE LOT 20 PB 15 PG 16 ORB 2142 PG 97

**Neighborhood Profile (2000 Census)**
Average Age: 46
Median Household Income: $38,625
Median Owner Occupied Home Value: $96,600
Average Years of Education: 13

VANCE R MOORE JR - 6815 TUSCAWILLA DR, LEESBURG FL 34748-9112, LAKE COUNTY (Sep 1991 - Jan 1998)

**Neighborhood Profile (2000 Census)**
Average Age: 39
Median Household Income: $49,489
Median Owner Occupied Home Value: $101,000
Average Years of Education: 13

VANCE R MOORE JR - 7740 LAVON DR R 2, CLARKSTON MI 48348-4330, OAKLAND COUNTY (Feb 1982 - Dec 1990)

**Current phones listed at this address:**
SHEFFIELD PHILIP V  (248) 625-9590

**Neighborhood Profile (2000 Census)**
Average Age: 34
Median Household Income: $90,824
Median Owner Occupied Home Value: $288,800
Average Years of Education: 14

## Possible Properties Owned by Subject:

**Property:**
Parcel Number -
Book - 002153
Page - 002379
Name Owner 1 - MOORE, VANCE
Address - 35414 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6215, LAKE COUNTY
Owner's Address - 35414 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6215, LAKE COUNTY
Land Usage - SINGLE FAMILY RESIDENCE
Sale Date - 07/29/2002
Sale Price - $0

**Property:**
Parcel Number - 27-18-24-0050-000-007
Book - 002044
Page - 002015
Lot Number - 7
Name Owner 1 - THEODOROPOULOS PAUL S
Address - 3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY
Owner's Address - 3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY
Land Usage - SFR
Subdivision Name - GLENN HILLS
Total Value - $88,439

Land Value - $17,500
Improvement Value - $70,939
Year Built - 1991
Sale Date - 12/12/2001
Sale Price - $90,000
Name of Seller - MOORE VANCE R
Legal Description - GLENN HILLS SUB LOT 7 PB 31 PGS 51-52 ORB 2044 PG 2015

## Motor Vehicles Registered To Subject:

**Vehicle:**
Description: White 2000 GMC Savana G2500 - Extended Cargo Van
License Plate: T67JFH
License Plate Type: Sunshine License Plates (Sunshine State)
VIN: 1GTGG29R5Y1199088
State of Origin: Florida
Vehicle Use: Private
Mileage: 10
Title Number: 0080618055
Title Date: 04/25/2000
Title Status: Lien Maint Only
Decal Year: 2005
Engine Size: 350
Number of Cylinders: 8
Body: Extended Cargo Van
Record Type: Current
Expiration Date: 05/03/2005
*Owner(s)*
　Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
　DL #: M600876541630
　Address: PO BOX 279, FRUITLAND PARK FL 34731, LAKE COUNTY

*Registrant(s)*
　Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
　DL #: M600876541630
　Address: PO BOX 279, FRUITLAND PARK FL 34731, LAKE COUNTY

*Lien Holder*
　Holder: FIRST FEDERAL SAVINGS BANK
　Lien Date: 04/18/2000
　Address: P O BOX 490420, LEESBURG FL 34749-0420

**Vehicle:**
Description: 1988 - Trailer
License Plate: G98IFB
License Plate Type: Car & Pickup Tags (County Name)
VIN: 1ZE1RMU15HAN26888
State of Origin: Florida
Vehicle Use: Private
Title Number: 0000000000
Decal Year: 2003
Body: Trailer
Record Type: Historical
Expiration Date: 05/03/2003
*Owner(s)*
　Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
　DL #: M600876541630
　Address: PO BOX 279, FRUITLAND PARK FL 34731, LAKE COUNTY

*Registrant(s)*
　Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
　DL #: M600876541630
　Address: PO BOX 279, FRUITLAND PARK FL 34731, LAKE COUNTY

*Lien Holder*
　None

**Vehicle:**
Description: Orange Black 1974 Volkswagen - 2 Door
License Plate: A60UND

## Possible Criminal Records:
[None Found]


## Sexual Offenses:
[None Found]


## Accidents:
**Accident 1**
Date/Time: Sunday, 04/30/2000 11:34
City: Casselberry
County: Seminole

**Vehicle 1 - Vehicle was traveling East on SR 436. Estimated speed was 35 mph in a 40 mph speed zone.**
Type: 1996 Ford Ranger - Pickup/Light Truck (2 rear tires)
Tag: URE40W
VIN: 1FTCR10UOTUD35249
Fault: Vehicle At-Fault

**Driver**
Name: JAMES J MELFI
Address: 122 LYNDHURST DR, LONGWOOD FL 32779-4575, SEMINOLE COUNTY
DL#: D541-450-78-052-
DL State: FL

**Owner**
Name: JAMES J MELFI
Address: 122 LYNDHURST DR, LONGWOOD FL 32779-4575, SEMINOLE COUNTY
DL #: D54145078052

**Vehicle 2 - Vehicle was traveling East on SR 436. Estimated speed was 10 mph in a 40 mph speed zone.**
Type: 1996 - Passenger Van
Tag: TJH42P
VIN: 08TFS24H4THA83549
Fault: Vehicle Not-At-Fault

**Driver**
Name: JOHN S CANNON
Address: 27218 S QUARTER RD, OKAHUMPKA FL 34762, LAKE COUNTY
DL#: C550-477-55-003-
DL State: FL

**Owner**
Name: VANCE R MOORE
Address: 301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY

**Accident 2**
Date/Time: Thursday, 05/29/1997 16:30
City: Orlando
County: Orange

**Vehicle 1 - Vehicle was traveling East on 2000 BLK E SR 50. Estimated speed was 25 mph in a 40 mph speed zone.**
Type: 1991 Chevrolet Corsica LT - Automobile
Tag: PBM78D
VIN: 1G1LT53T9ME206765
Fault: Vehicle At-Fault

**Driver**
Name: TERRY G PUGMIRE
Address: 1037 SHINNECOCK HILLS DR, OVIEDO FL 32765-5809, SEMINOLE COUNTY
DL#: P256-807-48-289-0
DL State: FL

**Owner**
Name: TERRY G PUGMIRE
Address: 1037 SHINNECOCK HILLS DR, OVIEDO FL 32765-5809, SEMINOLE COUNTY
DL #: P256807482890

Decal Year: 0000
Length: 18 ft.
Vessel Type: Open Motorboat
Vessel Propulsion Type: Inboard / Outboard
Vessel Description: C & C MANUFACTURING INC
Hull Material Type: Fiberglass
Record Type: Historical
Expiration Date: 06/30/1901
*Owner(s)*
    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

    Name: MOORE DARCY JO
    Address: 35414 OLD LAKE UNITY ROAD, FRUITLAND PARK FL 34731, LAKE COUNTY

*Registrant(s)*
    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

    Name: MOORE DARCY JO
    Address: 35414 OLD LAKE UNITY ROAD, FRUITLAND PARK FL 34731, LAKE COUNTY

*Lien Holder*
    None

**Vehicle:**
Description: White 1997 GMC Savana Cutaway Van G3500 - Cutaway
License Plate: DA644Z
License Plate Type: Car & Pickup Tags (County Name)
VIN: 1GDHG31RXV1028074
State of Origin: Florida
Vehicle Use: Private
Mileage: 36,726
Title Number: 0075494603
Title Date: 08/07/1998
Title Status: Original Used
Decal Year: 2001
Engine Size: 350
Number of Cylinders: 8
Body: Cutaway
Record Type: Historical
Expiration Date: 12/31/2001
*Owner(s)*
    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

*Registrant(s)*
    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

*Lien Holder*
    Holder: GENERAL MOTORS ACCEPTANCE CORP
    Lien Date: 07/06/1998
    Address: P O BOX 8111, COCKEYSVILLE MD 21030-8111

## Merchant Vessels:
[None Found]

## FAA Certifications:
[None Found]

## FAA Aircrafts:
[None Found]

License Plate Type: Car & Pickup Tags (County Name)
VIN: 1342605425
State of Origin: Florida
Vehicle Use: Private
Title Number: 0013750766
Title Date: 09/21/1999
Title Status: Transfer
Decal Year: 2002
Body: 2 Door
Record Type: Historical
Expiration Date: 05/03/2002
*Owner(s)*
    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

*Registrant(s)*
    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

*Lien Holder*
    None

**Vehicle:**
Description: Turquoise 1995 GMC Safari - Extended Sport Van
License Plate: L2251D
License Plate Type: Car & Pickup Tags (County Name)
VIN: 1GKDM19W2SB511191
State of Origin: Florida
Vehicle Use: Private
Mileage: 12
Title Number: 0067602555
Title Date: 12/01/1994
Title Status: Title Correction
Decal Year: 2002
Engine Size: 262
Number of Cylinders: 6
Body: Extended Sport Van
Record Type: Historical
Expiration Date: 02/10/2002
*Owner(s)*
    Name: MOORE DARCY JO DOB: 02/10/1953 Age: 51 Sex: Female
    DL #: M600170535500
    Address: PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY

    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

*Registrant(s)*
    Name: MOORE DARCY JO DOB: 02/10/1953 Age: 51 Sex: Female
    DL #: M600170535500
    Address: PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY

    Name: MOORE VANCE R J DOB: 05/03/1954 Age: 50 Sex: Male
    DL #: M600876541630
    Address: 301 S RICHIE ROAD, LEESBURG FL 34748, LAKE COUNTY

*Lien Holder*
    None

**Vehicle:**
Description: 1985 C & C MANUFACTURING INC Open Motorboat
License Plate: FL6042FR
Hull ID: CBA92025K485
State of Origin: Florida
Title Number: 0001291872
Title Date: 12/16/1994
Title Status: Original New

**Vehicle 2 - Vehicle was traveling East on 2000 BLK E SR 50.  Estimated speed was 0 mph in a 40 mph speed zone.**
Type: 1989 Chevrolet Blazer - Automobile
Tag: F66UB
VIN: 1GNCS18Z7K8126786
Fault: Vehicle Not-At-Fault

**Driver**
Name: KELLY A LAFLER
Address: 102 OKLAHOMA AVE, LEESBURG FL 34748-5417, LAKE COUNTY
DL#: L146-501-76-441-0
DL State: FL

**Owner**
Name: VANCE R MOORE III
Address: 35414 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6215, LAKE COUNTY

## Professional License(s):
[None Found]

## Voter Registration:
[None Found]

## Hunting/Fishing Permit:
[None Found]

## Concealed Weapons Permit:
Name: VANCE R MOORE
Address: PO BOX 279, FRUITLAND PK FL 34731-0279
DOB: 05/03/1954
Gender: Male
Ethnicity: White
License State: Florida
Permit Number: W 9927051
Permit Type: Issued
Expiration Date: 02/21/2005

## Possible Associates:
MOORE VANCE   Age:
   **Previous And Non-Verified Address(es):**
    § 35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Apr 1996 - 2003)
    § PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Apr 1996 - 2003)

LAUREL BENEFIELD DOB: 02/26/1963 Age: 41
262-75-xxxx issued in Florida between 01/01/1976 and 12/31/1977
   **Names Associated with Associate:**
   LAUREL P BENEFIELD DOB: 02/26/1963 Age: 41
   262-75-xxxx issued in Florida between 01/01/1976 and 12/31/1977
   LAUREL PACE BENEFIELD   DOB: 02/26/1963 Age: 41
   LAUREL S BENEFIELD   Age:
   LAUREL PACE DOB: 02/1963 Age: 41
   262-75-xxxx issued in Florida between 01/01/1976 and 12/31/1977
   LAUREL S PACE DOB: 02/1963 Age: 41
   262-75-xxxx issued in Florida between 01/01/1976 and 12/31/1977
   **Previous And Non-Verified Address(es):**
   3594 SW STATE ROAD 247, LAKE CITY FL 32024-0785, COLUMBIA COUNTY (Jul 2004 - Aug 2004)
   RR 22 BOX 2946-1, LAKE CITY FL 32024-9200, COLUMBIA COUNTY (Aug 1997 - Jul 2004)
   RR 2 BOX 1313F, FRUITLAND PARK FL 34731, LAKE COUNTY (Dec 1999)
   RR 2 BOX 294-61, LAKE CITY FL 32024-9608, COLUMBIA COUNTY (Oct 1997 - Jan 1999)
   RR 5 BOX 947, LAKE CITY FL 32024, SUWANNEE COUNTY (Aug 1994 - Jan 1999)
   2301 ENGLEWOOD DR, LAKE CITY FL 32024, COLUMBIA COUNTY (Jul 1997)
   2301 INGLEWOOD DR, LAKE CITY FL 32025-6700, COLUMBIA COUNTY (Jul 1995 - Jan 1997)
   5220 NE 9TH LN, OCALA FL 34470-0806, MARION COUNTY (Dec 1989 - Dec 1992)

8 SAINT JAMES AVE, LAKE CITY FL 32025-6525, COLUMBIA COUNTY (Apr 1985 - Dec 1991)

35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (May 1989 - Apr 1991)
1313 OLD LAKE UNIFY RD, FRUITLAND PARK FL 34731, LAKE COUNTY (Mar 1991)
RR 10 BOX 517, LAKE CITY FL 32025-9175, COLUMBIA COUNTY (Jan 1988 - Jan 1990)

35415 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6232, LAKE COUNTY (Nov 1989)
100 E WOODWARD ST, LEESBURG FL 34748-5854, LAKE COUNTY (May 1989)

NORMA SGEKKEBBERGER DOB: 06/1935 Age: 69
285-30-xxxx issued in Ohio between 01/01/1951 and 12/31/1953
   **Names Associated with Associate:**
   NORMA J SGEKKEBBERGER DOB: 06/1935 Age: 69
   285-30-xxxx issued in Ohio between 01/01/1951 and 12/31/1953
   NORMA SHELLENBERGER DOB: 06/1935 Age: 69
   285-30-xxxx issued in Ohio between 01/01/1951 and 12/31/1953
   NORMA J SHELLENBERGER DOB: 06/1935 Age: 69
   285-30-xxxx issued in Ohio between 01/01/1951 and 12/31/1953
   **Active Address(es):**

✔35738 OAKRIDGE DR, LEESBURG FL 34788-2854, LAKE COUNTY (Jun 2003)
   **Previous And Non-Verified Address(es):**
203 WESSINGTON PL, HENDERSONVILLE TN 37075-3032, SUMNER COUNTY (Feb 2004 - Aug 2004)
1006 BRISTOL LAKES RD APT 202, MOUNT DORA FL 32757-7527, LAKE COUNTY (Feb 2002 - Sep 2003)
PO BOX 895302, LEESBURG FL 34789-5302, LAKE COUNTY (Apr 2002 - Jun 2002)
RR 5 BOX 209R, LEESBURG FL 34788, LAKE COUNTY (Sep 1994)

35415 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6232, LAKE COUNTY (Jul 1990 - Dec 1992)

35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Aug 1990 - Dec 1990)
35414 OLD LK, FRUITLAND PARK FL 34731, LAKE COUNTY (Aug 1990)
10505 CYPRESS RD, LEESBURG FL 34788-3122, LAKE COUNTY (Oct 1989)
707 N 14TH ST, LEESBURG FL 34748-4205, LAKE COUNTY (Jun 1987 - Jul 1989)
109 LYONIA LN, WILDWOOD FL 34785-9200, SUMTER COUNTY (Jun 1987)
16 STACY DR, NEW MIDDLETOWN OH 44442-9705, MAHONING COUNTY (Mar 1986 - Apr 1986)

PAUL SGEKKEBBERGER DOB: 07/1936 Age: 68
175-28-xxxx issued in Pennsylvania between 01/01/1951 and 12/31/1954
   **Names Associated with Associate:**
   PAUL G SGEKKEBBERGER DOB: 07/1936 Age: 68
   175-28-xxxx issued in Pennsylvania between 01/01/1951 and 12/31/1954
   PAUL G SHELLENBERGE Age:
   175-28-xxxx issued in Pennsylvania between 01/01/1951 and 12/31/1954
   PAUL E SHELLENBERGER  Age:
   175-28-xxxx issued in Pennsylvania between 01/01/1951 and 12/31/1954
   PAUL G SHELLENBERGER DOB: 07/27/1936 Age: 68
   175-28-xxxx issued in Pennsylvania between 01/01/1951 and 12/31/1954
   PAULA SHELLENBERGER Age:
   175-28-xxxx issued in Pennsylvania between 01/01/1951 and 12/31/1954
   **Previous And Non-Verified Address(es):**
35738 OAKRIDGE DR, LEESBURG FL 34788-2854, LAKE COUNTY (Feb 1994 - Jan 1999)
16 STACEY DR, MIDDLETOWN OH 45042, BUTLER COUNTY (Sep 1993)

35415 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6232, LAKE COUNTY (Dec 1990 - Dec 1992)
707 N 14TH ST, LEESBURG FL 34748-4205, LAKE COUNTY (Jul 1989 - Jul 1991)

35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Aug 1990 - Dec 1990)
RR 17 BOX 209R, LEESBURG FL 34788, LAKE COUNTY (Nov 1989)
10505 CYPRESS RD, LEESBURG FL 34788-3122, LAKE COUNTY (Oct 1989)
1147 BENTLEY RD, LEESBURG FL 34748-7111, LAKE COUNTY (Nov 1987)
109 LYONIA LN, WILDWOOD FL 34785-9200, SUMTER COUNTY (Jun 1987)
707 1 2 ST, LEESBURG FL 32748 (May 1987)
16 STACY DR, NEW MIDDLETOWN OH 44442-9705, MAHONING COUNTY (Jul 1985 - Apr 1986)

## Possible Relative Summary: *(Click on name to link to more details within this report - No Charge)*
> DARCY JO MOORE JR, Age 51
> KRISTI MICHELLE MOORE, Age 21
>> KRISTIE MOORE - (AKA), Age 21
> VANCE R MOORE III, Age 25
>> VANCE ROTHROCK MOORE III - (AKA)

>> D DAN C MOORE SR, Age 92
>> DAN CECIL MOORE JR
>>>> DAN CECIL MOORE JR - (AKA), Age 67

>>>> DAVID MOORE - (AKA), Age 67
>>> **D** LENA L MOORE, Age 90
>>> EST OF MOORE
> DARCY MOORE JR
> DARCY J MOORE
> EDITH M MOORE
>> EDITH S MOORE - (AKA), Age 71
>> ROBIN L MOORE, Age 36
>>> ROBIN LYNN MOORE - (AKA), Age 35
>>> ROBIN L WATERMAN - (AKA), Age 35
>>> ROBIN LYNN WATERMAN - (AKA), Age 35
>>> WATERMAN JEFF, Age 37
>>>> JEFF D WATERMAN - (AKA)
>>>> JEFFERY D WATERMAN - (AKA)
>>>> JEFFREY D WATERMAN - (AKA), Age 37
>>> MARSHA A WATERMAN, Age 56
>>> MICHELLE L BILLUPS, Age 42
>>>> MICHELLE L HAIGHE - (AKA)
>>>> MICHELLE L HAIGHT - (AKA), Age 42
>>>> MMICHELLE HAIGHT - (AKA)
>>>> MICHELLE L LAMEY - (AKA), Age 42
>>>> MMICHELLE L LAMEY - (AKA), Age 42
>>>> MICHELLE L LMEY - (AKA)
>>>> MICHELLE L WATERMAN - (AKA), Age 42
>>> DOUGLAS G WATERMAN, Age 56
>>> JENNIFER J HOYT, Age 34
>>>> HOYT JENNIFER - (AKA)
>>>> JENNIFER J WATERMAN - (AKA), Age 34
>>> JULIANN R ANGELONE, Age 29
>>>> JULIANN R WATERMAN - (AKA), Age 29
>>> ROBIN WATERMAN
>> VANCE MOORE JR
>>> VANCE R MOORE SR - (AKA), Age 72
>>> DARCY MOORE
> VANCE MOORE
> VANLE MOORE

## Possible Relatives:

DARCY JO MOORE JR DOB: 02/10/1953 Age: 51
    372-64-xxxx issued in Michigan between 01/01/1971 and 12/31/1972
    **Previous And Non-Verified Address(es):**

    DARCY JO MOORE - **S** PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Nov 1994 - Aug 2004)

    DARCY JO MOORE JR - **S** 35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Apr 1996 - Apr 2004)

    DARCY J MOORE JR - **S** 3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY (Sep 1992 - Sep 2001)

    DARCY JO MOORE - **S** 490510 POB 490510, LEESBURG FL 34749, LAKE COUNTY (Mar 2001 - Jun 2001)

    DARCY JO MOORE - **S** 6815 TUSCAWILLA DR, LEESBURG FL 34748-9112, LAKE COUNTY (Sep 1991 - Dec 1991)

    DARCY JO MOORE - **S** PO BOX 295, CLARKSTON MI 48347-0295, OAKLAND COUNTY (Apr 1986 - Dec 1990)

    DARCY JO MOORE - 1608 MANYLESTONE, UNION LAKE MI 48387, OAKLAND COUNTY (Jan 1990)

    DARCY JO MOORE - **S** 7740 LAVON DR, CLARKSTON MI 48348-4330, OAKLAND COUNTY (Oct 1985 - Apr 1986)

    KRISTI MICHELLE MOORE  DOB: 10/02/1982 Age: 21
        **Names Associated with Relative:**
        KRISTIE MOORE DOB: 10/02/1982 Age: 21
           132-72-xxxx issued in New York between 01/01/1988 and 12/31/1989
        **Active Address(es):**

        KRISTIE MOORE - ✔ 8578 NW 22ND AVE, GAINESVILLE FL 32606-9223, ALACHUA COUNTY (Aug 2004)
           MOORE KRISTI  (352) 333-3188

        **Previous And Non-Verified Address(es):**

KRISTIE MOORE - 🔳 PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Mar 2001 - Aug 2004)

KRISTI MICHELLE MOORE - 🔳 35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Sep 2001 - Sep 2002)

VANCE R MOORE III DOB: 04/23/1979 Age: 25
131-72-xxxx issued in New York between 01/01/1988 and 12/31/1989
**Names Associated with Relative:**
VANCE ROTHROCK MOORE III Age:
131-72-xxxx issued in New York between 01/01/1988 and 12/31/1989
**Active Address(es):**
VANCE ROTHROCK MOORE III - ✔️ 1221 LINKS DR, MORRISVILLE NC 27560-7056, WAKE COUNTY (Dec 2003 - Aug 2004)

VANCE R MOORE III - ✔️ 600 REUSENS RD APT K120, LYNCHBURG VA 24503-1268, LYNCHBURG CITY COUNTY (May 2002 - Aug 2002)
**Previous And Non-Verified Address(es):**
VANCE R MOORE III - 410 KERRY LN APT G, LYNCHBURG VA 24502-5723, LYNCHBURG CITY COUNTY (Aug 2002 - Jan 2004)

VANCE R MOORE III - 🔳 PO BOX 279, FRUITLAND PARK FL 34731-0279, LAKE COUNTY (Nov 1994 - Jul 2003)

VANCE R MOORE II - 2247 CITRUS BLVD APT 200, LEESBURG FL 34748-3012, LAKE COUNTY (Jul 2003)

VANCE R MOORE III - 🔳 35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Apr 1996 - Aug 2002)

VANCE R MOORE 3 - 2300 WEEPING WILLOW DR APT F, LYNCHBURG VA 24501-3970, LYNCHBURG CITY COUNTY (Aug 2001 - Jan 2002)

VANCE R MOORE JR - 102 MAPLE HILLS DR APT A, LYNCHBURG VA 24502-4420, BEDFORD COUNTY (Mar 2001 - Jan 2002)

VANCE R MOORE III - PO BOX 295, FRUITLAND PARK FL 34731-0295, LAKE COUNTY (Apr 2000 - Jan 2002)

VANCE R MOORE III - 102 A MAPLE HILLS 40, LYNCHBURG VA 24502, LYNCHBURG CITY COUNTY (Mar 2001 - Jun 2001)

VANCE R MOORE 3 - LU BOX 22424, LYNCHBURG VA 24506, LYNCHBURG CITY COUNTY (Nov 2000)

VANCE R MOORE III - PO BOX 1, LYNCHBURG VA 24505-0001, LYNCHBURG CITY COUNTY (Oct 1998 - Oct 2000)

VANCE R MOORE III - PO BOX 22682, LYNCHBURG VA 24506, LYNCHBURG CITY COUNTY (Oct 2000)

VANCE R MOORE III - 225 COFFEE RD APT 17, LYNCHBURG VA 24503-3818, BEDFORD COUNTY (Aug 1999 - Dec 1999)

VANCE R MOORE III - 22682L, LYNCHBURG VA 24506, LYNCHBURG CITY COUNTY (Jan 1999)

VANCE R MOORE III - PO BOX 22683, LYNCHBURG VA 24506, LYNCHBURG CITY COUNTY (Nov 1998 - Jan 1999)

VANCE R MOORE III - B 22682 LIBERTY UNIV, LYNCHBURG VA 24506, LYNCHBURG CITY COUNTY (Mar 1998)

**Possible Relative:**
🅓 DAN C MOORE SR DOB: 03/20/1912 DOD: 03/06/2000 (FAYETTE, KY)  Age at Death: 87 (Born 92 years ago)
254-18-xxxx issued in Georgia between 01/01/1936 and 01/01/1951
**Previous And Non-Verified Address(es):**
DAN C MOORE SR - 877 SUMMERVILLE DR, LEXINGTON KY 40504-2367, FAYETTE COUNTY (Jan 1988 - Aug 2004)

DAN C MOORE - 2247 CITRUS BLVD # 200, LEESBURG FL 34748-3032, LAKE COUNTY (Jul 1995 - Oct 2000)

DAN MOORE - 40504 (Mar 2000)

DAN C MOORE SR - 1851 ROYSTER RD, LEXINGTON KY 40516-9705, FAYETTE COUNTY (Jul 1995 - Jan 1999)

DAN C MOORE SR - PO BOX 11790, LEXINGTON KY 40578-1790, FAYETTE COUNTY (Jan 1988 - Jan 1997)

DAN C MOORE - 810 LAKESHORE DR, LEESBURG FL 34748-6833, LAKE COUNTY (Jun 1994)

DAN C MOORE - PO BOX 501, FRUITLAND PARK FL 34731-0501, LAKE COUNTY (Oct 1990 - Dec 1992)

**Possible Relative:**
DAN CECIL MOORE JR Age:
404-50-xxxx issued in Kentucky between 01/01/1955 and 12/31/1956
**Names Associated with Relative:**
DAN CECIL MOORE JR  DOB: 12/09/1936 Age: 67
DAVID MOORE DOB: 12/1936 Age: 67
404-50-xxxx issued in Kentucky between 01/01/1955 and 12/31/1956

**Active Address(es):**
DAN CECIL MOORE JR - ✔2440 SOUTH ST, LEESBURG FL 34748-6426, LAKE COUNTY
(Apr 1996 - Aug 2004)
MOORE DAN  (352) 365-9787

**Previous And Non-Verified Address(es):**
DAN CECIL MOORE JR - PO BOX 501, FRUITLAND PARK FL 34731-0501, LAKE COUNTY
(Dec 1998)
DAVID MOORE - 5717 W LAKE BUTLER RD, WINTER GARDEN FL 34787, ORANGE COUNTY
(Feb 1996)
DAN CECIL MOORE JR - 810 LAKESHORE DR, LEESBURG FL 34748-6833, LAKE COUNTY
(Jun 1994)
DAN CECIL MOORE JR - 5450 MCCOWANS FERRY RD, VERSAILLES KY 40383-
9695, WOODFORD COUNTY (Mar 1994)
DAN CECIL MOORE JR - 2247 CITRUS BLVD, LEESBURG FL 34748-3032, LAKE COUNTY
(Jul 1993)
DAN CECIL MOORE JR - 3101 RICHMOND RD, LEXINGTON KY 40509-1599, FAYETTE
COUNTY (Jan 1993)
DAN C MOORE - PO BOX 721, WINDERMERE FL 34786-0721, ORANGE COUNTY (Apr 1985 -
Dec 1992)
DAVID MOORE - 8033 W SUNSET BLVD # 27, WEST HOLLYWOOD CA 90046-2401, LOS
ANGELES COUNTY (Dec 1990 - Dec 1992)
DAN CECIL MOORE JR - 622 1ST AVE, LADY LAKE FL 32159-4625, LAKE COUNTY (Jan 1990 -
Dec 1991)
DAN CECIL MOORE JR - 777 RIVER HILL DR, RICHMOND KY 40475-8418, MADISON COUNTY
(Oct 1991 - Dec 1991)
DAN CECIL MOORE - 442 WINDFIELD PL, LEXINGTON KY 40517-4327, FAYETTE COUNTY
(Feb 1989 - Dec 1991)
DAN CECIL MOORE JR - 36540 VIA MARCIA, FRUITLAND PARK FL 34731-5343, LAKE
COUNTY (Jan 1990 - May 1990)
DAN C MOORE JR - PO BOX 2530, OCALA FL 34478-2530, MARION COUNTY (Sep 1987)
DAN C MOORE - 3120 RICHMOND RD, LEXINGTON KY 40509-1509, FAYETTE COUNTY
(Apr 1986)
DAN C MOORE - 130 ARCADIA PARK, LEXINGTON KY 40503-1360, FAYETTE COUNTY
(Apr 1985)
DAN CECIL MOORE JR - 5717 W LAKE BUTLER RD, WINTER GARDEN FL 32787 (Apr 1985)

**D** LENA L MOORE DOB: 02/11/1914 DOD: 04/26/1997 (FAYETTE, KY)  Age at Death: 83 (Born 90
years ago)
402-76-xxxx issued in Kentucky between 01/01/1967 and 12/31/1968
**Previous And Non-Verified Address(es):**
LENA MOORE - , LEXINGTON KY 40578, FAYETTE COUNTY (Apr 1997)
LENA L MOORE - 877 SUMMERVILLE DR, LEXINGTON KY 40504-2367, FAYETTE COUNTY
(Nov 1994 - Jan 1997)

EST OF MOORE  Age:
**Previous And Non-Verified Address(es):**
EST OF MOORE - 877 SUMMERVILLE DR, LEXINGTON KY 40504-2367, FAYETTE COUNTY
(Feb 2002 - Jun 2002)

DARCY MOORE JR Age:
125-46-xxxx issued in New York between 01/01/1969 and 12/31/1971
**Previous And Non-Verified Address(es):**
DARCY MOORE JR - 💲 PO BOX 295, CLARKSTON MI 48347-0295, OAKLAND COUNTY (Aug 2000 -
Oct 2000)

DARCY J MOORE Age:
372-64-xxxx issued in Michigan between 01/01/1971 and 12/31/1972
**Previous And Non-Verified Address(es):**
DARCY J MOORE - 💲422 E BENITA BLVD, VESTAL NY 13850-2623, BROOME COUNTY (Jul 1986 -
Dec 1990)

EDITH M MOORE  Age:
**Names Associated with Relative:**
EDITH S MOORE  DOB: 08/28/1933 Age: 71
**Active Address(es):**
EDITH S MOORE - ✔1505 DREXEL DR, VESTAL NY 13850-4014, BROOME COUNTY (Jun 1991 - Aug 2004)

MOORE VANCE R  (607) 722-3361

**Previous And Non-Verified Address(es):**
EDITH M MOORE - 35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY
(Feb 1997)
EDITH S MOORE - 1505 DREXEL DR, BINGHAMTON NY 01390 (Sep 1991 - Dec 1991)
EDITH S MOORE - 1505 DREXEL DR, BINGHAMTON NY 13903, BROOME COUNTY (Dec 1985 - Dec 1990)

**Possible Relative:**
ROBIN L MOORE DOB: 00/1968 Age: 36
     060-64-xxxx issued in New York between 01/01/1980 and 12/31/1981
     **Names Associated with Relative:**
     ROBIN LYNN MOORE DOB: 00/1969 Age: 35
          060-64-xxxx Issued in New York between 01/01/1980 and 12/31/1981
     ROBIN L WATERMAN DOB: 00/1969 Age: 35
          060-64-xxxx issued in New York between 01/01/1980 and 12/31/1981
     ROBIN LYNN WATERMAN DOB: 11/24/1968 Age: 35
          060-64-xxxx issued in New York between 01/01/1980 and 12/31/1981
     **Active Address(es):**
     ROBIN LYNN WATERMAN - 2 NEWTON AVE, BINGHAMTON NY 13903-1807, BROOME COUNTY
(Sep 1998 - Aug 2004)
          WATERMAN R  (607) 771-6195

     ROBIN LYNN WATERMAN - 222 E TEMPLE ST, OWEGO NY 13827-1425, TIOGA COUNTY
(May 2000 - Jun 2004)
          WATERMAN JEFF  (607) 687-6963

     **Previous And Non-Verified Address(es):**
     ROBIN L WATERMAN - 125 S MAIN ST, NEWARK VALLEY NY 13811-5727, TIOGA COUNTY (Feb 1991 -
Aug 2004)
     ROBIN L WATERMAN - PO BOX 2161, BINGHAMTON NY 13902-2161, BROOME COUNTY (Apr 2000)
     ROBIN LYNN WATERMAN - RR 1 BOX 1620, GREAT BEND PA 18821-9737, SUSQUEHANNA COUNTY
(Jun 1999 - Mar 2000)
     ROBIN L WATERMAN - PO BOX 411, BINGHAMTON NY 13902-0411, BROOME COUNTY (May 1999)
     ROBIN L WATERMAN - RR 1 BOX 137RH, HALLSTEAD PA 18822-9801, SUSQUEHANNA COUNTY
(Jul 1994 - Mar 1999)
     ROBIN L WATERMAN - 310 GRANT AVE APT 2N, ENDICOTT NY 13760-5462, BROOME COUNTY
(Sep 1991 - Jan 1999)
     ROBIN L WATERMAN - 137 RT 1 NR, HALLSTEAD PA 18822, SUSQUEHANNA COUNTY (Jul 1996 -
Jan 1997)
     ROBIN L WATERMAN - PO BOX 137, HALLSTEAD PA 18822-0137, SUSQUEHANNA COUNTY
(Jul 1995)
     ROBIN L WATERMAN - 1505 DREXEL DR, BINGHAMTON NY 13903, BROOME COUNTY (Mar 1994)
     ROBIN L WATERMAN - 1 RD APT, HALLSTEAD PA 18822, SUSQUEHANNA COUNTY (Jul 1993)
     ROBIN L WATERMAN - 504 W MAIN ST APT 18, ENDICOTT NY 13760-4680, BROOME COUNTY
(Nov 1990 - Dec 1992)
     ROBIN L WATERMAN - 1505 DREXEL DR, VESTAL NY 13850-4014, BROOME COUNTY (Jun 1991 -
Dec 1991)
     ROBIN L MOORE - 3 BOX 48, NEWARK VALLEY NY 13811, TIOGA COUNTY (Oct 1989)
     ROBIN WATERMAN - PO BOX 48, NEWARK VALLEY NY 13811-0048, TIOGA COUNTY (Sep 1989)

     **Possible Relative:**
     WATERMAN JEFF DOB: 04/1967 Age: 37
     133-60-xxxx issued in New York between 01/01/1978 and 12/31/1980
     **Names Associated with Relative:**
     JEFF D WATERMAN Age:
          133-60-xxxx issued in New York between 01/01/1978 and 12/31/1980
     JEFFERY D WATERMAN   Age:
     JEFFREY D WATERMAN DOB: 04/16/1967 Age: 37
          133-60-xxxx issued in New York between 01/01/1978 and 12/31/1980
     **Active Address(es):**

     JEFF D WATERMAN - 222 E TEMPLE ST, OWEGO NY 13827-1425, TIOGA COUNTY
(Jul 2000 - Aug 2004)
          WATERMAN JEFF  (607) 687-6963

     **Previous And Non-Verified Address(es):**
     WATERMAN JEFF - 2 NEWTON AVE, BINGHAMTON NY 13903-1807, BROOME COUNTY
(Jan 1999 - Jun 2004)

JEFFREY D WATERMAN - PO BOX 411, BINGHAMTON NY 13902-0411, BROOME COUNTY (Dec 1999 - Oct 2000)

JEFF D WATERMAN - 125 S MAIN ST, NEWARK VALLEY NY 13811-5727, TIOGA COUNTY (Apr 2000 - May 2000)

JEFFREY D WATERMAN - RR 1 BOX 1620, GREAT BEND PA 18821-9737, SUSQUEHANNA COUNTY (Mar 2000)

JEFFREY D WATERMAN - 1017 MAIN ST, DICKSON CITY PA 18519-1339, LACKAWANNA COUNTY (Nov 1999)

JEFFREY D WATERMAN - PO BOX 2161, BINGHAMTON NY 13902-2161, BROOME COUNTY (Sep 1999)

JEFFREY D WATERMAN - PO BOX 411, BINGHAMTON NY 13903-0411, BROOME COUNTY (Sep 1999)

JEFFREY D WATERMAN - 504 W MAIN ST # A 18, ENDICOTT NY 13760-4648, BROOME COUNTY (Oct 1990 - May 1998)

JEFFREY D WATERMAN - 324 HI VIEW FARM RD, NICHOLS NY 13812-2406, TIOGA COUNTY (May 1998)

JEFFREY D WATERMAN - 406 WINSTON CT APT 3, ITHACA NY 14850-1962, TOMPKINS COUNTY (May 1998)

JEFFREY D WATERMAN - RR 1 BOX 137, HALLSTEAD PA 18822-9801, SUSQUEHANNA COUNTY (Jun 1994 - May 1998)

JEFFREY D WATERMAN - 137 RT 1 NR, HALLSTEAD PA 18822, SUSQUEHANNA COUNTY (Aug 1996)

JEFFREY D WATERMAN - PO BOX 48, NEWARK VALLEY NY 13811-0048, TIOGA COUNTY (Mar 1994)

JEFFREY D WATERMAN - 310 GRANT AVE APT 2N, ENDICOTT NY 13760-5462, BROOME COUNTY (Dec 1991 - Dec 1992)

JEFFREY D WATERMAN - RR 3 BOX 48, NEWARK VALLEY NY 13811, TIOGA COUNTY (Dec 1985 - Dec 1990)

JEFFREY D WATERMAN - 3 BOX 48, NEWARK VALLEY NY 13811, TIOGA COUNTY (Dec 1988)

MARSHA A WATERMAN DOB: 03/22/1948 Age: 56
128-40-xxxx issued in New York between 01/01/1964 and 12/31/1967
**Previous And Non-Verified Address(es):**
MARSHA A WATERMAN - PO BOX 91, NEWARK VALLEY NY 13811-0091, TIOGA COUNTY (Dec 2002 - Aug 2004)

MARSHA A WATERMAN - 13 SILK ST, NEWARK VALLEY NY 13811-5701, TIOGA COUNTY (Jun 1998 - Jul 2003)

MARSHA A WATERMAN - RR 1 BOX 137, HALLSTEAD PA 18822-9801, SUSQUEHANNA COUNTY (Feb 1998 - Oct 2000)

MARSHA A WATERMAN - RR 3 BOX 48, NEWARK VALLEY NY 13811, TIOGA COUNTY (Oct 1984 - Jan 1999)

MARSHA A WATERMAN - 125 S MAIN ST, NEWARK VALLEY NY 13811-5727, TIOGA COUNTY (Jan 1988 - Jun 1998)

MARSHA A WATERMAN - PO BOX 48, NEWARK VALLEY NY 13811-0048, TIOGA COUNTY (Jan 1987 - Dec 1991)

MARSHA A WATERMAN - 92 E BEECHER HILL RD, OWEGO NY 13827-3440, TIOGA COUNTY (Dec 1990)

MICHELLE L BILLUPS DOB: 09/1962 Age: 42
089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
**Names Associated with Relative:**
MICHELLE L HAIGHE  Age:
MICHELLE L HAIGHT DOB: 09/18/1962 Age: 42
    089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
MMICHELLE HAIGHT Age:
    089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
MICHELLE L LAMEY DOB: 09/1962 Age: 42
    089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
MMICHELLE L LAMEY DOB: 09/01/1962 Age: 42
    089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
MICHELLE L LMEY  Age:
    089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
MICHELLE L WATERMAN DOB: 09/18/1962 Age: 42
    089-60-xxxx issued in New York between 01/01/1977 and 12/31/1979
**Previous And Non-Verified Address(es):**
MICHELLE L HAIGHT - 222 E TEMPLE ST, OWEGO NY 13827-1425, TIOGA COUNTY (Apr 2000 - Aug 2004)

MMICHELLE L LAMEY - 30 UNION ST APT 2, CORTLAND NY 13045-2957, CORTLAND COUNTY (Jun 2000 - Aug 2004)

MICHELLE L LAMEY - RR 1 BOX 1620, GREAT BEND PA 18821-9737, SUSQUEHANNA

COUNTY (Nov 1999 - Oct 2000)

       MICHELLE L LAMEY -  PO BOX 1620, GREAT BEND PA 18821, SUSQUEHANNA COUNTY
(Feb 2000)

       MICHELLE L LMEY -  BLDG 406, ITHACA NY 14850, TOMPKINS COUNTY (Jan 2000)

       MICHELLE L LAMEY - 2013 ALPHA CIR, CORTLAND NY 13045-9528, CORTLAND COUNTY
(Oct 1999)

       MMICHELLE L LAMEY - 1017 MAIN ST 1FL, DICKSON CITY PA 18519-1339, LACKAWANNA
COUNTY (Sep 1999)

       MMICHELLE L LAMEY -  PO BOX 411, BINGHAMTON NY 13902-0411, BROOME COUNTY
(Jul 1999)

       MICHELLE L LMEY - 406 WINSTON CT APT 3, ITHACA NY 14850-1962, TOMPKINS COUNTY
(Jul 1999)

       MICHELLE L HAIGHT - 60 DELAWARE AVE, CORTLAND NY 13045-3345, CORTLAND COUNTY
(Dec 1986 - Sep 1997)

       MICHELLE L LAMEY - 60 DELAWARE AVE, CLOCKVILLE NY 13043, MADISON COUNTY
(Aug 1994)

       MICHELLE L LAMEY - 14 DELAWARE AVE, CORTLAND NY 13045-3336, CORTLAND COUNTY
(Mar 1992)

       MICHELLE L BILLUPS - 88 MADISON ST, CORTLAND NY 13045-1702, CORTLAND COUNTY
(Jan 1988 - Apr 1988)

       MICHELLE L HAIGHT - 38 MADISON ST, CORTLAND NY 13045-2011, CORTLAND COUNTY
(Mar 1985 - Apr 1986)

       MICHELLE L HAIGHT - 100 TOMPKINS ST, CORTLAND NY 13045-2406, CORTLAND COUNTY
(Nov 1984 - Jan 1985)


     DOUGLAS G WATERMAN DOB: 04/10/1948 Age: 56

     059-42-xxxx issued in New York between 01/01/1965 and 12/31/1967

     **Previous And Non-Verified Address(es):**

       DOUGLAS G WATERMAN -  RR 2 BOX 85C, LE RAYSVILLE PA 18829-9627, BRADFORD
COUNTY (Feb 1996 - Aug 2004)

       DOUGLAS G WATERMAN - 125 S MAIN ST, NEWARK VALLEY NY 13811-5727, TIOGA
COUNTY (Jan 1988 - Oct 2000)

       DOUGLAS G WATERMAN -  PO BOX 104, TIOGA CENTER NY 13845-0104, TIOGA COUNTY
(Apr 2000)

       DOUGLAS G WATERMAN -  TABERNACLE RD, LE RAYSVILLE PA 18829, BRADFORD
COUNTY (Jan 1996)

       DOUGLAS G WATERMAN - 241 HICKORY ESTATES RD # 2D, OWEGO NY 13827, TIOGA
COUNTY (Mar 1994)

       DOUGLAS G WATERMAN - 241 HICKORY EST, OWEGO NY 13827, TIOGA COUNTY (Mar 1993)

       DOUGLAS G WATERMAN - RR 3 BOX 48, NEWARK VALLEY NY 13811, TIOGA COUNTY
(Oct 1984 - Dec 1992)

       DOUGLAS G WATERMAN - 92 E BEECHER HILL RD, OWEGO NY 13827-3440, TIOGA COUNTY
(Dec 1990 - Dec 1992)

       DOUGLAS G WATERMAN -  PO BOX 48, NEWARK VALLEY NY 13811-0048, TIOGA COUNTY
(Jan 1988 - Sep 1989)


     JENNIFER J HOYT DOB: 06/23/1970 Age: 34

     133-60-xxxx issued in New York between 01/01/1978 and 12/31/1980

     **Names Associated with Relative:**

     HOYT JENNIFER Age:

       133-60-xxxx issued in New York between 01/01/1978 and 12/31/1980

     JENNIFER J WATERMAN   DOB: 06/1970 Age: 34

     **Previous And Non-Verified Address(es):**

     JENNIFER J WATERMAN - 11 W JEFFERSON RD, PITTSFORD NY 14534-1901, MONROE
COUNTY (Aug 2002 - Aug 2004)

       JENNIFER WATERMAN - 143 KEHRS MILL BEND DR, BALLWIN MO 63011-3277, ST. LOUIS
COUNTY (Jan 2003)

       JENNIFER J WATERMAN - 1277 PINECREST LN APT B, BALLWIN MO 63021-5468, ST. LOUIS
COUNTY (Jan 2003)

       JENNIFER J WATERMAN - 25 SWAN TRL, FAIRPORT NY 14450-3323, MONROE COUNTY
(Sep 2001 - Aug 2002)

       JENNIFER J WATERMAN -  PO BOX 16544, ROCHESTER NY 14616-0544, MONROE COUNTY
(Jan 2002 - Jun 2002)

       JENNIFER J WATERMAN - 6011 ALLEN PADGHAM RD, FARMINGTON NY 14425-
7011, ONTARIO COUNTY (May 1998 - Sep 2001)

       JENNIFER J WATERMAN - 125 S MAIN ST, NEWARK VALLEY NY 13811-5727, TIOGA COUNTY
(Aug 1988 - Oct 2000)

       JENNIFER J WATERMAN - 32 PINECREST DR # B, ROCHESTER NY 14617-2223, MONROE
COUNTY (Apr 2000)

       JENNIFER J WATERMAN - 93 DEVONSHIRE CIR, PENFIELD NY 14526-2664, MONROE

COUNTY (Feb 1999 - Feb 2000)
       JENNIFER J WATERMAN - 1277B PINE LN, MANCHESTER MO 63021, ST. LOUIS COUNTY
(Mar 1995)
       JENNIFER J WATERMAN - 32 BROOK HILL LN APT B, ROCHESTER NY 14625-2247, MONROE
COUNTY (Mar 1994)
       JENNIFER J WATERMAN -  RR 3 BOX 48, NEWARK VALLEY NY 13811, TIOGA COUNTY
(Oct 1989 - Dec 1992)
       JENNIFER J WATERMAN -  PO BOX 48, NEWARK VALLEY NY 13811-0048, TIOGA COUNTY
(Aug 1988)

    JULIANN R ANGELONE DOB: 10/30/1974 Age: 29
     132-60-xxxx issued in New York between 01/01/1978 and 12/31/1980
     **Names Associated with Relative:**
     JULIANN R WATERMAN DOB: 10/1974 Age: 29
      132-60-xxxx issued in New York between 01/01/1978 and 12/31/1980
     **Previous And Non-Verified Address(es):**
     JULIANN R WATERMAN - 125 S MAIN ST # 48, NEWARK VALLEY NY 13811-5727, TIOGA
COUNTY (Oct 1992 - Aug 2004)
     JULIANN R WATERMAN - 27 CEDAR ST APT 3, BINGHAMTON NY 13905-3647, BROOME
COUNTY (Jun 1996 - Oct 2000)
     JULIANN R WATERMAN - 550 E MAIN ST, OWEGO NY 13827-1220, TIOGA COUNTY
(Dec 1997 - Jan 1999)
       JULIANN R ANGELONE - 27 1/2 CEDAR ST, BINGHAMTON NY 13905-3610, BROOME COUNTY
(Nov 1997)

    ROBIN WATERMAN Age:
     060-64-xxxx issued in New York between 01/01/1980 and 12/31/1981
     **Previous And Non-Verified Address(es):**
     ROBIN WATERMAN - 125 S MAIN ST, NEWARK VALLEY NY 13811-5727, TIOGA COUNTY
(Jun 2004 - Aug 2004)

   VANCE MOORE JR   Age:
    **Names Associated with Relative:**
    VANCE R MOORE SR DOB: 07/22/1932 Age: 72
     070-22-xxxx issued in New York between 01/01/1936 and 01/01/1951
    **Active Address(es):**
    VANCE R MOORE SR - ✔1505 DREXEL DR, VESTAL NY 13850-4014, BROOME COUNTY (Jan 1991 -
Aug 2004)
      **Current phones listed at this address:**
       MOORE VANCE R  (607) 722-1683
       MOORE VANCE R  (607) 722-3361

    VANCE R MOORE SR - ✔1505 DREXEL DR, BINGHAMTON NY 13902, BROOME COUNTY (Apr 1985 -
Oct 2000)
      **Current phones listed at this address:**
       MOORE VANCE R  (607) 722-1683
       MOORE VANCE R  (607) 722-3361

    **Possible Relative:**
    DARCY MOORE   Age:
     **Previous And Non-Verified Address(es):**
     DARCY MOORE - 1505 DREXEL ST, BINGHAMTON NY 13903, BROOME COUNTY (Jul 1994)

  VANCE MOORE Age:
   593-38-xxxx issued in Florida between 01/01/1986 and 12/31/1986
   **Previous And Non-Verified Address(es):**
   VANCE MOORE - ▨301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY (Jan 1997)

  VANLE MOORE  Age:
   **Previous And Non-Verified Address(es):**
   VANLE MOORE - ▨7740 LAVON DR, CLARKSTON MI 48348-4330, OAKLAND COUNTY (Jan 1988)

# Neighbors:
  **Neighborhood:**
   301 RICHEY RD, LEESBURG FL 34748-8582, LAKE COUNTY
    **Current phones listed at this address:**

(000) 355-3772
BEST LAB DEALS INC  (352) 728-1115
FAMILY KARATE CENTER  (352) 365-0744
CHECK WATCHERS INC  (352) 360-2638
HARVEST TECHNOLOGIES LLC  (352) 326-5333
MULTI TECH PRODUCTIONS  (352) 326-4002
FIRST AMERICA FUNDING  (352) 315-0773
ATM FINANCIAL SERVICES  (352) 314-2214


**Address(es):**

✔200 RICHEY RD, LEESBURG FL 34748-9728, LAKE COUNTY
   MASONIC LODGE LEESBURG NO 58 F & A M  (352) 787-5696


✔421 RICHEY RD, LEESBURG FL 34748-8563, LAKE COUNTY (Sep 2001 - Sep 2002)
   **Residents:**
      JAMES CLAYTON LEE DOB: 08/03/1935 Age: 69
         267-44-xxxx issued in Florida between 01/01/1936 and 01/01/1951
      JUNE N LEE Age:
         273-20-xxxx issued in Ohio between 01/01/1936 and 01/01/1951
      JUNE DELONG LEE  DOB: 03/10/1924 Age: 80
   LEE JAMES C  (352) 787-3794


✔431 RICHEY RD, LEESBURG FL 34748-8563, LAKE COUNTY
   **Residents:**
      APRIL PARKER RICHEY DOB: 05/07/1961 Age: 43
         261-27-xxxx issued in Florida between 01/01/1970 and 12/31/1970
      JUSTIN TYLER RICHEY DOB: 01/09/1984 Age: 20
         591-92-xxxx issued in Florida between 01/01/1990 and 12/31/1990
      THOMAS W RICHEY  Age:
   RICHEY THOMAS W & APRIL  (352) 728-2227


✔445 RICHEY RD, LEESBURG FL 34748-8563, LAKE COUNTY (Aug 1999 - 2003)
   **Residents:**
      DANNY SIMMONS Age:
         267-98-xxxx issued in Florida between 01/01/1965 and 12/31/1966
      DEBRA SHOOP SIMMONS DOB: 09/04/1952 Age: 52
         266-02-xxxx issued in Florida between 01/01/1966 and 12/31/1966
      LUTHER D SIMMONS  Age:
   SIMMONS DANNY  (352) 728-1057

**Neighborhood:**
   35414 OLD LAKE UNITY RD, FRUITLAND PARK FL 34731-6215, LAKE COUNTY (Apr 1996 - Aug 2002)


**Address(es):**

✔35415 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6232, LAKE COUNTY (Aug 2004)
   **Residents:**
      BRANDON L MOUNCE Age:
         239-69-xxxx issued in North Carolina between 01/01/1991 and 12/31/1991
      BUEY MOUNCE JR  Age:
      CRYSTAL EVE MOUNCE  DOB: 05/06/1985 Age: 19
   MOUNCE BUEY JR  (352) 638-9074


✔35423 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6232, LAKE COUNTY
   **Residents:**
      CARMEN J FALCON DOB: 02/21/1967 Age: 37
         261-55-xxxx issued in Florida between 01/01/1974 and 12/31/1974
      FLOR M FALCON DOB: 00/1940 Age: 64
         088-48-xxxx issued in New York between 01/01/1970 and 12/31/1971
      FLORA M FALCON DOB: 11/1939 Age: 64
         088-48-xxxx issued in New York between 01/01/1970 and 12/31/1971
      GUILLERMO JESUS FALCON DOB: 09/12/1962 Age: 42
         264-67-xxxx issued in Florida between 01/01/1975 and 12/31/1976
      GUILLERMO D FALCON  DOB: 09/12/1962 Age: 42
      GUILLERMO J FALCON  Age:
      JOYCE FALCON  Age:

FALCON JOYCE  (352) 323-8428

✓35429 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6232, LAKE COUNTY (Sep 1995 - Aug 2004)
   **Residents:**
      CORBITT SCHURMAN TODD DOB: 05/29/1967 Age: 37
         261-39-xxxx Issued in Florida between 01/01/1972 and 12/31/1973
      NICOLE MARIE TODD DOB: 07/05/1972 Age: 32
         593-50-xxxx issued in Florida between 01/01/1987 and 12/31/1987

✓35437 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6232, LAKE COUNTY (Feb 1995 - Aug 2004)
   **Residents:**
      AUDRA DEANN PARTIN DOB: 01/07/1972 Age: 32
         591-44-xxxx issued in Florida between 01/01/1986 and 12/31/1987
      AUDRA BRASHER PARTIN  DOB: 01/07/1972 Age: 32
      AUDRA D PARTIN  Age:
      EDWARD EUGENE PARTIN JR DOB: 11/22/1970 Age: 33
         591-16-xxxx issued in Florida between 01/01/1982 and 12/31/1983

✓35349 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6216, LAKE COUNTY (Jan 2000 - Aug 2004)
   **Residents:**
      ROBERT T TURNER DOB: 04/25/1964 Age: 40
         126-62-xxxx issued in New York between 01/01/1979 and 12/31/1981
      T TURNER  Age:
      TINA MARIE TURNER DOB: 09/05/1967 Age: 37
         593-18-xxxx issued in Florida between 01/01/1983 and 12/31/1983
      TURNER T (352) 314-0549

✓35343 OLD LAKE UNITY RD, FRUITLAND PK FL 34731-6216, LAKE COUNTY (Jan 2004 - Apr 2004)
      JUSTIN ANTHONY MOUSER  DOB: 12/20/1979 Age: 24
      MOUSER JUSTIN  (352) 787-3844

**Neighborhood:**
  3650 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY (Jan 2001 - Aug 2004)
   **Residents:**
      ANNA VLAHOS THEODOROPOULOS DOB: 12/06/1945 Age: 58
         593-08-xxxx issued in Florida between 01/01/1991 and 12/31/1991
      ANNE THEODOROPOULOS DOB: 12/06/1945 Age: 58
         593-08-xxxx issued in Florida between 01/01/1991 and 12/31/1991
      PAUL THEODOROPOULOS  DOB: 01/21/1939 Age: 65
   **Current phones listed at this address:**
      (000) 778-5023
      THEODOROPOULOS PAUL (352) 750-5019

**Address(es):**
✓3635 STEPHEN RD, LADY LAKE FL 32159-5328, LAKE COUNTY ( 2003 - May 2003)
   **Residents:**
      ARTHUR GENE MCDONALD DOB: 10/08/1951 Age: 52
         007-52-xxxx issued in Maine between 01/01/1967 and 12/31/1968
      BERNADET E MCDONALD Age:
         004-54-xxxx issued in Maine between 01/01/1967 and 12/31/1968
      BERNADETTE MCDONALD  Age:
      MCDONALD ARTHUR & BERNADETTE (352) 753-0693

✓3617 STEPHEN RD, LADY LAKE FL 32159-5328, LAKE COUNTY
   **Residents:**
      BIENN E WHITTINGTON DOB: 10/1954 Age: 49
         252-94-xxxx issued in Georgia between 01/01/1969 and 12/31/1970
      BRENDA J WHITTINGTON DOB: 03/02/1952 Age: 52
         264-06-xxxx issued in Florida between 01/01/1966 and 12/31/1966
      BRENDA SMITH WHITTINGTON  DOB: 03/02/1952 Age: 52
      BRENDA E WHITTINGTON  DOB: 03/02/1952 Age: 52
      BRENDA J WHITTINGTON  Age:
      GLENN E WHITTINGTON  Age:
      WHITTINGTON GLENN E & BRENDA (352) 753-3142

✔3616 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY
  **Residents:**
      KELLY P PEEKS DOB: 03/26/1961 Age: 43
          463-17-xxxx issued in Texas between 01/01/1973 and 12/31/1973
      MICHELE PEEKS  Age:
  PEEKS KELLY & MICHELE  (352) 259-6783

✔3710 STEPHEN RD, LADY LAKE FL 32159-5327, LAKE COUNTY
  **Residents:**
      JEREMY DEAN HOORNSTRA  DOB: 02/11/1981 Age: 23
      JOHN EDWARD HOORNSTRA DOB: 05/25/1954 Age: 50
          263-19-xxxx issued in Florida between 01/01/1969 and 12/31/1969
      K E HOORNSTRA  Age:
  HOORNSTRA K E  (352) 750-3988

✔3711 STEPHEN RD, LADY LAKE FL 32159-5328, LAKE COUNTY
  **Residents:**
      DONALD PAGE MONTGOMERY DOB: 01/29/1944 Age: 60
          265-62-xxxx issued in Florida between 01/01/1957 and 12/31/1958
      JO MONTGOMERY  Age:
      ROCHELLE MONTGOMERY  Age:
  MONTGOMERY DONALD P & ROCHELLE  (352) 753-3711

**Neighborhood:**
  490510 POB 490510, LEESBURG FL 34749, LAKE COUNTY (Mar 2001 - Sep 2001)

# EXHIBIT C

[RSKO Draft – 1/7/05]

<u>MANAGEMENT AGREEMENT</u>

THIS MANAGEMENT AGREEMENT, dated as of January 1, 2005 (together with the exhibits attached hereto, this "<u>Agreement</u>"), is made and entered into by and between Greywolf Holdings LP, a limited partnership organized under the laws of Delaware (the "<u>Company</u>") and Robert Ong, an individual (the "<u>Manager</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, the Company wishes to engage the Manager to, among other things, manage the day to day operations of the Company, and assist the Company in identifying, analyzing, acquiring and maintaining Automated Teller Machines ("<u>ATMs</u>") in accordance with the Investment Policy, and the Manager is willing to accept this engagement on the terms and conditions herein set forth; and

WHEREAS, capitalized terms used herein without definition shall have the respective meanings assigned to them in Section 19 of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements of the parties as herein set forth, the parties agree as follows:

1. <u>APPOINTMENT AND DUTIES OF THE MANAGER</u>.

(a) <u>Appointment</u>.  Subject to the terms and conditions of this Agreement, the Company hereby appoints the Manager, and the Manager hereby accepts such appointment, to assist the Company in performing the duties set forth in Section 1(b) hereof (the "<u>Duties</u>").

(b) <u>Duties</u>.  Subject to the terms and conditions of this Agreement, including the notice and approval procedures set forth in Section 2 hereof, the Manager hereby agrees to render the following services:

(i) manage, operate and administer the day to day operations of the Company;

(ii) identify, analyze, acquire, operate, maintain and manage ATMs in a manner consistent with the Investment Policy;

(iii) conduct due diligence concerning ATMs suitable for purchase by the Company in accordance with the Investment Policy;

(iv) (A) negotiate with third parties on behalf of the Company concerning the acquisition of ATMs, (B) assist with the preparation and negotiation of any relevant transaction documents, including without limitation, confidentiality agreements, term

sheets, letters of intent, exclusivity letters, definitive transaction documents and other relevant documents, and (C) assist with closing and consummating such acquisitions on behalf of the Company (ATMs acquired by the Company that were sourced by the Manager under this Agreement are referred to herein as "ATM Investments");

(v) (A) evaluate existing ATM Investments and (B) seek, identify, analyze, screen, and recommend to the Company technical, commercial and/or financial enhancements for existing ATM Investments, including opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs in the Investment Portfolio;

(vi) (A) seek disposition opportunities for ATM Investments consistent with the Investment Policy, (B) conduct due diligence concerning dispositions of ATM Investments, (C) negotiate with third parties on behalf of the Company concerning such dispositions, (D) close and consummate such dispositions on behalf of the Company, and (E) perform the foregoing services set forth in this Section 1(b)(vi) so as to efficiently and optimally liquidate or otherwise dispose of the Investment Portfolio on or prior to the Termination Date; and

(vii) provide such reports on the activities of the Manager under this Agreement as the Company may from time to time request.

(c) Standard of Performance. The Manager agrees to perform his duties and obligations hereunder pursuant to the standard of care, skill and diligence such as would normally be provided by an experienced professional in like circumstances engaged with similar responsibilities. The Manager agrees to devote such portion of his working time as is reasonably necessary or advisable to fulfill his Duties hereunder.

2. INVESTMENT PROCESS.

(a) Authority of Manager. Subject to the terms of the LP Agreement and this Agreement (including without limitation, Sections 2(f), 2(g) and 5 hereof), the Manager shall have the responsibility and authority to manage the day to day operations of the Company in accordance with, and in furtherance of, the Investment Policy.

(b) Investment Notice and Memorandum. The Manager shall promptly provide notice to the Company of relevant information concerning each ATM proposed to be acquired by the Company (each, an "Investment Opportunity"), including its location, purchase price, financial and operational history, any conflicts of interest (as required under Section 1(e)) and such other information as the Manager or General Partner may deem relevant or appropriate (the "Investment Notice"). Upon the General Partner's request, the Manager may also be required to prepare a report concerning ATMs in the Investment Portfolio or ATMs proposed to be acquired ("Investment Memorandum"). The Investment

-2-

Memorandum shall include, to the extent reasonably available, the following information and documents:

(i) a description of the Investment Opportunity, including the investment case, key risks, target returns, historical costs and cash flows and historical maintenance, reliability and operational information;

(ii) a proposed timetable for the transaction;

(iii) any bid package, term sheet, letter of intent, exclusivity letter, purchase agreement or similar document with respect to the proposed investment;

(iv) any interests of the Manager, the Manager's Agents, the Manager's Affiliates or such Affiliates' Agents with respect to an Investment Opportunity, an ATM Investment, or any party to a proposed acquisition or disposition of an ATM Investment, including without limitation, any interest in the foregoing that is managed, held, controlled or beneficially owned by the Manager or his Affiliates.

(v) projected costs, budgets and statements of cash flow for the proposed investment and pricing assessments;

(vi) drafts of the proposed purchase or acquisition agreements to be entered into by the Company; and

(vii) an assessment of possible exit strategies for the Company if it were to participate in the proposed investment.

(c) Technical, Commercial and Financial Enhancements. At the Company's request, the Manager will (i) prepare reports analyzing and making recommendations concerning possible technical, commercial and/or financial enhancements for existing ATM Investments, and (ii) assist the Company in implementing recommended technical, commercial and/or financial enhancements for existing ATM Investments, including without limitation, opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs.

(d) Dispositions. The Manager will seek disposition opportunities for existing ATM Investments. In the event that the Manager identifies an opportunity to sell or otherwise dispose of an ATM Investment, at the Company's request, (i) the Manager shall prepare a report in connection with such proposed disposition containing information relevant to the proposed transaction similar in format to that set forth in Section 2(b) above and (ii) shall assist in analyzing, evaluating, negotiating and preparing documentation for such disposition.

NY284047.10/1927-00031

(e) <u>Conflicts</u>.  The Manager agrees that it shall have an on-going duty during the Term of this Agreement to promptly advise the Company of any conflicts or potential conflicts of interest involving the Manager, the Manager's Agents, the Manager's Affiliates or the Agents of such Affiliates, including conflicts of the types described in Section 2(b)(iv), whenever such conflicts arise, may reasonably be expected to arise and, in any event, prior to the Company entering into any transaction involving such conflict or potential conflict.  A conflict of interest disclosed by the Manager to the Company pursuant to this Section 2 is herein referred to as a "<u>Disclosed Conflict</u>".

(f) <u>General Partner Has Sole Authority</u>.  Notwithstanding anything to the contrary herein, the General Partner shall have the sole authority and discretion, on behalf of the Company, to (i) determine whether or not to consummate an investment in an Investment Opportunity or a disposition of an ATM Investment; and (ii) enter into or deliver binding or definitive agreements pertaining to any Investment Opportunity or ATM Investment, including without limitation, any confidentiality agreements, term sheets, letters of intent, purchase agreements, or similar agreements binding upon the Company.

(g) <u>Company Accounts</u>.  The parties hereby agree that the Commitment Amount and any and all income, payments, credits and other cash receipts received by the Company, whether from ATM Investments or any other source, shall be deposited into one or more accounts designated by the General Partner, which account(s) shall be under the sole control and authority of the General Partner ("<u>Company Accounts</u>").  Furthermore, the parties hereby agree that the Manager shall have no access, power or authority (x) with respect to any cash or other funds deposited into Company Accounts, or (y) to invest, spend, or otherwise use any such funds without the specific prior written consent of the General Partner.

## 3.  REPRESENTATIONS AND WARRANTIES OF THE MANAGER.

The Manager hereby represents, warrants and covenants to the Company as follows:

(a) The Manager has and shall have the legal power and authority to carry on the business and to perform the Duties set forth herein. The execution and delivery of this Agreement has been duly authorized by all necessary legal action by the Manager, and no further action is necessary to make this Agreement valid and binding upon the Manager.  The execution, delivery and performance of this Agreement will not violate any agreement, document, organizational document, law or court order binding upon the Manager.

(b) The Manager has the requisite skill, experience and resources to fully perform his Duties as required hereunder.

(c) None of the Manager, his Affiliates or his Agents performing, or expected to perform, any services under this Agreement has been convicted of any crime, been

-4-

found by any court to have violated any law or entered into any plea of guilty or nolo contendre to any criminal charge (other than in each such case with respect to minor traffic matters) or been subject to any suit alleging fraud, gross negligence or any crime, other than suits dismissed with prejudice or otherwise resolved in such party's favor.

4. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company hereby represents, warrants and covenants to the Manager as follows:

(a) The Company is a limited partnership validly existing and in good standing under the laws of the State of Delaware and has and shall have the partnership power and authority to carry on the business contemplated herein. The execution and delivery of this Agreement by the Company has been duly authorized by all necessary partnership and other action, and no further partnership or other action is necessary to make this Agreement valid and binding upon the Company. The execution, delivery and performance of this Agreement will not violate any agreement, document, organizational document, law or court order binding upon the Company.

(b) The Company has full authority to make ATM Investments as contemplated by this Agreement.

(c) None of the Company, its general partner, or any principals of the Company or its general partner has been convicted of any crime, been found by any court to have violated any law or entered into any plea of guilty or nolo contendre to any criminal charge (other than in each such case with respect to minor traffic matters) or been subject to any suit alleging fraud, gross negligence or any crime, other than suits dismissed with prejudice or otherwise resolved in such party's favor.

5. NO AUTHORITY TO ACT OR CONTRACT FOR COMPANY.

The Manager is not authorized to contract for or bind the Company in any way, or to enter into, execute or deliver on behalf of the Company any agreements or instruments, regardless of whether or not such agreements or instruments constitute a binding offer, agreement or legal commitment of the Company. The Manager shall not represent to any third party that it has any authority to act or contract for the Company.

6. NO DELEGATION OF DUTIES.

The rights, duties and obligations of the Manager set forth herein may not be delegated or assigned to any Affiliate, Agent or other third party without the express prior written consent of the Company.

NY284047.10/1927-00031

7. EXPENSES.

(a) Other than as provided in Sections 7(b) and 7(c), the Manager shall be responsible for all expenses incurred by the Manager, his Agents and their Affiliates in the performance of the Manager's duties and obligations hereunder, including without limitation, any and all expenses relating to the performance of the Manager's duties and obligations set forth in Sections 1 and 2, the Manager's personnel (including with respect to compensation and benefits), office rental, overhead, utilities, stationery, insurance, regulatory and legal compliance, and tax expenses.

(b) Upon presentation of receipts or similar documentation, the Company shall reimburse the Manager for reasonable out-of-pocket expenses of the following types incurred by the Manager in connection with his performance under this Agreement, provided that such expenses are pre-approved by the General Partner:

(i) all reasonable, out-of-pocket travel and lodging costs incurred in connection with performing his duties pursuant to Section 1(b).

(c) Unless specifically pre-approved by the Company in writing, the Manager shall not be entitled to reimbursement for any third party legal, accounting, Management, or other expenses incurred by the Manager, his Agents or their Affiliates in the performance of this Agreement.

8. MANAGEMENT FEE AND INCENTIVE COMPENSATION.

(a) Management Fee. During the Term of this Agreement, the Company shall pay to the Manager a fee for the services to be rendered hereunder as follows (collectively, the "Management Fee"): (i) within 5 business days of the first day of a given quarter, the Manager shall receive a fee in an amount equal to one-half of one percent (0.50%) of the Beginning NAV for such quarter; and (ii) concurrently with each Draw Down of the Commitment Amount, the Manager shall receive a fee in an amount equal to the product of (x) the amount of such Draw Down, multiplied by (y) the Pro Rata Draw Down Factor calculated as of such date.

(b) Incentive Compensation. During the Term of this Agreement, in addition to the Management Fee, the Company will issue to the Manager, if earned, an incentive fee based on the Profits received by the Company during the relevant calendar year, in the amount and manner and subject to the terms and restrictions set forth in Exhibit B (the "Incentive Fee Schedule").

(c) Termination Date. For the avoidance of doubt, no Management Fee or Incentive Fee shall be payable to the Manager at any time after the Termination Date.

9. LIMITATION ON LIABILITY; INDEMNITY.

NY284047.10/1927-00031

(a) As used in this Section 9, the term "Manager" and "Company" shall include directors, general and limited partners, members, managers, officers, employees, agents, and Affiliates of such entity as well as the entity itself.

(b) The Manager may rely on any powers of attorney, certified charter documents, certificates of government authorities, certified resolutions, incumbency certificate, and any other properly certified legal existence, authority, or incumbency document reasonably believed by it to be genuine and to have been signed or presented by the proper person. The Manager need not investigate any fact or matter stated in any such document.

(c) Manager agrees to promptly advise the General Partner if Manager believes any action requested by the Company or the General Partner would be inconsistent with applicable laws and regulations.

(d) The Company shall indemnify and hold harmless each of the Manager, his Affiliates, employees, and Agents (together, the "Manager Indemnified Persons") from and against any and all third-party actions, suits, proceedings, claims, damages, settlement payments, losses, and liabilities arising in connection with Manager's performance under this Agreement, to the maximum extent permitted by Delaware law, unless they result from (i) such Manager Indemnified Person's breach of this Agreement, bad faith, gross negligence, fraud, or willful misconduct in the performance of such Manager Indemnified Person's duties under this Agreement or (ii) any Manager Indemnified Person acting beyond the scope of its authority under this Agreement.

(e) The Manager shall indemnify and hold harmless the Company, its Affiliates, and the general and limited partners, members, directors, managers, officers, employees, and Agents of the Company and its Affiliates (together, the "Company Indemnified Persons") from and against any and all third-party actions, suits, proceedings, claims, damages, settlement payments, losses, and liabilities arising in connection with (i) breach of this Agreement by the Manager, his Agents or their Affiliates, (ii) the bad faith, gross negligence, fraud, or willful misconduct of the Manager, his Agents or their Affiliates or (iii) the Manager, his Agents or their Affiliates acting beyond the scope of their authority under this Agreement.

(f) The Company may, in the sole discretion of the General Partner, advance to any Manager Indemnified Person amounts to cover expenses incurred by such Manager Indemnified Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Manager Indemnified Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that the Manager Indemnified Person is not entitled to be indemnified hereunder.

10.  OTHER ACTIVITIES OF THE MANAGER.

-7-

(a) Other Activities. The Manager and his Affiliates may acquire, operate and/or manage ATMs for third parties or for the Manager's own account, provided that the Manager shall not (i) provide investment advice, identification, sourcing, advisory, Management or other services to another person that fall within the scope of the Duties or the Investment Policy prior to the date on which the entire Commitment Amount is fully invested in accordance with the Investment Policy ("Fully Invested Date"), (ii) refer to any party other than the Company any investment opportunity that falls within the scope of the Investment Policy prior to the Fully Invested Date, or (iii) sell, liquidate or otherwise dispose of any ATMs for any third party or for the Manager's own account prior to the Termination Date. Notwithstanding the foregoing, during the Term of this Agreement, the Manager shall be permitted to sell or dispose of up to twenty (20) ATMs during any calendar year for his own account.

11. TERM.

(a) Term. This Agreement shall commence on January 1, 2005 (the "Commencement Date"), and shall continue until the later of (i) the fifth (5th) anniversary of the Commencement Date (the "Interim Period") and (ii) the date on which the Company disposes of all ATMs in its Investment Portfolio that were acquired with the Manager's assistance pursuant to this Agreement. Notwithstanding the foregoing, the Term of this Agreement may be extended as provided in Section 11(c), provided that this Agreement may be terminated at any time by action of the Company as provided in Section 11(b). When exercising any rights under Section 11(b)(i) to terminate this Agreement, the Company shall give the Manager 30 calendar days prior notice of such termination, and any such termination pursuant to Section 11(b)(i) shall only become effective at the close of business in New York, New York on the 30th day following the date on which the Manager receives such notice, or such later termination date as may be specified in such notice. Upon any termination of this Agreement pursuant to Section 11(b), all authorities and duties of the Manager under this Agreement shall, except as otherwise provided in this Section 11, terminate. The termination date of this Agreement is herein referred to as the "Termination Date", and the period from the Commencement Date to the Termination Date is herein referred to as the "Term".

(b) Early Termination. The Company may terminate this Agreement at any time if the Manager has (i) breached in any material respect any term of this Agreement and failed to cure such breach within 30 days after notice thereof from the Company, (ii) engaged in any fraud, gross negligence or willful misconduct in relation to the Company, (iii) been charged with, convicted of, or entered a guilty plea or plea of nolo contendre with respect to, a felony or other crime involving dishonesty, (iv) commenced any voluntary bankruptcy, dissolution, or insolvency proceeding, (v) consented to, or failed to promptly contest, any involuntary bankruptcy, dissolution, or insolvency proceeding commenced by other parties, or (vi) become subject to any bankruptcy, dissolution, or insolvency proceeding that is not dismissed within 60 days.

-8-

(c) <u>Extension</u>.    The parties may by mutual agreement extend the term of this Agreement beyond the Interim Period for any such extension of the term.

(d) Termination of this Agreement shall not affect the rights of the Manager (i) to reimbursement under Section 7 of applicable costs and expenses incurred through the Termination Date; (ii) to receive under Section 8(a) any Management Fee accrued through the Termination Date; or (iii) to receive any Incentive Fee distributable under Section 8(b) calculated through the Termination Date.

(e) Promptly after the Termination Date, the Manager shall hand over to the Company or its designee all confidential information of the Company and all books of account, correspondence, and records of the Company that are in its possession or control, including any documentation relating to Company ATM Investments.

(f) Termination of this Agreement shall not affect the rights of the Company or the Manager under Section 9.

(g) Section 16 shall survive any termination of this Agreement.

12. <u>ADDITIONAL COVENANTS</u>.

(a) The Manager shall at any time during business hours permit any duly authorized representative or Agent of the General Partner to inspect any and all systems, procedures, records and documents of the Manager or any person to whom the Manager has delegated any or all of its functions, powers, discretions, Duties and obligations hereunder and shall give any such representative or Agent all information, explanations or assistance as such representative or Agent may reasonably require.

(b) The Manager shall meet with any duly authorized representative or Agent of the General Partner at such reasonable times as the General Partner may require to review and report on matters arising in connection with the services provided under this Agreement and to answer such questions as such persons may have.

(c) The Manager undertakes that he: (i) possesses and will continue to possess all authorizations from any relevant regulatory body (together the "<u>Regulators</u>") that are necessary or requisite to enable him fully and effectively to discharge his obligations under this Agreement and will immediately notify the General Partner of any alteration to its authorization which affects its ability to perform its obligations under this Agreement; (ii) will, at all times, comply with applicable legislation, statutory instruments and the rules and regulations of the Regulators as from time to time in force insofar as they relate to the performance of his obligations under this Agreement (together the "<u>Legislation and Regulations</u>"); and (iii) will not knowingly or recklessly do or omit to do anything that would cause the General Partner to be in breach of the Legislation and Regulations.

-9-

(d) The Manager undertakes promptly to notify the General Partner of any event which affects the Manager's ability to perform his Duties or obligations under this Agreement or which may result in the Manager's ability being so affected, or if a breach of any material provision of this Agreement occurs or is likely to occur. The Manager further undertakes promptly to do all such things as may reasonably be required by the General Partner or otherwise take all necessary steps to remedy or prevent such a breach.

(e) In the event that any third party fails to deliver any necessary documents, or pay any amount due, or otherwise settle a transaction within a reasonable period, so that the Manager decides the third party is in breach of its obligations to the Company, the Manager will notify the General Partner forthwith and, at the option of the General Partner, pursue all appropriate legal remedies against the third party to settle the transaction or recover compensation in lieu therefor in accordance with the General Partner's instructions or assist the General Partner to pursue all such remedies. The costs and expenses properly incurred by the Manager in connection with the pursuit of such remedies shall be agreed in advance by the General Partner on behalf of the Company, and thereafter may be invoiced to the Company.

13. NOTICES.

Any notices, requests, and other communications under this Agreement shall be in writing, shall be sent via overnight courier service, facsimile transmission, or registered or certified mail (postage prepaid and return receipt requested), and will be deemed to have been received upon delivery to the address of the recipient party set forth on the signature page of this Agreement or to any other address that such party shall have designated in a notice to the other party.

14. RELATIONSHIP OF THE PARTIES.

This Agreement does not constitute a general agency, partnership or employer-employee relationship. The Manager is an independent contractor in respect of the activities contemplated in this Agreement. The Manager shall not be considered an agent or legal representative of the Company (or any Affiliate thereof) for any purpose, and neither the Manager nor any subcontractor, agent, employee or Affiliate of the Manager shall be, or be considered, an agent or employee of the Company (or any Affiliate thereof).

15. RESERVED.

16. CONFIDENTIALITY.

(a) For purposes of this Section 16, (i) "Confidential Material of the Company" means any and all non-public or proprietary information or material of the Company that is provided by or on behalf of the Company to the Manager or that is developed under the

-10-

terms of this Agreement; and (ii) "Confidential Material" means any Confidential Material of the Company or Confidential Material of the Manager.

(b) For purposes of this Agreement, "Agents" means with respect to any party its employees, agents, and professional advisors, provided that the Manager shall not be considered an Agent of the Company.

(c) The Manager shall not, and he shall cause his Agents not to, (i) release or disclose any Confidential Material of the Company to any person other than the Manager, his Agents, the Company, the general and limited partners of the Company, or the Company's service providers; or (ii) use any Confidential Material of the Company for the benefit of any person other than the Company.

(d) Nothing contained herein shall prevent any party from releasing or disclosing Confidential Material (i) to its financial, accounting, legal or other advisors or its independent auditors, (ii) to third parties as required under applicable laws, rules or regulations or by order of any court or governmental authority or self-regulatory organization, or (iii) that has become public through no fault of such party or its Agents.

(e) In the event the Company, the Manager or any of their Agents receives a request to disclose any Confidential Material under the terms of a subpoena, order, or other process issued by a court or other government agency (a "Request"), the party that received the Request shall (i) immediately notify the other party of the Request, and, (ii) if, in the opinion of such receiving party's counsel, disclosure of Confidential Material is legally required pursuant to the Request, disclose only so much of the Confidential Material as such receiving party is legally required to disclose and advise the other party of such disclosure as far in advance as is reasonably possible.

17. MISCELLANEOUS.

(a) Neither party may assign or transfer its rights or obligations hereunder without the prior written consent of the other party. Notwithstanding the foregoing, the Company may elect to make any ATM Investment in the name of (i) the Company, (ii) any Affiliate of the Company, or (iii) any managed account managed by the Company or an Affiliate of the Company, or using any combination of such entities.

(b) This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(c) This Agreement shall be construed in accordance with and governed by the laws of Delaware without regard to any choice of law rules that would require or permit the application of the laws of another jurisdiction.

NY284047.10/1927-00031

(d) This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e) The headings of the various Sections hereof are for convenience of reference only and shall not affect the meaning or construction of any provisions hereof.

(f) Any provision of this agreement which is prohibited or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability, without invalidating the remaining provisions hereof.

(g) No failure or delay on the part of any party hereto in exercising any right hereunder shall operate as a waiver of, or impair, any such right. No single or partial exercise of any such right shall preclude any other or further exercise of any other rights. No waiver of any such right shall be effective unless given in writing. No waiver of any such right shall be deemed a waiver of any other right hereunder.

(h) This Agreement may be amended (or provisions of this Agreement waived) only by an instrument in writing signed by the General Partner (on behalf of the Company) and the Manager.

(i) This Agreement and the Confidentiality Agreement contain the entire agreement between the parties with respect to the subject matter hereof and thereof. This Agreement supersedes all prior discussions and understandings concerning the subject matter hereof.

18. <u>RULES OF INTERPRETATION</u>.

The following rules shall apply in the interpretation of this Agreement:

(a) The singular shall include the plural, and the plural shall include the singular.

(b) A reference to any gender shall include each other gender.

(c) A reference to any Section shall, unless otherwise specified, be to a Section of this Agreement.

(d) A reference to any agreement, instrument, organizational document, law, regulation, or other document shall include any amendments, modifications, restatements, or supplements thereof.

(e) The words "include" and "including" shall not be limiting.

-12-

19. DEFINITIONS.

The following definitions shall apply to this Agreement:

"Affiliate" means with respect to any person any other person who either directly or indirectly (i) controls such first person, (ii) is controlled by such first person, or (iii) is under common control with such first person. For this purpose "control" shall mean the ability to direct the management or policies of a person by ownership of voting securities, contract, or otherwise.

"Agents" shall have the meaning assigned to it in Section 16(b).

"Agreement" means this Management Agreement by and between the Company and the Manager.

"ATM Investments" shall have the meaning assigned to it in Section 1(b)(iv).

"ATMs" shall have the meaning set forth in the recitals to this Agreement.

"Average NAV" means, for any given quarter, the average Daily Net Asset Value of such quarter, calculated based on the actual number of days elapsed.

"Beginning NAV" means, for any given quarter, the Company's Net Asset Value as of the first calendar day of such quarter.

"Capital Appreciation" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Capital Depreciation" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Cash Proceeds" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Clause" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Commencement Date" shall have the meaning assigned to it in Section 11(a).

"Committed Amount" shall have the meaning assigned to it in the Investment Policy.

"Company" means Greywolf Holdings LP, a limited partnership organized under the laws of Delaware.

"Company Accounts" shall have the meaning assigned to it in Section 2(g).

-13-

"Company Indemnified Persons" shall have the meaning assigned to it in Section 9(e).

"Confidential Material" shall have the meaning assigned to it in Section 16(a).

"Confidential Material of the Company" shall have the meaning assigned to it in Section 16(a).

"Daily Net Asset Value" means, for any given day, the Net Asset Value as of such date.

"Disclosed Conflict" shall have the meaning assigned to it in Section 2(e).

"Draw Down" means each round of capital investment contributed or otherwise funded to the Company, the aggregate amount of which shall not exceed the Committed Amount.

"Duties" shall have the meaning assigned to it in Section 1(a).

"Ending NAV" means, for any given quarter, the Company's Net Asset Value as of the last calendar day of such quarter.

"Entity" means any corporation, company, partnership, trust, unincorporated association, joint venture, limited liability company, or other legal entity.

"Expenses" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Fully Invested Date" shall have the meaning assigned to it in Section 10(a).

"General Partner" means Greywolf Holdings GP LLC, a Delaware limited liability company and general partner of the Company.

"Incentive Fee" shall have the meaning assigned to it in Clause 1 of Exhibit B.

"Incentive Fee Schedule" shall have the meaning assigned to it in Section 8(b).

"Interim Period" shall have the meaning assigned to it in Section 11(a).

"Investment Memorandum" shall have the meaning assigned to it in Section 2(b).

"Investment Notice" shall have the meaning assigned to it in Section 2(b).

"Investment Opportunity" shall have the meaning assigned to it in Section 2(b).

-14-

"Investment Policy" shall mean the investment policies and restrictions set forth on Exhibit A hereto, as may be amended from time to time pursuant to Section 17(h).

"Investment Portfolio" shall mean, as of any given date, any and all ATM Investments owned by the Company as of such date.

"Legislation and Regulations" shall have the meaning assigned to it in Section 12(c).

"Loss Carry Forward" shall have the meaning assigned to it in Clause 4(a) of Exhibit B.

"LP Agreement" shall mean the Limited Partnership Agreement of Greywolf Holdings LP.

"Management Fee" shall have the meaning assigned to it in Section 8(a).

"Manager" means Robert Ong, an individual, in his capacity as manager of the Company pursuant to this Agreement.

"Manager Indemnified Persons" shall have the meaning assigned to it in Section 9(d).

"Net Asset Value" means, as of any given date, the fair market value of all ATMs owned by the Company as of such date, as determined by the General Partner in its reasonable discretion. For the avoidance of doubt, Net Asset Value shall not include the value of any cash, securities or other assets of any kind of the Company, other than ATMs.

"person" means any individual or Entity.

"Profits" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Pro Rata Draw Down Factor" shall mean, as of the date of any given Draw Down, the product of (x) a ratio, the numerator of which shall be equal to 0.005, and the denominator of which shall be equal to 90, multiplied by (y) the number of days remaining in the quarter in which such Draw Down occurred.

"Regulators" shall have the meaning assigned to it in Section 12(c).

"Remaining Profits" shall have the meaning assigned to it in Clause 3(c) of Exhibit B.

"Request" shall have the meaning assigned to it in Section 16(e).

-15-

"Term" shall have the meaning assigned to it in Section 11(a).

"Termination Date" shall have the meaning assigned to it in Section 11(a).

*[Signature Page Follows]*

NY264047.10/1927-00031

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be executed and delivered in their names and on their behalf by the undersigned, thereunto duly authorized, on the day and year first above written.

GREYWOLF HOLDINGS LP

By: GREYWOLF HOLDINGS GP LLC
its general partner

By: GREYWOLF GP LLC
its managing member

By: _____
Name: Jonathan Savitz
Title: Managing Member

Address: Attn: Jonathan Savitz
411 West Putnam Avenue, Suite 265
Greenwich, CT 06830

ROBERT ONG

By: _____

Address: _143. J Bedford Rd_
_POUND RIDGE, N.Y. 10576_

-17-

Exhibit A

Investment Policy

1.    The maximum aggregate amount to be invested by the Company pursuant to the Agreement shall be $10,000,000 (the "Committed Amount").

2.    The target net return for ATM Investments will generally be at least 29% per annum.

3.    ATM Investments may take the form of single-unit or portfolio investments (i.e. the purchase of a pool of existing ATMs).

4.    The Company shall only acquire ATMs located in the United States of America.

5.    Each ATM to be purchased by the Company must meet the following minimum operating criteria: (i) have a minimum of five (5) years remaining on the space lease agreement with the merchant or relevant party, (ii) be either Triple Data Encryption Standard or Advanced Encryption Standard compliant, (iii) have a minimum of six (6) months of performance history, (iv) comply with the Americans with Disabilities Act requirements for wheelchair and handicap access, and (v) have an average minimum monthly net income of at least four hundred dollars ($400.00) based on performance history information gathered within six (6) months prior to its purchase.

                                              → *or longer*       *Jan. 18/05*

-18-

Exhibit B

Incentive Fee Schedule

Capitalized terms used herein without definition shall have the meanings assigned to them in the Management Agreement dated as of January 1, 2005 (the "Agreement") by and between Greywolf Holdings LP (the "Company") and Robert Ong (the "Manager").

1. The Incentive Fee.   During the Term of the Agreement, in addition to the Management Fee, the Manager shall be eligible to receive, if earned, a monthly fee as set forth herein, based on the Cash Proceeds received by the Company from ATM Investments during the relevant month (the "Incentive Fee").

2. Definitions.  The following terms have the meanings stated:

"Capital Appreciation" means, for any given month, an amount (which shall not be less than zero) equal to (x) the Net Asset Value as of the last calendar day of such month, minus (y) the Net Asset Value as of the first calendar day of such month, provided, however, that for the purposes of this definition of Capital Appreciation, "Net Asset Value" shall not include the value of any ATMs acquired or disposed of by the Company during the relevant month.

"Capital Depreciation" means, for any given month, an amount (which shall not be less than zero) equal to (x) the Net Asset Value as of the first calendar day of such month, minus (y) the Net Asset Value as of the last calendar day of such month, provided, however, that for the purposes of this definition of Capital Depreciation, "Net Asset Value" shall not include the value of any ATMs acquired or disposed of by the Company during the relevant month.

"Cash Proceeds" means, for any given month, an amount (which shall not be less than zero) equal to (x) the net cash received by the Company during such month from usage and transaction fees generated by ATM Investments in the ordinary course of their operation, less (y) the Management Fee payable for such month and all Expenses paid or attributable to such month. For the avoidance of doubt, Cash Proceeds shall not include any proceeds from sales and other dispositions of ATMs by the Company.

"Clause", as used in this Incentive Fee Schedule, means a clause within this Incentive Fee Schedule.

"Expenses" means (i) all costs, fees and expenses paid by or on behalf of the Company to third parties, including without limitation, technicians, maintenance providers, contractors, consultants, accountants, attorneys, bankers, brokers, agents, advisors, and other persons retained in connection with the maintenance, repair, servicing,

-19-

stocking, refilling, evaluation, acquisition, improvement or disposition of ATM Investments, and (ii) all interest, letter of credit fees and other financing charges and fees paid in connection with the acquisition or improvement of any ATM Investments.

"Loss Carry Forward" shall have the meaning given in Clause 4.

"Profits" means, for any given month, an amount equal to (x) the aggregate Cash Proceeds for such month, plus (y) any Capital Appreciation for such month, minus (z) any Capital Depreciation for such month.

"Remaining Profits" shall have the meaning given in Clause 3(c).

3. Incentive Fee. Subject to Clause 4, all Profits received with respect to any given calendar year during the Term shall be distributed as set forth in this Clause 3.

(a) First, 100% of any Profits received by the Company for a given month falling within the relevant calendar year shall be retained by the Company, until the aggregate payments retained by the Company under this Clause 3(a) for the relevant calendar year equal 10% of the Committed Amount;

(b) Second, 100% of any Profits received by the Company for a given month falling within the relevant calendar year and available for distribution after retention of the amounts set forth in Clause 3(a) by the Company shall be paid to the Manager (within 5 business days of the Company's receipt of all Cash Proceeds receivable with respect to such month) until such time as the Manager has received under this Clause 3(b) an amount equal to 25% of the aggregate amount retained by the Company under Clause 3(a) with respect to such calendar year; and

(c) Third, 100% of any remaining Profits received by the Company for a given month falling within the relevant calendar year and available for distribution after distribution of the amounts set forth in Clauses 3(a) and (b) ("Remaining Profits") shall be distributed concurrently to the Company and the Manager (within 5 business days of the Company's receipt of all Cash Proceeds receivable with respect to such month), with the Manager receiving 20% of such Remaining Profits, and the Company retaining the balance of such Remaining Profits.

4. Calculations.

(a) Loss Carry Forward. Notwithstanding anything to the contrary herein, if the Profits received for any given calendar year are insufficient to pay in full the maximum amount retainable by the Company with respect to such year under Clause 3(a), such unpaid amount shall carry over to the following year as an additional amount for which the Company must be paid in full during such following year pursuant to Clause 3(a), prior to

-20-

the Manager receiving any distributions for such following year pursuant to Clause 3 (all such unpaid amounts in the aggregate, the "Loss Carry Forward").

NY284047.10/1927-00031

# EXHIBIT D

EXECUTION COPY

MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT, dated as of May 25, 2006 (together with the exhibits attached hereto, this "Agreement"), is made and entered into by and between ACM ATM, LLC, a limited liability company organized under the laws of Delaware (the "Company"), and Robert Ong, an individual (the "Manager").

W I T N E S S E T H:

WHEREAS, the Company wishes to engage the Manager to, among other things, assist the Company in identifying, analyzing, acquiring and maintaining Automated Teller Machines ("ATMs") in accordance with the Investment Policy and manage the day to day operations of the Company in connection therewith (collectively, the "Business"), and the Manager is willing to accept this engagement on the terms and conditions herein set forth; and

WHEREAS, capitalized terms used herein without definition shall have the respective meanings assigned to them in Section 18 of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements of the parties as herein set forth, the parties agree as follows:

1. APPOINTMENT AND DUTIES OF THE MANAGER.

(a) Appointment. Subject to the terms and conditions of this Agreement, the Company hereby appoints the Manager, and the Manager hereby accepts such appointment, to assist the Company in performing the duties set forth in Section 1(b) hereof (the "Duties").

(b) Duties. Subject to the terms and conditions of this Agreement, including the notice and approval procedures set forth in Section 2 hereof, the Manager hereby agrees to render the following services:

(i) manage, operate and administer the day to day operations of the Business;

(ii) identify, analyze, acquire, operate, maintain and manage ATMs in a manner consistent with the Investment Policy;

(iii) conduct due diligence concerning ATMs suitable for purchase by the Company in accordance with the Investment Policy;

(iv) (A) negotiate with third parties on behalf of the Company concerning the acquisition of ATMs, (B) assist with the preparation and negotiation of any relevant transaction documents, including, without limitation, confidentiality agreements,

term sheets, letters of intent, exclusivity letters, definitive transaction documents and other relevant documents and (C) assist with closing and consummating such acquisitions on behalf of the Company (ATMs acquired by the Company that were sourced by the Manager under this Agreement are referred to herein as "ATM Investments");

(v) (A) evaluate existing ATM Investments and (B) seek, identify, analyze, screen and recommend to the Company technical, commercial and/or financial enhancements for existing ATM Investments, including opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs in the Investment Portfolio;

(vi) (A) seek disposition opportunities for ATM Investments consistent with the Investment Policy, (B) conduct due diligence concerning dispositions of ATM Investments, (C) negotiate with third parties on behalf of the Company concerning such dispositions, (D) close and consummate such dispositions on behalf of the Company and (E) perform the foregoing services set forth in this Section 1(b)(vi) so as to efficiently and optimally liquidate or otherwise dispose of the Investment Portfolio on or prior to the Termination Date;

(vii) provide such reports on the activities of the Manager under this Agreement as the Company may from time to time request;

(viii) keep financial and accounting records of the Company, including the preparation of financial statements; and

(ix) oversee any audits that may be required by the Company.

(c) Standard of Performance. The Manager agrees to perform his duties and obligations hereunder pursuant to the standard of care, skill and diligence such as would normally be provided by an experienced professional in like circumstances engaged with similar responsibilities. The Manager agrees to devote such portion of his working time as is reasonably necessary or advisable to fulfill his Duties hereunder.

2. INVESTMENT PROCESS.

(a) Authority of Manager. Subject to the terms of this Agreement (including without limitation, Sections 2(f), 2(g) and 5 hereof), the Manager shall have the responsibility and authority to manage the day to day operations of the Business in accordance with, and in furtherance of, the Investment Policy.

(b) Investment Notice and Memorandum. The Manager shall promptly provide notice to the Company of relevant information concerning each ATM proposed to be acquired by the Company (each, an "Investment Opportunity"),

-2-

including its location, purchase price, financial and operational history, any conflicts of interest and such other information as the Manager or the Company may deem relevant or appropriate (the "Investment Notice"). Upon the Company's request, the Manager may also be required to prepare a report concerning ATMs in the Investment Portfolio or ATMs proposed to be acquired (the "Investment Memorandum"). The Investment Memorandum shall include, to the extent reasonably available, the following information and documents:

(i) a description of the Investment Opportunity, including the investment case, key risks, target returns, historical costs and cash flows and historical maintenance, reliability and operational information;

(ii) a proposed timetable for the transaction;

(iii) any bid package, term sheet, letter of intent, exclusivity letter, purchase agreement or similar document with respect to the proposed investment;

(iv) any interests of the Manager, the Manager's Agents, the Manager's Affiliates or such Affiliates' Agents with respect to an Investment Opportunity, an ATM Investment or any party to a proposed acquisition or disposition of an ATM Investment, including, without limitation, any interest in the foregoing that is managed, held, controlled or beneficially owned by the Manager or his Affiliates.

(v) projected costs, budgets and statements of cash flow for the proposed investment and pricing assessments;

(vi) drafts of the proposed purchase or acquisition agreements to be entered into by the Company; and

(vii) an assessment of possible exit strategies for the Company if it were to participate in the proposed investment.

(c) Technical, Commercial and Financial Enhancements. At the Company's request, the Manager will (i) prepare reports analyzing and making recommendations concerning possible technical, commercial and/or financial enhancements for existing ATM Investments and (ii) assist the Company in implementing recommended technical, commercial and/or financial enhancements for existing ATM Investments, including, without limitation, opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs.

(d) Dispositions. The Manager will seek disposition opportunities for existing ATM Investments. In the event that the Manager identifies an opportunity to sell or otherwise dispose of an ATM Investment, at the Company's request, (i) the Manager shall prepare a report in connection with such proposed disposition

-3-

containing information relevant to the proposed transaction similar in format to that set forth in Section 2(b) above and (ii) shall assist in analyzing, evaluating, negotiating and preparing documentation for such disposition.

(e) Conflicts. The Company hereby acknowledges that the Manager and his Affiliates may acquire, operate and/or manage ATMs for third parties or for the Manager's own account and that these activities are not deemed to be a conflict pursuant to this Agreement. The Manager agrees that it shall have an on-going duty during the Term of this Agreement to promptly advise the Company of any conflicts or potential conflicts of interest involving the Manager, the Manager's Agents, the Manager's Affiliates or the Agents of such Affiliates, including conflicts of the types described in Section 2(b)(iv), whenever such conflicts arise, may reasonably be expected to arise and, in any event, prior to the Company entering into any transaction involving such conflict or potential conflict. A conflict of interest disclosed by the Manager to the Company pursuant to this Section 2 is herein referred to as a "Disclosed Conflict". Failure on the part of the Manager to disclose a conflict that is not material shall not be considered a material breach of this Agreement and shall not subject the Manager to the early termination provisions of Section 11(b).

(f) Company Has Sole Authority. Notwithstanding anything to the contrary herein, the Company shall have the sole authority and discretion to (i) determine whether or not to consummate an investment in an Investment Opportunity or a disposition of an ATM Investment and (ii) enter into or deliver binding or definitive agreements pertaining to any Investment Opportunity or ATM Investment, including, without limitation, any confidentiality agreements, term sheets, letters of intent, purchase agreements or similar agreements binding upon the Company.

(g) Company Accounts. The parties hereby agree that the Committed Amount and any and all income, payments, credits and other cash receipts received by the Company, whether from ATM Investments or any other source, shall be deposited into one or more accounts designated by the Company, which account(s) shall be under the sole control and authority of the Company (the "Company Accounts"). Furthermore, the parties hereby agree that the Manager shall have no access, power or authority (x) with respect to any cash or other funds deposited into Company Accounts or (y) to invest, spend, or otherwise use any such funds without the specific prior written consent of the Company.

(h) Maximum Participation. Until $1.5 million of the Committed Amount has been invested in ATM Investments pursuant to the terms of this Agreement, the Manager shall offer to the Company the opportunity to participate in the purchase of at least 33% of any ATMs presented for purchase to any member of the Manager Group.

-4-

(i) Tag-Along Right. The Company will have the right to participate in any transaction is where multiple pools of ATMs held by members of the Manager Group are combined and sold to the public, with the Company's ATMs receiving the same or better valuation as such other pools of ATMs; provided that market conditions allow for such valuation; provided, further, that such right of participation is subject to the reasonable efforts of the Manager.

## 3. REPRESENTATIONS AND WARRANTIES OF THE MANAGER.

The Manager hereby represents, warrants and covenants to the Company as follows:

(a) The Manager has and shall have the legal power and authority to carry on the business and to perform the Duties set forth herein. The execution and delivery of this Agreement has been duly authorized by all necessary legal action by the Manager, and no further action is necessary to make this Agreement valid and binding upon the Manager. The execution, delivery and performance of this Agreement will not violate any agreement, document, organizational document, law or court order binding upon the Manager.

(b) The Manager has the requisite skill, experience and resources to fully perform his Duties as required hereunder.

(c) None of the Manager, his Affiliates or his Agents performing, or expected to perform, any services under this Agreement has been convicted of any crime, been found by any court to have violated any law or entered into any plea of guilty or nolo contendre to any criminal charge (other than in each such case with respect to minor traffic matters) or been subject to any suit alleging fraud, gross negligence or any crime, other than suits dismissed with prejudice or otherwise resolved in such party's favor.

## 4. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company hereby represents, warrants and covenants to the Manager as follows:

(a) The Company is a limited liability company validly existing and in good standing under the laws of the State of Delaware and has and shall have the limited liability company power and authority to carry on the business contemplated herein. The execution and delivery of this Agreement by the Company has been duly authorized by all necessary limited liability company and other action, and no further limited liability company or other action is necessary to make this Agreement valid and binding upon the Company. The execution, delivery and performance of this Agreement will not violate any agreement, document, organizational document, law or court order binding upon the Company.

-5-

(b) The Company has full authority to make ATM Investments as contemplated by this Agreement.

(c) Neither the Company nor any principals of the Company has been convicted of any crime, been found by any court to have violated any law or entered into any plea of guilty or nolo contendre to any criminal charge (other than in each such case with respect to minor traffic matters) or been subject to any suit alleging fraud, gross negligence or any crime, other than suits dismissed with prejudice or otherwise resolved in such party's favor.

## 5. NO AUTHORITY TO ACT OR CONTRACT FOR COMPANY.

The Manager is not authorized to contract for or bind the Company in any way, or to enter into, execute or deliver on behalf of the Company any agreements or instruments, regardless of whether or not such agreements or instruments constitute a binding offer, agreement or legal commitment of the Company. The Manager shall not represent to any third party that it has any authority to act or contract for the Company.

## 6. NO DELEGATION OF DUTIES.

The rights, duties and obligations of the Manager set forth herein may not be delegated or assigned to any Affiliate, Agent or other third party without the express prior written consent of the Company.

## 7. EXPENSES.

(a) Other than as provided in Sections 7(b) and 7(c), the Manager shall be responsible for all expenses incurred by the Manager, his Agents and their Affiliates in the performance of the Manager's duties and obligations hereunder, including, without limitation, any and all expenses relating to the performance of the Manager's duties and obligations set forth in Sections 1 and 2, the Manager's personnel (including with respect to compensation and benefits), office rental, overhead, utilities, stationery, insurance, regulatory and legal compliance and tax expenses.

(b) Upon presentation of receipts or similar documentation, the Company shall reimburse the Manager for reasonable out-of-pocket expenses of the following types incurred by the Manager in connection with his performance under this Agreement, provided that such expenses are pre-approved by the Company: all reasonable, out-of-pocket travel and lodging costs incurred in connection with performing his duties pursuant to Section 1(b).

(c) Unless specifically pre-approved by the Company in writing, the Manager shall not be entitled to reimbursement for any third party legal,

-6-

accounting, management or other expenses incurred by the Manager, his Agents or their Affiliates in the performance of this Agreement.

8. MANAGEMENT FEE AND INCENTIVE COMPENSATION.

    (a) Management Fee. During the Term of this Agreement, the Company shall pay to the Manager a fee for the services to be rendered hereunder (collectively, the "Management Fee") as follows: (i) within five business days of the first day of each three-month period (each, a "Quarter"), beginning on each June 1, September 1, December 1 and March 1 during the Term of this Agreement, an amount equal to 0.50% of the Beginning Invested Amount for such Quarter; and (ii) concurrently with each Draw Down of the Committed Amount, an amount equal to the product of (x) the amount of such Draw Down, multiplied by (y) the Pro Rata Draw Down Factor calculated as of such date.

    (b) Incentive Compensation. During the Term of this Agreement, in addition to the Management Fee, the Company will issue to the Manager, if earned, an Incentive Fee based on the Profits received by the Company during any month, in the amount and manner and subject to the terms and restrictions set forth in Exhibit B (the "Incentive Fee Schedule").

    (c) Termination Date. For the avoidance of doubt, no Management Fee or Incentive Fee shall be payable to the Manager at any time after the Termination Date or after the disposition of all ATM Investments of the Company.

9. LIMITATION ON LIABILITY; INDEMNITY.

    (a) As used in this Section 9, the terms "Manager" and "Company" shall include, as applicable, directors, general and limited partners, members, managers, officers, employees, agents, and Affiliates of such person as well as the person himself or itself, as the case may be.

    (b) The Manager may rely on any powers of attorney, certified charter documents, certificates of government authorities, certified resolutions, incumbency certificate and any other properly certified legal existence, authority or incumbency document reasonably believed by it to be genuine and to have been signed or presented by the proper person. The Manager need not investigate any fact or matter stated in any such document.

    (c) The Manager agrees to promptly advise the Company if the Manager believes any action requested by the Company would be inconsistent with applicable laws and regulations.

    (d) The Company shall indemnify and hold harmless each of the Manager, his Affiliates, employees and Agents (together, the "Manager Indemnified

-7-

Persons") from and against any and all third-party actions, suits, proceedings, claims, damages, settlement payments, losses and liabilities (including, but not limited to, reasonable attorneys' fees) arising in connection with the Manager's performance under this Agreement, to the maximum extent permitted by Delaware law, unless resulting from (i) such Manager Indemnified Person's breach of this Agreement, bad faith, gross negligence, fraud or willful misconduct in the performance of such Manager Indemnified Person's duties under this Agreement or (ii) any Manager Indemnified Person acting beyond the scope of its authority under this Agreement.

(e) The Manager shall indemnify and hold harmless the Company, its Affiliates and the general and limited partners, members, directors, managers, officers, employees and Agents of the Company and its Affiliates (together, the "Company Indemnified Persons") from and against any and all third-party actions, suits, proceedings, claims, damages, settlement payments, losses and liabilities (including, but not limited to, reasonable attorneys' fees) arising in connection with (i) breach of this Agreement by the Manager, his Agents or their Affiliates, (ii) the bad faith, gross negligence, fraud or willful misconduct of the Manager, his Agents or their Affiliates or (iii) the Manager, his Agents or their Affiliates acting beyond the scope of their authority under this Agreement.

(f) The Company may, in its sole discretion, advance to any Manager Indemnified Person amounts to cover expenses incurred by such Manager Indemnified Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of such Manager Indemnified Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that such Manager Indemnified Person is not entitled to be indemnified hereunder.

10. <u>OTHER ACTIVITIES OF THE MANAGER</u>.    The Manager and his Affiliates may acquire, operate and/or manage ATMs for third parties or for the Manager's own account.

11. <u>TERM</u>.

(a) <u>Term</u>.    This Agreement shall commence on May 25, 2006 (the "Commencement Date"), and shall continue until the later of (i) the sixth anniversary of the Commencement Date (the "Interim Period") and (ii) the date on which the Company disposes of all ATMs in its Investment Portfolio that were acquired with the Manager's assistance pursuant to this Agreement. Notwithstanding the foregoing, the Term of this Agreement may be extended as provided in Section 11(c), provided that this Agreement may be terminated at any time by action of the Company as provided in Section 11(b). When exercising any

-8-

rights under Section 11(b)(i) to terminate this Agreement, the Company shall give the Manager 30 calendar days prior notice of such termination, and any such termination pursuant to Section 11(b)(i) shall only become effective at the close of business in New York, New York on the 30th day following the date on which the Manager receives such notice, or such later termination date as may be specified in such notice. Upon any termination of this Agreement pursuant to Section 11(b), all authorities and duties of the Manager under this Agreement shall, except as otherwise provided in this Section 11, terminate. The termination date of this Agreement is herein referred to as the "Termination Date", and the period from the Commencement Date to the Termination Date is herein referred to as the "Term".

(b) Early Termination. The Company may terminate this Agreement at any time if (i) the Manager has breached in any material respect any term of this Agreement and failed to cure such breach within 30 days after notice thereof from the Company, (ii) the Manager has engaged in any fraud, gross negligence or willful misconduct in relation to the Company, (iii) the Manager has been charged with, convicted of or entered a guilty plea or plea of nolo contendre with respect to a felony or other crime involving dishonesty, (iv) the Manager has commenced any voluntary bankruptcy, dissolution or insolvency proceeding, (v) the Manager has consented to, or failed to promptly contest, any involuntary bankruptcy, dissolution or insolvency proceeding commenced by other parties, (vi) the Manager has become subject to any bankruptcy, dissolution or insolvency proceeding that is not dismissed within 60 days, or (vii) upon the Manager's retirement, withdrawal, death or disability, if a suitable replacement is not promptly found and approved by the Company. In addition, the Company may terminate this Agreement by giving the Manager 30 days notice if cumulative Cash Proceeds for six months following the first acquisition of any ATM Investment pursuant to this Agreement are a negative amount.

(c) Extension. The parties may by mutual agreement extend the term of this Agreement beyond the Interim Period for any such extension of the Term.

(d) Termination of this Agreement shall not affect the rights of the Manager (i) to reimbursement under Section 7 of applicable costs and expenses incurred through the Termination Date, (ii) to receive under Section 8(a) any Management Fee accrued through the Termination Date or (iii) to receive any Incentive Fee distributable under Section 8(b) calculated through the Termination Date.

(e) Promptly after the Termination Date, the Manager shall hand over to the Company or its designee all confidential information of the Company and all books of account, correspondence and records of the Company that are in its possession or control, including any documentation relating to the Company's ATM Investments.

-9-

(f) Termination of this Agreement shall not affect the rights of the Company or the Manager under Section 9.

(g) Section 15 shall survive any termination of this Agreement.

12. ADDITIONAL COVENANTS.

(a) The Manager shall at any time during business hours permit any duly authorized representative or Agent of the Company or its Affiliates to inspect any and all systems, procedures, records and documents of the Manager or any person to whom the Manager has delegated any or all of its functions, powers, discretions, Duties and obligations hereunder and shall give any such representative or Agent all information, explanations or assistance as such representative or Agent may reasonably require.

(b) The Manager shall meet with any officer, director or duly authorized representative or Agent of the Company or its Affiliates at such reasonable times as the Company may require to review and report on matters arising in connection with the services provided under this Agreement and to answer such questions as such persons may have.

(c) The Manager undertakes that he: (i) possesses and will continue to possess all authorizations from any relevant regulatory body (together the "Regulators") that are necessary or requisite to enable him fully and effectively to discharge his obligations under this Agreement and will immediately notify the Company of any alteration to its authorization which affects his ability to perform his obligations under this Agreement, (ii) will, at all times, comply with applicable legislation, statutory instruments and the rules and regulations of the Regulators as from time to time in force insofar as they relate to the performance of his obligations under this Agreement (together the "Legislation and Regulations") and (iii) will not knowingly or recklessly do or omit to do anything that would cause the Company to be in breach of the Legislation and Regulations.

(d) The Manager undertakes promptly to notify the Company of any event which affects the Manager's ability to perform his Duties or obligations under this Agreement or which may result in the Manager's ability being so affected, or if a breach of any material provision of this Agreement occurs or is likely to occur. The Manager further undertakes promptly to do all such things as may reasonably be required by the Company or otherwise take all necessary steps to remedy or prevent such a breach.

(e) In the event that any third party fails to deliver any necessary documents, pay any amount due or otherwise settle a transaction within a reasonable period, so that the Manager decides the third party is in breach of its obligations to the Company, the Manager will notify the Company forthwith and,

-10-

at the option of the Company, pursue all appropriate legal remedies against the third party to settle the transaction or recover compensation in lieu therefor in accordance with the Company's instructions or assist the Company to pursue all such remedies. The costs and expenses properly incurred by the Manager in connection with the pursuit of such remedies shall be agreed in advance by the Company, and thereafter may be invoiced to the Company.

## 13. NOTICES.

Any notices, requests and other communications under this Agreement shall be in writing, shall be sent via overnight courier service, facsimile transmission or registered or certified mail (postage prepaid and return receipt requested), and will be deemed to have been received upon delivery to the address of the recipient party set forth on the signature page of this Agreement or to any other address that such party shall have designated in a notice to the other party.

## 14. RELATIONSHIP OF THE PARTIES.

This Agreement does not constitute a general agency, partnership or employer-employee relationship. The Manager is an independent contractor in respect of the activities contemplated in this Agreement. The Manager shall not be considered an agent or legal representative of the Company (or any Affiliate thereof) for any purpose, and neither the Manager nor any subcontractor, agent, employee or Affiliate of the Manager shall be, or be considered, an agent or employee of the Company (or any Affiliate thereof).

## 15. CONFIDENTIALITY.

(a) For purposes of this Section 15, (i) "Confidential Material of the Company" means this Agreement, the terms hereof, the identity of the Company and any of its Affiliates and any and all non-public or proprietary information or material of the Company that is provided by or on behalf of the Company to the Manager or that is developed under the terms of this Agreement and (ii) "Confidential Material" means any Confidential Material of the Company or Confidential Material of the Manager. The provisions of this paragraph shall not apply to, and the Manager shall have no liability with respect to, the disclosure of information which:

(i) is or becomes generally available to the public other than as a result of the breach of this Agreement by the Manager; or

(ii) is received by the Manager from a source other than the Company and/or its Affiliates without restriction and without breach of this Agreement.

-11-

(b) For purposes of this Agreement, "Agents" means, with respect to any party, such party's employees, agents, and professional advisors, provided that the Manager shall not be considered an Agent of the Company.

(c) The Manager shall not, and shall cause his Agents not to, (i) release or disclose any Confidential Material of the Company to any person other than the Manager, his Agents, the Company, the Affiliates of the Company or the Company's service providers or (ii) use any Confidential Material of the Company for the benefit of any person other than the Company.

(d) Nothing contained herein shall prevent any party from releasing or disclosing Confidential Material (i) to its financial, accounting, legal or other advisors or its independent auditors, (ii) to third parties as required under applicable laws, rules or regulations or by order of any court or governmental authority or self-regulatory organization or (iii) that has become public through no fault of such party or its Agents.

(e) In the event the Company, the Manager or any of their Agents receives a request to disclose any Confidential Material under the terms of a subpoena, order or other process issued by a court or other government agency (a "Request"), the party that received the Request shall (i) immediately notify the other party of the Request and (ii) if, in the opinion of such receiving party's counsel, disclosure of Confidential Material is legally required pursuant to the Request, disclose only so much of the Confidential Material as such receiving party is legally required to disclose and advise the other party of such disclosure as far in advance as is reasonably possible.

16. MISCELLANEOUS.

(a) Neither party may assign or transfer its rights or obligations hereunder without the prior written consent of the other party.    Notwithstanding the foregoing, the Company may elect to make any ATM Investment in the name of (i) the Company, (ii) any Affiliate of the Company or (iii) any managed account managed by the Company or an Affiliate of the Company, or using any combination of such entities.

(b) This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(c) This Agreement and any action based on this Agreement, including disagreements or disputes regarding the terms and conditions hereof, alleged breaches of contract and remedies under contract, shall be governed by the laws of the State of New York and shall be adjudicated by a court of competent jurisdiction in the federal or state courts of New York county, New York.

-12-

18. DEFINITIONS.

The following definitions shall apply to this Agreement:

"Affiliate" means with respect to any person any other person who either directly or indirectly (i) controls such first person, (ii) is controlled by such first person or (iii) is under common control with such first person. For this purpose "control" shall mean the ability to direct the management or policies of a person by ownership of voting securities, contract or otherwise.

"Additional State" shall have the meaning assigned to it in the Investment Policy.

"Agents" shall have the meaning assigned to it in Section 15(b).

"Agreement" means this Management Agreement by and between the Company and the Manager.

"ATM Investments" shall have the meaning assigned to it in Section 1(b)(iv).

"ATMs" shall have the meaning set forth in the recitals to this Agreement.

"Beginning Invested Amount" means, for any given Quarter, the aggregate amount funded by the Company to acquire ATM Investments as of the first day of such Quarter, less the acquisition costs of any ATM Investments previously disposed of by the Company prior to the first day of such Quarter.

"Business" shall have the meaning set forth in the recitals to this Agreement.

"Cash Proceeds" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Clause" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Commencement Date" shall have the meaning assigned to it in Section 11(a).

"Committed Amount" shall have the meaning assigned to it in the Investment Policy.

"Company" means ACM ATM, LLC, a limited liability company organized under the laws of Delaware.

"Company Accounts" shall have the meaning assigned to it in Section 2(g).

"Company Indemnified Persons" shall have the meaning assigned to it in Section 9(e).

"Confidential Material" shall have the meaning assigned to it in Section 15(a).

-14-

"Confidential Material of the Company" shall have the meaning assigned to it in Section 15(a).

"Disclosed Conflict" shall have the meaning assigned to it in Section 2(e).

"Draw Down" means each capital investment funded by the Company to acquire ATM Investments, the aggregate amount of which, together with amounts funded by the Company to pay Expenses or the Management Fee, shall not exceed the Committed Amount.

"Duties" shall have the meaning assigned to it in Section 1(a).

"Entity" means any corporation, company, partnership, trust, unincorporated association, joint venture, limited liability company or other legal entity.

"Incentive Fee" shall have the meaning assigned to it in Clause 1 of Exhibit B.

"Incentive Fee Schedule" shall have the meaning assigned to it in Section 8(b).

"Interim Period" shall have the meaning assigned to it in Section 11(a).

"Investment Memorandum" shall have the meaning assigned to it in Section 2(b).

"Investment Notice" shall have the meaning assigned to it in Section 2(b).

"Investment Opportunity" shall have the meaning assigned to it in Section 2(b).

"Investment Policy" shall mean the investment policies and restrictions set forth on Exhibit A hereto, as may be amended from time to time pursuant to Section 16(h).

"Investment Portfolio" shall mean, as of any given date, any and all ATM Investments owned by the Company as of such date.

"Legislation and Regulations" shall have the meaning assigned to it in Section 12(c).

"Management Fee" shall have the meaning assigned to it in Section 8(a).

"Manager" means Robert Ong, an individual, in his capacity as manager of the Business pursuant to this Agreement.

"Manager Group" means Robert Ong, as the Manager, Jade Stone Capital Management, LLC, any of their Affiliates, any entities managed by any of the foregoing and each other person in which Robert Ong, Jade Stone Capital Management, LLC or any of their Affiliates has a direct or indirect economic interest.

-15-

"Manager Indemnified Persons" shall have the meaning assigned to it in Section 9(d).

"person" means any individual or Entity.

"Profits" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Pro Rata Draw Down Factor" shall mean, as of the date of any given Draw Down, the product of (x) a ratio, the numerator of which shall be equal to 0.005, and the denominator of which shall be equal to 90, multiplied by (y) the number of days remaining in the Quarter in which such Draw Down occurred.

"Quarter" shall have the meaning assigned to it in Section 8(a).

"Regulators" shall have the meaning assigned to it in Section 12(c).

"Request" shall have the meaning assigned to it in Section 15(e).

"Term" shall have the meaning assigned to it in Section 11(a).

"Termination Date" shall have the meaning assigned to it in Section 11(a).

*[Signature Page Follows]*

NY351467.6/2298-00001

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be executed and delivered in their names and on their behalf by the undersigned, thereunto duly authorized, on the day and year first above written.

ACM ATM, LLC

By:_____

Eric Edidin, as director on behalf of
Archer Capital Fund, L.P., its sole member

Address: c/o Archer Capital Management
570 Lexington Avenue, 40th floor
New York, New York

ROBERT ONG

By:_____

Address: c/o Jade Stone Capital Management, LLC
143 South Bedford Road
Pound Ridge, New York 10576

NY351467.6/2298-00001

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be executed and delivered in their names and on their behalf by the undersigned, thereunto duly authorized, on the day and year first above written.

ACM ATM, LLC

By:_____
     Eric Edidin, as director on behalf of
     Archer Capital Fund, L.P., its sole member

Address:  c/o Archer Capital Management
            570 Lexington Avenue, 40th floor
            New York, New York

ROBERT ONG

By:_____  5/26/06

Address: c/o Jade Stone Capital Management, LLC
          143 South Bedford Road
          Pound Ridge, New York 10576

Exhibit A

Investment Policy

The following represent guidelines for the ATM Investments of the Company, provided that the Company has the sole authority and discretion, pursuant to Section 2(f) of the Agreement, to determine whether or not to consummate an investment in an Investment Opportunity that may or may not meet the following criteria:

1.    The maximum aggregate amount to be invested by the Company pursuant to the Agreement shall be $3,000,000 (the "Committed Amount"), subject to any increases approved by the Company in its sole and absolute discretion.

2.    The target net return for ATM Investments will generally be at least 20% per annum.

3.    ATM Investments may take the form of single-unit or portfolio investments (i.e. the purchase of a pool of existing ATMs).

4.    The Company shall only acquire ATMs located in (a) Alaska, Florida, Nevada, New Hampshire, South Dakota, Tennessee, Texas, Washington or Wyoming or (b) up to five additional states (each, an "Additional State"), provided that ATMs may be acquired in any Additional State only if (i) the number of initial ATM Investments in such Additional State is not less than 30 ATMs (which ATM Investments, for avoidance of doubt, must all be approved by the Company in accordance with the terms of Section 2(f) of this Agreement) and (ii) each such Additional State has been approved in advance by the Company.

5.    In general, each ATM to be purchased by the Company must meet the following minimum operating criteria: (i) have a minimum of six (6) years remaining on the space lease agreement with the merchant or relevant party, (ii) be either Triple Data Encryption Standard or Advanced Encryption Standard compliant, (iii) have a minimum of six (6) months of performance history, (iv) comply with the Americans with Disabilities Act requirements for wheelchair and handicap access and (v) have an average minimum monthly net income of at least four hundred dollars ($400.00) based on performance history information gathered within twelve (12) months (or longer) prior to its purchase.

-2-

## Exhibit B

### Incentive Fee Schedule

Capitalized terms used herein without definition shall have the meanings assigned to them in the Management Agreement dated as of May 25, 2006 (the "Agreement") by and between ACM ATM, LLC (the "Company") and Robert Ong (the "Manager").

1. The Incentive Fee.    During the Term of the Agreement, in addition to the Management Fee, the Manager shall be eligible to receive, if earned, a monthly fee as set forth herein, based on the Cash Proceeds received by the Company from ATM Investments during the relevant month (the "Incentive Fee").

2. Definitions.  The following terms have the meanings stated:

"Capital Gain" means, for any given calendar month, the amount (which shall not be less than zero) by which aggregate proceeds received from the disposition by the Company of any ATM Investments during such month exceeds the acquisition costs attributable to such ATM Investments (including all capital expenditures applicable to such ATM Investments from the time of acquisition that have not already been counted as Expenses).

"Capital Loss" means, for any given calendar month, the amount (which shall not be less than zero) by which acquisition costs attributable to any ATM Investments (including all capital expenditures applicable to such ATM Investments from the time of acquisition that have not already been counted as Expenses) disposed of by the Company during such month exceeds the aggregate proceeds received from the disposition of such ATM Investments.

"Cash Proceeds" means, for any given calendar month, an amount (which shall not be less than zero) equal to (x) the net cash received by the Company during such month from surcharge, interchange and advertising fees and any and all other recurring revenues generated by ATM Investments in the ordinary course of their operation, less (y) the Management Fee payable for such month and all Expenses paid or attributable to such month.  For the avoidance of doubt, Cash Proceeds shall not include any proceeds from sales and other dispositions of ATMs by the Company.

"Clause", as used in this Incentive Fee Schedule, means a clause within this Incentive Fee Schedule.

"Expenses" means (i) all costs, fees and expenses paid by or on behalf of the Company to third parties, including, without limitation, technicians, maintenance providers, contractors, consultants, accountants, attorneys, bankers, brokers, agents, advisors and other persons retained in connection with the maintenance, repair, servicing, stocking, refilling, evaluation, acquisition, improvement, disposition, accounting or

auditing of ATM Investments and the execution of the Agreement and (ii) all interest, letter of credit fees and other financing charges and fees paid in connection with the acquisition or improvement of any ATM Investments.

"Loss Carry Forward" shall have the meaning given in Clause 4.

"Profits" means, for any given calendar month, an amount equal to (w) the aggregate Cash Proceeds for such month, plus (x) any Capital Gain for such month, minus (y) any Capital Loss for such month, minus (z) the Loss Carry Forward, if any.

3. Incentive Fee.  100% of the Profits received by the Company for a given month during the Term shall be distributed concurrently to the Company and the Manager (within five business days of the Company's receipt of all Cash Proceeds and disposition proceeds receivable with respect to such month), with the Manager receiving 20% of such Profits, and the Company retaining the 80% balance of such Profits.

4. Loss Carry Forward.  Notwithstanding anything to the contrary herein, if the Profits received for any month are a negative amount, such negative amount shall carry over to the following month as a reduction of that following month's Profits (the absolute value of any such amount, the "Loss Carry Forward").

NY351467.6/2298-00001

# EXHIBIT E

1-1-06

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT, dated as of January 1, 2006 (together with the exhibits attached hereto, this "Agreement"), is made and entered into by and between Caspian Opportunities, Inc, a corporation organized under the laws of Delaware (the "Company") and Robert Ong, an individual (the "Manager").

## W I T N E S S E T H:

WHEREAS, the Company wishes to engage the Manager to, among other things, manage the day to day operations of the Company, and assist the Company in identifying, analyzing, acquiring and maintaining Automated Teller Machines ("ATMs") in accordance with the Investment Policy, and the Manager is willing to accept this engagement on the terms and conditions herein set forth; and

WHEREAS, capitalized terms used herein without definition shall have the respective meanings assigned to them in Section 19 of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements of the parties as herein set forth, the parties agree as follows:

1. APPOINTMENT AND DUTIES OF THE CONSULTANT.

(a) Appointment. Subject to the terms and conditions of this Agreement, the Company hereby appoints the Manager, and the Manager hereby accepts such appointment, to assist the Company in performing the duties set forth in Section 1(b) hereof (the "Duties").

(b) Duties. Subject to the terms and conditions of this Agreement, including the notice and approval procedures set forth in Section 2 hereof, the Manager hereby agrees to render the following services:

(i) manage, operate and administer the day to day operations of the Company;

(ii) identify, analyze, acquire, operate, maintain and manage ATMs in a manner consistent with the Investment Policy;

(iii) conduct due diligence concerning ATMs suitable for purchase by the Company in accordance with the Investment Policy;

(iv) (A) negotiate with third parties on behalf of the Company concerning the acquisition of ATMs, (B) assist with the preparation and negotiation of any relevant transaction documents, including without limitation, confidentiality agreements, term

sheets, letters of intent, exclusivity letters, definitive transaction documents and other relevant documents, and (C) assist with closing and consummating such acquisitions on behalf of the Company (ATMs acquired by the Company that were sourced by the Manager under this Agreement are referred to herein as "ATM Investments");

(v) (A) evaluate existing ATM Investments and (B) seek, identify, analyze, screen, and recommend to the Company technical, commercial and/or financial enhancements for existing ATM Investments, including opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs in the Investment Portfolio;

(vi) (A) seek disposition opportunities for ATM Investments consistent with the Investment Policy, (B) conduct due diligence concerning dispositions of ATM Investments, (C) negotiate with third parties on behalf of the Company concerning such dispositions, (D) close and consummate such dispositions on behalf of the Company, and (E) perform the foregoing services set forth in this Section 1(b)(vi) so as to efficiently and optimally liquidate or otherwise dispose of the Investment Portfolio on or prior to the Termination Date; and

(vii) provide such reports on the activities of the Manager under this Agreement as the Company may from time to time request.

(c) Standard of Performance. The Manager agrees to perform his duties and obligations hereunder pursuant to the standard of care, skill and diligence such as would normally be provided by an experienced professional in like circumstances engaged with similar responsibilities. The Manager agrees to devote such portion of his working time as is reasonably necessary or advisable to fulfill his Duties hereunder.

2. INVESTMENT PROCESS.

(a) Authority of Manager. Subject to the terms of the Corporation Agreement and this Agreement (including without limitation, Sections 2(f), 2(g) and 5 hereof), the Manager shall have the responsibility and authority to manage the day to day operations of the Company in accordance with, and in furtherance of, the Investment Policy.

(b) Investment Notice and Memorandum. The Manager shall promptly provide notice to the Company of relevant information concerning each ATM proposed to be acquired by the Company (each, an "Investment Opportunity"), including its location, purchase price, financial and operational history, any conflicts of interest (as required under Section 1(e)) and such other information as the Manager or General Partner may deem relevant or appropriate (the "Investment Notice"). Upon the General Partner's request, the Manager may also be required to prepare a report concerning ATMs in the Investment Portfolio or ATMs proposed to be acquired ("Investment Memorandum"). The Investment

-2-

Memorandum shall include, to the extent reasonably available, the following information and documents:

(i) a description of the Investment Opportunity, including the investment case, key risks, target returns, historical costs and cash flows and historical maintenance, reliability and operational information;

(ii) a proposed timetable for the transaction;

(iii) any bid package, term sheet, letter of intent, exclusivity letter, purchase agreement or similar document with respect to the proposed investment;

(iv) any interests of the Manager, the Manager's Agents, the Manager's Affiliates or such Affiliates' Agents with respect to an Investment Opportunity, an ATM Investment, or any party to a proposed acquisition or disposition of an ATM Investment, including without limitation, any interest in the foregoing that is managed, held, controlled or beneficially owned by the Manager or his Affiliates.

(v) projected costs, budgets and statements of cash flow for the proposed investment and pricing assessments;

(vi) drafts of the proposed purchase or acquisition agreements to be entered into by the Company; and

(vii) an assessment of possible exit strategies for the Company if it were to participate in the proposed investment.

(c) Technical, Commercial and Financial Enhancements. At the Company's request, the Manager will (i) prepare reports analyzing and making recommendations concerning possible technical, commercial and/or financial enhancements for existing ATM Investments, and (ii) assist the Company in implementing recommended technical, commercial and/or financial enhancements for existing ATM Investments, including without limitation, opportunities to increase the aggregate value of the Investment Portfolio and its associated cash flows through the substitution and exchange of ATMs.

(d) Dispositions. The Manager will seek disposition opportunities for existing ATM Investments. In the event that the Manager identifies an opportunity to sell or otherwise dispose of an ATM Investment, at the Company's request, (i) the Manager shall prepare a report in connection with such proposed disposition containing information relevant to the proposed transaction similar in format to that set forth in Section 2(b) above and (ii) shall assist in analyzing, evaluating, negotiating and preparing documentation for such disposition.

NY284047.4/1927-00031

(e) <u>Conflicts</u>. The Manager agrees that it shall have an on-going duty during the Term of this Agreement to promptly advise the Company of any conflicts or potential conflicts of interest involving the Manager, the Manager's Agents, the Manager's Affiliates or the Agents of such Affiliates, including conflicts of the types described in Section 2(b)(iv), whenever such conflicts arise, may reasonably be expected to arise and, in any event, prior to the Company entering into any transaction involving such conflict or potential conflict. A conflict of interest disclosed by the Manager to the Company pursuant to this Section 2 is herein referred to as a "<u>Disclosed Conflict</u>".

(f) <u>General Partner Has Sole Authority</u>. Notwithstanding anything to the contrary herein, the General Partner shall have the sole authority and discretion, on behalf of the Company, to (i) determine whether or not to consummate an investment in an Investment Opportunity or a disposition of an ATM Investment; and (ii) enter into or deliver binding or definitive agreements pertaining to any Investment Opportunity or ATM Investment, including without limitation, any confidentiality agreements, term sheets, letters of intent, purchase agreements, or similar agreements binding upon the Company.

(g) <u>Company Accounts</u>. The parties hereby agree that the Commitment Amount and any and all income, payments, credits and other cash receipts received by the Company, whether from ATM Investments or any other source, shall be deposited into one or more accounts designated by the General Partner, which account(s) shall be under the sole control and authority of the General Partner ("<u>Company Accounts</u>"). Furthermore, the parties hereby agree that the Manager shall have no access, power or authority (x) with respect to any cash or other funds deposited into Company Accounts, or (y) to invest, spend, or otherwise use any such funds without the specific prior written consent of the General Partner.

3. <u>REPRESENTATIONS AND WARRANTIES OF THE MANAGER</u>.

The Manager hereby represents, warrants and covenants to the Company as follows:

(a) The Manager has and shall have the legal power and authority to carry on the business and to perform the Duties set forth herein. The execution and delivery of this Agreement has been duly authorized by all necessary legal action by the Manager, and no further action is necessary to make this Agreement valid and binding upon the Manager. The execution, delivery and performance of this Agreement will not violate any agreement, document, organizational document, law or court order binding upon the Manager.

(b) The Manager has the requisite skill, experience and resources to fully perform his Duties as required hereunder.

(c) None of the Manager, his Affiliates or his Agents performing, or expected to perform, any services under this Agreement has been convicted of any crime, been found by any court to have violated any law or entered into any plea of guilty or nolo contendre to any

-4-

criminal charge (other than in each such case with respect to minor traffic matters) or been subject to any suit alleging fraud, gross negligence or any crime, other than suits dismissed with prejudice or otherwise resolved in such party's favor.

4. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company hereby represents, warrants and covenants to the Manager as follows:

(a) The Company is a corporation validly existing and in good standing under the laws of the State of Delaware and has and shall have the partnership power and authority to carry on the business contemplated herein. The execution and delivery of this Agreement by the Company has been duly authorized by all necessary partnership and other action, and no further partnership or other action is necessary to make this Agreement valid and binding upon the Company. The execution, delivery and performance of this Agreement will not violate any agreement, document, organizational document, law or court order binding upon the Company.

(b) The Company has full authority to make ATM Investments as contemplated by this Agreement.

(c) None of the Company, its general partner, or any principals of the Company or its general partner has been convicted of any crime, been found by any court to have violated any law or entered into any plea of guilty or nolo contendre to any criminal charge (other than in each such case with respect to minor traffic matters) or been subject to any suit alleging fraud, gross negligence or any crime, other than suits dismissed with prejudice or otherwise resolved in such party's favor.

5. NO AUTHORITY TO ACT OR CONTRACT FOR COMPANY.

The Manager is not authorized to contract for or bind the Company in any way, or to enter into, execute or deliver on behalf of the Company any agreements or instruments, regardless of whether or not such agreements or instruments constitute a binding offer, agreement or legal commitment of the Company. The Manager shall not represent to any third party that it has any authority to act or contract for the Company.

6. NO DELEGATION OF DUTIES.

The rights, duties and obligations of the Manager set forth herein may not be delegated or assigned to any Affiliate, Agent or other third party without the express prior written consent of the Company.

7. EXPENSES.

NY284047.4/1927-00031

(a) Other than as provided in Sections 7(b) and 7(c), the Manager shall be responsible for all expenses incurred by the Manager, his Agents and their Affiliates in the performance of the Manager's duties and obligations hereunder, including without limitation, any and all expenses relating to the performance of the Manager's duties and obligations set forth in Sections 1 and 2, the Manager's personnel (including with respect to compensation and benefits), office rental, overhead, utilities, stationery, insurance, regulatory and legal compliance, and tax expenses.

(b) Upon presentation of receipts or similar documentation, the Company shall reimburse the Manager for reasonable out-of-pocket expenses of the following types incurred by the Manager in connection with his performance under this Agreement:

(i) all reasonable, out-of-pocket travel and lodging costs incurred in connection with performing his duties pursuant to Section 1(b); and

(ii) out-of-pocket expenses incurred for retention of third party experts and service providers in furtherance of the Manager's performance of his duties hereunder, provided that such retention and expenses are preapproved by the Company.

(c) Unless specifically pre-approved by the Company in writing, the Manager shall not be entitled to reimbursement for any third party legal, accounting, Management, or other expenses incurred by the Manager, his Agents or their Affiliates in the performance of this Agreement.

## 8. MANAGEMENT FEE AND INCENTIVE COMPENSATION.

(a) Management Fee. During the Term of this Agreement, the Company shall pay to the Manager a quarterly fee for the services to be rendered hereunder, payable on or before the final calendar day of the relevant quarter by cash, check or wire transfer, as set forth in this Section 8(a) (the "Management Fee"). Prior to the Fully Invested Date, the Management Fee shall be payable quarterly in an amount equal to one-half of one percent (0.50%) of the Average NAV for the relevant quarter. After the Fully Invested Date, the Management Fee shall be payable quarterly in an amount equal to one-half of one percent (0.50%) of the Beginning NAV for the relevant quarter. The first payment of the Management fee shall occur on or about January 1, 2006.

(b) Incentive Compensation. During the Term of this Agreement, in addition to the Management Fee, the Company will issue to the Manager, if earned, an incentive fee based on the Profits received by the Company during the relevant year, in the amount and manner set forth in Exhibit B (the "Incentive Fee Schedule"), subject to the terms and restrictions set forth in the Incentive Fee Schedule.

-6-

(c) Termination Date. For the avoidance of doubt, no Management Fee or Incentive Fee shall be payable to the Manager at any time after the Termination Date.

9. LIMITATION ON LIABILITY; INDEMNITY.

(a) As used in this Section 9, the term "Manager" and "Company" shall include directors, general and limited partners, members, managers, officers, employees, agents, and Affiliates of such entity as well as the entity itself.

(b) The Manager may rely on any powers of attorney, certified charter documents, certificates of government authorities, certified resolutions, incumbency certificate, and any other properly certified legal existence, authority, or incumbency document reasonably believed by it to be genuine and to have been signed or presented by the proper person. The Manager need not investigate any fact or matter stated in any such document.

(c) Manager agrees to promptly advise the General Partner if Manager believes any action requested by the Company or the General Partner would be inconsistent with applicable laws and regulations.

(d) The Company shall indemnify and hold harmless each of the Manager, his Affiliates, employees, and Agents (together, the "Manager Indemnified Persons") from and against any and all third-party actions, suits, proceedings, claims, damages, settlement payments, losses, and liabilities arising in connection with Manager's performance under this Agreement, to the maximum extent permitted by Delaware law, unless they result from (i) such Manager Indemnified Person's breach of this Agreement, bad faith, gross negligence, fraud, or willful misconduct in the performance of such Manager Indemnified Person's duties under this Agreement or (ii) any Manager Indemnified Person acting beyond the scope of its authority under this Agreement.

(e) The Manager shall indemnify and hold harmless the Company, its Affiliates, and the general and limited partners, members, directors, managers, officers, employees, and Agents of the Company and its Affiliates (together, the "Company Indemnified Persons") from and against any and all third-party actions, suits, proceedings, claims, damages, settlement payments, losses, and liabilities arising in connection with (i) breach of this Agreement by the Manager, his Agents or their Affiliates, (ii) the bad faith, gross negligence, fraud, or willful misconduct of the Manager, his Agents or their Affiliates or (iii) the Manager, his Agents or their Affiliates acting beyond the scope of their authority under this Agreement.

(f) The Company may, in the sole discretion of the General Partner, advance to any Manager Indemnified Person amounts to cover expenses incurred by such Manager Indemnified Person in defense or settlement of any claim that may be subject to a right of indemnification hereunder prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Manager Indemnified Person to repay such amount if it

-7-

shall be determined ultimately by a court of competent jurisdiction that the Manager Indemnified Person is not entitled to be indemnified hereunder.

10. OTHER ACTIVITIES OF THE CONSULTANT.

(a) Other Activities. The Manager and his Affiliates may acquire, operate and/or manage ATMs for third parties or for the Manager's own account.

11. TERM.

(a) Term. This Agreement shall commence on January 1, 2006 (the "Commencement Date"), and shall continue until the sixth (6th) anniversary of the Commencement Date (the "Interim Period"), and may be extended as provided in Section 11(c), provided that this Agreement may be terminated by action of the Company as provided in Section 11(b). When exercising any such rights under Section 11(b)(i) to terminate this Agreement, the Company shall give the Manager 30 days prior notice of such termination, and any such termination pursuant to Section 11(b)(i) shall only become effective at the close of business in New York, New York on the 30th day following the date on which the Manager receives such notice, or such later termination date as may be specified in such notice. Upon any termination of this Agreement pursuant to Section 11(b), all authorities and duties of the Manager under this Agreement shall, except as otherwise provided in this Section 11, terminate. The termination date of this Agreement is herein referred to as the "Termination Date", and the period from the Commencement Date to the Termination Date is herein referred to as the "Term".

(b) Early Termination. The Company may terminate this Agreement at any time if the Manager has (i) breached in any material respect any term of this Agreement and failed to cure such breach within 30 days after notice thereof from the Company, (ii) engaged in any fraud, gross negligence or willful misconduct in relation to the Company, (iii) been charged with, convicted of, or entered a guilty plea or plea of nolo contendre with respect to, a felony or other crime involving dishonesty, (iv) commenced any voluntary bankruptcy, dissolution, or insolvency proceeding, (v) consented to, or failed to promptly contest, any involuntary bankruptcy, dissolution, or insolvency proceeding commenced by other parties, or (vi) become subject to any bankruptcy, dissolution, or insolvency proceeding that is not dismissed within 60 days.

(c) Extension. The parties may by mutual agreement extend the term of this Agreement beyond the Interim Period for any such extension of the term.

(d) Termination of this Agreement shall not affect the rights of the Manager (i) to reimbursement under Section 7 of costs and expenses incurred through the Termination Date; (ii) to receive under Section 8(a) any Management Fee accrued through the Termination Date; or (iii) to receive any Incentive Fee distributable under Section 8(b) calculated through the Termination Date.

-8-

(e) Promptly after the Termination Date, the Manager shall hand over to the Company or its designee all confidential information of the Company and all books of account, correspondence, and records of the Company that are in its possession or control, including any documentation relating to Company ATM Investments.

(f) Termination of this Agreement shall not affect the rights of the Company or the Manager under Section 9.

(g) Section 16 shall survive any termination of this Agreement.

12. ADDITIONAL COVENANTS.

(a) The Manager shall at any time during business hours permit any duly authorized representative or Agent of the General Partner to inspect any and all systems, procedures, records and documents of the Manager or any person to whom the Manager has delegated any or all of its functions, powers, discretions, Duties and obligations hereunder and shall give any such representative or Agent all information, explanations or assistance as such representative or Agent may reasonably require.

(b) The Manager shall meet with any duly authorized representative or Agent of the General Partner at such reasonable times as the General Partner may require to review and report on matters arising in connection with the services provided under this Agreement and to answer such questions as such persons may have.

(c) The Manager undertakes that he: (i) possesses and will continue to possess all authorizations from any relevant regulatory body (together the "Regulators") that are necessary or requisite to enable him fully and effectively to discharge his obligations under this Agreement and will immediately notify the General Partner of any alteration to its authorization which affects its ability to perform its obligations under this Agreement; (ii) will, at all times, comply with applicable legislation, statutory instruments and the rules and regulations of the Regulators as from time to time in force insofar as they relate to the performance of his obligations under this Agreement (together the "Legislation and Regulations"); and (iii) will not knowingly or recklessly do or omit to do anything that would cause the General Partner to be in breach of the Legislation and Regulations.

(d) The Manager undertakes promptly to notify the General Partner of any event which affects the Manager's ability to perform his Duties or obligations under this Agreement or which may result in the Manager's ability being so affected, or if a breach of any material provision of this Agreement occurs or is likely to occur. The Manager further undertakes promptly to do all such things as may reasonably be required by the General Partner or otherwise take all necessary steps to remedy or prevent such a breach.

(e) In the event that any third party fails to deliver any necessary documents, or pay any amount due, or otherwise settle a transaction within a reasonable period, so that the

-9-

Manager decides the third party is in breach of its obligations to the Company, the Manager will notify the General Partner forthwith and, at the option of the General Partner, pursue all appropriate legal remedies against the third party to settle the transaction or recover compensation in lieu therefor in accordance with the General Partner's instructions or assist the General Partner to pursue all such remedies. The costs and expenses properly incurred by the Manager in connection with the pursuit of such remedies shall be agreed in advance by the General Partner on behalf of the Company, and thereafter may be invoiced to the Company.

13. NOTICES.

Any notices, requests, and other communications under this Agreement shall be in writing, shall be sent via overnight courier service, facsimile transmission, or registered or certified mail (postage prepaid and return receipt requested), and will be deemed to have been received upon delivery to the address of the recipient party set forth on the signature page of this Agreement or to any other address that such party shall have designated in a notice to the other party.

14. RELATIONSHIP OF THE PARTIES.

This Agreement does not constitute a general agency, partnership or employer-employee relationship. The Manager is an independent contractor in respect of the activities contemplated in this Agreement. The Manager shall not be considered an agent or legal representative of the Company (or any Affiliate thereof) for any purpose, and neither the Manager nor any subcontractor, agent, employee or Affiliate of the Manager shall be, or be considered, an agent or employee of the Company (or any Affiliate thereof).

15. RESERVED.

16. CONFIDENTIALITY.

(a) For purposes of this Section 16, (i) "Confidential Material of the Company" means any and all non-public or proprietary information or material of the Company that is provided by or on behalf of the Company to the Manager or that is developed under the terms of this Agreement; and (ii) "Confidential Material" means any Confidential Material of the Company or Confidential Material of the Manager.

(b) For purposes of this Agreement, "Agents" means with respect to any party its employees, agents, and professional advisors, provided that the Manager shall not be considered an Agent of the Company.

(c) The Manager shall not, and he shall cause his Agents not to, (i) release or disclose any Confidential Material of the Company to any person other than the Manager, his Agents, the Company, the general and limited partners of the Company, or the

-10-

Company's service providers; or (ii) use any Confidential Material of the Company for the benefit of any person other than the Company.

(d) Nothing contained herein shall prevent any party from releasing or disclosing Confidential Material (i) to its financial, accounting, legal or other advisors or its independent auditors, (ii) to third parties as required under applicable laws, rules or regulations or by order of any court or governmental authority or self-regulatory organization, or (iii) that has become public through no fault of such party or its Agents.

(e) In the event the Company, the Manager or any of their Agents receives a request to disclose any Confidential Material under the terms of a subpoena, order, or other process issued by a court or other government agency (a "Request"), the party that received the Request shall (i) immediately notify the other party of the Request, and, (ii) if, in the opinion of such receiving party's counsel, disclosure of Confidential Material is legally required pursuant to the Request, disclose only so much of the Confidential Material as such receiving party is legally required to disclose and advise the other party of such disclosure as far in advance as is reasonably possible.

17. MISCELLANEOUS.

(a) Neither party may assign or transfer its rights or obligations hereunder without the prior written consent of the other party. Notwithstanding the foregoing, the Company may elect to make any ATM Investment in the name of (i) the Company, (ii) any Affiliate of the Company, or (iii) any managed account managed by the Company or an Affiliate of the Company, or using any combination of such entities.

(b) This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(c) This Agreement shall be construed in accordance with and governed by the laws of Delaware without regard to any choice of law rules that would require or permit the application of the laws of another jurisdiction.

(d) This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e) The headings of the various Sections hereof are for convenience of reference only and shall not affect the meaning or construction of any provisions hereof.

(f) Any provision of this agreement which is prohibited or unenforceable shall be ineffective only to the extent of such prohibition or unenforceability, without invalidating the remaining provisions hereof.

NY284047.4/1927-00031

(g) No failure or delay on the part of any party hereto in exercising any right hereunder shall operate as a waiver of, or impair, any such right. No single or partial exercise of any such right shall preclude any other or further exercise of any other rights. No waiver of any such right shall be effective unless given in writing. No waiver of any such right shall be deemed a waiver of any other right hereunder.

(h) This Agreement may be amended (or provisions of this Agreement waived) only by an instrument in writing signed by the General Partner (on behalf of the Company) and the Manager.

(i) This Agreement and the Confidentiality Agreement contain the entire agreement between the parties with respect to the subject matter hereof and thereof. This Agreement supersedes all prior discussions and understandings concerning the subject matter hereof.

18. RULES OF INTERPRETATION.

The following rules shall apply in the interpretation of this Agreement:

(a) The singular shall include the plural, and the plural shall include the singular.

(b) A reference to any gender shall include each other gender.

(c) A reference to any Section shall, unless otherwise specified, be to a Section of this Agreement.

(d) A reference to any agreement, instrument, organizational document, law, regulation, or other document shall include any amendments, modifications, restatements, or supplements thereof.

(e) The words "include" and "including" shall not be limiting.

19. DEFINITIONS.

The following definitions shall apply to this Agreement:

"Affiliate" means with respect to any person any other person who either directly or indirectly (i) controls such first person, (ii) is controlled by such first person, or (iii) is under common control with such first person. For this purpose "control" shall mean the ability to direct the management or policies of a person by ownership of voting securities, contract, or otherwise.

"Agents" shall have the meaning assigned to it in Section 16(b).

-12-

"Agreement" means this Management Agreement by and between the Company and the Manager.

"ATM Investments" shall have the meaning assigned to it in Section 1(b)(iv).

"ATMs" shall have the meaning set forth in the recitals to this Agreement.

"Average Quarterly NAV" means, for any given quarter, the average Daily Net Asset Value of such quarter, calculated based on the actual number of days elapsed.

"Beginning NAV" means, for any given quarter, the Company's Net Asset Value as of the first calendar day of such quarter.

"Cash Proceeds" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Clause" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Commencement Date" shall have the meaning assigned to it in Section 11(a).

"Committed Amount" shall have the meaning assigned to it in the Investment Policy.

"Company" means Caspian Opportunities, Inc a corporation organized under the laws of Delaware.

"Company Accounts" shall have the meaning assigned to it in Section 2(g).

"Company Indemnified Persons" shall have the meaning assigned to it in Section 9(e).

"Confidential Material" shall have the meaning assigned to it in Section 16(a).

"Confidential Material of the Company" shall have the meaning assigned to it in Section 16(a).

"Daily Net Asset Value" means, for any given day, the Net Asset Value as of such date.

"Disclosed Conflict" shall have the meaning assigned to it in Section 2(e).

"Duties" shall have the meaning assigned to it in Section 1(a).

"Ending NAV" means, for any given quarter, the Company's Net Asset Value as of the last calendar day of such quarter.

-13-

"Entity" means any corporation, company, partnership, trust, unincorporated association, joint venture, limited liability company, or other legal entity.

"Expenses" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Fully Invested Date" shall have the meaning assigned to it in Section 10(a).

"General Partner" means Caspian Opportunities, Inc, a company and general partner of the Company.

"Incentive Fee" shall have the meaning assigned to it in Clause 1 of Exhibit B.

"Incentive Fee Schedule" shall have the meaning assigned to it in Section 8(b).

"Interim Period" shall have the meaning assigned to it in Section 11(a).

"Investment Memorandum" shall have the meaning assigned to it in Section 2(b).

"Investment Notice" shall have the meaning assigned to it in Section 2(b).

"Investment Opportunity" shall have the meaning assigned to it in Section 2(b).

"Investment Policy" shall mean the investment policies and restrictions set forth on Exhibit A hereto, as may be amended from time to time pursuant to Section 17(h).

"Investment Portfolio" shall mean, as of any given date, any and all ATM Investments owned by the Company as of such date.

"Legislation and Regulations" shall have the meaning assigned to it in Section 12(c).

"Loss Carry Forward" shall have the meaning assigned to it in Clause 4 of Exhibit B.

"Agreement" shall mean the Management Agreement between  Caspian Opportunities, Inc. and Robert Ong.

"Management Fee" shall have the meaning assigned to it in Section 8(a).

"Manager" means Robert Ong, an individual, in his capacity as manager of the Company pursuant to this Agreement.

"Manager Indemnified Persons" shall have the meaning assigned to it in Section 9(d).

-14-

"Net Asset Value" means, as of any given date, the fair market value of all ATMs owned by the Company as of such date, as determined by the General Partner in its reasonable discretion. For the avoidance of doubt, Net Asset Value shall not include the value of any cash, securities or other assets of any kind of the Company, other than ATMs.

"person" means any individual or Entity.

"Profits" shall have the meaning assigned to it in Clause 2 of Exhibit B.

"Regulators" shall have the meaning assigned to it in Section 12(c).

"Request" shall have the meaning assigned to it in Section 16(e).

"Term" shall have the meaning assigned to it in Section 11(a).

"Termination Date" shall have the meaning assigned to it in Section 11(a).

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be executed and delivered in their names and on their behalf by the undersigned, thereunto duly authorized, on the day and year first above written.

Caspian Opportunities, Inc
By: Its Principal or Senior Manager

By:_____

Name: _____

Title: _____

Address: 500 Mamaroneck Avenue, Suite 101
Harrison, New York  10528

ROBERT ONG

By:_____  1/30/06

Address:
c/o Jade Stone Capital Management, LLC
143 S. Bedford Rd
Pound Ridge, NY 10576

-16-

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be executed and delivered in their names and on their behalf by the undersigned, thereunto duly authorized, on the day and year first above written.

Caspian Opportunities, Inc
By: Its Principal or Senior Manager

By: _____

Name: _____Adam S. Chu_____

Title: _____Partner_____

Address: 500 Mamaroneck Avenue, Suite 101
Harrison, New York 10528

ROBERT ONG

By: _____   1/30/06

Address:
c/o Jade Stone Capital Management, LLC
143 S. Bedford Rd
Pound Ridge, NY 10576

-16-

Exhibit A

Investment Policy

1.   The maximum aggregate amount to be invested by the Company pursuant to the Agreement shall be $30,000,000 (the "Committed Amount").

2.   The target net return for ATM Investments will generally be in the range of at least 20% per annum.

3.   ATM Investments may take the form of single-unit or portfolio investments (i.e. the purchase of a pool of existing ATMs).

4.   The Company shall only acquire ATMs located in the United States of America.

5.   Each ATM to be purchased by the Company must meet the following minimum operating criteria: (i) have a minimum of six (6) years remaining on the space lease agreement with the merchant or relevant party, (ii) be either Triple Data Encryption Standard or Advanced Encryption Standard compliant, (iii) have a minimum of six (6) months of performance history, (iv) comply with the Americans with Disabilities Act requirements for wheelchair and handicap access, (v) have an average minimum monthly net income of at least four hundred dollars ($400.00) based on performance history information gathered within twelve (12) months prior to its purchase.

NY284047.4/1927-00031

Exhibit B

Incentive Fee Schedule

Capitalized terms used herein without definition shall have the meanings assigned to them in the Management Agreement dated as of January 1, 2006 (the "Agreement") by and between Caspian Opportunities, Inc (the "Company") and Robert Ong (the "Manager").

1. The Incentive Fee. During the Term of the Agreement, in addition to the Management Fee, the Manager shall be eligible to receive, if earned, a monthly fee as set forth herein, based on the Cash Proceeds received by the Company from ATM Investments during the relevant month (the "Incentive Fee").

2. Definitions. The following terms have the meanings stated:

"Capital Appreciation" means, for any given calendar year, an amount (which shall not be less than zero) equal to (x) the Net Asset Value as of the last calendar day of such year, minus (y) the Net Asset Value as of the first calendar day of such year.

"Capital Depreciation" means, for any given calendar year, an amount (which shall not be less than zero) equal to (x) the Net Asset Value as of the first calendar day of such year, minus (y) the Net Asset Value as of the last calendar day of such year.

"Cash Proceeds" means, for any given calendar month, an amount (which shall not be less than zero) equal to (x) the net cash received by the Company during such month from usage and transaction fees generated by ATM Investments in the ordinary course of their operation, less (y) the Management Fee payable for such month and all Expenses paid or attributable to such month. For the avoidance of doubt, Cash Proceeds shall not include any proceeds from sales and other dispositions of ATMs by the Company.

"Clause", as used in this Incentive Fee Schedule, means a clause within this Incentive Fee Schedule.

"Expenses" means (i) all costs, fees and expenses paid by or on behalf of the Company to third parties, including without limitation, technicians, maintenance providers, contractors, consultants, accountants, attorneys, bankers, brokers, agents, advisors, and other persons retained in connection with the maintenance, repair, servicing, stocking, refilling, evaluation, acquisition, improvement or disposition of ATM Investments, and (ii) all interest, letter of credit fees and other financing charges and fees paid in connection with the acquisition or improvement of any ATM Investments.

"Loss Carry Forward" shall have the meaning given in Clause 4.

-18-

"Profits" means, for any given calendar year, an amount equal to (x) the aggregate Cash Proceeds for such year, plus (y) any Capital Appreciation for such year, minus (z) any Capital Depreciation for such year.

3. Incentive Fee.  Subject to Clause 4, Cash Proceeds received during any given calendar month during the Term shall be distributed as set forth in this Clause 3 on or before the last calendar day of such month. (For the avoidance of doubt, attached as Exhibit C to the Agreement is an example setting forth the manner in which Cash Proceeds are intended to be distributed under this Clause 3, given the hypothetical Cash Proceeds amounts set forth therein.)

(a) First, 100% of any such Cash Proceeds shall be paid to the Company until the aggregate payments to the Company under this Clause 3(a) equal the sum of (i) 10% of the Committed Amount, and (ii) 100% of any Loss Carry Forward;

(b) Second, subject to Clause 4(b), 100% of any Profits available for distribution after payment of the amounts set forth in Clause 3(a) shall be paid to the Manager until such time as the Manager has received under this Clause 3(b) an amount equal to 20% of the Profits for such calendar year.

(c) Third, 100% of any remaining Cash Proceeds available for distribution after payment of the amounts set forth in Clauses 3(a) and (b) shall be paid to the Company.

4. Calculations.

(a) Loss Carry Forward.  If the Cash Proceeds for any given month are insufficient to pay in full the maximum amount payable to the Company during such month under Clause 3(a), such unpaid amount shall carry over to the following month as an additional amount for which the Company must be paid in full during such following month pursuant to Clause 3(a)(ii), prior to the Manager receiving any distributions for such following month pursuant to Clause 3 (all such unpaid amounts in the aggregate, the "Loss Carry Forward").

(b) Timing of Payments.  Notwithstanding anything to the contrary herein, no amounts payable with respect to any given calendar year pursuant to Clause 3(b) shall be paid prior to the last calendar day of such year.

-19-

**Caspian Opportunities, Inc.**

1/30/06; 15:3

## Compensation Structure

| | | | | |
|---|---|---|---|---|
| Machine price | 16,600 | Preferred hurdle rate | 10.0% | |
| Sale value | 16,600 | Mgmt fee | 2.0% | |
| | | Incentive fee | 20.0% | |

| Period | 0 | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| Date | 1/1/06 | 1/1/06 | 1/1/07 | 1/1/08 | 1/1/09 | 1/1/10 | 1/1/11 |
| Pre-fee dividend rate | | 28.9% | 28.9% | 28.9% | 28.9% | 28.9% | 28.9% |
| Investment/sale cash flows | | (16,600) | - | - | - | | |
| Gross dividend ($) | | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Mark-to-market | | - | - | - | - | - | |
| Mgmt fee | | (332) | (332) | (332) | (332) | (332) | (332) |
| **Total P&L** | | 4,468 | 4,468 | 4,468 | 4,468 | 4,468 | 4,468 |
| Beginning NAV | | 16,600 | 16,600 | 16,600 | 16,600 | 16,600 | 16,600 |
| Mark-to-market | | = | = | = | = | = | - |
| Ending NAV | | 16,600 | 16,600 | 16,600 | 16,600 | 16,600 | 16,600 |
| **Average NAV** | | 16,600 | 16,600 | 16,600 | 16,600 | 16,600 | 16,600 |
| Current year preferred return | | 1,660 | 1,660 | 1,660 | 1,660 | 1,660 | 1,660 |
| Prior year catch-up | | = | = | = | = | = | - |
| **Total preferred hurdle** | | 1,660 | 1,660 | 1,660 | 1,660 | 1,660 | 1,660 |
| Cumualtive deficit | | - | - | - | - | - | - |

-20-

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash flow after preferred hurdle | | 2,808 | 2,808 | 2,808 | 2,808 | 2,808 | 2,808 |
| | | | | | | | |
| Bob's pref return | | 893.60 | 893.60 | 893.60 | 893.60 | 893.60 | 893.60 |
| % of total CF | | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Bob's mgmt fee | | 332 | 332 | 332 | 332 | 332 | 332 |
| **Bob's total cash flow** | | 1225.60 | 1225.60 | 1225.60 | 1225.60 | 1225.60 | 1225.60 |
| | | | | | | | |
| Supplemental CF to Caspian Opp | | 1914.40 | 1914.40 | 1914.40 | 1914.40 | 1914.40 | 1914.40 |
| **Total CF to Caspian Opp** | | 3574.40 | 3574.40 | 3574.40 | 3574.40 | 3574.40 | 3574.40 |
| % of total CF | | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| **XIRR calc** | 11.6% (16,600) | 3574.40 | 3574.40 | 3574.40 | 3574.40 | 3574.40 | 3574.40 |

-21-

# EXHIBIT F

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT made as of this 1st day of April, 2006, by and between 36 Main Street, LLC., a Nevada Limited Liability Corporation having its offices at 2400 Dallas Pkwy., Ste. 180, Plano, Texas 75093 ("Seller"), and Greywolf Holdings, LP ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Purchaser desires to purchase the Assets of Seller attached hereto as Schedule A (the "Assets"); and

WHEREAS, Seller desire to sell the Assets.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto agree as follows:

1.       Purchase and Sale at the Closing.

1.1.  On the terms and subject to the conditions provided in this Agreement, at the "Closing" (as hereinafter defined), Seller shall convey, sell, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase and accept, all the right, title, and interest of Seller in and to the Assets as set forth on Schedule A annexed hereto and made a part of hereof.

1.2.       The Assets shall be acquired in good working condition free and clear of any liens, claims and encumbrances.

1.3.       The transfer of the Assets as herein provided shall be effected by a bill of sale, delivered to Purchaser on the Closing Date in form sufficient to transfer the Assets as contemplated by this Agreement and as shall be reasonably requested by Purchaser.

2.       Purchase Price.   The purchase price for the Assets shall be $16,600 (Sixteen Thousand Six Hundred Dollars) per ATM Business for and aggregate of $464,800 (Four Hundred Sixty Four Thousand Eight Hundred Dollars) to be paid in cash via sire transfer at Closing.

3.       The Closing.   The closing of the transaction contemplated by this Agreement (the "Closing") shall be held at such place, time, and date as may be agreed to by Seller and Purchaser (the "Closing Date").

4.       Seller's Representations and Warranties.   Seller represents and warrants to Purchaser as follows:

4.1. Seller is a corporation duly organized, validly existing, and in good standing under the laws of Texas, and has full power and authority to own its assets and carry on its business as and in the places where such assets are now owned or such business is now being conducted. Seller has not taken any action or failed to take any action that would preclude or prevent Purchaser from conducting its business after the Closing in the same manner as it is now conducted.

4.2. No action, approval, consent, or authorization by any governmental or quasi-governmental agency, commission, board, bureau, or instrumentality is necessary as to Seller in order to constitute this Agreement as a binding and enforceable obligation of Seller in accordance with its terms.

4.3. To the best of Seller's knowledge, there have been no material adverse changes in the Assets, and Seller has not:

4.3.1.   incurred any damage, destruction, or similar loss, whether or not covered by insurance, materially affecting the Assets;

1

4.3.2.    mortgaged, pledged, or granted or suffered to exist any lien or other encumbrance or charge on any of the Assets; and

4.3.3.    waived any rights of material value or cancelled any material debts or claims regarding the Assets.

4.4. Seller has duly paid all applicable federal, state, county, foreign and local income, profit: franchise, excise, sales, use, occupancy, property, withholding, and other taxes returns and reports required to have been paid by it to the date hereof.

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

4.6. The Seller will provide safe and proper storage for the Assets until such time as the Assets are delivered to Buyer at such premises described in the attached Schedule A.

4.7. There are no litigations, suits, proceedings, actions, arbitrations or administrative proceedings pertaining to the assets in which Seller is a party.

4.8. Seller has all required permits, licenses, orders, and approvals of, and has made all required filings with, all federal, or local governmental or regulatory bodies required for it sell the Assets. All such permits licenses, orders, and approvals are in full force and effect and no suspension or cancellation of any of them is pending or threatened. No such permits, licenses, orders, or approvals will be adversely affected by the consummation of the transactions contemplated by this Agreement. Seller is in compliance with all such permits, licenses, orders, and approvals and with all limitations, conditions, standards, and requirements contained in those laws, rules, regulations, codes, orders, judgments, and decrees applicable to it and the business conducted by it.

4.9. No representation or warranty by Seller in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the transaction contemplated hereby contains any untrue statement of material fact or omits tot state a material fact necessary to make the statements or facts contained herein or therein not misleading.

4.10.    Seller has maintained and will continue to maintain until Closing in full force and effect, all policies of fire, liability, and other forms of insurance listed, to comply with all laws affecting the Assets (except where the failure to comply would not have any adverse effect on such business) and shall give prompt notice to Purchaser of any change in the information contained in its representation and warranties hereunder.

2

5.         Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller as follows:

5.1. Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of the State of New York. Purchaser has full power and authority to enter into this Agreement and to assume and perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of it obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of it obligations hereunder have been duly authorized by it Members and its shareholders, and no further action or approval is required to constitute this Agreement as a binding and enforceable obligation of Purchaser. The execution and delivery hereof and the performance by Purchaser of it obligations hereunder will not (i) violate any provision of law, any governmental regulation or any judgment, writ, injunction, decree, or order of any court or other governmental authority relating to it, or (ii) violate any indenture, contract, other commitment, or restriction to which it is a party or by which it or its Assets are bound, or (iii) be in conflict with or result in or constitute a breach or default (or an occurrence which by the lapse of time or the giving of notice or both would constitute a breach or default), on its part under any such indenture, contract, other commitment, or restriction, or (iv) conflict with its certificate of Incorporation.

5.2. No representation or warranty by Purchaser in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the transaction contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

6.         Remedies for Breach.

6.1. If Purchaser elects to close the transaction contemplated by this Agreement and Seller wrongfully refuses so to do, or if Seller fails, or if a filing by Seller is threatened, to comply with any of its covenants and agreements contained in this agreement, then in addition to all other remedies which may be available to it, Purchaser shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to recover from Seller its losses, costs, and expenses, including reasonable attorney's fees, incurred by Purchaser in securing such injunctive or equitable relief.

6.2. If Seller elects to close the transaction contemplated by this Agreement and Purchaser wrongfully refuses so to do, of if Purchaser fails, or if a failing Purchaser is threatened, to comply with any of its covenants and agreements contained in this Agreement, then in addition to all other remedies which may be available to it, Seller shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to recover from Purchaser its losses, costs and expenses, including reasonable attorney's fees, incurred by it in securing such injunctive or equitable relief.

6.3. The specific remedies to which any party may resort under the terms of this Agreement cumulative and are not intended to be exclusive of any remedies or means of redress to which it may lawfully be entitled in case of any breach or threatened breach or failure or observance or performance of any representation, warranty, covenant, agreement, or commitment made hereunder or relating to or by reason of any such representation, warranty, covenant, agreement, or commitment being untrue or incorrect.

6.4. The ATM machines are warranted by the Seller to operate as designed for a period of thirty (30) days after delivery. All other representations, warranties, covenants, and agreements made by the parties to this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder for a period of five years.

7.                 Indemnification.

7.1. Purchaser shall defend and promptly indemnify Seller and save Seller harmless from, against, for, and in respect of, and pay any and all damages, losses, obligations, liabilities, attorneys' fees encumbrances, deficiencies, costs, and expenses, including, without limitation, reasonable attorneys' fees, and other costs and expenses incident to any suit, action, investigation, claim, or proceeding suffered, sustained, incurred, or required to be paid by Seller by reason of any breach or failure of observance of performance of any representation, warranty, covenant, or agreement being untrue or incorrect in any respect.

7.2. Seller shall defend and promptly indemnify Purchaser and save and hold it harmless from, against, for, and in respect of, and pay any and all damages, losses, obligations, liabilities, claims, encumbrances, deficiencies, costs, and expenses, including, without limitation, reasonable attorneys' fees, and other costs and expenses incident to any suit, action, investigation, claim, or proceeding suffered sustained, incurred, or required to be paid by Purchaser or Seller by reason of (i) all liabilities and obligations of Seller not expressly assumed by Purchaser hereunder, or (ii) any breach or failure of observance or performance of any representation, warranty, covenant, or agreement made by Seller hereunder or relating to or as a result of any such representation, warranty, covenant, or agreement being untrue or incorrect in any respect.

7.3. In the event that at any time on or before the first anniversary of the Closing, one party ("Indemnifier") shall be obligated to the other ("Indemnitee") pursuant to this Article 7.3 or in the event that a suit, action, investigation, claim, or proceeding is begun, made or instituted prior to such anniversary as a result of which Indemnifier may become obligated to Indemnitee hereunder, Indemnitee shall give prompt written notice to Indemnifier of the occurrence of such event. Indemnifier agrees to defend, contest, or otherwise protect Indemnitee against any such suit, action, investigation, claim, or proceeding at Indemnifier's own cost and expense using counsel reasonably satisfactory to Indemnitee. Indemnitee shall have the right but not the obligation to participate at its own expense in the defense thereof by counsel of it own choice. In the event that indemnifier fails timely to defend, contest, or otherwise protect against any such suit, action, investigation, claim, or proceeding, Indemnitee shall have he right to defend, contest, or otherwise protect against the same and may make any compromise or settlement thereof and recover the entire cost thereof from Indemnifier, including, without limitation, reasonable attorneys' fees, disbursements, and all amounts paid as a result of such suit, action investigation, claim, or proceeding, or compromise or settlement thereof. Any failure by Indemnitee to comply with the notice requirement of this Paragraph 7.3 shall relieve the Indemnifier of its obligations hereunder only if Indemnifier does not otherwise receive actual notice of the event as to which indemnification is sought.

8.                 General Provisions.

8.1. Notice. Any notice, report, demand, or payment required, permitted, or desired to be given pursuant to any of the provisions of this Agreement shall be deemed to have been sufficiently given or served for all purposes if hand delivered by a responsible overnight delivery service or sent by certified or registered mail, return receipt requested and postage prepaid as follows:

        36 Main Street, LLC.
        2400 Dallas Pkwy., Ste. 180
        Plano, TX 75093

If to Purchaser, at its address set forth above, with copies to:

        Greywolf Holdings, LP
        4 Manhattanville Rd., Ste. 201
        Purchase, NY 10577

If to Seller, at its address set forth above.

4

Any of the foregoing parties may at any time and from time to time change the address which notice shall be sent hereunder by notice to the other parties given under this paragraph. The date of giving of such notice shall be the date of hand delivery or delivery by responsible overnight delivery service or the date three days following the posting of the mail.

8.2. Purchaser and Seller each shall bear its own legal fees and other costs and expenses with respect to this transaction.

8.3. This agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof. No change, modification, addition, or termination of this Agreement or any part thereof shall be valid unless in writing and signed by or on behalf of the party to be charged therewith.

8.4. No waiver of the provisions hereof shall be effective unless in writing and signed by the party to be charged with such waiver. No waiver shall be deemed a continuing waiver or waiver in respect of any subsequent breach or default, either of a similar or different nature, unless expressly so stated in writing.

8.5. Should any clause, section, or part of this Agreement be held or declared to be void or illegal for any reason, all other clauses, sections, or parts of this Agreement that can be effected without such illegal clause, section, part shall nevertheless remain in full force and effect.

8.6. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the parties hereto and their respective assigns.

8.7. This Agreement maybe executed by facsimiles and in any number of counterparts, each of which, when taken together, shall constitute on and the same instrument.

8.8. Jurisdiction. It is the intention of the parties that the laws of the State of Florida shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties with proper venue being Lake County, Florida.

8.9. Construction. The parties agree and acknowledge that each party has reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting parties shall not be employed in the interpretation of this Agreement or any amendment or exhibit thereto.

8.10.      Time of the Essence. The parties acknowledge that for purposes of this Agreement, time is of the essence.

8.11.      Survival. All statements contained in this Agreement or any certificate or other instrument delivered pursuant hereto, or in connection with the transactions contemplated hereby, shall be deemed representations and warranties made by the parties in this Agreement which shall survive the Closing and any investigation at any time made by or on behalf of the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed on the date and year first above written.

36 Main Street, LLC.                              Greywolf Holdings, LP

By: _____                      By: _____
Danielle Jones
Vice President

ATM #'s: 1304-1331

| # | Location | Address | City | State | Zip | Serial # | Make | Average |
|---|----------|---------|------|-------|-----|----------|------|---------|
| 1304 | Quillins, Inc. | 1515 West Ave. S. | LaCrosse | WI | 54601 | TR550439 | Tidel | 401 |
| 1305 | Roettgers Co., Inc. | 5169 N. 37th St. | Milwaukee | WI | 53209 | TR610562 | Tidel | 402 |
| 1306 | Ronaco, Inc. | 3515 S. 282nd St. | Auburn | WA | 98001 | TR610668 | Tidel | 401 |
| 1307 | Ronetco Supermarkets, Inc. | 1070 US Highway 46 | Ledgewood | NJ | 07852 | TR550631 | Tidel | 402 |
| 1308 | Rose & Associates | 2701 Beacon Ave. S | Seattle | WA | 98144 | TR610431 | Tidel | 403 |
| 1309 | S&R Quisberg, Inc. | 375 Edgewood Dr. N. | Baxter | MN | 56425 | TR610705 | Tidel | 401 |
| 1310 | Saars, Inc. | 551 NE Midway Blvd., Ste. 1 | Oak Harbor | WA | 98277 | TR688414 | Tidel | 400 |
| 1311 | Sagaya Corp. | 3310 Arctic Blvd. | Anchorage | AK | 99503 | TR689105 | Tidel | 406 |
| 1312 | Save More Market, Inc. | 334 S. 13th St. | Tekamah | NE | 68061 | TR705541 | Tidel | 402 |
| 1313 | Scottsburg Save-A-Lot | 130 W. McClain Ave. | Scottsburg | IN | 47170 | TR550164 | Tidel | 403 |
| 1314 | Seabras Group, Inc. | 574 Ferry St. | Newark | NJ | 07105 | TR550184 | Tidel | 401 |
| 1315 | Select Market, Inc. | 110 Deer Creek Rd. | Selma | OR | 97538 | TR550194 | Tidel | 404 |
| 1316 | Severson Oil Co. | 265 E. Mark St. | Winona | MN | 55987 | TR550223 | Tidel | 401 |
| 1317 | Shoppers Express | 108 W. 2100 S | Salt Lake City | UT | 84115 | TR550231 | Tidel | 400 |
| 1318 | Shore Foods | 115 Garfield Pkwy. | Bethany Beach | DE | 19930 | TR550244 | Tidel | 401 |
| 1319 | Skico, Inc. | 508 S. Detroit St. | Lagrange | IN | 46761 | TR550321 | Tidel | 401 |
| 1320 | Sleepers Lebanon St. Market | 45 Lebanon St. #A | Sanford | ME | 04073 | TR550327 | Tidel | 401 |
| 1321 | SOCO, Inc. | 1111 N. Jefferson St. | Indianola | IA | 50125 | TR550677 | Tidel | 400 |
| 1322 | Southeast Petroleum Corp. | W229N2573 Duplainville Rd. | Waukesha | WI | 53186 | TR550621 | Tidel | 400 |
| 1323 | T.A. Soldberg Co., Inc. | 420 Oneida St. | Minocqua | WI | 54548 | TR911061 | Tidel | 401 |
| 1324 | Tabish Bros Dist. Inc. | 1002 E. Broadway St. | Missoula | MT | 59802 | TR936472 | Tidel | 400 |
| 1325 | Tevis Oil, Inc. | 82 John St. | Westminster | MD | 21157 | TR845613 | Tidel | 400 |
| 1326 | Torcroft, LLC | 16320 SE Cascade Park Dr. | Vancouver | WA | 98683 | TR947777 | Tidel | 403 |
| 1327 | Totrama, Inc. | 25 Village Plaza Way | North Scituate | RI | 02857 | TR966741 | Tidel | 405 |
| 1328 | Tri-Town Foods, Inc. | 119 S. Main St. | Colchester | CT | 06415 | TR951051 | Tidel | 403 |
| 1329 | Uwajimaya, Inc. | 4601 6th Ave. S | Seattle | WA | 98108 | TR550516 | Tidel | 402 |
| 1330 | Yoder Oil Co., Inc. | 2204 California Rd. | Elkhart | IN | 46514 | TR550591 | Tidel | 402 |
| 1331 | Yorkstown Oil Co., Inc. | 2801 Roeder Ave. | Bellingham | WA | 98225 | TR550583 | Tidel | 401 |

*36 Main Street, LLC.*
*2400 Dallas Pkwy., Ste. 180*
*Plano, TX 75093*

## BILL OF SALE

Pursuant to and in accordance with that certain Asset Purchase Agreement by and between 36 Main Street, LLC. ("36 Main Street") and Greywolf Holdings, LP dated the 1st day of April, 2006, 36 Main Street hereby conveys, sells, transfers and assigns to Greywolf Holdings, LP, all of the right, title and interest of 36 Main Street in and to the assets on Schedule A attached hereto including all ATM royalty agreements and related equipment (the "Assets").

36 Main Street represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

The 36 Main Street will provide safe and proper storage for the Assets until such time as the Assets are delivered to Greywolf Holdings, LP at such premises described in the attached Schedule A.

36 Main Street will receive as good and valuable consideration for the transfer of the Assets herein proceeds in the amount of Four Hundred Sixty Four Thousand Eight Hundred Dollars ($464,800).

IN WITNESS WHEREOF, the 36 Main Street has executed this Bill of Sale this 1st day of April, 2006.

36 Main Street, LLC.


By: _Danni Jones_
Name: Danielle Jones
Title: Vice President


State of ___TEXAS___ )
                      ) ss:
County of ___COLLIN___ )

On the __5th__ day of __April__ in the year __2006__, before me, the undersigned, personally appeared ___Danielle Jones___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_Sheri K. Hardeman_
Signature and Office of Individual
taking acknowledgement



SHERRI K. HARDEMAN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
AUGUST 28, 2007

# EXHIBIT G

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT made as of this 1st day of February, 2006, by and between 36 Main Street, LLC, a Nevada Limited Liability Corporation having its offices at 2400 Dallas Pkwy., Ste. 180, Plano, TX 75093 ("Seller"), and Caspian Opportunities, Inc. ("Purchaser").

## WITNESSETH:

WHEREAS, Purchaser desires to purchase the Assets of Seller attached hereto as Schedule A (the "Assets"); and

WHEREAS, Seller desire to sell the Assets,

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto agree as follows:

1.    Purchase and Sale at the Closing.

1.1.    On the terms and subject to the conditions provided in this Agreement, at the "Closing" (as hereinafter defined), Seller shall convey, sell, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase and accept, all the right, title, and interest of Seller in and to the Assets as set forth on Schedule A annexed hereto and made a part of hereof.

1.2.    The Assets shall be acquired in good working condition free and clear of any liens, claims and encumbrances.

1.3.    The transfer of the Assets as herein provided shall be effected by a bill of sale, delivered to Purchaser on the Closing Date in form sufficient to transfer the Assets as contemplated by this Agreement and as shall be reasonably requested by Purchaser.

2.    Purchase Price.    The purchase price for the Assets shall be $16,600 (Sixteen Thousand Six Hundred Dollars) per ATM Business for and aggregate of $647,400 (Six Hundred Forty Seven Thousand Four Hundred Dollars) to be paid in cash via wire transfer at Closing.

3.    The Closing.    The closing of the transaction contemplated by this Agreement (the "Closing") shall be held at such place, time, and date as may be agreed to by Seller and Purchaser (the "Closing Date").

4.    Seller's Representations and Warranties.    Seller represents and warrants to Purchaser as follows:

4.1. Seller is a corporation duly organized, validly existing, and in good standing under the laws of Florida, and has full power and authority to own its assets and carry on its business as and in the places where such assets are now owned or such business is now being conducted. Seller has not taken any action or failed to take any action that would preclude or prevent Purchaser from conducting its business after the Closing in the same manner as it is now conducted.

4.2. No action, approval, consent, or authorization by any governmental or quasi-governmental agency, commission, board, bureau, or instrumentality is necessary as to Seller in order to constitute this Agreement as a binding and enforceable obligation of Seller in accordance with its terms.

4.3. To the best of Seller's knowledge, there have been no material adverse changes in the Assets, and Seller has not:

4.3.1.    incurred any damage, destruction, or similar loss, whether or not covered by insurance, materially affecting the Assets;

1

Feb 03 2006 3:11PM    Jade Stone Capital Manage    914 764 9668    p.4

Feb '03 08 02:02p    Walter Netschi    972-403-3308    p.4

4.3.2.    mortgaged, pledged, or granted or suffered to exist any lien or other encumbrance or charge on any of the Assets; and

4.3.3.    waived any rights of material value or cancelled any material debts or claims regarding the Assets.

4.4. Seller has duly paid all applicable federal, state, county, foreign and local income, profits, franchise, excise, sales, use, occupancy, property, withholding, and other taxes returns and reports required to have been paid by it to the date hereof.

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

4.6. The Seller will provide safe and proper storage for the Assets until such time as the Assets are delivered to Buyer at such premises described in the attached Schedule A.

4.7. There are no litigations, suits, proceedings, actions, arbitrations or administrative proceedings pertaining to the assets in which Seller is a party.

4.8. Seller has all required permits, licenses, orders, and approvals of, and has made all required filings with, all federal, or local governmental or regulatory bodies required for it sell the Assets. All such permits licenses, orders, and approvals are in full force and effect and no suspension or cancellation of any of them is pending or threatened. No such permits, licenses, orders, or approvals will be adversely affected by the consummation of the transactions contemplated by this Agreement. Seller is in compliance with all such permits, licenses, orders, and approvals and with all limitations, conditions, standards, and requirements contained in those laws, rules, regulations, codes, orders, judgments, and decrees applicable to it and the business conducted by it.

4.9. No representation or warranty by Seller in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the transaction contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements or facts contained herein or therein not misleading.

4.10.    Seller has maintained and will continue to maintain until Closing in full force and effect, all policies of fire, liability, and other forms of insurance listed, to comply with all laws affecting the Assets (except where the failure to comply would not have any adverse affect on such business) and shall give prompt notice to Purchaser of any change in the information contained in its representation and warranties hereunder.

2

5.    Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller as follows:

5.1. Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware. Purchaser has full power and authority to enter into this Agreement and to assume and perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of it obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of it obligations hereunder have been duly authorized by it Members and its shareholders, and no further action or approval is required to constitute this Agreement as a binding and enforceable obligation of Purchaser. The execution and delivery hereof and the performance by Purchaser of it obligations hereunder will not (i) violate any provision of law, any governmental regulation or any judgment, writ, injunction, decree, or order of any court or other governmental authority relating to it, or (ii) violate any indenture, contract, other commitment, or restriction to which it is a party or by which it or its Assets are bound, or (iii) be in conflict with or result in or constitute a breach or default (or an occurrence which by the lapse of time or the giving of notice or both would constitute a breach or default), on its part under any such indenture, contract, other commitment, or restriction, or (iv) conflict with its certificate of incorporation.

5.2. No representation or warranty by Purchaser in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the transaction contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

6.    Remedies for Breach.

6.1. If Purchaser elects to close the transaction contemplated by this Agreement and Seller wrongfully refuses so to do, or if Seller fails, or if a filing by Seller is threatened, to comply with any of its covenants and agreements contained in this agreement, then in addition to all other remedies which may be available to it, Purchaser shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to recover from Seller its losses, costs, and expenses, including reasonable attorney's fees, incurred by Purchaser in securing such injunctive or equitable relief.

6.2. If Seller elects to close the transaction contemplated by this Agreement and Purchaser wrongfully refuses so to do, of if Purchaser fails, or if a failing Purchaser is threatened, to comply with any of its covenants and agreements contained in this Agreement, then in addition to all other remedies which may be available to it, Seller shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to recover from Purchaser its losses, costs and expenses, including reasonable attorney's fees, incurred by it in securing such injunctive or equitable relief.

6.3. The specific remedies to which any party may resort under the terms of this Agreement cumulative and are not intended to be exclusive of any remedies or means of redress to which it may lawfully be entitled in case of any breach or threatened breach or failure or observance or performance of any representation, warranty, covenant, agreement, or commitment made hereunder or relating to or by reason of any such representation, warranty, covenant, agreement, or commitment being untrue or incorrect.

6.4. The ATM machines are warranted by the Seller to operate as designed for a period of thirty (30) days after delivery. All other representations, warranties, covenants, and agreements made by the parties to this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder for a period of five years.

3

7.    Indemnification.

7.1. Purchaser shall defend and promptly indemnify Seller and save Seller harmless from, against, for, and in respect of, and pay any and all damages, losses, obligations, liabilities, attorneys' fees encumbrances, deficiencies, costs, and expenses, including, without limitation, reasonable attorneys' fees, and other costs and expenses incident to any suit, action, investigation, claim, or proceeding suffered, sustained, incurred, or required to be paid by Seller by reason of any breach or failure of observance of performance of any representation, warranty, covenant, or agreement being untrue or incorrect in any respect.

7.2. Seller shall defend and promptly indemnify Purchaser and save and hold it harmless from, against, for, and in respect of, and pay any and all damages, losses, obligations, liabilities, claims, encumbrances, deficiencies, costs, and expenses, including, without limitation, reasonable attorneys' fees, and other costs and expenses incident to any suit, action, investigation, claim, or proceeding suffered sustained, incurred, or required to be paid by Purchaser or Seller by reason of (i) all liabilities and obligations of Seller not expressly assumed by Purchaser hereunder, or (ii) any breach or failure of observance or performance of any representation, warranty, covenant, or agreement made by Seller hereunder or relating to or as a result of any such representation, warranty, covenant, or agreement being untrue or incorrect in any respect.

7.3. In the event that at any time on or before the first anniversary of the Closing, one party ("Indemnifier") shall be obligated to the other ("Indemnitee") pursuant to this Article 7.3 or in the event that a suit, action, investigation, claim, or proceeding is begun, made or instituted prior to such anniversary as a result of which Indemnifier may become obligated to Indemnitee hereunder, Indemnitee shall give prompt written notice to Indemnifier of the occurrence of such event. Indemnifier agrees to defend, contest, or otherwise protect Indemnitee against any such suit, action, investigation, claim, or proceeding at Indemnifier's own cost and expense using counsel reasonably satisfactory to Indemnitee. Indemnitee shall have the right but not the obligation to participate at its own expense in the defense thereof by counsel of it own choice. In the event that Indemnifier fails timely to defend, contest, or otherwise protect against any such suit, action, investigation, claim, or proceeding, Indemnitee shall have the right to defend, contest, or otherwise protect against the same and may make any compromise or settlement thereof and recover the entire cost thereof from Indemnifier, including, without limitation, reasonable attorneys' fees, disbursements, and all amounts paid as a result of such suit, action investigation, claim, or proceeding, or compromise or settlement thereof. Any failure by Indemnitee to comply with the notice requirement of this Paragraph 7.3 shall relieve the Indemnifier of its obligations hereunder only if Indemnifier does not otherwise receive actual notice of the event as to which indemnification is sought.

8.    General Provisions.

8.1. Notice. Any notice, report, demand, or payment required, permitted, or desired to be given pursuant to any of the provisions of this Agreement shall be deemed to have been sufficiently given or served for all purposes if hand delivered by a responsible overnight delivery service or sent by certified or registered mail, return receipt requested and postage prepaid as follows:

    36 Main Street, LLC.
    2400 Dallas Pkwy., Ste. 180
    Plano, TX 75093

If to Purchaser, at its address set forth above, with copies to:

    Caspian Opportunities, Inc.
    500 Mamaroneck Ave., Suite 101
    Harrison, NY 10528

If to Seller, at its address set forth above.

4

Feb 03 2008 3:12PM    Jade Stone Capital Manage    914 764 9668    p.7

Feb 03 08 02:02p    Walter Netschi    972-403-3308    p.7

Any of the foregoing parties may at any time and from time to time change the address which notice shall be sent hereunder by notice to the other parties given under this paragraph. The date of giving of such notice shall be the date of hand delivery or delivery by responsible overnight delivery service or the date three days following the posting of the mail.

8.2. Purchaser and Seller each shall bear its own legal fees and other costs and expenses with respect to this transaction.

8.3. This agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof. No change, modification, addition, or termination of this Agreement or any part thereof shall be valid unless in writing and signed by or on behalf of the party to be charged therewith.

8.4. No waiver of the provisions hereof shall be effective unless in writing and signed by the party to be charged with such waiver. No waiver shall be deemed a continuing waiver or waiver in respect of any subsequent breach or default, either of a similar or different nature, unless expressly so stated in writing.

8.5. Should any clause, section, or part of this Agreement be held or declared to be void or illegal for any reason, all other clauses, sections, or parts of this Agreement that can be effected without such illegal clause, section, part shall nevertheless remain in full force and effect.

8.6. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the parties hereto and their respective assigns.

8.7. This Agreement maybe executed by facsimiles and in any number of counterparts, each of which, when taken together, shall constitute on and the same instrument.

8.8. Jurisdiction. It is the intention of the parties that the laws of the State of Florida shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties with proper venue being Lake County, Florida.

8.9. Construction. The parties agree and acknowledge that each party has reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting parties shall not be employed in the interpretation of this Agreement or any amendment or exhibit thereto.

8.10.    Time of the Essence. The parties acknowledge that for purposes of this Agreement, time is of the essence.

8.11.    Survival. All statements contained in this Agreement or any certificate or other instrument delivered pursuant hereto, or in connection with the transaction contemplated hereby, shall be deemed representations and warranties made by the parties in this Agreement which shall survive the Closing and any investigation at any time made by or on behalf of the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed on the date and year first above written.

36 Main Street, LLC.                        Caspian Opportunities, Inc.

By:                                         By:
Danielle Jones                              Charles Howe
Vice President

5

Caspian Opportunities, Inc.
February 1, 2006
ATM #'s 58-115

| 94 | Wee Willy's | 1204 Industrial Blvd. | Gainesville | GA | 30501 | AA38439 | T44 | 400 |
| 95 | Olesons Food Stores | 3860 N. Long Lake Rd. | Traverse City | MI | 49684 | AP01522 | Tider | 402 |
| 96 | Rick's Convenience Store | 1120 North 14th St. | Bessemer City | NC | 28016 | AP903165 | Tidel | 402 |

CASPIAN CAPITAL PARTNERS
MARINER INVESTMENT GROUP

## FACSIMILE TRANSMITTAL SHEET

| TO Bob Ong | FROM: Terese McCarthy |
|---|---|
| COMPANY: Jade Stone Capital Management | DATE 6 FEBRUARY 2006 |
| FAX NUMBER 914-764-9668 | TOTAL NO. OF PAGES INCLUDING COVER 18 |
| PHONE NUMBER: 914-764-8064 | SENDER'S PHONE NUMBER: 914-798-4206 |
| RE: | SENDER'S FAX NUMBER: 914-777-3363 |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

**36 Main Street, LLC.**
**2400 Dallas Pkwy., Ste. 180**
**Plano, TX 75093**

## BILL OF SALE

Pursuant to and in accordance with that certain Asset Purchase Agreement by and between 36 Main Street, LLC ("36 Main Street") and CASPIAN OPPORTUNITIES, INC. dated the 1st day of February, 2006, 36 Main Street hereby conveys, sells, transfers and assigns to CASPIAN OPPORTUNITIES, INC., all of the right, title and interest of 36 Main Street in and to the assets on Schedule A attached hereto including all ATM royalty agreements and related equipment (the "Assets").

36 Main Street represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

The 36 Main Street will provide safe and proper storage for the Assets until such time as the Assets are delivered to CASPIAN OPPORTUNITIES, INC. at such premises described in the attached Schedule A.

36 Main Street will receive as good and valuable consideration for the transfer of the Assets herein proceeds in the amount of Six Hundred Forty Seven Thousand Four Hundred Dollars ($647,400).

IN WITNESS WHEREOF, the 36 Main Street has executed this Bill of sale this 1st day of February, 2006.

36 Main Street, LLC.

By: _____
Name: Danielle Jones
Title: Vice President

State of ___TEXAS_____ )
                                        ) ss:
County of ___COLLIN___ )

On the 3rd day of February in the year 2006, before me, the undersigned, personally appeared Danielle Jones, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of Individual
taking acknowledgement


SHERRI K. HARDEMAN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES
AUGUST 28, 2007

# EXHIBIT H

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT made as of this 15th day of June, 2006, by and between 36 Main Street, LLC, a Nevada Limited Liability Corporation having its offices at 2400 Dallas Pkwy., Ste. 180, Plano, TX 75093 ("Seller"), and ACM ATM, LLC ("Purchaser").

## W I T N E S S E T H:

WHEREAS, Purchaser desires to purchase the Assets of Seller attached hereto as Schedule A (the "Assets"); and

WHEREAS, Seller desire to sell the Assets.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto agree as follows:

1.  <u>Purchase and Sale at the Closing.</u>

    1.1. On the terms and subject to the conditions provided in this Agreement, at the "Closing" (as hereinafter defined), Seller shall convey, sell, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase and accept, all the right, title, and interest of Seller in and to the Assets as set forth on Schedule A annexed hereto and made a part of hereof.

    1.2. The Assets shall be acquired in good working condition free and clear of any liens, claims and encumbrances.

    1.3. The transfer of the Assets as herein provided shall be effected by a bill of sale, delivered to Purchaser on the Closing Date in form sufficient to transfer the Assets as contemplated by this Agreement and as shall be reasonably requested by Purchaser.

2.  <u>Purchase Price.</u> The purchase price for the Assets shall be $16,600 (Sixteen Thousand Six Hundred Dollars) per ATM Business for and aggregate of $298,800 (Two Hundred Ninety Eight Thousand Eight Hundred Dollars) to be paid in cash via sire transfer at Closing.

3.  <u>The Closing.</u> The closing of the transaction contemplated by this Agreement (the "Closing") shall be held at such place, time, and date as may be agreed to by Seller and Purchaser (the "Closing Date").

4.  <u>Seller's Representations and Warranties.</u> Seller represents and warrants to Purchaser as follows:

    4.1. Seller is a corporation duly organized, validly existing, and in good standing under the laws of Florida, and has full power and authority to own its assets and carry on its business as and in the places where such assets are now owned or such business is now being conducted. Seller has not taken any action or failed to take any action that would preclude or prevent Purchaser from conducting its business after the Closing in the same manner as it is now conducted.

    4.2. No action, approval, consent, or authorization by any governmental or quasi-governmental agency, commission, board, bureau, or instrumentality is necessary as to Seller in order to constitute this Agreement as a binding and enforceable obligation of Seller in accordance with its terms.

    4.3. To the best of Seller's knowledge, there have been no material adverse changes in the Assets, and Seller has not:

    4.3.1. incurred any damage, destruction, or similar loss, whether or not covered by insurance, materially affecting the Assets;

I

4.3.2. mortgaged, pledged, or granted or suffered to exist any lien or other encumbrance or charge on any of the Assets; and

4.3.3. waived any rights of material value or cancelled any material debts or claims regarding the Assets.

4.4. Seller has duly paid all applicable federal, state, county, foreign and local income, profits, franchise, excise, sales, use, occupancy, property, withholding, and other taxes returns and reports required to have been paid by it to the date hereof.

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

4.6. The Seller will provide safe and proper storage for the Assets until such time as the Assets are delivered to Buyer at such premises described in the attached Schedule A.

4.7. There are no litigations, suits, proceedings, actions, arbitrations or administrative proceedings pertaining to the assets in which Seller is a party.

4.8. Seller has all required permits, licenses, orders, and approvals of, and has made all required filings with, all federal, or local governmental or regulatory bodies required for it sell the Assets. All such permits licenses, orders, and approvals are in full force and effect and no suspension or cancellation of any of them is pending or threatened. No such permits, licenses, orders, or approvals will be adversely affected by the consummation of the transactions contemplated by this Agreement. Seller is in compliance with all such permits, licenses, orders, and approvals and with all limitations, conditions, standards, and requirements contained in those laws, rules, regulations, codes, orders, judgments, and decrees applicable to it and the business conducted by it.

4.9. No representation or warranty by Seller in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the transaction contemplated hereby contains any untrue statement of material fact or omits tot state a material fact necessary to make the statements or facts contained herein or therein not misleading.

4.10. Seller has maintained and will continue to maintain until Closing in full force and effect, all policies of fire, liability, and other forms of insurance listed, to comply with all laws affecting the Assets (except where the failure to comply would not have any adverse effect on such business) and shall give prompt notice to Purchaser of any change in the information contained in its representation and warranties hereunder.

2

5.        Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller as follows:

5.1. Purchaser is a corporation duly organized, validly existing, and in good standing under the laws of the State of New York. Purchaser has full power and authority to enter into this Agreement and to assume and perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of it obligations hereunder. The execution and delivery of this Agreement and the performance by Purchaser of it obligations hereunder have been duly authorized by it Members and its shareholders, and no further action or approval is required to constitute this Agreement as a binding and enforceable obligation of Purchaser. The execution and delivery hereof and the performance by Purchaser of it obligations hereunder will not (i) violate any provision of law, any governmental regulation or any judgment, writ, injunction, decree, or order of any court or other governmental authority relating to it, or (ii) violate any indenture, contract, other commitment, or restriction to which it is a party or by which it or its Assets are bound, or (iii) be in conflict with or result in or constitute a breach or default (or an occurrence which by the lapse of time or the giving of notice or both would constitute a breach or default), on its part under any such indenture, contract, other commitment, or restriction, or (iv) conflict with its certificate of Incorporation.

5.2. No representation or warranty by Purchaser in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the transaction contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

6.        Remedies for Breach.

6.1. If Purchaser elects to close the transaction contemplated by this Agreement and Seller wrongfully refuses so to do, or if Seller fails, or if a filing by Seller is threatened, to comply with any of its covenants and agreements contained in this Agreement, then in addition to all other remedies which may be available to it, Purchaser shall be entitled to injunctive and other equitable relief, including, without imitation, specific performance, and shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to recover from Seller its losses, costs, and expenses, including reasonable attorney's fees, incurred by Purchaser in securing such injunctive or equitable relief.

6.2. If Seller elects to close the transaction contemplated by this Agreement and Purchaser wrongfully refuses so to do, or if Purchaser fails, or if a failing Purchaser is threatened, to comply with any of its covenants and agreements contained in this Agreement, then in addition to all other remedies which may be available to it, Seller shall be entitled to injunctive and other equitable relief, including, without limitation, specific performance, and shall be entitled to recover from Purchaser its losses, costs and expenses, including reasonable attorney's fees, incurred by it in securing such injunctive or equitable relief.

6.3. The specific remedies to which any party may resort under the terms of this Agreement cumulative and are not intended to be exclusive of any remedies or means of redress to which it may lawfully be entitled in case of any breach or threatened breach or failure or observance or performance of any representation, warranty, covenant, agreement, or commitment made hereunder or relating to or by reason of any such representation, warranty, covenant, agreement, or commitment being untrue or incorrect.

6.4. The ATM machines are warranted by the Seller to operate as designed for a period of thirty (30) days after delivery. All other representations, warranties, covenants, and agreements made by the parties to this Agreement shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder for a period of five years.

3

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

7.    Indemnification.

7.1. Purchaser shall defend and promptly indemnify Seller and save Seller harmless from, against, for, and in respect of, and pay any and all damages, losses, obligations, liabilities, attorneys' fees encumbrances, deficiencies, costs, and expenses, including, without limitation, reasonable attorneys' fees, and other costs and expenses incident to any suit, action, investigation, claim, or proceeding suffered, sustained, incurred, or required to be paid by Seller by reason of any breach or failure of observance of performance of any representation, warranty, covenant, or agreement being untrue or incorrect in any respect.

7.2. Seller shall defend and promptly indemnify Purchaser and save and hold it harmless from, against, for, and in respect of, and pay any and all damages, losses, obligations, liabilities, claims, encumbrances, deficiencies, costs, and expenses, including, without limitation, reasonable attorneys' fees, and other costs and expenses incident to any suit, action, investigation, claim, or proceeding suffered sustained, incurred, or required to be paid by Purchaser or Seller by reason of (i) all liabilities and obligations of Seller not expressly assumed by Purchaser hereunder, or (ii) any breach or failure of observance or performance of any representation, warranty, covenant, or agreement made by Seller hereunder or relating to or as a result of any such representation, warranty, covenant, or agreement being untrue or incorrect in any respect.

7.3. In the event that at any time on or before the first anniversary of the Closing, one party ("Indemnifier") shall be obligated to the other ("Indemnitee") pursuant to this Article 7.3 or in the event that a suit, action, investigation, claim, or proceeding is begun, made or instituted prior to such anniversary as a result of which Indemnifier may become obligated to Indemnitee hereunder, Indemnitee shall give prompt written notice to Indemnifier of the occurrence of such event. Indemnifier agrees to defend, contest, or otherwise protect Indemnitee against any such suit, action, investigation, claim, or proceeding at Indemnifier's own cost and expense using counsel reasonably satisfactory to Indemnitee. Indemnitee shall have the right but not the obligation to participate at its own expense in the defense thereof by counsel of it own choice. In the event that Indemnifier fails timely to defend, contest, or otherwise protect against any such suit, action, investigation, claim, or proceeding, Indemnitee shall have the right to defend, contest, or otherwise protect against the same and may make any compromise or settlement thereof and recover the entire cost thereof from Indemnifier, including, without limitation, reasonable attorneys' fees, disbursements, and all amounts paid as a result of such suit, action investigation, claim, or proceeding, or compromise or settlement thereof. Any failure by Indemnitee to comply with the notice requirement of this Paragraph 7.3 shall relieve the Indemnifier of its obligations hereunder only if Indemnifier does not otherwise receive actual notice of the event as to which indemnification is sought.

8.    General Provisions.

8.1. Notice. Any notice, report, demand, or payment required, permitted, or desired to be given pursuant to any of the provisions of this Agreement shall be deemed to have been sufficiently given or served for all purposes if hand delivered by a responsible overnight delivery service or sent by certified or registered mail, return receipt requested and postage prepaid as follows:

    36 Main Street, LLC.
    2400 Dallas Pkwy., Ste. 180
    Plano, TX 75093

If to Purchaser, at its address set forth above, with copies to:

    ACM ATM, LLC
    570 Lexington, 40th Floor
    New York, NY 10022

If to Seller, at its address set forth above.

4

Any of the foregoing parties may at any time and from time to time change the address which notice shall be sent hereunder by notice to the other parties given under this paragraph. The date of giving of such notice shall be the date of hand delivery or delivery by responsible overnight delivery service or the date three days following the posting of the mail.

8.2. Purchaser and Seller each shall bear its own legal fees and other costs and expenses with respect to this transaction.

8.3. This agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof. No change, modification, addition, or termination of this Agreement or any part thereof shall be valid unless in writing and signed by or on behalf of the party to be charged therewith.

8.4. No waiver of the provisions hereof shall be effective unless in writing and signed by the party to be charged with such waiver. No waiver shall be deemed a continuing waiver or waiver in respect of any subsequent breach or default, either of a similar or different nature, unless expressly so stated in writing.

8.5. Should any clause, section, or part of this Agreement be held or declared to be void or illegal for any reason, all other clauses, sections, or parts of this Agreement that can be effected without such illegal clause, section, part shall nevertheless remain in full force and effect.

8.6. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the parties hereto and their respective assigns.

8.7. This Agreement maybe executed by facsimiles and in any number of counterparts, each of which, when taken together, shall constitute on and the same instrument.

8.8. Jurisdiction. It is the intention of the parties that the laws of the State of Florida shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties with proper venue being Lake County, Florida.

8.9. Construction. The parties agree and acknowledge that each party has reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting parties shall not be employed in the interpretation of this Agreement or any amendment or exhibit thereto.

8.10. Time of the Essence. The parties acknowledge that for purposes of this Agreement, time is of the essence.

8.11. Survival. All statements contained in this Agreement or any certificate or other instrument delivered pursuant hereto, or in connection with the transactions contemplated hereby, shall be deemed representations and warranties made by the parties in this Agreement which shall survive the Closing and any investigation at any time made by or on behalf of the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed on the date and year first above written.

36 Main Street, LLC.                                ACM ATM, LLC

By: _____          By: _____
     Danielle Jones                                         Eric Edidin
     Vice President

5

ACK ATM, LLC
ATMs #1-18

| # | Location | Address | City | State | Zip | Serial # | Make | Average | Effective |
|---|----------|---------|------|-------|-----|----------|------|---------|-----------|
| 1 | Inland Oil Propane | 747 Basin Street NW | Ephrata | WA | | 96823 78Z2Y491 | Tidel | 400 | 6/15/2006 |
| 2 | J&T Enterprises, Inc. | 77 Nh Route 104 Unit 15 | Meredith | NH | | 00253 78Z2Y851 | Tidel | 403 | 6/16/2006 |
| 3 | | | | | | | | 402 | 6/15/2006 |
| 4 | | | | | | | | | 6/15/2006 |
| 5 | | | | | | | | | 6/15/2006 |
| 6 | | | | | | | | | 6/15/2006 |
| 7 | | | | | | | | 401 | 6/15/2006 |
| 8 | | | | | | | | 401 | 6/15/2006 |
| 9 | | | | | | | | 402 | 6/15/2006 |
| 10 | | | | Houston | TX | | | 400 | 6/16/2006 |
| 11 | | | | | | | | 306 | 6/16/2006 |
| 12 | | | | | TX | | | 403 | 6/15/2006 |
| 13 | | | | | TX | | | 402 | 6/16/2006 |
| 14 | | | | | | | | 401 | 6/16/2006 |
| 15 | Country Boys | 20631 TX Hwy. 14 E | Flanagy Cmt | TX | | 75494 1015Y164 | Tidel | 401 | 6/15/2006 |
| 16 | Fastop Foods of East Texas, Inc | 312 Higginbotham Rd | Kilgore | TX | | 75662 1114Y292 | Tidel | 400 | 6/15/2006 |
| 17 | L&M Food Store | 3600 Hemphill St. | Fort Worth | TX | | 76110 1112Y221 | Tidel | 401 | 6/15/2006 |
| 18 | Times Market | 312 Travis | Port Lavac | TX | | 77979 1015Y124 | Tidel | 401 | 6/15/2006 |

*36 Main Street, LLC.*
*2400 Dallas Pkwy., Ste. 180*
*Plano, TX 75093*

## BILL OF SALE

Pursuant to and in accordance with that certain Asset Purchase Agreement by and between 36 Main Street, LLC ("36 Main Street") and ACM ATM, LLC dated the 15th day of June, 2006, 36 Main Street hereby conveys, sells, transfers and assigns to ACM ATM, LLC, all of the right, title and interest of 36 Main Street in and to the assets on Schedule A attached hereto including all ATM royalty agreements and related equipment (the "Assets").

36 Main Street represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

The 36 Main Street will provide safe and proper storage for the Assets until such time as the Assets are delivered to ACM ATM, LLC at such premises described in the attached Schedule A.

36 Main Street will receive as good and valuable consideration for the transfer of the Assets herein proceeds in the amount of Two Hundred Ninety Eight Thousand Eight Hundred Dollars ($298,800).

IN WITNESS WHEREOF, the 36 Main Street has executed this Bill of sale this 15th day of June, 2006.

36 Main Street, LLC.

By: _____
Name: Danielle Jones
Title: Vice President

State of ___TEXAS_____ )
                                          ) ss:
County of ___COLLIN_____ )

On the 14th day of June, in the year 2006, before me, the undersigned, personally appeared ___Danielle Jones_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of Individual
taking acknowledgement

SHERRI K. HARDEMAN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
AUGUST 28, 2007

# EXHIBIT I

04/10/2006 03:53 FAX 914 251 8244        GREYWOLF CAPITAL                              ☒002/015

Apr 06 2006 8:59AM    Jade Stone Capital Manage    914 784 9668              P.2

# AUTOMATED TELLER MACHINE (ATM)
# EQUIPMENT MANAGEMENT AGREEMENT

## BACKGROUND

THIS AGREEMENT is made this 1st day of April 2006, by and between ATM Financial Services LLC, a Delaware Corporation of Leesburg, Florida (hereinafter "AFS" or "Operator") and Greywolf Holdings, LP, a Delaware Corporation with an address at 4 Manhattanville Road Purchase, N.Y. 10577 (hereinafter "Machine Owner").

Operator is in the business of managing and operating automated teller machines ("ATMs") in suitable locations for a profit. Machine Owner has purchased or otherwise owns and controls one or more ATM units and desires to engage Operator's services to install, operate and manage Machine Owner's ATMs as provided in this Agreement. In consideration of the foregoing and the mutual covenants and promises contained herein, the parties agree as follows:

1. **OWNERSHIP OF ATMs.** Machine owner hereby represents and warrants, and Operator acknowledges that Machine owner owns or lawfully controls, one or more ATM units identified in the attached Exhibit "A" (hereafter the "Subject ATMs"). Machine Owner has full power and authority to enter into this Agreement with respect to the subject ATMs.

2. **MANAGEMENT OF ATMs.** Machine Owner hereby grants to Operator, for the term of this Agreement, the right to act on Machine owner's behalf to install, manage, operate and maintain the Subject ATMs, and authorizes Operator to take all actions as are reasonably necessary for operation and maintenance of said ATM units, consistent with this Agreement. Operator agrees to manage said ATM units on a best efforts basis.

3. **TERM.** The initial term of this Agreement is for six (6) years, commencing on the date first above written, unless earlier terminated under this Agreement. This Agreement shall automatically renew for additional six (6) year periods, except as otherwise provided in paragraph 12 hereof. Both Operator and Machine Owner have the option to terminate this Agreement by providing notice as provided herein to the other party at least thirty (30) days prior to expiration of the initial or any such six (6) year term.

4. **SITE LOCATIONS; CASH INVENTORY**

   4.1 **Site Location Lease.** Machine Owner shall allow Operator to lease from third parties, or otherwise secure suitable sites for the placement of the Subject ATMs (the "Leases"). Operator will provide Machine Owner with relevant site evaluation information. Operator will be the sole party to any location agreement or lease with the "Location Owner" provided however that Operator specifically acknowledges and agrees that any and all rights to any particular retail location and Lease, is the sole property of Machine Owner. Upon termination of this Agreement, Operator shall assign all rights to the Leases to Machine Owner, or such other third party as Machine Owner so chooses. Such location of the Leases is attached hereto as Exhibit C.

   4.2 **Cash Inventory Supply.** Operator will contract with a bank or other cash provider, to maintain a continuous supply of sufficient cash inventory ("Cash Inventory") to the Subject ATMs.

5. **REPRESENTATIONS AND WARRANTIES OF OPERATOR.** Operator represents and warrants to Machine Owner as follows:

   5.1    Operator is a corporation duly organized, validly existing, and in good standing under the laws of the state of Delaware, and has full power and authority to carry on its business as and in the places where such ATMs are now owned or such business is now being conducted. The assets, properties, and rights owned or held by Operator on the date hereof are all of the assets, properties, and rights necessary or desirable to permit Operator to carry on the business as conducted by it on the date hereof. Operator has not taken any action or failed to take any action that would preclude or prevent Machine Owner from conducting the business in the same manner as now conducted.

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement GW Hldgs LP
4-1-06.doc

5.2    As of the date of this Agreement, all requisite actions, approvals, consents, and authorizations by any governmental or quasi-governmental agencies, commissions, boards, bureaus, or instrumentalities necessary as to Operator in order to constitute this Agreement as a binding and enforceable obligation of Operator in accordance with its terms (the "Approvals") have been obtained. Operator will use reasonable efforts to ensure such Approvals will continue in full force and effect.

5.3    There are no material litigations, suits, proceedings, actions, arbitrations or administrative proceedings in which Operator is a party.

5.4    Other than as disclosed to Machine Owner in writing, Operator has no financial, monetary or other interest in, and has received no benefit from, the sale or acquisition of the Subject ATMs.

5.5    There are no actions, suits, proceedings, investigations, or claims pending, or to the best of Operator's knowledge threatened, against or affecting the business, operations, or financial condition of Operator at law or in equity in any court of before any federal, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, nor does Operator know of any basis for such action, suit, proceeding, investigation, or claim. Operator is not in default in respect of any judgment, order, writ, injunction, decree, or regulation of any court or federal, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality. There are no judgments outstanding against Operator.

5.6    As of the date of this Agreement, Operator has all permits, licenses, orders, and approvals of, and has made all required filings with, all federal, provincial, or local governmental or regulatory bodies required for it to conduct its business as presently conducted. All such permits, licenses, orders, and approvals are in full force and effect and no suspension or cancellation of any of them is pending or threatened. Operator is in compliance with all such permits, licenses, orders, and approvals and with all limitations, conditions, standards, and requirements contained in those laws, rules, regulations, codes, orders, judgments, and decrees applicable to it and the business conducted by it. Operator will use reasonable efforts to ensure such permits, licenses, orders and approvals will continue in full force and effect.

5.7    Operator has full power and authority to enter into this Agreement and to assume and perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Operator of its obligations hereunder have been duly authorized by its members, this Agreement has been duly executed and delivered by Operator, and no further action or approval is required in order to constitute this Agreement as a binding and enforceable obligation of Operator. The execution and delivery hereof and the performance by Operator of its obligations hereunder will not (i) violate any provision of law, any governmental regulation or any judgment, writ, injunction, decree, or order of any court or other governmental authority relating to Operator, or (ii) violate any indenture, contract, other commitment, or restriction to which Operator is a party or by which it or the Assets are bound, or (iii) be in conflict with or result in or constitute a breach or default (or an occurrence which by the lapse of time or the giving of notice or both would constitute a breach or default), on the part of Operator, under any such indenture, contract, other commitment, or restriction, or (iv) result in the creation or imposition of any lien, charge, or encumbrance of any nature whatsoever upon any of the ATMs.

5.8    No representation or warranty by Operator in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the services contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained herein or therein not misleading.

6.    **INSURANCE FOR ATM UNITS.** Operator will secure and maintain in force throughout the term of this Agreement, an appropriate policy or policies of insurance covering the ATM units and the cash therein naming the Machine Owner as the designated beneficiary. Such insurance shall include coverage for: (a) the Cash Inventory in such subject ATM and (b) property damage or loss to ATM units from casualty or loss by fire, theft, vandalism, collapse of building, etc.; and (c) appropriate premises liability coverage for any loss, damage, liability and expenses (including reasonable attorney's fees) arising from personal injury or death to any person or property damage, from the use, location or maintenance of ATM units. The cost of insurance will be paid pursuant to Section (10).

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

7. **DUTIES OF OPERATOR.** Operator shall be responsible for the following matters:

7.1    **Installation.** Install the Subject ATMs at locations mutually agreed to by the parties, in a workman-like manner and in compliance with all local, federal and state laws and regulations, and with any requirements of the Location Agreement. Installation will be completed within ninety (90) days of receipt of ATM, signed contract, and location space agreement.

7.2    **Armored Car Services.** Contract and/or coordinate with Brinks or similar company to provide necessary armored car services for delivery, installation and replenishment of ATM Cash Inventory.

7.3    **Processing, Communications With Network and Sponsorship.** Contract with an appropriate "Processor," presently USA Payment Systems, Inc. a Nevada Corporation, to supply network access links, sponsorship and processing services to accurately operate, record, report and distribute the revenues from card transactions handled by the Subject ATMs.

7.4    **Supplies.** Provide the necessary paper or supplies for operations of the Subject ATMs.

7.5    **Maintenance.** Operator will secure appropriate maintenance/repair agreements with certified technicians, to repair and maintain the ATM equipment in a workable, operating condition so that members of the public can successfully access cash through the Subject ATMs during all local business hours. The cost of maintenance/repair agreements will be paid pursuant to Section (10).

7.6    **Collection of Revenues and Fees.** Contract with USA Payment Systems, or other processor, for the collection, data processing and electronic deposit and transfer to Operator's settlement account, of all collected revenues and fees, including surcharge revenues and network access (interchange) fees, due from operations of the Subject ATMs.

7.7    **Accounting.** Provide Machine owner with a monthly statement itemizing gross earned revenues and all fixed and variable operating expenses incurred or paid for operation of the Subject ATMs along with payment for the net amount due to the Machine Owner as provided in this Agreement. Operator also will provide Machine Owner a full disclosure of the number of transactions for the Subject ATM as reflected by the processor's ATM printout, on a monthly basis by first class mail.

7.8    **Operating Expenses and Distribution of Net Revenues.** Operator shall pay all expenses of operation ("Operation Expenses") from the Gross Revenues of the Subject ATM and distribute the "Net Revenues" or "Net Losses" monthly to Machine Owner as provided in Paragraph 10 below.

8. **DUTIES OF MACHINE OWNER.** Machine Owner is responsible for the following matters:

8.1    **ATM Units.** Provide for and grant to Operator the use of the Subject ATMs (per Exhibit "A") for installation at locations agreed upon by the Parties.

8.2    **Confirm Accounting and Distribution of Net Revenues.** Machine Owner shall review, verify or confirm the monthly accounting of ATM operations provided by Operator, and the allocation and distribution of "net revenues" provided therewith, in accordance with this Agreement. Machine Owner must contact Operator within ten (10) days of receipt to discuss any questions about ATM operations as reflected in such accounting; provided however, any failure by Machine Owner to identify or address any accounting matter shall not be deemed a waiver of any rights of Machine Owner.

8.3    **Relocation of ATMs.** Arrange relocation of the Subject ATMs as requested by and at the expense of the Machine Owner.

9. **COMPENSATION OF OPERATOR.** As compensation for Operator's services under this Agreement, Machine Owner agrees to pay Operator a management fee as defined in Exhibit B from operations of the Subject ATMs. This management fee will be automatically deducted and paid to Operator each month from any Net Revenues otherwise payable to Machine Owner from operations of the Subject ATMs. This fee will be paid to Operator for the duration of the Agreement and as long as Machine Owner's ATM units are under Operator's management. If revenues are not sufficient to pay these fees Machine Owner will within 15 days of notice pay to Operator any shortages of fees. Failure of timely payment will result in Operator becoming a lien holder of ATM unit.

10.   **ALLOCATION OF NET REVENUES; EXPENSES.**

10.1  **Operating Expenses.** "Net Revenues" for purposes of this Agreement shall mean "Gross Revenues" collected from operations of the Subject ATMs which are surcharge fees, and interchange fees, less the following expenses ("Operating Expenses"): (a) cost of cash inventory and cash replacement (b) service fees to Brinks/armored car services; (c) monitoring/processing/ communications for network access (phone line charges) sponsorship; (d) insurance; (e) supplies; (f) maintenance; and (g) space or location fees, (h) utilities (i) management fees. Machine Owner shall also be responsible for any and all additional expenses incurred or paid by Operator as reasonably necessary for proper operation and maintenance of the Subject ATMs. Should "Gross Revenues" not be sufficient to cover "Operating Cost" Machine Owner will within 5 days of Statement pay to Operator the amount equaling One Hundred percent (100%) of the "Net Loss."

10.2  **No Guarantee of Income.** Operator hereby specifically disclaims, and Machine Owner specifically acknowledges, understands and agrees, that Operator has made no representations, warranty, or guarantee in any manner of the projected or potential income, or net revenues to be received by Machine Owner from operations of the Subject ATMs. Operator specifically does not guarantee any net income to Machine Owner.

11.   **MAINTENANCE OF ATM UNITS.** Machine Owner will pay for all service, maintenance and/or upkeep expenses over and above any manufacturing warranties or maintenance programs. The cost of maintenance/repair agreements will be paid pursuant to Section (10). It is further understood and agreed that Machine Owner SHALL NOT open, adjust, remove, disconnect, replace, repair or alter the ATM unit(s) in any way, so long as any ATM is under management by Operator under this Agreement. Machine Owner hereby grants operator the right, at Machine Owner's expense, to make all replacements, updates, additions or modifications deemed reasonably necessary by Operator in the continued successful operation of the Subject ATMs.

12.   **EVENTS OF DEFAULT: TERMINATION AND CURE.**

12.1  If either Party materially breaches any provision of this Agreement or any representation or warranty of this Agreement or materially fails to perform any obligations or covenants of said party under this Agreement, the other party hereto shall have the right to terminate this Agreement as to all Subject ATMs, by giving written notice to the "defaulting party." This remedy shall be in addition to any and all other rights and remedies the non-defaulting party shall have, in law or in equity for such breach, including holding the defaulting party liable for any and all damages and associated costs incurred by said breach.

12.2  Machine Owner may terminate this Agreement immediately upon (i) willful misconduct in the performance of Operator's duties, (ii) fraud, embezzlement, dishonesty or theft by Operator in connection with the Subject ATMs, (iii) Operator's conviction of or plea of nolo contendere to a felony or an act of moral turpitude, (iv) Operator's retirement, withdrawal, death, or disability, if a suitable replacement is not found and approved by Machine Owner, such approval not to be unreasonably withheld, or (v) Operator 's insolvency or filing of a petition under the federal bankruptcy laws.

12.3  **Cure.** Failure of the defaulting party to cure the breach within thirty (30) days of notification, this Agreement will be deemed terminated as of the Notification date;

13.   **RELOCATION OF ATM UNIT(S).** If the Location Agreement applicable to any ATM unit is terminated for any reason, Operator shall remove or relocate the subject ATM to another site or storage facility acceptable to Machine Owner, within 60 days of such termination, with costs of such relocation borne by Machine Owner.

14.   **ASSIGNMENT.** This Agreement shall be binding on Machine Owner and Operator and their respective successors and assigns. Operator shall not have the right to assign this Agreement and its rights, obligations and benefits hereunder without the prior written consent of the Machine Owner. Machine Owner may assign this Agreement and its rights, obligations and benefits hereunder as to any subject ATMs, without prior written consent of Operator. Machine Owner agrees that in the event of the sale or transfer of the Subject ATMs, this Agreement will be binding on all assignees or successors, which will be notified of its existence, as a part of any such transfer. Machine owner will secure the written consent of any successors to the terms of this Agreement.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

15.    **MISCELLANEOUS:**

15.1    **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Florida; except as to any issues specifically governed by the laws of the state where an ATM unit is located.

15.2    **Enforcement.** Any controversy, claim or disputes arising out of the terms or conditions or interpretation of this Agreement shall be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Venue for any such arbitration shall be in Orlando County, Florida. The decision of the arbitrator shall be final and binding upon both parties. The Arbitrator(s) shall award the expenses of arbitration, including arbitrator's expenses, and reasonable attorney's fees and costs, to the prevailing party in any such arbitration. Because it may be impossible or inadequate to measure the damages from any breach, dispute or controversy arising under or in connection with this Agreement, the parties hereby agree that the parties will have available, in addition to any other right or remedy available, the right to obtain injunctive relief from a court of competent jurisdiction.

15.3    **Force Majeure.** No failure, delay or default in performing any obligation hereunder shall constitute default or breach of this Agreement to the extent it arises from causes beyond the control and without fault or neglect of the party otherwise chargeable with such failure, delay or default, including, but not limited to, action or inaction of governmental authority or civil commotion; fire; flood; earthquake; natural disaster; or default of common carrier. Each party shall give prompt notice by certified mail to the other of any such cause.

15.4    **Independent Review.** Machine Owner and operator each represent that they are entering into this Agreement freely and voluntarily, for the purposes herein stated, each has fully read and understood the contents hereof, and each has done its own due diligence in researching and evaluating the terms of this Agreement. Each Party has had advice, or an opportunity to review with its own legal counsel, prior to execution of this Agreement. No presumption shall arise by the fact one party or its attorney drafted this Agreement.

15.5    **Severability.** Should any provision of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.6    **Entire Agreement.** This Agreement consists of pages 1-6 and Exhibit "A" & "B" only. This Agreement and the documents referred to herein contain the entire agreement between Machine Owner and Operator respecting the subject matter hereof. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties. No oral representation made prior to or at execution of this Agreement shall be binding on either party.

15.7    **Litigation Costs.** In the event litigation is necessary to enforce any of the terms of this Agreement, including all amendments or exhibits thereto, the prevailing party shall be entitled to recover all reasonable costs of suit.

15.8    **Relationship of Parties.** Operator is an independent contractor and not an employee of Machine Owner for any purposes. Nothing in this Agreement shall be deemed to constitute Machine Owner and Operator as either partners or joint ventures in any matters.

15.9    **No Interest in ATM.** Nothing contained in this Agreement shall be deemed or construed to create in Operator any lien or property interest in or to the Subject ATMs.

15.10   **Licenses.** Operator represents and warrants to Machine Owner that Operator has obtained, at its own expense, and will keep in effect during the term hereof, any licenses, permits or other governmental consents as required for Operator to perform its obligations hereunder and that operator will comply with all applicable laws and regulations for such ATM operations. Operator covenants that it will maintain all such required licenses, permits or other governmental consents.

15.11   **Confidentiality.** Except as specifically required for the performance of the obligations under the Agreement, each of the Parties agrees that the terms, conditions, requirements, and associated understandings of this Agreement are confidential and shall not be disclosed to any person or entity not a party to this Agreement.

**15.12  Indemnification Of Parties.**

(1) To the extent not covered by applicable insurance, the Machine Owner agrees to indemnify and hold Operator harmless from and against every loss, damage, claim, cost, or proceeding related directly or indirectly to: (a) any claims by third parties that the Machine Owner breached an agreement with them; (b) any claims of error by cardholders; (c) any damage or injury to cardholders, maintenance or courier personnel, or ATM site personnel in connection with an ATM or an ATM transaction; (d) the design, accessibility and/or placement of ATMs; (e) Machine Owner's breach of this Agreement; or (f) any other Loss.

(2) To the extent not covered by applicable insurance, the Operator agrees to indemnify and hold Machine Owner harmless from and against every loss, damage, claim, cost, or proceeding related directly or indirectly to: (a) any claims by third parties that the Operator breached an agreement with them; (b) any claims of error by cardholders; (c) any damage or injury to cardholders, maintenance or courier personnel, or ATM site personnel in connection with an ATM or an ATM transaction; (d) the design, accessibility and/or placement of ATMs; (e) Operator's breach of this Agreement; or (f) any other Loss.

**15.13  Notices.** All notices and requests in connection with this Agreement shall be deemed delivered or given as of the next business day following the day they are received and may be addressed as designated below, or to such other address as the party receiving notice may from time to time designate in writing by notice delivered in accordance with this Section: All notices should be delivered by certified U. S. Mail.

If to Machine Owner:

Greywolf Holdings, LP
4 Manhattanville Road
Purchase, New York 10577

IF TO OPERATOR:

ATM FINCANCIAL SERVICES, LLC.
Vance Moore, Manager
301 South Richey Road
Leesburg, FL 34748-0510

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement GW Hldgs LP
4-1-06 .doc

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

MACHINE OWNER:

GREYWOLF HOLDINGS, LP

By: _____
Name: Jon Savitz

Date _____


OPERATOR:

ATM FINANCIAL SERVICES, LLC

By: _____
Name: Vance Moore, Manager

4/6/06
Date _____


I hereby acknowledge, understand and agree that Operator has made no representations, warranty, or guarantee in any manner of the projected or potential income, number of transactions or net revenues to be received by Machine Owner from operations of the Subject ATMs. I also hereby acknowledge, understand and agree that Operator specifically does not guarantee any net income to Machine Owner. Should "Gross Revenues" not be sufficient to cover "Operating Cost" Machine owner will within 5 days of Statement pay to Operator the amount equaling one hundred percent (100%) of the "Net Loss."

_____                    _____
Machine Owner Signature                       Date


C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement GW Hldgs LP 4-1-06 .doc

EXHIBIT B

### Estimated Fee Schedule

**Monthly Fees**

| | |
|---|---|
| Management Fee | $25.00 |
| Insurance | $39.75 This rate is subject to change by Insurance Company |
| Maintenance Fee | $50.00 (Payable pursuant to Management Agreement) |
| Supplies | $15.00 |
| Processing | .26 per transaction |
| Property Taxes Est. | $19.00 Per Month |
| Telephone Line | $42.00-$45.00 per month |

04/10/2006 03:55 FAX 914 251 8244     GREYWOLF CAPITAL
Apr 06 2006 8:54AM   Jade Stone Capital Manage   914 764 9668     p.10

Greywolf, LP
April 1, 2006
ATM #s: 1304-1331

| # | Location | Address | City | State | Zip | Serial # | Make | Average |
|---|----------|---------|------|-------|-----|----------|------|---------|
| 1304 | Quilliris, Inc. | 1515 West Ave. S. | LaCrosse | WI | 54601 | TR550439 | Tidel | 401 |
| 1305 | Roettgers Co., Inc. | 5169 N. 37th St. | Milwaukee | WI | 53209 | TR610562 | Tidel | 402 |
| 1306 | Ronaco, Inc. | 3915 S. 282nd St. | Auburn | WA | 98001 | TR610668 | Tidel | 401 |
| 1307 | Ronelco Supermarkets, Inc. | 1070 US Highway 46 | Ledgewood | NJ | 07852 | TR550631 | Tidel | 402 |
| 1308 | Rose & Associates | 2701 Beacon Ave. S | Seattle | WA | 98144 | TR610431 | Tidel | 403 |
| 1309 | S&R Quisberg, Inc. | 375 Edgewood Dr. N | Baxter | MN | 56425 | TR610705 | Tidel | 401 |
| 1310 | Sears, Inc. | 551 NE Midway Blvd., Ste. 1 | Oak Harbor | WA | 98277 | TR688414 | Tidel | 400 |
| 1311 | Sagaya Corp. | 3310 Arctic Blvd. | Anchorage | AK | 99503 | TR689105 | Tidel | 406 |
| 1312 | Save More Market, Inc. | 334 S. 13th St. | Tekamah | NE | 68061 | TR705541 | Tidel | 402 |
| 1313 | Scottsburg Save-A-Lot | 130 W. McClain Ave. | Scottsburg | IN | 47170 | TR550164 | Tidel | 403 |
| 1314 | Seabras Group, Inc. | 574 Ferry St. | Newark | NJ | 07105 | TR650184 | Tidel | 401 |
| 1315 | Select Market, Inc. | 110 Deer Creek Rd. | Selma | OR | 97538 | TR550194 | Tidel | 404 |
| 1316 | Severson Oil Co. | 265 E. Mark St. | Winona | MN | 55987 | TR550223 | Tidel | 401 |
| 1317 | Shoppers Express | 108 W. 2100 S | Salt Lake City | UT | 84115 | TR550231 | Tidel | 400 |
| 1318 | Shore Foods | 115 Garfield Pkwy. | Bethany Beach | DE | 19930 | TR550244 | Tidel | 401 |
| 1319 | Skico, Inc. | 506 S. Detroit St. | Lagrange | IN | 46761 | TR550321 | Tidel | 401 |
| 1320 | Sleepers Lebanon St. Market | 45 Lebanon St. #A | Sanford | ME | 04073 | TR550327 | Tidel | 401 |
| 1321 | SOCO, Inc. | 1111 N. Jefferson St. | Indianola | IA | 50125 | TR550577 | Tidel | 400 |
| 1322 | Southeast Petroleum Corp. | W229N2573 Duplainville Rd. | Waukesha | WI | 53186 | TR550621 | Tidel | 400 |
| 1323 | T.A. Soldberg Co., Inc. | 420 Oneida St. | Minocqua | WI | 54548 | TR911061 | Tidel | 401 |
| 1324 | Tabish Bros Dist. Inc. | 1002 E. Broadway St. | Missoula | MT | 59802 | TR935472 | Tidel | 400 |
| 1325 | Tevis Oil, Inc. | 82 John St. | Westminster | MD | 21157 | TR846613 | Tidel | 400 |
| 1326 | Tonaroff, LLC | 16320 SE Cascade Park Dr. | Vancouver | WA | 98603 | TR947777 | Tidel | 403 |
| 1327 | Tolrama, Inc. | 25 Village Plaza Way | North Scituate | RI | 02857 | TR968741 | Tidel | 405 |
| 1328 | Tri-Town Foods, Inc. | 119 S. Main St. | Colchester | CT | 06415 | TR951051 | Tidel | 403 |
| 1329 | Uwajimaya, Inc. | 4601 6th Ave. S. | Seattle | WA | 98108 | TR550516 | Tidel | 402 |
| 1330 | Yoder Oil Co., Inc. | 2204 California Rd. | Elkhart | IN | 46514 | TR550691 | Tidel | 402 |
| 1331 | Yorktown Oil Co., Inc. | 2601 Roeder Ave. | Bellingham | WA | 98225 | TR550683 | Tidel | 401 |

# EXHIBIT J

## AUTOMATED TELLER MACHINE (ATM)
## EQUIPMENT MANAGEMENT AGREEMENT

THIS AGREEMENT is made this 1st day of February 2006, by and between ATM Financial Services LLC, a Delaware Corporation of Leesburg, Florida (hereinafter "AFS" or "Operator") and Caspian Opportunities, Inc, a Delaware Corporation with an address at 500 Mamaroneck Ave, Suite 101 Harrison, N.Y. 10528 (hereinafter "Machine Owner").

### BACKGROUND

Operator is in the business of managing and operating automated teller machines ("ATMs") in suitable locations for a profit. Machine Owner has purchased or otherwise owns and controls one or more ATM units and desires to engage Operator's services to install, operate and manage Machine Owner's ATMs as provided in this Agreement. In consideration of the foregoing, and the mutual covenants and promises contained herein, the parties agree as follows:

1.  **OWNERSHIP OF ATMs.** Machine owner hereby represents and warrants, and Operator acknowledges that Machine owner owns or lawfully controls, one or more ATM units identified in the attached Exhibit "A" (hereafter the "Subject ATMs"). Machine Owner has full power and authority to enter into this Agreement with respect to the subject ATMs.

2.  **MANAGEMENT OF ATMs.** Machine Owner hereby grants to Operator, for the term of this Agreement, the right to act on Machine owner's behalf to install, manage, operate and maintain the Subject ATMs, and authorizes Operator to take all actions as are reasonably necessary for operation and maintenance of said ATM units, consistent with this Agreement. Operator agrees to manage said ATM units on a best efforts basis.

3.  **TERM.** The initial term of this Agreement is for six (6) years, commencing on the date first above written, unless earlier terminated under this Agreement. This Agreement shall automatically renew for additional six (6) year periods, except as otherwise provided in paragraph 12 hereof. Both Operator and Machine Owner have the option to terminate this Agreement by providing notice as provided herein to the other party at least thirty (30) days prior to expiration of the initial or any such six (6) year term.

4.  **SITE LOCATIONS; CASH INVENTORY**

    4.1 Site Location Lease. Machine Owner shall allow Operator to lease from third parties, or otherwise secure suitable sites for the placement of the Subject ATMs (the "Leases"). Operator will provide Machine Owner with relevant site evaluation information. Operator will be the sole party to any location agreement or lease with the "Location Owner" provided however that Operator specifically acknowledges and agrees that any and all rights to any particular retail location and Lease, is the sole property of Machine Owner. Upon termination of this Agreement, Operator shall assign all rights to the Leases to Machine Owner, or such other third party as Machine Owner so chooses. Such location of the Leases is attached hereto as Exhibit C.

    4.2 Cash Inventory Supply. Operator will contract with a bank or other cash provider, to maintain a continuous supply of sufficient cash inventory ("Cash Inventory") to the Subject ATMs.

5.  **REPRESENTATIONS AND WARRANTIES OF OPERATOR.** Operator represents and warrants to Machine Owner as follows.

    5.1     Operator is a corporation duly organized, validly existing, and in good standing under the laws of the state of Delaware, and has full power and authority to carry on its business as and in the places where such ATMs are now owned or such business is now being conducted. The assets, properties, and rights owned or held by Operator on the date hereof are all of the assets, properties, and rights necessary or desirable to permit Operator to carry on the business as conducted by it on the date hereof. Operator has not taken any action or failed to take any action that would preclude or prevent Machine Owner from conducting the business in the same manner as now conducted.

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement Caspian 2-1-06 .doc

Feb 03 2006 3:14PM    Jade Stone Capital Manage    514 767 5668    P...

Case 7:08-cv-05971-SCR    Document 7-11    Filed 09/05/2008    Page 3 of 8

5.2    As of the date of this Agreement, all requisite actions, approvals, consents, and authorizations by any governmental or quasi-governmental agencies, commissions, boards, bureaus, or instrumentalities necessary as to Operator in order to constitute this Agreement as a binding and enforceable obligation of Operator in accordance with its terms (the "Approvals") have been obtained. Operator will use reasonable efforts to ensure such Approvals will continue in full force and effect.

5.3    There are no material litigations, suits, proceedings, actions, arbitrations or administrative proceedings in which Operator is a party.

5.4    Other than as disclosed to Machine Owner in writing, Operator has no financial, monetary or other interest in, and has received no benefit from, the sale or acquisition of the Subject ATMs.

5.5    There are no actions, suits, proceedings, investigations, or claims pending, or to the best of Operator's knowledge threatened, against or affecting the business, operations, or financial condition of Operator at law or in equity in any court of before any federal, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, nor does Operator know of any basis for such action, suit, proceeding, investigation, or claim. Operator is not in default in respect of any judgment, order, writ, injunction, decree, or regulation of any court or federal, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality. There are no judgments outstanding against Operator.

5.6    As of the date of this Agreement, Operator has all permits, licenses, orders, and approvals of, and has made all required filings with, all federal, provincial, or local governmental or regulatory bodies required for it to conduct its business as presently conducted. All such permits, licenses, orders, and approvals are in full force and effect and no suspension or cancellation of any of them is pending or threatened. Operator is in compliance with all such permits, licenses, orders, and approvals and with all limitations, conditions, standards, and requirements contained in those laws, rules, regulations, codes, orders, judgments, and decrees applicable to it and the business conducted by it. Operator will use reasonable efforts to ensure such permits, licenses, orders, and approvals will continue in full force and effect.

5.7    Operator has full power and authority to enter into this Agreement and to assume and perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Operator of its obligations hereunder have been duly authorized by its members, this Agreement has been duly executed and delivered by Operator, and no further action or approval is required in order to constitute this Agreement as a binding and enforceable obligation of Operator. The execution and delivery hereof and the performance by Operator of its obligations hereunder will not (i) violate any provision of law, any governmental regulation or any judgment, writ, injunction, decree, or order of any court or other governmental authority relating to Operator, or (ii) violate any indenture, contract, other commitment, or restriction to which Operator is a party or by which it or the Assets are bound, or (iii) be in conflict with or result in or constitute a breach or default (or an occurrence which by the lapse of time or the giving of notice or both would constitute a breach or default), on the part of Operator, under any such indenture, contract, other commitment, or restriction, or (iv) result in the creation or imposition of any lien, charge, or encumbrance of any nature whatsoever upon any of the ATMs.

5.8    No representation or warranty by Operator in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the services contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained herein or therein not misleading.

6.    **INSURANCE FOR ATM UNITS.** Operator will secure and maintain in force throughout the term of this Agreement, an appropriate policy or policies of insurance covering the ATM units and the cash therein naming the Machine Owner as the designated beneficiary. Such insurance shall include coverage for: (a) the Cash Inventory in each subject ATM and (b) property damage or loss to ATM units from casualty or loss by fire, theft, vandalism, collapse of building, etc.; and (c) appropriate premises liability coverage for any loss, damage, liability and expenses (including reasonable attorney's fees) arising from personal injury or death to any person or property damage, from the use, location or maintenance of ATM units. The cost of insurance will be paid pursuant to Section (10).

Feb 03 2006 3:15PM    Jade Stone Capital Manage    514 787 5056    p. ---

Case 7:08-cv-05971-SCR    Document 7-11    Filed 09/05/2008    Page 4 of 8

7.    **DUTIES OF OPERATOR.** Operator shall be responsible for the following matters:

7.1    **Installation.** Install the Subject ATMs at locations mutually agreed to by the parties, in a workman-like manner and in compliance with all local, federal and state laws and regulations, and with any requirements of the Location Agreement. Installation will be completed within ninety (90) days of receipt of ATM, signed contract, and location space agreement.

7.2    **Armored Car Services.** Contract and/or co-ordinate with Brinks or similar company to provide necessary armored car services for delivery, installation and replenishment of ATM Cash Inventory.

7.3    **Processing, Communications With Network and Sponsorship.** Contract with an appropriate "Processor," presently USA Payment Systems, Inc. a Nevada Corporation, to supply network access links, sponsorship and processing services to accurately operate, record, report and distribute the revenues from card transactions handled by the Subject ATMs.

7.4    **Supplies.** Provide the necessary paper or supplies for operations of the Subject ATMs.

7.5    **Maintenance.** Operator will secure appropriate maintenance/repair agreements with certified technicians, to repair and maintain the ATM equipment in a workable, operating condition so that members of the public can successfully access cash through the Subject ATMs during all local business hours. The cost of maintenance/repair agreements will be paid pursuant to Section (10).

7.6    **Collection of Revenues and Fees.** Contract with USA Payment Systems, or other processor, for the collection, data processing and electronic deposit and transfer to Operator's settlement account, of all collected revenues and fees, including surcharge revenues and network access (interchange) fees, due from operations of the Subject ATMs.

7.7    **Accounting.** Provide Machine owner with a monthly statement itemizing gross earned revenues and all fixed and variable operating expenses incurred or paid for operation of the Subject ATMs along with payment for the net amount due to the Machine Owner as provided in this Agreement. Operator also will provide Machine Owner a full disclosure of the number of transactions for the Subject ATM as reflected by the processor's ATM printout, on a monthly basis by first class mail.

7.8    **Operating Expenses and Distribution of Net Revenues.** Operator shall pay all expenses of operation ("Operation Expenses") from the Gross Revenues of the Subject ATM and distribute the "Net Revenues" or "Net Losses" monthly to Machine Owner as provided in Paragraph 10 below.

8.    **DUTIES OF MACHINE OWNER.** Machine Owner is responsible for the following matters:

8.1    **ATM Units.** Provide for and grant to Operator the use of the Subject ATMs (per Exhibit "A") for installation at locations agreed upon by the Parties.

8.2    **Confirm Accounting and Distribution of Net Revenues.** Machine Owner shall review, verify or confirm the monthly accounting of ATM operations provided by Operator, and the allocation and distribution of "net revenues" provided therewith, in accordance with this Agreement. Machine Owner must contact Operator within ten (10) days of receipt to discuss any questions about ATM operations as reflected in such accounting; provided however, any failure by Machine Owner to identify or address any accounting matter shall not be deemed a waiver of any rights of Machine Owner.

8.3    **Relocation of ATMs.** Arrange relocation of the Subject ATMs as requested by and at the expense of the Machine Owner.

9.    **COMPENSATION OF OPERATOR.** As compensation for Operator's services under this Agreement, Machine Owner agrees to pay Operator a management fee as defined in Exhibit B from operations of the Subject ATMs. This management fee will be automatically deducted and paid to Operator each month from any Net Revenues otherwise payable to Machine Owner from operations of the Subject ATMs. This fee will be paid to Operator for the duration of the Agreement and as long as Machine Owner's ATM units are under Operator's management. If revenues are not sufficient to pay these fees Machine Owner will within 15 days of notice pay to Operator any shortages of fees. Failure of timely payment will result in Operator becoming a lien holder of ATM unit.

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK886\Management Agreement Caspian 2-1-06 doc

10.    ALLOCATION OF NET REVENUES; EXPENSES.

10.1    Operating Expenses. "Net Revenues" for purposes of this Agreement shall mean "Gross Revenues" collected from operations of the Subject ATMs which are surcharge fees, and interchange fees, less the following expenses ("Operating Expenses"): (a) cost of cash inventory and cash replacement, (b) service fees to Brinks/armored car services; (c) monitoring/processing/ communications for network access (phone line charges) sponsorship; (d) insurance; (e) supplies; (f) maintenance; and (g) space or location fees, (h) utilities (I) management fees. Machine Owner shall also be responsible for any and all additional expenses incurred or paid by Operator as reasonably necessary for proper operation and maintenance of the Subject ATMs. Should "Gross Revenues" not be sufficient to cover "Operating Cost" Machine Owner will within 5 days of Statement pay to Operator the amount equaling One Hundred percent (100%) of the "Net Loss."

10.2    No Guarantee of Income. Operator hereby specifically disclaims, and Machine Owner specifically acknowledges, understands and agrees, that Operator has made no representations, warranty, or guarantee in any manner of the projected or potential income, or net revenues to be received by Machine Owner from operations of the Subject ATMs. Operator specifically does not guarantee any net income to Machine Owner.

11      MAINTENANCE OF ATM UNITS. Machine Owner will pay for all service, maintenance and/or upkeep expenses over and above any manufacturing warranties or maintenance programs. The cost of maintenance/repair agreements will be paid pursuant to Section (10). It is further understood and agreed that Machine Owner SHALL NOT open, adjust, remove, disconnect, replace, repair or alter the ATM unit(s) in any way, so long as any ATM is under management by Operator under this Agreement. Machine Owner hereby grants operator the right, at Machine Owner's expense, to make all replacements, updates, additions or modifications deemed reasonably necessary by Operator to the continued successful operation of the Subject ATMs.

12      EVENTS OF DEFAULT; TERMINATION AND CURE.

12.1    If either Party materially breaches any provision of this Agreement or any representation or warranty of this Agreement or materially fails to perform any obligations or covenants of said party under this Agreement, the other party hereto shall have the right to terminate this Agreement as to all Subject ATMs, by giving written notice to the "defaulting party." This remedy shall be in addition to any and all other rights and remedies the non-defaulting party shall have, in law or in equity for such breach, including holding the defaulting party liable for any and all damages and associated costs incurred by said breach.

12.2    Machine Owner may terminate this Agreement immediately upon (i) willful misconduct in the performance of Operator's duties, (ii) fraud, embezzlement, dishonesty or theft by Operator in connection with the Subject ATMs, (iii) Operator's conviction or plea of nolo contendere to a felony or an act of moral turpitude, (iv) Operator's retirement, withdrawal, death, or disability, if a suitable replacement is not found and approved by Machine Owner, such approval not to be unreasonably withheld, or (v) Operator 's insolvency or filing of a petition under the federal bankruptcy laws.

12.3    Cure. Failure of the defaulting party to cure the breach within thirty (30) days of notification, this Agreement will be deemed terminated as of the Notification date.

13.     RELOCATION OF ATM UNIT(S). If the Location Agreement applicable to any ATM unit is terminated for any reason, Operator shall remove or relocate the subject ATM to another site or storage facility acceptable to Machine Owner, within 60 days of such termination, with costs of such relocation borne by Machine Owner.

14.     ASSIGNMENT. This Agreement shall be binding on Machine owner and Operator and their respective successors and assigns. Operator shall not have the right to assign this Agreement and its rights, obligations and benefits hereunder without the prior written consent of the Machine Owner. Machine Owner may assign this Agreement and its rights, obligations and benefits hereunder as to any subject ATMs, without prior written consent of Operator. Machine Owner agrees that in the event of the sale or transfer of the Subject ATMs, this Agreement will be binding on all assignees or successors, which will be notified of its existence, as a part of any such transfer. Machine owner will secure the written consent of any successors to the terms of this Agreement.

15.    MISCELLANEOUS:

15.1    Governing Law. This Agreement shall be governed by and construed under the laws of the State of Florida; except as to any issues specifically governed by the laws of the state where an ATM unit is located.

15.2    Enforcement. Any controversy, claim or disputes arising out of the terms or conditions or interpretation of this Agreement shall be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Venue for any such arbitration shall be in Orlando County, Florida. The decision of the arbitrator shall be final and binding upon both parties. The Arbitrator(s) shall award the expenses of arbitration, including arbitrator's expenses, and reasonable attorney's fees and costs, to the prevailing party in any such arbitration. Because it may be impossible or inadequate to measure the damages from any breach, dispute or controversy arising under or in connection with this Agreement, the parties hereby agree that the parties will have available, in addition to any other right or remedy available, the right to obtain injunctive relief from a court of competent jurisdiction.

15.3    Force Majure. No failure, delay or default in performing any obligation hereunder shall constitute default or breach of this Agreement to the extent it arises from clauses beyond the control and without fault or neglect of the party otherwise chargeable with such failure, delay or default, including, but not limited to, action or inaction of governmental authority or civil commotion; fire; flood; earthquake; natural disaster; or default of common carrier. Each party shall give prompt notice by certified mail to the other of any such cause.

15.4    Independent Review. Machine Owner and operator each represent that they are entering into this Agreement freely and voluntarily, for the purposes herein stated. each has fully read and understood the contents hereof, and each has done its own due diligence in researching and evaluating the terms of this Agreement. Each Party has had advice, or an opportunity to review with its own legal counsel, prior to execution of this Agreement. No presumption shall arise by the fact one party or its attorney drafted this Agreement.

15.5    Severability. Should any provision of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.6    Entire Agreement. This Agreement consists of pages 1-6 and Exhibit "A" & "B" only. This Agreement and the documents referred to herein contain the entire agreement between Machine Owner and operator respecting the subject matter hereof. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties. No oral representation made prior to or at execution of this Agreement shall be binding on either party.

15.7    Litigation Costs. In the event litigation is necessary to enforce any of the terms of this Agreement, including all amendments or exhibits thereto, the prevailing party shall be entitled to recover all reasonable costs of suit.

15.8    Relationship of Parties. Operator is an independent contractor and not an employee of Machine Owner for any purposes. Nothing in this Agreement shall be deemed to constitute Machine Owner and Operator as either partners or joint ventures in any matters.

15.9    No Interest in ATM. Nothing contained in this Agreement shall be deemed or construed to create in Operator any lien or property interest in or to the Subject ATMs.

15.10    Licenses. Operator represents and warrants to Machine Owner that Operator has obtained, at its own expense, and will keep in effect during the term hereof, any licenses, permits or other governmental consents as required for Operator to perform its obligations hereunder and that operator will comply with all applicable laws and regulations for such ATM operations. Operator covenants that it will maintain all such required licenses, permits or other governmental consents.

15.11    Confidentiality. Except as specifically required for the performance of the obligations under the Agreement. each of the Parties agrees that the terms, conditions, requirements, and associated understandings of this Agreement are confidential and shall not be disclosed to any person or entity not a party to this Agreement.

15 12    **Indemnification Of Parties.**

(1)  To the extent not covered by applicable insurance, the Machine Owner agrees to indemnify and hold Operator harmless from and against every loss, damage, claim, cost, or proceeding related directly or indirectly to: (a) any claims by third parties that the Machine Owner breached an agreement with them; (b) any claims of error by cardholders, (c) any damage or injury to cardholders, maintenance or courier personnel, or ATM site personnel in connection with an ATM or an ATM transaction; (d) the design, accessibility and/or placement of ATMs; (e) Machine Owner's breach of this Agreement; or (f) any other Loss.

(2)  To the extent not covered by applicable insurance, the Operator agrees to indemnify and hold Machine Owner harmless from and against every loss, damage, claim, cost, or proceeding related directly or indirectly to; (a) any claims by third parties that the Operator breached an agreement with them; (b) any claims of error by cardholders; (c) any damage or injury to cardholders, maintenance or courier personnel, or ATM site personnel in connection with an ATM or an ATM transaction; (d) the design, accessibility and/or placement of ATMs; (e) Operator's breach of this Agreement; or (f) any other Loss.

15.13    **Notices.** All notices and requests in connection with this Agreement shall be deemed delivered or given as of the next business day following the day they are received and may be addressed as designated below, or in such other address as the party receiving notice may from time to time designate in writing by notice delivered in accordance with this Section. All notices should be delivered by certified U. S. Mail.

If to Machine Owner:

Caspian Opportunities, Inc.
500 Mamaroneck Ave. Suite 101
Harrison, New York 10528

IF TO OPERATOR.

ATM FINANCIAL SERVICES, LLC.
Vance Moore, Manager
301 South Richey Road
Leesburg, FL 34748-0510

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLKBB4\Management Agreement Caspian 2-1-06 .doc

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

**MACHINE OWNER:**

CASPIAN OPPORTUNITIES, INC

By: _____

Name: Adam Cohen

_____
Date

**OPERATOR:**

ATM FINANCIAL SERVICES, LLC

By: _____

Name:  Vance Moore, Manager

_____
Date

I hereby acknowledge, understand and agree that Operator has made no representations, warranty, or guarantee in any manner of the projected or potential income, number of transactions or net revenues to be received by Machine Owner from operations of the Subject ATMs. I also hereby acknowledge, understand and agree that Operator specifically does not guarantee any net income to Machine Owner. Should "Gross Revenues" not be sufficient to cover "Operating Cost" Machine owner will within 5 days of Statement pay to Operator the amount equaling one hundred percent (100%) of the "Net Loss."

_____          _____
Machine Owner Signature                    Date

# EXHIBIT K

## AUTOMATED TELLER MACHINE (ATM)
## EQUIPMENT MANAGEMENT AGREEMENT

THIS AGREEMENT is made this 15th day of June 2006, by and between ATM Financial Services LLC, a Delaware Corporation of Leesburg, Florida (hereinafter "AFS" or "Operator") and ACM ATM, LLC, a Delaware Corporation with an address at 570 Lexington Avenue New York, N.Y 10022(hereinafter "Machine Owner").

### BACKGROUND

Operator is in the business of managing and operating automated teller machines ("ATMs") in suitable locations for a profit. Machine Owner has purchased or otherwise owns and controls one or more ATM units and desires to engage Operator's services to install, operate and manage Machine Owner's ATMs as provided in this Agreement. In consideration of the foregoing and the mutual covenants and promises contained herein, the parties agree as follows:

1.    **OWNERSHIP OF ATMs.** Machine Owner hereby represents and warrants, and Machine Owner acknowledges that Machine Owner owns or lawfully controls, one or more ATM units identified in the attached Exhibit "A" (hereafter the "Subject ATMs"). Machine Owner has full power and authority to enter into this Agreement with respect to the subject ATMs.

2.    **MANAGEMENT OF ATMs.** Machine Owner hereby grants to Operator, for the term of this Agreement, the right to act on Machine Owner's behalf to install, manage, operate and maintain the Subject ATMs, and authorizes Operator to take all actions as are reasonably necessary for operation and maintenance of said ATM units, consistent with this Agreement. Operator agrees to manage said ATM units on a best efforts basis.

3.    **TERM.** The initial term of this Agreement is for six (6) years, commencing on the date first above written, unless earlier terminated under this Agreement. This Agreement shall automatically renew for additional six (6) year periods, except as otherwise provided in paragraph 12 hereof.   Both Operator and Machine Owner have the option to terminate this Agreement by providing notice as provided herein to the other party at least thirty (30) days prior to expiration of the initial or any such six (6) year term.

4.    **SITE LOCATIONS; CASH INVENTORY**

4.1 **Site Location Lease.** Machine Owner shall allow Operator to lease from third parties, or otherwise secure suitable sites for the placement of the Subject ATMs (the "Leases"). Operator will provide Machine Owner with relevant site evaluation information. Operator will be the sole party to any location agreement or lease with the "Location Owner" provided however that Operator specifically acknowledges and agrees that any and all rights to any particular retail location and Lease, is the sole property of Machine Owner. Upon termination of this Agreement, Operator shall assign all rights to the Leases to Machine Owner, or such other third party as Machine Owner so chooses. Such location of the Leases is attached hereto as Exhibit C.

4.2 **Cash Inventory Supply.** Operator will contract with a bank or other cash provider, to maintain a continuous supply of sufficient cash inventory ("Cash Inventory") to the Subject ATMs.

5.    **REPRESENTATIONS AND WARRANTIES OF OPERATOR.**   Operator represents and warrants to Machine Owner as follows:

5.1    Operator is a corporation duly organized, validly existing, and in good standing under the laws of the state of Delaware, and has full power and authority to carry on its business as and in the places where such ATMs are now owned or such business is now being conducted.  The assets, properties, and rights owned or held by Operator on the date hereof are all of the assets, properties, and rights necessary or desirable to permit Operator to carry on the business as conducted by it on the date hereof. Operator has not taken any action or failed to take any action that would preclude or prevent Machine Owner from conducting the business in the same manner as now conducted.

5.2    As of the date of this Agreement, all requisite actions, approvals, consents, and authorizations by any governmental or quasi-governmental agencies, commissions, boards, bureaus, or instrumentalities necessary as to Operator in order to constitute this Agreement as a binding and enforceable obligation of Operator in accordance with its terms (the "Approvals") have been obtained. Operator will use reasonable efforts to ensure such Approvals will continue in full force and effect.

5.3    There are no material litigations, suits, proceedings, actions, arbitrations or administrative proceedings in which Operator is a party.

5.4    Other than as disclosed to Machine Owner in writing, Operator has no financial, monetary or other interest in, and has received no benefit from, the sale or acquisition of the Subject ATMs.

5.5    There are no actions, suits, proceedings, investigations, or claims pending, or to the best of Operator's knowledge threatened, against or affecting the business, operations, or financial condition of Operator at law or in equity in any court of before any federal, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, nor does Operator know of any basis for such action, suit, proceeding, investigation, or claim. Operator is not in default in respect of any judgment, order, writ, injunction, decree, or regulation of any court or federal, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality. There are no judgments outstanding against Operator.

5.6    As of the date of this Agreement, Operator has all permits, licenses, orders, and approvals of, and has made all required filings with, all federal, provincial, or local governmental or regulatory bodies required for it to conduct its business as presently conducted. All such permits, licenses, orders, and approvals are in full force and effect and no suspension or cancellation of any of them is pending or threatened. Operator is in compliance with all such permits, licenses, orders, and approvals and with all limitations, conditions, standards, and requirements contained in those laws, rules, regulations, codes, orders, judgments, and decrees applicable to it and the business conducted by it. Operator will use reasonable efforts to ensure such permits, licenses, orders, and approvals will continue in full force and effect.

5.7    Operator has full power and authority to enter into this Agreement and to assume and perform its obligations hereunder. The execution and delivery of this Agreement and the performance by Operator of its obligations hereunder have been duly authorized by its members, this Agreement has been duly executed and delivered by Operator, and no further action or approval is required in order to constitute this Agreement as a binding and enforceable obligation of Operator. The execution and delivery hereof and the performance by Operator of its obligations hereunder will not (i) violate any provision of law, any governmental regulation or any judgment, writ, injunction, decree, or order of any court or other governmental authority relating to Operator, or (ii) violate any indenture, contract, other commitment, or restriction to which Operator is a party or by which it or the Assets are bound, or (iii) be in conflict with or result in or constitute a breach or default (or an occurrence which by the lapse of time or the giving of notice or both would constitute a breach or default), on the part of Operator, under any such indenture, contract, other commitment, or restriction, or (iv) result in the creation or imposition of any lien, charge, or encumbrance of any nature whatsoever upon any of the ATMs.

5.8    No representation or warranty by Operator in this Agreement or under any documents, instruments, certificates, or schedules furnished pursuant hereto or in connection with the services contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained herein or therein not misleading.

6.    INSURANCE FOR ATM UNITS. Operator will secure and maintain in force throughout the term of this Agreement, an appropriate policy or policies of insurance covering the ATM units and the cash therein naming the Machine Owner as the designated beneficiary. Such insurance shall include coverage for: (a) the Cash Inventory in each subject ATM and (b) property damage or loss to ATM units from casualty or loss by fire, theft, vandalism, collapse of building, etc.; and (c) appropriate premises liability coverage for any loss, damage, liability and expenses (including reasonable attorney's fees) arising from personal injury or death to any person or property damage, from the use, location or maintenance of ATM units. The cost of Insurance will be paid pursuant to Section (10).

7.    **DUTIES OF OPERATOR.** Operator shall be responsible for the following matters:

7.1    Installation. Install the Subject ATMs at locations mutually agreed to by the parties, in a workman-like manner and in compliance with all local, federal and state laws and regulations, and with any requirements of the Location Agreement. Installation will be completed within ninety (90) days of receipt of ATM, signed contract, and location space agreement.

7.2    Armored Car Services. Contract and/or co-ordinate with Brinks or similar company to provide necessary armored car services for delivery, installation and replenishment of ATM Cash Inventory.

7.3    Processing, Communications With Network and Sponsorship. Contract with an appropriate "Processor," presently USA Payment Systems, Inc. a Nevada Corporation, to supply network access links, sponsorship and processing services to accurately operate, record, report and distribute the revenues from card transactions handled by the Subject ATMs.

7.4    Supplies. Provide the necessary paper or supplies for operations of the Subject ATMs.

7.5    Maintenance. Operator will secure appropriate maintenance/repair agreements with certified technicians, to repair and maintain the ATM equipment in a workable, operating condition so that members of the public can successfully access cash through the Subject ATMs during all local business hours. The cost of maintenance/repair agreements will be paid pursuant to Section (10).

7.6    Collection of Revenues and Fees. Contract with USA Payment Systems, or other processor, for the collection, data processing and electronic deposit and transfer to Operator's settlement account of all collected revenues and fees, including surcharge revenues and network access (interchange) fees, due from operations of the Subject ATMs.

7.7    Accounting. Provide Machine owner with a monthly statement itemizing gross earned revenues and all fixed and variable operating expenses incurred or paid for operation of the Subject ATMs along with payment for the net amount due to the Machine Owner as provided in this Agreement. Operator also will provide Machine Owner a full disclosure of the number of transactions for the Subject ATM as reflected by the processor's ATM printout, on a monthly basis by first class mail.

7.8    Operating Expenses and Distribution of Net Revenues. Operator shall pay all expenses of operation ("Operation Expenses") from the Gross Revenues of the Subject ATM and distribute the "Net Revenues" or "Net Losses" monthly to Machine Owner as provided in Paragraph 10 below.

8.    **DUTIES OF MACHINE OWNER.** Machine Owner is responsible for the following matters:

8.1    ATM Units. Provide for and grant to Operator the use of the Subject ATMs (per Exhibit "A") for installation at locations agreed upon by the Parties.

8.2    Confirm Accounting and Distribution of Net Revenues. Machine Owner shall review, verify or confirm the monthly accounting of ATM operations provided by Operator, and the allocation and distribution of "net revenues" provided therewith, in accordance with this Agreement. Machine Owner must contact Operator within ten (10) days of receipt to discuss any questions about ATM operations as reflected in such accounting; provided however, any failure by Machine Owner to identify or address any accounting matter shall not be deemed a waiver of any rights of Machine Owner.

8.3    Relocation of ATMs. Arrange relocation of the Subject ATMs as requested by and at the expense of the Machine Owner.

9.    **COMPENSATION OF OPERATOR.** As compensation for Operator's services under this Agreement, Machine Owner agrees to pay Operator a management fee as defined in Exhibit B from operations of the Subject ATMs. This management fee will be automatically deducted and paid to Operator each month from any Net Revenues otherwise payable to Machine Owner from operations of the Subject ATMs. This fee will be paid to Operator for the duration of the Agreement and as long as Machine Owner's ATM units are under Operator's management. If revenues are not sufficient to pay these fees Machine Owner will within 15 days of notice pay to Operator any shortages of fees. Failure of timely payment will result in Operator becoming a lien holder of ATM unit.

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement ACM ATM

10.    ALLOCATION OF NET REVENUES; EXPENSES.

10.1  Operating Expenses. "Net Revenues" for purposes of this Agreement shall mean "Gross Revenues" collected from operations of the Subject ATMs which are surcharge fees, and interchange fees, less the following expenses ("Operating Expenses"): (a) cost of cash inventory and cash replacement; (b) service fees to Brinks/armored car services; (c) monitoring/processing/ communications for network access (phone line charges) sponsorship; (d) insurance; (e) supplies; (f) maintenance; and (g) space or location fees, (h) utilities (i) management fees. Machine Owner shall also be responsible for any and all additional expenses incurred or paid by Operator as reasonably necessary for proper operation and maintenance of the Subject ATMs. Should "Gross Revenues" not be sufficient to cover "Operating Cost" Machine Owner will within 5 days of Statement pay to Operator the amount equaling One Hundred percent (100%) of the "Net Loss."

10.2  No Guarantee of Income. Operator hereby specifically disclaims, and Machine Owner specifically acknowledges, understands and agrees, that Operator has made no representations, warranty, or guarantee in any manner of the projected or potential income, or net revenues to be received by Machine Owner from operations of the Subject ATMs. Operator specifically does not guarantee any net income to Machine Owner.

11.    MAINTENANCE OF ATM UNITS. Machine Owner will pay for all service, maintenance and/or upkeep expenses over and above any manufacturing warranties or maintenance programs. The cost of maintenance/repair agreements will be paid pursuant to Section (10). It is further understood and agreed that Machine Owner SHALL NOT open, adjust, remove, disconnect, replace, repair or alter the ATM unit(s) in any way, so long as any ATM is under management by Operator under this Agreement. Machine Owner hereby grants operator the right, at Machine Owner's expense, to make all replacements, updates, additions or modifications deemed reasonably necessary by Operator to the continued successful operation of the Subject ATMs.

12.    EVENTS OF DEFAULT; TERMINATION AND CURE.

12.1  If either Party materially breaches any provision of this Agreement or any representation or warranty of this Agreement or materially fails to perform any obligations or covenants of said party under this Agreement, the other party hereto shall have the right to terminate this Agreement as to all Subject ATMs, by giving written notice to the "defaulting party." This remedy shall be in addition to any and all other rights and remedies the non-defaulting party shall have, in law or in equity for such breach, including holding the defaulting party liable for any and all damages and associated costs incurred by said breach.

12.2  Machine Owner may terminate this Agreement immediately upon (i) willful misconduct in the performance of Operator's duties, (ii) fraud, embezzlement, dishonesty or theft by Operator in connection with the Subject ATMs, (iii) Operator's conviction of or plea of nolo contendere to a felony or an act of moral turpitude, (iv) Operator's retirement, withdrawal, death, or disability, if a suitable replacement is not found and approved by Machine Owner, such approval not to be unreasonably withheld, or (v) Operator 's insolvency or filing of a petition under the federal bankruptcy laws.

12.3  Cure. Failure of the defaulting party to cure the breach within thirty (30) days of notification, this Agreement will be deemed terminated as of the Notification date.

13.    RELOCATION OF ATM UNIT(S). If the Location Agreement applicable to any ATM unit is terminated for any reason, Operator shall remove or relocate the subject ATM to another site or storage facility acceptable to Machine Owner, within 60 days of such termination, with costs of such relocation borne by Machine Owner.

14.    ASSIGNMENT. This Agreement shall be binding on Machine owner and Operator and their respective successors and assigns. Operator shall not have the right to assign this Agreement and its rights, obligations and benefits hereunder without the prior written consent of the Machine Owner. Machine Owner may assign this Agreement and its rights, obligations and benefits hereunder as to any subject ATMs, without prior written consent of Operator. Machine Owner agrees that in the event of the sale or transfer of the Subject ATMs, this Agreement will be binding on all assignees or successors, which will be notified of its existence, as a part of any such transfer. Machine owner will secure the written consent of any successors to the terms of this Agreement.

15.    **MISCELLANEOUS:**

15.1    Governing Law. This Agreement shall be governed by and construed under the laws of the State of Florida; except as to any issues specifically governed by the laws of the state where an ATM unit is located.

15.2    Enforcement. Any controversy, claim or disputes arising out of the terms or conditions or interpretation of this Agreement shall be resolved through binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Venue for any such arbitration shall be in Orlando County, Florida. The decision of the arbitrator shall be final and binding upon both parties. The Arbitrator(s) shall award the expenses of arbitration, including arbitrator's expenses, and reasonable attorney's fees and costs, to the prevailing party in any such arbitration. Because it may be impossible or inadequate to measure the damages from any breach, dispute or controversy arising under or in connection with this Agreement, the parties hereby agree that the parties will have available, in addition to any other right or remedy available, the right to obtain injunctive relief from a court of competent jurisdiction.

15.3    Force Majeure. No failure, delay or default in performing any obligation hereunder shall constitute default or breach of this Agreement to the extent it arises from clauses beyond the control and without fault or neglect of the party otherwise chargeable with such failure, delay or default, including, but not limited to, action or inaction of governmental authority or civil commotion; fire; flood; earthquake; natural disaster; or default of common carrier. Each party shall give prompt notice by certified mail to the other of any such cause.

15.4    Independent Review. Machine Owner and Operator each represent that they are entering into this Agreement freely and voluntarily, for the purposes herein stated, each has fully read and understood the contents hereof, and each has done its own due diligence in researching and evaluating the terms of this Agreement. Each Party has had advice, or an opportunity to review with its own legal counsel, prior to execution of this Agreement. No presumption shall arise by the fact one party or its attorney drafted this Agreement.

15.5    Severability. Should any provision of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

15.6    Entire Agreement. This Agreement consists of pages 1-6 and Exhibit "A" & "B" only. This Agreement and the documents referred to herein contain the entire agreement between Machine Owner and Operator respecting the subject matter hereof. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties. No oral representation made prior to or at execution of this Agreement shall be binding on either party.

15.7    Litigation Costs. In the event litigation is necessary to enforce any of the terms of this Agreement, including all amendments or exhibits thereto, the prevailing party shall be entitled to recover all reasonable costs of suit.

15.8    Relationship of Parties. Operator is an independent contractor and not an employee of Machine Owner for any purposes. Nothing in this Agreement shall be deemed to constitute Machine Owner and Operator as either partners or joint ventures in any matters.

15.9    No Interest in ATM. Nothing contained in this Agreement shall be deemed or construed to create in Operator any lien or property interest in or to the Subject ATMs.

15.10    Licenses. Operator represents and warrants to Machine Owner that Operator has obtained, at its own expense, and will keep in effect during the term hereof, any licenses, permits or other governmental consents as required for Operator to perform its obligations hereunder and that operator will comply with all applicable laws and regulations for such ATM operations. Operator covenants that it will maintain all such required licenses, permits or other governmental consents.

15.11    Confidentiality. Except as specifically required for the performance of the obligations under this Agreement, each of the Parties agrees that the terms, conditions, requirements, and associated understandings of this Agreement are confidential and shall not be disclosed to any person or entity not a party to this Agreement.

15.12   **Indemnification Of Parties.**

(1)   To the extent not covered by applicable insurance, the Machine Owner agrees to indemnify and hold Operator harmless from and against every loss, damage, claim, cost, or proceeding related directly or indirectly to: (a) any claims by third parties that the Machine Owner breached an agreement with them; (b) any claims of error by cardholders; (c) any damage or injury to cardholders, maintenance or courier personnel, or ATM site personnel in connection with an ATM or an ATM transaction; (d) the design, accessibility and/or placement of ATMs; (e) Machine Owner's breach of this Agreement; or (f) any other Loss.

(2)   To the extent not covered by applicable insurance, the Operator agrees to indemnify and hold Machine Owner harmless from and against every loss, damage, claim, cost, or proceeding related directly or indirectly to: (a) any claims by third parties that the Operator breached an agreement with them; (b) any claims of error by cardholders; (c) any damage or injury to cardholders, maintenance or courier personnel, or ATM site personnel in connection with an ATM or an ATM transaction; (d) the design, accessibility and/or placement of ATMs; (e) Operator's breach of this Agreement; or (f) any other Loss.

15.13   **Notices.** All notices and requests in connection with this Agreement shall be deemed delivered or given as of the next business day following the day they are received and may be addressed as designated below, or to such other address as the party receiving notice may from time to time designate in writing by notice delivered in accordance with this Section: All notices should be delivered by certified U. S. Mail.

If to Machine Owner:

ACM ATM, LLC
570 Lexington Ave, 40th Fl
New York, N.Y. 10022

IF TO OPERATOR:

ATM FINCANCIAL SERVICES, LLC.
Vance Moore, Manager
301 South Richey Road
Leesburg, FL 34748-0510

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement ACM ATM

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first set forth above.

MACHINE OWNER:

ACM ATM, LLC

X  By:
Name: Eric Edidin    6/15/06

Date

OPERATOR:

ATM FINANCIAL SERVICES, LLC

By:
Name:  Vance Moore, Manager

6/15/06

Date

I hereby acknowledge, understand and agree that Operator has made no representations, warranty, or guarantee in any manner of the projected or potential income, number of transactions or net revenues to be received by Machine Owner from operations of the Subject ATMs. I also hereby acknowledge, understand and agree that Operator specifically does not guarantee any net income to Machine Owner. Should "Gross Revenues" not be sufficient to cover "Operating Cost" Machine owner will within 5 days of Statement pay to Operator the amount equaling one hundred percent (100%) of the "Net Loss."

X
Machine Owner Signature                     6/15/06

Date

C:\Documents and Settings\Vance Moore\Local Settings\Temporary Internet Files\OLK884\Management Agreement ACM ATM
MFS 6-13-06 .doc

EXHIBIT B

### Estimated Fee Schedule

Monthly Fees

| | |
|---|---|
| Management Fee | $25.00 |
| Insurance | $39.75 This rate is subject to change by Insurance Company |
| Maintenance Fee | $50.00 (Payable pursuant to Management Agreement) |
| Supplies | $15.00 |
| Processing | .26 per transaction |
| Property Taxes Est. | $19.00 Per Month |
| Telephone Line | $42.00-$45.00 per month |

ACM ATM, LLC
ATMs #1-1B

| # | Location | Address | City | State | Zip | Serial # | Make | Average | Effective |
|---|----------|---------|------|-------|-----|----------|------|---------|-----------|
| 1 | Inland Oil Propane | 747 Basin Street NW | Ephrata | WA | 98823 | 7822Y401 | Tidel | 400 | 6/15/2006 |
| 2 | J&T Enterprises, Inc. | 71 Nh Route 104 Unit 15 | Meredith | NH | 03253 | 7822Y851 | Tidel | 403 | 6/15/2006 |
| 3 | Farm Stores | 6800 N.W. 74th Ave. | Miami | FL | 33166 | 7922Y106 | Tidel | 401 | 6/15/2006 |
| 4 | Hudson Food Stores, Inc. | 204 Main St. | Chiefland | FL | 32626 | 7822Y841 | Tidel | 402 | 6/15/2006 |
| 5 | Fickts | 3121 Venture Pl., Ste. 4 | Jacksonvill | FL | 32257 | AX498903 | Tidel | 404 | 6/15/2006 |
| 6 | Hanco, Inc. | 215 N. Main St. | Jamestown | TN | 38556 | 7922Y119 | Tidel | 401 | 6/15/2006 |
| 7 | F.M.J. Inc. | 5601 Highway 70 | Pegram | TN | 37143 | AA106079 | Tidel | 402 | 6/15/2006 |
| 8 | Gene Stimson of Arkansas, Inc. | 13555 Lynnfield Rd. Ste 296 | Memphis | TN | 38119 | 7922Y396 | Tidel | 401 | 6/15/2006 |
| 9 | Getman's Food Fair, Inc. | 3131 Pawnee Street | Houston | TX | 77054 | 7822Y300 | Tidel | 402 | 6/15/2006 |
| 10 | Gary Spot | 14081 FM 2920 | Tomball | TX | 77375 | 7822Y327 | Tidel | 400 | 6/15/2006 |
| 11 | Food Flash Holdings, Ltd. | 4703 Dc Dr, Ste. 100 | Tyler | TX | 75701 | 7822Y524 | Tidel | 406 | 6/15/2006 |
| 12 | Horkey OilCo. | 408 Erskine St. | Lubbock | TX | 79403 | 7822Y741 | Tidel | 403 | 6/15/2006 |
| 13 | Flintex Marketing, Inc. | 1617 Meyer St. | Sealy | TX | 77474 | 7922Y209 | Tidel | 402 | 6/15/2006 |
| 14 | Fast Stop Stores, Inc. | 3400 B Pecos | Austin | TX | 78703 | 7922Y641 | Tidel | 401 | 6/15/2006 |
| 15 | Country Boys | 20931 TX Hwy. 11 E | Randy Cra | TX | 75494 | 1010Y1611 | Tidel | 401 | 6/15/2006 |
| 16 | Festop Foods of East Texas, Inc. | 312 Higginbotham Rd. | Kilgore | TX | 75662 | 1114Y2903 | Tidel | 400 | 6/15/2006 |
| 17 | J&M Food Store | 3500 Hemphill St. | Fort Worth | TX | 76110 | 1112Y2216 | Tidel | 401 | 6/15/2006 |
| 18 | Times Market | 312 Travis | Port Lavac | TX | 77979 | 1016Y1244 | Tidel | 401 | 6/15/2006 |

# EXHIBIT L

Middle District of Florida Live Database - Docket Report                                    Page 1 of 27
Case 7:08-cv-05971-SCR     Document 7-13     Filed 09/05/2008     Page 2 of 28

**CONVERTED**

# U.S. Bankruptcy Court
## Middle District of Florida (Orlando)
### Bankruptcy Petition #: 6:08-bk-00969-KSJ

*Assigned to:* Karen S. Jennemann
Chapter 7
Previous chapter 11
Voluntary
Asset

*Date Filed:* 02/12/2008
*Date Converted:* 06/20/2008

| | |
|---|---|
| **Debtor**<br>**ATM Financial Services, LLC**<br>Post Office Box 490510<br>Leesburg, FL 34748<br>Tax id: 03-0467860 | represented by **Peter N Hill**<br>Wolff Hill McFarlin & Herron PA<br>1851 West Colonial Drive<br>Orlando, FL 32804<br>407-648-0058<br>Fax : 407-648-0681<br>phill@whmh.com |
| **Trustee**<br>**Soneet R Kapila**<br>Post Office Box 14213<br>Fort Lauderdale, FL 33302<br>(954) 761-8707 | represented by **Soneet R Kapila**<br>PRO SE<br><br>**Roy S Kobert**<br>Post Office Box 4961<br>Orlando, FL 32802<br>407-839-4200<br>Fax : 407-425-8377<br>orlandobankruptcy@broadandcassel.com<br><br>**Soneet R Kapila**<br>(See above for address) |
| **U.S. Trustee**<br>**United States Trustee - ORL7, 7**<br>135 W. Central Blvd., Suite 620<br>Orlando, FL 32801<br>407-648-6301 | represented by **Kenneth C Meeker**<br>United States Trustee<br>135 West Central Boulevard<br>Suite 620<br>Orlando, FL 32801<br>(407) 648-6301<br>ken.meeker@usdoj.gov |

| Filing Date | # | Docket Text |
|---|---|---|
| 02/12/2008 | 1 | Voluntary Petition under Chapter 11. (Filing Fee Paid) ***Related Case, 6:03-ap-0112-KSJ, Dismissed 05/26/2004***. Schedules and Statements Incomplete, Statement of Financial Affairs Not Filed or Incomplete, Disclosure of Compensation of Attorney Not Filed or Not Required, Filed by Peter N Hill on behalf of ATM Financial Services, LLC. Chapter 11 Plan due by 6/11/2008 Disclosure Statement due by 6/11/2008 (Hill, Peter) Modified on 2/13/2008 (Hatcher, Pat). (Entered: 02/12/2008) |

| | | |
|---|---|---|
| 02/12/2008 | 2 | List of 20 Largest Unsecured Creditors Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 02/12/2008) |
| 02/12/2008 | 3 | Statement of Corporate Ownership Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 02/12/2008) |
| 02/12/2008 | | Receipt of Filing Fee for Voluntary Petition (Chapter 11)(6:08-bk-00969) [misc,volp11a2] (1039.00). Receipt Number 11238848, Amount Paid $1039.00 (U.S. Treasury) (Entered: 02/12/2008) |
| 02/13/2008 | | Assignment of the Honorable Karen S. Jennemann, Bankruptcy Judge to this case . (Hatcher, Pat) (Entered: 02/13/2008) |
| 02/13/2008 | 4 | Notice of Commencement of Case, Section 341 Meeting of Creditors, and Fixing Deadlines . Section 341(a) meeting to be held on 3/10/2008 at 09:00 AM at Orlando, FL (6-60) - 135 West Central Blvd., 6th Floor, Suite 600. Proofs of Claims due by 6/9/2008. (Henry, Mary) (Entered: 02/13/2008) |
| 02/13/2008 | 5 | Letter/Memorandum Re: schedules, statement of financial affairs, disclosure of compensation *due by 2/27/08* (related document(s)1). (Henry, Mary) Modified on 2/13/2008 (Henry, Mary). (Entered: 02/13/2008) |
| 02/13/2008 | 6 | Order of Retention of Debtor-In-Possession. Signed on 2/13/2008 (Henry, Mary) (Entered: 02/13/2008) |
| 02/13/2008 | 7 | Order Authorizing Debtor-In-Possession to Operate Business. Signed on 2/13/2008 (Henry, Mary) (Entered: 02/13/2008) |
| 02/13/2008 | 8 | Application/Motion for Authority *to Pay Prepetition Compensation and Benefits to Non-Insiders with Request for Expedited Hearing* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (Hill, Peter) (Entered: 02/13/2008) |
| 02/13/2008 | 9 | Application/Motion for Authority *to Compensate Darcy Moore, an Insider of the Debtor and Request for Expedited Hearing* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (Hill, Peter) (Entered: 02/13/2008) |
| 02/14/2008 | 10 | Notice *of Appearance for Purposes of CM/ECF* Filed by Miriam G Suarez on behalf of U.S. Trustee United States Trustee - ORL. (Suarez, Miriam) (Entered: 02/14/2008) |
| 02/14/2008 | 11 | Motion *to Compel Debtor ATM Financial Services, LLC's Compliance With Temporary Restraining Order, Or In The Alternative, To Prohibit Use of Property, Including Cash Collateral* Filed by Brian A McDowell on behalf of Creditor ATM Equity LP (Attachments: # 1 Exhibit A# 2 Exhibit B) (McDowell, Brian) (Entered: 02/14/2008) |
| 02/14/2008 | 12 | Certificate of Necessity *of Request for Emergency Hearing* Filed by Brian A |

| | | |
|---|---|---|
| | | McDowell on behalf of Creditor ATM Equity LP (related document(s)11). (McDowell, Brian) (Entered: 02/14/2008) |
| 02/14/2008 | 13 | Notice of Appearance and Request for Notice Filed by Brian A McDowell on behalf of Creditor ATM Equity LP. (McDowell, Brian) (Entered: 02/14/2008) |
| 02/14/2008 | 14 | Notice of Appearance and Request for Notice Filed by Samuel J Zusmann Jr on behalf of Creditor ATM Equity LP. (Zusmann, Samuel) (Entered: 02/14/2008) |
| 02/15/2008 | 15 | Notice of Appearance and Request for Notice Filed by Robert L Young on behalf of Caspian Opportunities, Inc., ACM ATM, LLC, Greywolf Holdings LP. (Young, Robert) (Entered: 02/15/2008) |
| 02/15/2008 | 16 | Verified Statement *of Carlton Fields, P.A. Pursuant to Bankruptcy Rule 2019 (Creditors ACM ATM LLC, Caspian Opportunities, Inc. and Greywolf Holdings LP)* Filed by Robert L Young on behalf of Creditor Greywolf Holdings LP. (Young, Robert) (Entered: 02/15/2008) |
| 02/15/2008 | 17 | Notice of Hearing Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (related document(s)8, 9). Hearing scheduled for 2/19/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Hill, Peter) (Entered: 02/15/2008) |
| 02/15/2008 | 18 | Notice of Hearing Filed by Brian A McDowell on behalf of Creditor ATM Equity LP (related document(s)11). Hearing scheduled for 2/19/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (McDowell, Brian) (Entered: 02/15/2008) |
| 02/15/2008 | 19 | Motion for Adequate Protection *of Greywolf Holdings LP, ACM ATM LLC and Caspian Opportunities, Inc.* Filed by Robert L Young on behalf of Creditor Greywolf Holdings LP (Attachments: # 1 Exhibit 1-4 toMotion for Adequate Protection# 2 Exhibit Exhibits 5-14 to Motion for Adequate Protection) (Young, Robert) (Entered: 02/15/2008) |
| 02/15/2008 | 20 | Certificate of Necessity *of Request for Emergency Hearing* Filed by Robert L Young on behalf of Creditor Greywolf Holdings LP. (Young, Robert) (Entered: 02/15/2008) |
| 02/15/2008 | 21 | Notice of Appearance and Request for Notice Filed by Andrew M. Brumby on behalf of Creditor Fortress Credit Corp.. (Brumby, Andrew) (Entered: 02/15/2008) |
| 02/15/2008 | 22 | Motion to Appoint Trustee Filed by Brian A McDowell on behalf of Creditor ATM Equity LP (McDowell, Brian) (Entered: 02/15/2008) |
| 02/15/2008 | 23 | BNC Certificate of Mailing - Order (related document(s) (Related Doc # 7)). Service Date 02/15/2008. (Admin.) (Entered: 02/16/2008) |

| | | |
|---|---|---|
| 02/15/2008 | 24 | BNC Certificate of Mailing - Order (related document(s) (Related Doc # 6)). Service Date 02/15/2008. (Admin.) (Entered: 02/16/2008) |
| 02/15/2008 | 25 | BNC Certificate of Mailing. (related document(s) (Related Doc # 5)). Service Date 02/15/2008. (Admin.) (Entered: 02/16/2008) |
| 02/15/2008 | 26 | BNC Certificate of Mailing - Notice of Meeting of Creditors. (related document(s) (Related Doc # 4)). Service Date 02/15/2008. (Admin.) (Entered: 02/16/2008) |
| 02/15/2008 | 30 | Notice of Appearance and Request for Notice Filed by Alvin F Benton on behalf of Creditor ATM Equity LP. (Henry, Mary) (Entered: 02/19/2008) |
| 02/18/2008 | 27 | Certificate of Service Re: *Notice of Expedited Hearing on Debtor's Motion to Pay Prepetition Compensation and Benefits to Non-Insiders and Debtor's Motion for Authority to Compensate Darcy Moore, an insider of the Debtor* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (related document(s)8, 17, 9). (Hill, Peter) (Entered: 02/18/2008) |
| 02/18/2008 | 28 | Chapter 11 Case Management Summary Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 02/18/2008) |
| 02/19/2008 | 29 | Motion to Appear pro hac vice *as co-counsel on behalf of Greywolf Holdings LP, ACM ATM, LLC, and Caspian Opportunities, Inc. (Michael Friedman, H. Rowan Gaither, IV, and Keith N. Sambur)* Filed by Robert L Young on behalf of Creditor Greywolf Holdings LP (Young, Robert) (Entered: 02/19/2008) |
| 02/19/2008 | 31 | Application to Employ Peter N. Hill and Wolff, Hill, McFarlin & Herron, P.A. as Attorneys for the Debtor Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (Hill, Peter) (Entered: 02/19/2008) |
| 02/19/2008 | 32 | Hearing Proceeding Memo: Hearing Held, Ruling: Motion to pay prepetition compensation to insider is granted on limited basis pending further hearing scheduled 3/13/08 at 9:30 a.m.: Order by Hill; see attached pro for further ruling. (related document(s)11, 8, 9). (Deetz, Kathy) (Entered: 02/20/2008) |
| 02/20/2008 | 33 | Notice of Evidentiary Hearing on Creditor Greywolf Holdings LP's Motion for Adequate Protection of Greywolf Holdings LP, ACM ATM LLC and Caspian Opportunities, Inc., and Creditor ATM Equity LP's Motion to Appoint Trustee (related document(s)19, 22). Hearing scheduled for 3/13/2008 at 09:30 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Henry, Mary) (Entered: 02/20/2008) |
| 02/21/2008 | 37 | Order Granting Motion To Appear pro hac vice (Related Doc # 29). Signed on 2/21/2008. (Henry, Mary ) (Entered: 02/22/2008) |
| 02/22/2008 | 34 | Notice of Appearance and Request for Notice Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC. (Russin, Peter) (Entered: 02/22/2008) |

| 02/22/2008 | 35 | Notice of Change of Address *of creditors Jon Rosenthal and Genesis ATM, LLC* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 02/22/2008) |
| 02/22/2008 | 36 | Notice of Filing *Debtor's Weekly Expenditure Report for the Period from February 13, 2008 through February 21, 2008* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 02/22/2008) |
| 02/22/2008 | 38 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 33)). Service Date 02/22/2008. (Admin.) (Entered: 02/23/2008) |
| 02/24/2008 | 39 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 37)). Service Date 02/24/2008. (Admin.) (Entered: 02/25/2008) |
| 02/25/2008 | 40 | Joinder *of Greywolf Holdings LP, ACM ATM, LLC, and Caspian Opportunities, Inc. to the Creditor/Property Owner ATM Equity LP's Motion for Appointment of Trustee* Filed by Robert L Young on behalf of ACM ATM, LLC, Caspian Opportunities, Inc., Greywolf Holdings LP (related document(s)22). (Young, Robert) (Entered: 02/25/2008) |
| 02/25/2008 | 41 | Supplemental Motion for Adequate Protection *of Greywolf Holdings LP, ACM ATM, LLC and Caspian Opportunities, Inc. for Adequate Protection Under Bankruptcy Code Sections 105(a), 361 and 363* Filed by Robert L Young on behalf of ACM ATM, LLC, Caspian Opportunities, Inc., Greywolf Holdings LP (related document(s)19). (Young, Robert) (Entered: 02/25/2008) |
| 02/25/2008 | 42 | Motion to Appoint Trustee Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (Attachments: # 1 Exhibits A through E# 2 Exhibits F through I# 3 Exhibit J# 4 Exhibits K through N# 5 Exhibit O) (Russin, Peter) (Entered: 02/25/2008) |
| 02/25/2008 | 43 | Motion to Prohibit Use of Cash Collateral *and Use of Property or Provide Adequate Protection* Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (Attachments: # 1 Exhibits A through E# 2 Exhibit F through I# 3 Exhibit J# 4 Exhibits K through N# 5 Exhibit O) (Russin, Peter) (Entered: 02/25/2008) |
| 02/26/2008 | 44 | Verified Statement *of Richards Kibbe & Orbe LLP Pursuant To Bankruptcy Rule 2019 (Creditors Greywolf Holdings LP, ACM ATM, LLC, Caspian Opportunities, Inc.)* Filed by Robert L Young on behalf of Creditor Greywolf Holdings LP. (Young, Robert) (Entered: 02/26/2008) |
| 02/26/2008 | 45 | Notice of Evidentiary Hearing on Greywolf Holdings LP, ACM ATM, LLC, and Caspian Opportunities, Inc's Joinder to the Creditor/Property Owner ATM Equity LP's Motion for Appointment of Trustee 40, Supplemental Motion for Adequate Protection of Greywolf Holdings LP, ACM ATM, LLC and Caspian Opportunities, Inc. for Adequate Protection Under Bankruptcy |

| | | |
|---|---|---|
| | | Code Sections 105(a), 361 and 363 <u>41</u>, Automated Teller Machine Advantage, LLC's Motion to Appoint Trustee <u>42</u>, and Automated Teller Machine Advantage, LLC's Motion to Prohibit Use of Cash Collateral and Use of Property or Provide Adequate Protection <u>43</u> . Hearing scheduled for 3/13/2008 at 09:30 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Henry, Mary) (Entered: 02/26/2008) |
| 02/27/2008 | <u>46</u> | Motion to Extend Time *to File Lists, Schedules and Statements* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (Hill, Peter) (Entered: 02/27/2008) |
| 02/28/2008 | <u>47</u> | Order Granting Motion to Extend Time *to File Lists, Schedules and Statement of Financial Affairs* (Related Doc # <u>46</u>). Signed on 2/28/2008. (<u>Henry, Mary</u> ) (Entered: 02/28/2008) |
| 02/28/2008 | <u>48</u> | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # <u>45</u>)). Service Date 02/28/2008. (Admin.) (Entered: 02/29/2008) |
| 02/28/2008 | <u>49</u> | Order *Granting In Part Motion By Debtor To Pay Prepetition Compensation and Benefits to Non-Insiders* (related document(s)<u>8</u>). Signed on 2/28/2008 (Henry, Mary) (Entered: 02/29/2008) |
| 02/28/2008 | <u>50</u> | Order *Scheduling Further Hearings On Various Motions* (related document (s)<u>19</u>, <u>22</u>, <u>11</u>, <u>8</u>, <u>9</u>). Signed on 2/28/2008 (Henry, Mary) (Entered: 02/29/2008) |
| 02/29/2008 | <u>51</u> | Notice of Filing *Debtor's Weekly Expenditure Report for the Period from February 22, 2008 through February 29, 2008* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 02/29/2008) |
| 02/29/2008 | <u>52</u> | Notice of Appearance and Request for Notice *of Reservation of Rights* Filed by Caspian Opportunities, Inc., Greywolf Holdings LP. (Friedman, Michael) (Entered: 02/29/2008) |
| 03/01/2008 | <u>53</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>47</u>)). Service Date 03/01/2008. (Admin.) (Entered: 03/02/2008) |
| 03/02/2008 | <u>54</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>49</u>)). Service Date 03/02/2008. (Admin.) (Entered: 03/03/2008) |
| 03/02/2008 | <u>55</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>50</u>)). Service Date 03/02/2008. (Admin.) (Entered: 03/03/2008) |
| 03/03/2008 | <u>56</u> | Motion to Convert Case to Chapter 7 Filing Fee Paid. Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (Hill, Peter) Modified on 3/5/2008 (Henry, Mary). (Entered: 03/03/2008) |
| | | |

| 03/03/2008 | | Receipt of Filing Fee for Motion to Convert Case to Chapter 7(6:08-bk-00969-KSJ) [motion,mcnv7] ( 15.00). Receipt Number 11388251, Amount Paid $ 15.00 (U.S. Treasury) (Entered: 03/03/2008) |
|---|---|---|
| 03/03/2008 | 57 | Corrective Notice *of Appearance and Reservation of Rights* Filed by Caspian Opportunities, Inc., Greywolf Holdings LP. (Friedman, Michael) Re: 52 Modified on 3/5/2008 (Henry, Mary). (Entered: 03/03/2008) |
| 03/03/2008 | 58 | Emergency Request *for Hearing on Motion for Appointment of Chapter 11 Trustee* Filed by Samuel J Zusmann Jr on behalf of Creditor ATM Equity LP (related document(s)22). (Attachments: # 1 Certificate of Service) (Zusmann, Samuel) (Entered: 03/03/2008) |
| 03/03/2008 | 59 | Motion to Appear pro hac vice Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (Russin, Peter) (Entered: 03/03/2008) |
| 03/03/2008 | 60 | Request *for Emergency Hearing and Supplement to Joinder of Greywolf Holdings, LP, ACM ATM, LLC, and Caspian Opportunities, Inc. To The Creditor/Property Owner ATM Equity LP's Motion for Appointment of Trustee* Filed by Robert L Young on behalf of Creditor Greywolf Holdings LP (related document(s)40). (Young, Robert) (Entered: 03/03/2008) |
| 03/04/2008 | 61 | Joinder *of Request for Emergency Hearing and Supplement to Joinder of Greywolf Holdings, LP, ACM ATM, LLC and Caspian Opportunities, Inc. to the Creditor/Property Owner ATM Equity LP's Motion for Appointment of Trustee* Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (related document(s)60). (Russin, Peter) (Entered: 03/04/2008) |
| 03/04/2008 | 62 | Hearing Proceeding Memo: Hearing Continued, *Re: Motion to Convert con't (AOCNFNG); Motion to appoint Trustee is Granted (Doc #58); books and records to be turned over to Trustee pursuant to terms discussed in Court: Order by McDowell* (related document(s)56). Hearing scheduled for 3/13/2008 at 09:30 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Conrad, Vicki) (Entered: 03/05/2008) |
| 03/05/2008 | 63 | Notice of Appearance and Request for Notice Filed by Michael A Tessitore on behalf of Creditor AIV, LLC. (Tessitore, Michael) (Entered: 03/05/2008) |
| 03/05/2008 | 64 | Motion for Relief from Stay. Filing Fee Paid. Re: Emergency Motion of Creditors and Property Owners for Relief form Automatic Stay and for Adequate Protection of Property Interests. Filed by Michael A Tessitore on behalf of Creditor AIV, LLC et al(Attachments: # 1 Exhibit Affidavit of Robert Ong# 2 Exhibit Matrix List) (Tessitore, Michael) Modified on 3/5/2008 (Henry, Mary). (Entered: 03/05/2008) |
| 03/05/2008 | 65 | Certification *of Necessity of Request for Emergency Hearing* Filed by Michael A Tessitore on behalf of Creditor AIV, LLC (related document(s) 64). (Tessitore, Michael) Modified on 3/5/2008 (Henry, Mary). (Entered: |

| | | 03/05/2008) |
|---|---|---|
| 03/05/2008 | 66 | Notice of Appearance and Request for Notice Filed by Joseph W. Wielebinski on behalf of Creditor AIV, LLC. (Mallow, Sabrina) (Entered: 03/05/2008) |
| 03/05/2008 | | Receipt of Filing Fee for Motion for Relief From Stay(6:08-bk-00969-KSJ) [motion,mrlfsty] ( 150.00). Receipt Number 11416768, Amount Paid $ 150.00 (U.S. Treasury) (Entered: 03/05/2008) |
| 03/05/2008 | 67 | Order *Granting Motion of Creditor/Property Owner ATM Equity LP for Appointment of Chapter 11 Trustee, and Continuing Debtor's Motion to Convert to Chapter 7 to 3/13/08 at 9:30 AM.* (related document(s)22, 56). Signed on 3/5/2008 (Henry, Mary) (Entered: 03/05/2008) |
| 03/05/2008 | 68 | Appointment *of Chapter 11 Trustee* Filed by Miriam G Suarez on behalf of U.S. Trustee United States Trustee - ORL (related document(s)67). (Suarez, Miriam) (Entered: 03/05/2008) |
| 03/05/2008 | 69 | Order Granting Motion To Appear pro hac vice (Related Doc # 59). Signed on 3/5/2008. (Henry, Mary ) (Entered: 03/06/2008) |
| 03/06/2008 | 70 | Order Approving Application to Employ/Retain *Peter N. Hill and Wolff, Hill, McFarlin & Herron, P.A. as Attorneys for the Debtor* (Related Doc # 31). Signed on 3/6/2008. (Henry, Mary ) (Entered: 03/06/2008) |
| 03/06/2008 | 71 | Notice of *Preliminary* Hearing Filed by Michael A Tessitore on behalf of Creditor AIV, LLC (related document(s)64). Hearing scheduled for 3/13/2008 at 09:30 AM at Orlando, FL - Courtroom A, 5th Floor, 135 W. Central Boulevard. (Tessitore, Michael) (Entered: 03/06/2008) |
| 03/06/2008 | 72 | Certificate of Service Re: Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (related document(s)42). (Russin, Peter) (Entered: 03/06/2008) |
| 03/06/2008 | 73 | Certificate of Service Re: Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (related document(s)43). (Russin, Peter) (Entered: 03/06/2008) |
| 03/06/2008 | 74 | Second Motion to Extend Time *to File Lists, Schedules and Statements* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (Hill, Peter) (Entered: 03/06/2008) |
| 03/07/2008 | 75 | Application/Motion for Authority *United State Trustee's Application for Approval of Appointment of Chapter 11 Trustee* Filed by United States Trustee - ORL (related document(s)68). (Attachments: # 1 Verified Statement of Trustee) (Suarez, Miriam) (Entered: 03/07/2008) |
| 03/07/2008 | 76 | Notice of Appearance and Request for Notice Filed by Max R Tarbox on |

| | | behalf of Interested Party American State Bank. (Tarbox, Max) (Entered: 03/07/2008) |
|---|---|---|
| 03/07/2008 | <u>77</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>67</u>)). Service Date 03/07/2008. (Admin.) (Entered: 03/08/2008) |
| 03/08/2008 | <u>78</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>69</u>)). Service Date 03/08/2008. (Admin.) (Entered: 03/09/2008) |
| 03/08/2008 | <u>79</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>70</u>)). Service Date 03/08/2008. (Admin.) (Entered: 03/09/2008) |
| 03/10/2008 | <u>80</u> | Order Approving Application for Authority *forAppointment of Chapter 11 Trustee Soneet R Kapila* (Related Doc # <u>75</u>). Signed on 3/10/2008. (<u>Henry, Mary</u> ) (Entered: 03/10/2008) |
| 03/10/2008 | | Soneet R Kapila added to case. (Henry, Mary) (Entered: 03/10/2008) |
| 03/10/2008 | <u>81</u> | Motion to Appear pro hac vice Filed by Joseph W Wielebinski on behalf of Creditor AIV, LLC (Attachments: # <u>1</u> Service List) (Wielebinski, Joseph) (Entered: 03/10/2008) |
| 03/10/2008 | <u>82</u> | Notice of Evidentiary Hearing on Debtor's Second Motion to Extend Time to File Lists, Schedules and Statements *w/Telephonic Notice* (related document (s)<u>74</u>. Hearing scheduled for 3/13/2008 at 09:30 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Henry, Mary) (Entered: 03/10/2008) |
| 03/11/2008 | <u>83</u> | Motion to Appear pro hac vice Filed by Max R Tarbox on behalf of Interested Party American State Bank (Tarbox, Max) (Entered: 03/11/2008) |
| 03/12/2008 | <u>84</u> | Application to Employ Soneet Kapila and Kapila & Comopany, Certified Public Accountants as Accountants *Nunc Pro Tunc to March 5, 2008* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # <u>1</u> Affidavit) (Kobert, Roy) (Entered: 03/12/2008) |
| 03/12/2008 | <u>85</u> | Application to Employ Roy S. Kobert, P.A. and Broad and Cassel as Counsel *by Chapter 11 Trustee Nunc Pro Tunc to March 5, 2008* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # <u>1</u> Mailing Matrix # <u>2</u> Affidavit) (Kobert, Roy) (Entered: 03/12/2008) |
| 03/12/2008 | <u>86</u> | Certificate of Service Re: *APPLICATION OF SONEET R. KAPILA, AS CHAPTER 11 TRUSTEE, FOR AN ORDER AUTHORIZING THE EMPLOYMENT OF SONEET R. KAPILA AND THE ACCOUNTING FIRM OF KAPILA & COMPANY AS ACCOUNTANTS* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)<u>84</u>). (Attachments: # <u>1</u> Mailing Matrix) (Kobert, Roy) (Entered: 03/12/2008) |
| 03/12/2008 | <u>87</u> | Notice of Appearance and Request for Notice Filed by Robert F Higgins on |

| | | |
|---|---|---|
| | | behalf of Creditor SDG Family Limited Partnership. (Higgins, Robert) (Entered: 03/12/2008) |
| 03/12/2008 | 88 | Notice of Appearance and Request for Notice Filed by Robert F Higgins on behalf of Creditor ATM Alliance, LP. (Higgins, Robert) (Entered: 03/12/2008) |
| 03/12/2008 | 89 | Notice of Appearance and Request for Notice Filed by Robert F Higgins on behalf of Creditor Stuart Dickinson. (Higgins, Robert) (Entered: 03/12/2008) |
| 03/12/2008 | 90 | Motion to Appear pro hac vice Filed by Jay H Ong on behalf of Creditor AIV, LLC (Attachments: # 1 Service List) (Ong, Jay) (Entered: 03/12/2008) |
| 03/12/2008 | 91 | Motion *For An Order Pursuant to 11 U.S.C 365(a) Authorizing the Trustee to Reject Certain Unexpired Lease of NonResidential Real Property on a Nunc Pro Tunc Basis from February 12, 2008* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 03/12/2008) |
| 03/12/2008 | 92 | Emergency Motion for Turnover of Property of the Estate Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Kobert, Roy) Modified on 3/12/2008 (Henry, Mary). (Entered: 03/12/2008) |
| 03/12/2008 | 93 | Certificate of Necessity *OF REQUEST FOR EMERGENCY RELIEF ON TRUSTEE?S EMERGENCY MOTION FOR TURNOVER OF PROPERTY OF THE ESTATE* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)92). (Kobert, Roy) (Entered: 03/12/2008) |
| 03/12/2008 | 94 | Motion to Reject Agreement with Debtor *Deed Certain Agreement to be a Financial Accommodation* Filed by Max R Tarbox on behalf of Interested Party American State Bank (Attachments: # 1 Exhibit "A" - ISO Agreement# 2 Exhibit "B" - ATM Listing) (Tarbox, Max) (Entered: 03/12/2008) |
| 03/12/2008 | 95 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 82)). Service Date 03/12/2008. (Admin.) (Entered: 03/13/2008) |
| 03/12/2008 | 96 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 80)). Service Date 03/12/2008. (Admin.) (Entered: 03/13/2008) |
| 03/13/2008 | 97 | Notice of Evidentiary Hearing on Motion For An Order Pursuant to 11 U.S.C 365(a) Authorizing the Trustee to Reject Certain Unexpired Lease of NonResidential Real Property on a Nunc Pro Tunc Basis from February 12, 2008 and Motion to Reject Agreement with Debtor Deed Certain Agreement to be a Financial Accommodation (related document(s)94, 91). Hearing scheduled for 3/27/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Moyet, Maggie) (Entered: 03/13/2008) |
| 03/13/2008 | 98 | Hearing Proceeding Memo: Hearing Held, Ruling: Order Granting Motion for Turnover on Preliminary basis pending further hearing scheduled 3/27/08 |

| | | |
|---|---|---|
| | | at 2pm: Order by Kobert; see attached pro for further ruling. (related document(s)41, 84, 64, 11, 94, 92, 8, 43, 85, 74, 91, 9). (Deetz, Kathy) (Entered: 03/13/2008) |
| 03/13/2008 | | Ore Tenus Motion for Chapter 11 Trustee to Gain Access to Property Filed by Roy S Kobert on behalf of (Deetz, Kathy) (Entered: 03/13/2008) |
| 03/13/2008 | 99 | Agreed Order on Ore Tenus Motion for Chapter 11 Trustee to Gain Access to Property Signed on 3/13/2008. (Moyet, Maggie ) Modified on 3/13/2008 (Moyet, Maggie). (Entered: 03/13/2008) |
| 03/13/2008 | 100 | Order Granting Motion To Appear pro hac vice (Related Doc # 81). Signed on 3/13/2008. (Henry, Mary ) (Entered: 03/14/2008) |
| 03/13/2008 | 101 | Order Granting Motion To Appear pro hac vice (Related Doc # 90). Signed on 3/13/2008. (Henry, Mary ) (Entered: 03/14/2008) |
| 03/14/2008 | 102 | Certificate of Service Re: *Agreed Order on Ore Tenus Emergency Motion to Secure and to Gain Access [D.E.99]* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)99). (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 03/14/2008) |
| 03/14/2008 | 103 | Notice of Continued Section 341(a) Meeting of Creditors Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila. Section 341(a) meeting to be held on 3/27/2008 at 10:30 AM (check with U.S. Trustee for location). (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 03/14/2008) |
| 03/14/2008 | 104 | Notice of Evidentiary Hearing on Trustee Soneet R Kapila's Motion For An Order Pursuant to 11 U.S.C 365(a) Authorizing the Trustee to Reject Certain Unexpired Lease of NonResidential Real Property on a Nunc Pro Tunc Basis from February 12, 2008, and American State Bank's Motion to Reject Agreement with Debtor Deed Certain Agreement to be a Financial Accommodation (related document(s)94, 91). Hearing scheduled for 3/27/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Henry, Mary) (Entered: 03/14/2008) |
| 03/14/2008 | 105 | Order *Preliminarily Granting Trustee's Emergency Motion For Turnover Of Property Of The Estate Re: U S Bank* (related document(s)92). Signed on 3/14/2008 (Henry, Mary) (Entered: 03/14/2008) |
| 03/14/2008 | 106 | Certificate of Service Re: Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (related document(s)69). (Russin, Peter) (Entered: 03/14/2008) |
| 03/15/2008 | 107 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 97)). Service Date 03/15/2008. (Admin.) (Entered: 03/16/2008) |
| 03/15/2008 | 108 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 99)). Service Date 03/15/2008. (Admin.) (Entered: 03/16/2008) |

| | | |
|---|---|---|
| 03/16/2008 | 109 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 104)). Service Date 03/16/2008. (Admin.) (Entered: 03/17/2008) |
| 03/16/2008 | 110 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 100)). Service Date 03/16/2008. (Admin.) (Entered: 03/17/2008) |
| 03/16/2008 | 111 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 101)). Service Date 03/16/2008. (Admin.) (Entered: 03/17/2008) |
| 03/16/2008 | 112 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 105)). Service Date 03/16/2008. (Admin.) (Entered: 03/17/2008) |
| 03/17/2008 | 113 | Order Denying in Open Court Motion to Convert Case to Chapter 7 (Related Doc # 56), Denying in Open Court Application for Authority *to Pay Prepetition Compensation and Benefits to Non-Insiders* (Related Doc # 8)., Denying in Open Court Application for Authority *to Compensate Darcy Moore, an Insider* (Related Doc # 9). Signed on 3/17/2008. (Courtney, Cindy ) (Entered: 03/17/2008) |
| 03/18/2008 | 114 | Ex Parte Motion for 2004 Examination *of Documents by Sprint Nextel Corporation* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Kobert, Roy) (Entered: 03/18/2008) |
| 03/18/2008 | 117 | Order Denying Application for Authority *to Pay Prepetition Compensation and Benefits to Non-Insiders Without Prejudice* (Related Doc # 8). Signed on 3/18/2008. (Henry, Mary ) (Entered: 03/20/2008) |
| 03/18/2008 | 118 | Order Denying Application for Authority *to Compensate Darcy Moore, an Insider of the Debtor Without Prejudice* (Related Doc # 9). Signed on 3/18/2008. (Henry, Mary ) (Entered: 03/20/2008) |
| 03/18/2008 | 119 | Order Denying Motion to Convert Case to Chapter 7 *Without Prejudice* (Related Doc # 56) Signed on 3/18/2008. (Henry, Mary ) (Entered: 03/20/2008) |
| 03/18/2008 | 120 | Order Granting Second Motion to Extend Time *to File Lists, Schedules and Statements* (Related Doc # 74). Signed on 3/18/2008. (Henry, Mary ) Modified on 3/20/2008 (Henry, Mary). (Entered: 03/20/2008) |
| 03/18/2008 | 121 | Order Approving Application to Employ/Retain Soneet R Kapila *and Accounting Firm of Kapila & Company as Accountants Nunc Pro Tunc to 3/5/08* (Related Doc # 84). Signed on 3/18/2008. (Henry, Mary ) (Entered: 03/20/2008) |
| 03/18/2008 | 122 | Order Approving Application to Employ/Retain *Roy S. Kobert, P.A. and Broad and Cassel as Counsel by Chapter 11 Trustee Nunc Pro Tunc to March 5, 2008* (Related Doc # 85). Signed on 3/18/2008. (Henry, Mary ) (Entered: 03/20/2008) |

| | | |
|---|---|---|
| 03/19/2008 | 115 | Emergency Motion for Relief from Stay. Filing Fee Paid. Re: Cash. *w/Certificate of Necessity Requesting Emergency Hearing* Filed by R Scott Shuker on behalf of Creditor U.S. Bank N.A. (Attachments: # 1 Affidavit # 2 Exhibit A) Cash Provisioning Agreement# 3 Exhibit B) List of ATMs# 4 Mailing Matrix) (Shuker, R) Modified on 3/20/2008 (Henry, Mary). Modified on 3/20/2008 (Henry, Mary). (Entered: 03/19/2008) |
| 03/19/2008 | 116 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 113)). Service Date 03/19/2008. (Admin.) (Entered: 03/20/2008) |
| 03/20/2008 | | Receipt of Filing Fee for Motion for Relief From Stay(6:08-bk-00969-KSJ) [motion,mrlfsty] ( 150.00). Receipt Number 11545791, Amount Paid $ 150.00 (U.S. Treasury) (Entered: 03/20/2008) |
| 03/20/2008 | 123 | Notice of *Emergency* Hearing Filed by R Scott Shuker on behalf of Creditor U.S. Bank N.A. (related document(s)115). Hearing scheduled for 3/27/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Attachments: # 1 Mailing Matrix) (Shuker, R) (Entered: 03/20/2008) |
| 03/20/2008 | 124 | Schedules A - J and Summary of Schedules, Filing Fee Not Paid or Not Required. Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 03/20/2008) |
| 03/20/2008 | 125 | Statement of Financial Affairs Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 03/20/2008) |
| 03/21/2008 | 126 | Declaration re: *Representation of Multiple Creditors Declaration Pursuant to Rule 2019* Filed by Robert F Higgins on behalf of Creditor Stuart Dickinson. (Higgins, Robert) (Entered: 03/21/2008) |
| 03/22/2008 | 127 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 117)). Service Date 03/22/2008. (Admin.) (Entered: 03/23/2008) |
| 03/22/2008 | 128 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 118)). Service Date 03/22/2008. (Admin.) (Entered: 03/23/2008) |
| 03/22/2008 | 129 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 119)). Service Date 03/22/2008. (Admin.) (Entered: 03/23/2008) |
| 03/22/2008 | 130 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 120)). Service Date 03/22/2008. (Admin.) (Entered: 03/23/2008) |
| 03/22/2008 | 131 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 121)). Service Date 03/22/2008. (Admin.) (Entered: 03/23/2008) |
| 03/22/2008 | 132 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 122)). Service Date 03/22/2008. (Admin.) (Entered: 03/23/2008) |

| 03/24/2008 | 133 | Notice of Deficient Filing. schedules and statement of financial affairs not signed by debtor (related document(s)124, 125). (Henry, Mary) (Entered: 03/24/2008) |
|---|---|---|
| 03/24/2008 | 134 | Exhibit List *and Witness List* Filed by Max R Tarbox on behalf of Interested Party American State Bank (related document(s)94). (Attachments: # 1 Exhibit A - ISO Agreement# 2 Exhibit B ATM Listing# 3 Exhibit C Credit Card Sample# 4 Exhibit D Enhanced ISO Agreement# 5 Exhibit E PIN Security Requirements Part 1 of 2# 6 Exhibit E PIN Security Requirements Part 2 of 2# 7 Exhibit F Operating Rules (Fees, Fines and Assessments)# 8 Exhibit G Operating Rules (Registration Requirements)) (Tarbox, Max) (Entered: 03/24/2008) |
| 03/25/2008 | 135 | Motion *to Extend Order on Ore Tenus Emergency Motion to Secure and to Gain Access* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)99). (Kobert, Roy) (Entered: 03/25/2008) |
| 03/25/2008 | 136 | Notice of Deficient Filing. matrix is referenced to, but not attached to declaration (related document(s)126). (Henry, Mary) (Entered: 03/25/2008) |
| 03/25/2008 | 137 | Notice of Deficient Filing. matrix referenced to, but not attached to exhibit and witness list (related document(s)134). (Henry, Mary) (Entered: 03/25/2008) |
| 03/25/2008 | 138 | Emergency Motion for Turnover of Property of the Estate Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Kobert, Roy) (Entered: 03/25/2008) |
| 03/25/2008 | 139 | Certificate of Necessity *of Request for Emergency Relief on Trustees Emergency Motion for Turnover of Property of the Estate* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)138). (Kobert, Roy) (Entered: 03/25/2008) |
| 03/25/2008 | 140 | Notice of Hearing Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)135, 138). Hearing scheduled for 3/27/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Kobert, Roy) (Entered: 03/25/2008) |
| 03/26/2008 | 141 | BNC Certificate of Mailing - Notice to Creditors and Parties in Interest (related document(s) (Related Doc # 133)). Service Date 03/26/2008. (Admin.) (Entered: 03/27/2008) |
| 03/27/2008 | 142 | Motion to Shorten Time *for Notice for Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. 363 and to Establish Sale Procedures* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Mailing Matrix # 2 Mailing Matrix) (Kobert, Roy) (Entered: 03/27/2008) |
| 03/27/2008 | 143 | Motion to Sell *Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. 363 and to Establish Sale Procedures.* |

| | | Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # (1) Exhibit # (2) Mailing Matrix # (3) Mailing Matrix) (Kobert, Roy) Additional attachment(s) added on 3/27/2008 (Johnson, Alyson). (Entered: 03/27/2008) |
|---|---|---|
| 03/27/2008 | 144 | Hearing Proceeding Memo: Hearing Continued, *(AOCNFNG) see attached pro for further ruling* (related document(s)41, 135, 114, 43, 143, 115, 91, 138, 11, 64, 94, 92, 142). Hearing scheduled for 4/9/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Deetz, Kathy) (Entered: 03/27/2008) |
| 03/27/2008 | 145 | BNC Certificate of Mailing - Notice to Creditors and Parties in Interest (related document(s) (Related Doc # 136)). Service Date 03/27/2008. (Admin.) (Entered: 03/28/2008) |
| 03/27/2008 | 146 | BNC Certificate of Mailing - Notice to Creditors and Parties in Interest (related document(s) (Related Doc # 137)). Service Date 03/27/2008. (Admin.) (Entered: 03/28/2008) |
| 03/28/2008 | 147 | Notice of Evidentiary Hearing on Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. 363 and to Establish Sale Procedures. (related document(s)143). Hearing scheduled for 4/9/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Henry, Mary) (Entered: 03/28/2008) |
| 03/30/2008 | 148 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 147)). Service Date 03/30/2008. (Admin.) (Entered: 03/31/2008) |
| 03/31/2008 | 149 | Amendment to Statement of Financial Affairs *to Delete Reference to Soneet R. Kapila, Trustee in Question 19.c. Re: 125* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) Modified on 4/1/2008 (Henry, Mary). (Entered: 03/31/2008) |
| 04/02/2008 | 150 | Order Granting Motion to Shorten Time (Related Doc # 142) *for Notice for Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. 363 and to Establish Sale Procedures* Signed on 4/2/2008. (Henry, Mary ) (Entered: 04/02/2008) |
| 04/02/2008 | 151 | Final Order Granting Motion for Turnover of Property of the Estate (Related Doc # 92). Signed on 4/2/2008. (Henry, Mary ) Modified on 4/2/2008 (Henry, Mary). (Entered: 04/02/2008) |
| 04/02/2008 | 152 | Order *Denying Without Prejudice Chapter 11 Trustee's Ex-Parte Motion for Rule 2004 Production of Documents by Sprint Nextel Corporation* (related document(s)114). Signed on 4/2/2008 (Henry, Mary) (Entered: 04/02/2008) |
| 04/02/2008 | 153 | Order Granting Motion *For An Order Pursuant to 11 U.S.C 365(a) Authorizing the Trustee to Reject Certain Unexpired Lease of NonResidential Real Property on a Nunc Pro Tunc Basis from February 12, 2008 -- Leesburg* |

| | | |
|---|---|---|
| | | *Florida* (Related Doc # 91). Signed on 4/2/2008. (Henry, Mary ) (Entered: 04/02/2008) |
| 04/04/2008 | 154 | Notice of Appearance and Request for Notice *on behalf of Genesis ATM, LLC* Filed by Creditor Stephen D Colbert. (Colbert, Stephen) (Entered: 04/04/2008) |
| 04/04/2008 | 155 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 150)). Service Date 04/04/2008. (Admin.) (Entered: 04/05/2008) |
| 04/04/2008 | 156 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 151)). Service Date 04/04/2008. (Admin.) (Entered: 04/05/2008) |
| 04/04/2008 | 157 | BNC Certificate of Mailing - Order (related document(s) (Related Doc # 152)). Service Date 04/04/2008. (Admin.) (Entered: 04/05/2008) |
| 04/04/2008 | 158 | BNC Certificate of Mailing - Order (related document(s) (Related Doc # 153)). Service Date 04/04/2008. (Admin.) (Entered: 04/05/2008) |
| 04/07/2008 | 159 | Response to *Notice of Deficient Filing* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC (related document(s)133). (Hill, Peter) (Entered: 04/07/2008) |
| 04/07/2008 | 160 | Response to *Chapter 11 Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. sec. 363 and to Establish Sale Procedures* Filed by Elizabeth A Green on behalf of Creditor U.S. Bank N.A. (related document(s)143). (Green, Elizabeth) (Entered: 04/07/2008) |
| 04/07/2008 | 161 | Certificate of Service Re: *Order Granting Trustee's Motion for Order Shortening the Time for Notice for Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)150). (Kobert, Roy) (Entered: 04/07/2008) |
| 04/08/2008 | 162 | Notice of Filing *Affidavit of Steve Gernes in Support of the Response of U.S. Bank National Association to Chapter 11 Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. 363 and to Establish Sale Procedures/i>* Filed by R Scott Shuker on behalf of Creditor U.S. Bank N.A. (related document(s)160). (Attachments: # 1 Mailing Matrix) (Shuker, R) Modified on 4/9/2008 (Coleman, Faye). (Entered: 04/08/2008)* |
| 04/08/2008 | 163 | Objection to *Chapter 11 Trustee's Motion to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. Section 363 and to Establish Sale Procedures* Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (related document(s)143). (Attachments: # 1 Exhibit A-E# 2 Exhibit F-J) (Russin, Peter) (Entered: 04/08/2008) |
| | | |

| | | |
|---|---|---|
| 04/09/2008 | 164 | Hearing Proceeding Memo: Hearing Held, Ruling: Motion to sell property is Granted and Sale Approved: Order by Kobert; see attached pro for further ruling. (related document(s)41, 135, 163, 64, 11, 43, 143, 115). (Deetz, Kathy) (Entered: 04/09/2008) |
| 04/10/2008 | 165 | Certificate of Service Re: Filed by Peter D. Russin on behalf of Creditor c/o Peter D. Russin Automated Teller Machine Advantage, LLC (related document(s)163). (Russin, Peter) (Entered: 04/10/2008) |
| 04/14/2008 | 166 | Motion to Expedite Hearing *and for Entry of Order Terminating Debtor's ISO Sponsorship Agreement Between Debtor and American State Bank* Filed by Max R Tarbox on behalf of Interested Party American State Bank (Attachments: # 1 Exhibit "A" - Statement# 2 Exhibit "B" Proposed Order) (Tarbox, Max) (Entered: 04/14/2008) |
| 04/14/2008 | 167 | Notice of *Expedited* Hearing *on Motion of American State Bank for Court to Enter Order Terminating Debtor's ISO Sponsorship Agreement* Filed by Max R Tarbox on behalf of Interested Party American State Bank (related document(s)166). Hearing scheduled for 4/16/2008 at 02:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Tarbox, Max) (Entered: 04/14/2008) |
| 04/15/2008 | 168 | Exhibit List *and Witness List* Filed by Max R Tarbox on behalf of Interested Party American State Bank. (Attachments: # 1 Exhibit "A" ISO Sponsorship Agreement# 2 Exhibit "B" List of ATM Locations# 3 Exhibit "C" Credit Card Sample# 4 Exhibit "D" Enhanced ISO Risk Standards# 5 Exhibit "E" Part 1 of 2# 6 Exhibit "E" Part 2 of 2# 7 Exhibit "F" Operating Rules (Fees, Fines)# 8 Exhibit "G" Operating Regulations (Registration)# 9 Exhibit "H" Settlement Statement# 10 Exhibit "I" Proposed Order to Terminate ISO Sponsorship) (Tarbox, Max) (Entered: 04/15/2008) |
| 04/16/2008 | 169 | Hearing Proceeding Memo: Hearing Held, Ruling: Motion to Enter Order Terminating Sponsorship Agreement is Granted: Order Submitted; see attached pro for further ruling. (related document(s)166, 143, 115). (Deetz, Kathy) (Entered: 04/16/2008) |
| 04/16/2008 | 172 | Order Granting Motion for Turnover of Property of the Estate (Related Doc # 138). Signed on 4/16/2008. (Monaghan, Susan ) Modified on 4/21/2008 (Monaghan, Susan). (Entered: 04/18/2008) |
| 04/16/2008 | 173 | Order Granting Motion To Reject *ISO Sponsorship Agreement btween Debtor and American State Bank* (Related Doc # 94). Signed on 4/16/2008. (Monaghan, Susan ) (Entered: 04/18/2008) |
| 04/16/2008 | 175 | Order Granting Expedited Motion for Entry of Order Terminating Debtor's ISO Sponsorship Agreement Between Debtor and American State Bank (Related Doc # 166). Signed on 4/16/2008. (Monaghan, Susan ) Modified on 4/18/2008 (Monaghan, Susan). (Entered: 04/18/2008) |
| 04/16/2008 | 184 | Exhibit List *with Exhibits A through H attached, admitted in open court on* |

| | | |
|---|---|---|
| | | *4/16/08 before the Honorable Karen S. Jennemann* Filed by Max R Tarbox on behalf of Interested Party American State Bank (related document(s)169). (Attachments: # 1 Continuation of Exhibits) (Monaghan, Susan) (Entered: 04/21/2008) |
| 04/17/2008 | 170 | Financial Reports for the Period March 5, 2008 to March 31, 2008. Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila. (Kapila, Soneet) (Entered: 04/17/2008) |
| 04/17/2008 | 171 | Verified Statement *of Attorneys for Creditors and Property Owners Pursuant to F.R.B.P. 2019* Filed by Michael A Tessitore on behalf of Creditor AIV, LLC. (Attachments: # 1 Exhibit A) (Tessitore, Michael) (Entered: 04/17/2008) |
| 04/18/2008 | 174 | Order Granting Motion To Sell *Assets of the Estate Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. Sec 363 and to Establish Sale Procedures* (Related Doc # 143). Signed on 4/18/2008. (Monaghan, Susan ) (Entered: 04/18/2008) |
| 04/18/2008 | 176 | Service of Previously Entered Order/Notice via Bankruptcy Noticing Center. Title of Previously Entered Document: Order Grnating Expedited Motion for Entry of Order Terminating Debtor's ISO Sponsorship Agreement Between Debtor and American State Bank Entered on the Docket 4/16/08 (related document(s)175). (Monaghan, Susan) (Entered: 04/18/2008) |
| 04/20/2008 | 177 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 172)). Service Date 04/20/2008. (Admin.) (Entered: 04/21/2008) |
| 04/20/2008 | 178 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 174)). Service Date 04/20/2008. (Admin.) (Entered: 04/21/2008) |
| 04/20/2008 | 179 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 175)). Service Date 04/20/2008. (Admin.) (Entered: 04/21/2008) |
| 04/20/2008 | 180 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 176)). Service Date 04/20/2008. (Admin.) (Entered: 04/21/2008) |
| 04/21/2008 | 181 | Certificate of Service Re: *April 18, 2008 Court Order Granting Trustee's Motion to Sell Assets of the Estate Free and Clear of Liens, Claims and Encumbrances [D.E.174]* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)174). (Attachments: # 1 Mailing Matrix Court's Mailing Matrix# 2 Mailing Matrix Mailing Matrix of Landlord/Tenant List of known ATM Machines) (Kobert, Roy) (Entered: 04/21/2008) |
| 04/21/2008 | 182 | Request for Payment of Administrative Expenses Amount Requested: $12,707.38+ Filed by Lyndel Anne Mason on behalf of Creditor c/o L. Mason Brink's, U.S. (Attachments: # 1 Contract ATM Machine Servicing Contract) (Mason, Lyndel) (Entered: 04/21/2008) |
| 04/21/2008 | 183 | Notice of Appearance and Request for Notice *for Brink's U.S.* Filed by |

| | | Lyndel Anne Mason on behalf of Creditor c/o L. Mason Brink's, U.S.. (Mason, Lyndel) (Entered: 04/21/2008) |
|---|---|---|
| 04/21/2008 | 185 | Letter/Memorandum Re: Improper Claim Form filed by Range Telephone Cooperative on 4/21/08 . (Monaghan, Susan) Modified on 4/22/2008 (Monaghan, Susan). (Entered: 04/21/2008) |
| 04/22/2008 | 186 | Supplemental Affidavit *in Support of Chapter 11 Trustee's Application for Employment of Counsel* Filed by Roy S Kobert on behalf of Attorney for Trustee Roy S. Kobert (related document(s)85). (Kobert, Roy) (Entered: 04/22/2008) |
| 04/23/2008 | 187 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 185)). Service Date 04/23/2008. (Admin.) (Entered: 04/24/2008) |
| 04/25/2008 | | Until further notice, the United States Trustee will not appoint a committee of creditors pursuant to 11 U.S.C. Section 1102 because of an insufficient number of unsecured creditors willing or able to serve on an unsecured creditors committee. Filed by United States Trustee - ORL. (Suarez, Miriam) (Entered: 04/25/2008) |
| 04/29/2008 | 188 | Second Order Granting Motion *to Extend Order on Ore Tenus Emergency Motion to Secure and to Gain Access. Extended through April 29, 2008* (Related Doc # 135). Signed on 4/29/2008. (Monaghan, Susan ) Modified on 5/1/2008 (Monaghan, Susan). (Entered: 04/30/2008) |
| 05/02/2008 | 189 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 188)). Service Date 05/02/2008. (Admin.) (Entered: 05/03/2008) |
| 05/02/2008 | 190 | BNC Certificate of Mailing - Order (related document(s) (Related Doc # 188)). Service Date 05/02/2008. (Admin.) (Entered: 05/03/2008) |
| 05/07/2008 | 191 | Motion to Sell Property Free and Clear of Liens , *Claims and Encumbrances Pursuant to 11 USC 363 and Objection Deadline, re: Grner, NC Personal Property, Computer and Office Furniture.* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Exhibit # 2 Mailing Matrix) (Kobert, Roy) Modified on 5/8/2008 (Monaghan, Susan). (Entered: 05/07/2008) |
| 05/07/2008 | 192 | Motion to Sell Property Free and Clear of Liens ,*Claims and Encumbrances at Auction (Florida Motor Vehicle).* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/07/2008) |
| 05/07/2008 | 193 | Application to Employ Robert Ewald/Ewald Enterprises, Inc as Auctioneer Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Exhibit) (Kobert, Roy) (Entered: 05/07/2008) |
| 05/07/2008 | 194 | Motion for Reconsideration *of Second Order Granting Chapter 11 Trustee's Motion to Extend Order on Ore Tenus Emergency Motion to Secure and to* |

| | | |
|---|---|---|
| | | *Gain Access* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)188). (Kobert, Roy) (Entered: 05/07/2008) |
| 05/07/2008 | 195 | Notice of Hearing Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)191, 194, 193, 192). Hearing scheduled for 5/28/2008 at 03:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Kobert, Roy) (Entered: 05/07/2008) |
| 05/08/2008 | 196 | Notice of Change of Address *of creditors ATM Capital Management LLC, AIV II LLC, AIV III LLC, AIV IV LLC, AIV V LLC, Onco LLC, Shaolin Capital LP, ATM Equity LP, Fortress Credit Corp, H Rowan Gaither IV, Michael Friedman, Keith N Sambur and Wolf ATM LLC* Filed by Peter N Hill on behalf of Debtor ATM Financial Services, LLC. (Hill, Peter) (Entered: 05/08/2008) |
| 05/09/2008 | 197 | Certificate of Service Re: Filed by Roy S Kobert on behalf of Attorney for Trustee Roy S. Kobert (related document(s)194). (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/09/2008) |
| 05/12/2008 | 202 | Objection to *Order Granting Motion To Sell Assets of the Estate Free and Clear of Liens, Claims and Encumbrances* Filed by Creditor CashKlix LLC (related document(s)174). (Monaghan, Susan) (Entered: 05/16/2008) |
| 05/15/2008 | 198 | Notice of Appearance and Request for Notice Filed by Ryan E Davis on behalf of Creditor Jon Rosenthal. (Davis, Ryan) (Entered: 05/15/2008) |
| 05/15/2008 | 199 | Notice of Filing *Executed Sale Letter* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)191). (Attachments: # 1 Exhibit) (Kobert, Roy) (Entered: 05/15/2008) |
| 05/15/2008 | 200 | Motion *to Establish Bar Date for Filing Administrative Claims* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/15/2008) |
| 05/15/2008 | 201 | Notice of Hearing Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)200). Hearing scheduled for 5/28/2008 at 03:00 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Kobert, Roy) (Entered: 05/15/2008) |
| 05/16/2008 | 203 | Certificate of Service Re: *Notice of Hearing* Filed by Roy S Kobert on behalf of Attorney for Trustee Roy S. Kobert (related document(s)201). (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/16/2008) |
| 05/16/2008 | 204 | Motion to Sell *Property of the Estate Free and Clear of Liens, Claims and Encumbrances at Auction (Garner, NC Motor Vehicles).* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/16/2008) |
| 05/16/2008 | 205 | Motion to Sell *Property of the Estate Free and Clear of Liens, Claims and Encumbrances at Auction (Texas Motor Vehicle).* Filed by Roy S Kobert on |

|            |     |                                                                                                                                                                                                                                                                                                                                                                                                                                               |
| ---------- | --- | --------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|            |     | behalf of Trustee Soneet R Kapila (Attachments: # <u>1</u> Mailing Matrix) (Kobert, Roy) (Entered: 05/16/2008)                                                                                                                                                                                                                                                                                                                                 |
| 05/16/2008 | <u>206</u> | Application to Employ Mike Gurkins and Country Boys Auction & Realty Co., Inc as Auctioneer Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # <u>1</u> Affidavit # <u>2</u> Mailing Matrix) (Kobert, Roy) Modified on 5/19/2008 (Monaghan, Susan). (Entered: 05/16/2008)                                                                                                                                               |
| 05/16/2008 | <u>207</u> | Application to Employ Steve Lajoie an Brunson and Associates as Auctioneer Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # <u>1</u> Affidavit # <u>2</u> Mailing Matrix) (Kobert, Roy) Modified on 5/19/2008 (Monaghan, Susan). (Entered: 05/16/2008)                                                                                                                                                                 |
| 05/19/2008 | <u>208</u> | Financial Reports for the Period April 1, 2008 to April 30, 2008. Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila. (Kapila, Soneet) (Entered: 05/19/2008)                                                                                                                                                                                                                                                                         |
| 05/19/2008 | <u>209</u> | Motion to Allow *Administrative* Claim(s) *of American State Bank, with 20 day negative notice given* Filed by Max R Tarbox on behalf of Interested Party American State Bank (Attachments: # <u>1</u> Exhibit "A" ISO Agreement# <u>2</u> Exhibit "B" McWhorter Cobb & Johnson Billing Statement# <u>3</u> Exhibit "C" Buddy Ford Billing Statement# <u>4</u> Mailing Matrix) (Tarbox, Max) Modified on 5/21/2008 (Monaghan, Susan). (Entered: 05/19/2008) |
| 05/20/2008 | <u>210</u> | Notice of Evidentiary Hearing on Motions to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances at Auction (Garner, NC Motor Vehicles) and (Texas Motor Vehicle) (related document(s)<u>204</u>, <u>205</u>). Hearing scheduled for 6/18/2008 at 10:15 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Monaghan, Susan) (Entered: 05/20/2008)                                                     |
| 05/20/2008 | <u>211</u> | Financial Reports for the Period April 1, 2008 to April 30, 2008. Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila. (Attachments: # <u>1</u> Pages 41 through 80 of TIP Report# <u>2</u> Pages 81 through 124 of TIP Report) (Kapila, Soneet) (Entered: 05/20/2008)                                                                                                                                                                 |
| 05/21/2008 | <u>212</u> | Notice of Withdrawal from Case and Request to Stop Electronic Notice Filed by Jay H Ong on behalf of Creditor AIV, LLC. (Ong, Jay) (Entered: 05/21/2008)                                                                                                                                                                                                                                                                                        |
| 05/22/2008 | <u>213</u> | Opposition *To Trustees Motions to Sell Property of the Estate Free and Clear of Liens, Claims and Encumbrances At Auction (Florida, Texas and NC Motor Vehicles)* Filed by Robert E Bone Jr on behalf of Creditor Darcy Jo Moore (related document(s)<u>204</u>, <u>205</u>, <u>192</u>). (Attachments: # <u>1</u> Exhibit Exhibit A-1 Vehicle Title# <u>2</u> Exhibit Exhibit A-2 Vehicle Title# <u>3</u> Exhibit Exhibit A-3 Vehicle Title# <u>4</u> Exhibit Exhibit A-4 Vehicle Title# <u>5</u> Exhibit Exhibit A-5 Vehicle Title# <u>6</u> Exhibit Exhibit B Promissory Note) (Bone, Robert) (Entered: 05/22/2008) |
| 05/22/2008 | <u>214</u> | Motion for Relief from Stay. (Fee Paid) Re: 5 GMC Vans. Filed by Robert E Bone Jr on behalf of Creditor Darcy Jo Moore (Attachments: # <u>1</u> Exhibit "A"                                                                                                                                                                                                                                                                                      |

| | | |
|---|---|---|
| | | Promissory Note# 2 Exhibit A-1 Vehicle Title# 3 Exhibit B-2 Vehicle Title# 4 Exhibit B-3 Vehicle Title# 5 Exhibit B-4 Vehicle Title# 6 Exhibit B-5 Vehicle Title) (Bone, Robert) Modified on 5/23/2008 (Monaghan, Susan). Modified on 5/27/2008 (Monaghan, Susan). (Entered: 05/22/2008) |
| 05/22/2008 | 215 | Affidavit *in Support of Darcy Jo Moore's Motion for Relief from Stay and Opposition to Trustee's Motions to Sell Property Free and Clear of Liens, Claims and Encumbrances* Filed by Robert E Bone Jr on behalf of Creditor Darcy Jo Moore (related document(s)214, 213). (Attachments: # 1 Exhibit A Mortgage Modifications# 2 Exhibit B Promissory Note# 3 Exhibit C-1 Vehicle Title# 4 Exhibit C-2 Vehicle Title# 5 Exhibit C-3 Vehicle Title# 6 Exhibit C-4 Vehicle Title# 7 Exhibit C-5 Vehicle Title) (Bone, Robert) (Entered: 05/22/2008) |
| 05/22/2008 | 216 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 210)). Service Date 05/22/2008. (Admin.) (Entered: 05/23/2008) |
| 05/23/2008 | 217 | Order Abating *Motion for Relief from Stay, $150.00 due* (related document(s) 214). Signed on 5/23/2008 (Monaghan, Susan) (Entered: 05/23/2008) |
| 05/23/2008 | | Receipt of Filing Fee for Motion for Relief From Stay(6:08-bk-00969-KSJ) [motion,mrlfsty] ( 150.00). Receipt Number 12097857, Amount Paid $ 150.00 (U.S. Treasury) (Entered: 05/23/2008) |
| 05/23/2008 | 218 | Amended Certificate of Mailing *Affidavit of Darcy Jo Moore, Opposition to Trustees Motions to Sell Property of the Estate (Motor Vehicles) and Darcy Jo Moore's Motion for Relief from Stay* Filed by Robert E Bone Jr on behalf of Creditor Darcy Jo Moore (related document(s)215, 214, 213). (Attachments: # 1 Mailing Matrix) (Bone, Robert) (Entered: 05/23/2008) |
| 05/25/2008 | 219 | BNC Certificate of Mailing - Order (related document(s) (Related Doc # 217)). Service Date 05/25/2008. (Admin.) (Entered: 05/26/2008) |
| 05/27/2008 | 220 | Notice of Preliminary Hearing and Order Extending the Automatic Stay *filed by Darcy Jo Moore* (related document(s)214). Preliminary hearing to be held on 6/17/2008 at 01:45 PM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Monaghan, Susan) (Entered: 05/27/2008) |
| 05/27/2008 | 221 | Motion to Withdraw as Counsel Filed by Michael A Tessitore on behalf of Creditor AIV, LLC (Tessitore, Michael) (Entered: 05/27/2008) |
| 05/27/2008 | 222 | Order Denying in Open Court Motion For Relief From Stay *(Denied Without Prejudice)* (Related Doc # 115) Signed on 5/27/2008. (Courtney, Cindy ) (Entered: 05/27/2008) |
| 05/28/2008 | 226 | Hearing Proceeding Memo: Hearing Continued, *(AOCNFNG); see attached pro for further ruling* (related document(s)200, 41, 191, 43, 194, 193, 192, 11, 64, 213). Hearing scheduled for 6/18/2008 at 10:15 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Deetz, Kathy) (Entered: |

| | | 05/29/2008) |
|---|---|---|
| 05/29/2008 | 223 | Notice Canceling and/or Rescheduling Hearing (related document(s)214, 220). Hearing scheduled for 6/18/2008 at 10:15 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Monaghan, Susan) (Entered: 05/29/2008) |
| 05/29/2008 | 224 | Amended Motion *by American State Bank Requesting Allowance of Administrative Claim* Filed by Max R Tarbox on behalf of Interested Party American State Bank (related document(s)209). (Attachments: # 1 Mailing Matrix# 2 Exhibit "A" - ISO Sponsorship Agreement# 3 Exhibit "B" - McWhorter, Cobb & Johnson, LLP Billing Statement# 4 Exhibit "C" - Buddy Ford, P.A. Billing Statement) (Tarbox, Max) (Entered: 05/29/2008) |
| 05/29/2008 | 225 | Motion to Convert Case to Chapter 7 (Verify Fee). Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/29/2008) |
| 05/29/2008 | 227 | Notice of Hearing Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)225). Hearing scheduled for 6/18/2008 at 10:15 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Attachments: # 1 Mailing Matrix) (Kobert, Roy) (Entered: 05/29/2008) |
| 05/29/2008 | 228 | BNC Certificate of Mailing. (related document(s) (Related Doc # 220)). Service Date 05/29/2008. (Admin.) (Entered: 05/30/2008) |
| 05/29/2008 | 229 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 222)). Service Date 05/29/2008. (Admin.) (Entered: 05/30/2008) |
| 05/30/2008 | 230 | Affidavit *of Vance Moore in Support of Darcy Jo Moore's Opposition (213) to Trustee's Motions to Sell Property (192, 204 and 205) and Darcy Jo Moore's Motion for Relief from Stay (214)* Filed by Robert E Bone Jr on behalf of Creditor Darcy Jo Moore (related document(s)214, 213). (Attachments: # 1 Exhibit A - Mortgage Modifications# 2 Exhibit B - Prommissory Note# 3 Exhibit C1 - Vehicle Title# 4 Exhibit C2 - Vehicle Title# 5 Exhibit C3 - Vehicle Title# 6 Exhibit C4 - Vehicle Title# 7 Exhibit C5 - Vehicle Title# 8 Exhibit D - Ledger Transcript of Payments# 9 Mailing Matrix Mailing Matrix) (Bone, Robert) (Entered: 05/30/2008) |
| 05/31/2008 | 231 | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # 223)). Service Date 05/31/2008. (Admin.) (Entered: 06/01/2008) |
| 06/06/2008 | 232 | Order Granting Motion To Withdraw as Counsel *Michael A Tessitore on behalf of Creditor AIV, LLC* (Related Doc # 221). Signed on 6/6/2008. (Monaghan, Susan ) (Entered: 06/06/2008) |
| 06/08/2008 | 233 | BNC Certificate of Mailing. (related document(s) (Related Doc # 232)). Service Date 06/08/2008. (Admin.) (Entered: 06/09/2008) |

| 06/09/2008 | 234 | Objection to *Motion by American State Bank Requesting Allowance of Administrative Claim* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)209 and 224). (Kobert, Roy) Modified on 6/12/2008 (Monaghan, Susan). (Entered: 06/09/2008) |
| --- | --- | --- |
| 06/17/2008 | 236 | Notice of Change of Address *for Servicing of Mortgage* Filed by Creditor Litton Loan Servicing. (Monaghan, Susan) (Entered: 06/18/2008) |
| 06/18/2008 | 235 | Hearing Proceeding Memo: Hearing Held, Ruling: Motion to Convert is Granted: Order by Kobert; see attached pro for further ruling. (related document(s)204, 200, 41, 193, 214, 192, 64, 11, 205, 225, 43, 213). (Deetz, Kathy) (Entered: 06/18/2008) |
| 06/19/2008 | 237 | Financial Reports for the Period May 1, 2008 to May 31, 2008. Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila. (Kapila, Soneet) (Entered: 06/19/2008) |
| 06/19/2008 | 238 | Order Granting Motion To Sell *Property Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 USC 363 and Objection Deadline, re: Grner, NC Personal Property, Computer and Office Furniture* (Related Doc # 191). Signed on 6/19/2008. (Monaghan, Susan ) (Entered: 06/20/2008) |
| 06/19/2008 | 239 | Order Granting Motion for Reconsideration *of Second Order Granting Chapter 11 Trustee's Motion to Extend Order on Ore Tenus Emergency Motion to Secure and to Gain Access* (Related Doc # 194). Signed on 6/19/2008. (Monaghan, Susan ) (Entered: 06/20/2008) |
| 06/19/2008 | 240 | Order Denying Motion For Adequate Protection *as Moot* (Related Doc # 41)., Denying Motion To Prohibit Use of Cash Collateral *as Moot* (Related Doc # 43)., Denying Motion For Relief From Stay *as Moot* (Related Doc # 64) , Denying Motion *Motion to Compel Debtor ATM Financial Services, LLC's Compliance With Temporary Restraining Order, Or In The Alternative, To Prohibit Use of Property, Including Cash Collateral as Moot* (Related Doc # 11). Signed on 6/19/2008. (Monaghan, Susan ) (Entered: 06/20/2008) |
| 06/19/2008 | 248 | Request for Notice Filed by Creditor Department of Veterans Affairs. (Monaghan, Susan) (Entered: 06/23/2008) |
| 06/20/2008 | 241 | Order Converting Case to Chapter 7.. Signed on 6/20/2008 (Monaghan, Susan) (Entered: 06/20/2008) |
| 06/20/2008 | 242 | Notice of Conversion of Case to Chapter 7, Notice of Section 341 Meeting of Creditors, Establishing Deadlines and Appointment of Trustee. New Trustee: Soneet R. Kapila . Section 341(a) meeting to be held on 7/23/2008 at 11:00 AM at Orlando, FL (6-65) - 135 West Central Blvd., 6th Floor, Suite 610. Proofs of Claims due by 10/21/2008. (Monaghan, Susan) (Entered: 06/20/2008) |
| 06/22/2008 | 243 | BNC Certificate of Mailing - Notice to Creditors and Parties in Interest |

| | | (related document(s) (Related Doc # 242)). Service Date 06/22/2008. (Admin.) (Entered: 06/23/2008) |
|---|---|---|
| 06/22/2008 | 244 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 238)). Service Date 06/22/2008. (Admin.) (Entered: 06/23/2008) |
| 06/22/2008 | 245 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 239)). Service Date 06/22/2008. (Admin.) (Entered: 06/23/2008) |
| 06/22/2008 | 246 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 240)). Service Date 06/22/2008. (Admin.) (Entered: 06/23/2008) |
| 06/22/2008 | 247 | BNC Certificate of Mailing. (related document(s) (Related Doc # 241)). Service Date 06/22/2008. (Admin.) (Entered: 06/23/2008) |
| 06/23/2008 | 249 | Order Granting Motion For Relief From Stay *filed by Darcy Jo Moore* (Related Doc # 214) Signed on 6/23/2008. (Monaghan, Susan ) (Entered: 06/25/2008) |
| 06/25/2008 | 250 | Certificate of Service Re: *upon Non-CM/ECF Filer, Robert E. Bone, Jr, Esquire, of Court Order Granting Darcy Jo Moore's Motion for Relief from Automatic Stay or for Adequate Protection [D.E.249]* Filed by Roy S Kobert on behalf of Attorney for Trustee Roy S. Kobert (related document(s)249). (Kobert, Roy) (Entered: 06/25/2008) |
| 06/26/2008 | 251 | Certificate of Service Re: *Court's June 19, 2008 Order Granting Chapter 11 Trustee's Motion to Sell Assets of the Estate Free and Clear of Liens, Claims and Encumbrances (Garner, NC Personal Property; Computer and Office Equipment) [D.E.238]* Filed by Roy S Kobert on behalf of Trustee Soneet R Kapila (related document(s)238). (Kobert, Roy) (Entered: 06/26/2008) |
| 06/27/2008 | 252 | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # 249)). Service Date 06/27/2008. (Admin.) (Entered: 06/28/2008) |
| 07/02/2008 | 253 | Notice *of Appointment of Trustee* Filed by United States Trustee - ORL7 7. (Meeker, Kenneth) (Entered: 07/02/2008) |
| 07/07/2008 | 254 | Notice of Filing *Schedule of Unpaid Debts pursuant to Bankruptcy Rule 1019(5)* Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila. (Kapila, Soneet) (Entered: 07/07/2008) |
| 07/07/2008 | 255 | Application for Final Compensation for Soneet R Kapila, Trustee Chapter 11, Fee: $3,251.00, Expenses: $00. For the period: October 5, 2007 to June 20, 2008 Filed by Attorney Soneet R Kapila (Kapila, Soneet) Modified on 7/10/2008 (Monaghan, Susan). (Entered: 07/07/2008) |
| 07/16/2008 | 256 | Application to Employ Soneet R. Kapila and Kapila & Company as Accountants *Nunc Pro Tunc* Filed by Roy S Kobert on behalf of Accountant Soneet R Kapila (Attachments: # 1 Exhibit) (Kobert, Roy) (Entered: |

| | | 07/16/2008) |
|---|---|---|
| 07/16/2008 | <u>257</u> | Application to Employ Roy S. Kobert, P.A. and Broad and Cassel as Attorney to Trustee *Nunc Pro Tunc to June 20, 2008* Filed by Roy S Kobert on behalf of Broad And Cassel, Roy S. Kobert, P.A. (Attachments: # <u>1</u> Exhibit) (Kobert, Roy) (Entered: 07/16/2008) |
| 07/16/2008 | <u>258</u> | Certificate of Service Re: Filed by Roy S Kobert on behalf of Attorney for Trustee Roy S. Kobert (related document(s)<u>256</u>, <u>257</u>). (Attachments: # <u>1</u> Mailing Matrix) (Kobert, Roy) (Entered: 07/16/2008) |
| 07/21/2008 | <u>259</u> | Financial Reports for the Period June 1, 2008 to June 24, 2008. Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila. (Kapila, Soneet) Modified on 7/23/2008 (Monaghan, Susan). (Entered: 07/21/2008) |
| 07/23/2008 | <u>260</u> | Order Approving Application to Employ/Retain Soneet R Kapila *and Kapila & Company as Accountants Nunc Pro Tunc to July 20, 2008* (Related Doc # <u>256</u>). Signed on 7/23/2008. (<u>Monaghan, Susan</u> ) (Entered: 07/23/2008) |
| 07/23/2008 | <u>261</u> | Application to Employ Holland & Knight LLP as Special Counsel Filed by Soneet R Kapila on behalf of Trustee Soneet R Kapila (Kapila, Soneet) (Entered: 07/23/2008) |
| 07/24/2008 | <u>262</u> | Application for Final Compensation *and Reimbursement of Expenses for Kapila & Co., and* for Soneet R Kapila, Accountant, Fee: $118652.80, Expenses: $00. For the period: 3/05/2008 - 07/11/2008 Filed by Accountant Soneet R Kapila (Attachments: # <u>1</u> Exhibit) (Kobert, Roy) Modified on 7/28/2008 (Monaghan, Susan). (Entered: 07/24/2008) |
| 07/25/2008 | <u>263</u> | Application for Compensation for Wolff, Hill, McFarlin & Herron, P.A., Debtor's Attorney, Fee: $17,960.00, Expenses: $154.51. For the period: February 12, 2008 through July 23, 2008 Filed by Attorney Peter N Hill (Attachments: # <u>1</u> Exhibit A - Fees# <u>2</u> Exhibit B - Expenses) (Hill, Peter) (Entered: 07/25/2008) |
| 07/25/2008 | <u>264</u> | Final Application for Compensation *for Allowance of Attorneys Fees and for Reimbursement of Expenses by Counsel to Chapter 11 Trustee* for Roy S Kobert, Trustee's Attorney, Fee: $122224.50, Expenses: $3906.16. For the period: 3/05/2008 - 06/20/2008 Filed by Attorney Roy S Kobert (Attachments: # <u>1</u> Exhibit # <u>2</u> Mailing Matrix) (Kobert, Roy) Modified on 7/30/2008 (Monaghan, Susan). (Entered: 07/25/2008) |
| 07/25/2008 | <u>265</u> | Certificate of Service Re: Filed by Roy S Kobert on behalf of Accountant Soneet R Kapila (related document(s)<u>262</u>). (Kobert, Roy) (Entered: 07/25/2008) |
| 07/25/2008 | <u>266</u> | Certificate of Service Re: *Mailing Matrix Attached* Filed by Roy S Kobert on behalf of Accountant Soneet R Kapila (related document(s)<u>265</u>). (Kobert, Roy) (Entered: 07/25/2008) |

| 07/25/2008 | <u>267</u> | BNC Certificate of Mailing - PDF Document. (related document(s) (Related Doc # <u>260</u>)). Service Date 07/25/2008. (Admin.) (Entered: 07/26/2008) |
| 07/30/2008 | <u>268</u> | Notice of Evidentiary Hearing on Application to Employ Roy S. Kobert, P.A. and Broad and Cassel as Attorney to Trustee Nunc Pro Tunc to June 20, 2008 andApplication to Employ Holland & Knight LLP as Special Counsel (related document(s)<u>261</u>, <u>257</u>). Hearing scheduled for 9/16/2008 at 10:15 AM at Orlando, FL - Courtroom B, 5th Floor, 135 W. Central Boulevard. (Monaghan, Susan) (Entered: 07/30/2008) |
| 08/01/2008 | <u>269</u> | BNC Certificate of Mailing - Notice of Hearing (related document(s) (Related Doc # <u>268</u>)). Service Date 08/01/2008. (Admin.) (Entered: 08/02/2008) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/03/2008 15:48:00 | | |
| **PACER Login:** | db0138 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 6:08-bk-00969-KSJ Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: HTML |
| **Billable Pages:** | 17 | **Cost:** | 1.36 |

# EXHIBIT M
# 1 of 4

## COUNT 1
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(c))

105.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 104 of this Complaint as if fully set forth herein.

106.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore,

Exclusive Properties, ATM Capital, Munier, and Brossman were "persons" as defined by

18 U.S.C. § 1961(3).

107.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore,

Exclusive Properties, ATM Capital, Munier, and Brossman, as detailed in Paragraphs 26

- 72, 81 and 91 – 104, *supra*, engaged in the operation or management of the ATM Sales

Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of

which affect interstate commerce.

108.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier,

and Brossman conducted the ATM Sales Enterprise's affairs through a pattern of

racketeering activity, detailed in Paragraphs 114 - 227 below, which were directed at

Plaintiff since at least November of 2005.

109.    Since at least November of 2005, Netschi, 36 Main, Jones, Moore, Exclusive

Properties, ATM Capital, Munier, and Brossman shared a common purpose while

engaging in the fraudulent course of conduct detailed in Paragraphs 26 – 72, 81 and 91 –

104 above, and worked together to achieve such purpose, specifically to induce Plaintiff

and other individuals and entities to enter into agreements to purchase Placed ATMs

which do not exist in exchange for the receipt of millions of dollars of funds.  The

scheme was carried out through the complex offering of fraudulent documentation and

34

verbal statements by the Defendants to hide the true nature of their "sale" of phantom ATMs to Plaintiff and others, thus allowing Defendants to maintain the ATM Sales Enterprise scheme while reaping substantial profits for themselves.

110.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman, operating together and individually, and in conjunction with unnamed others, directed and controlled the ATM Sales Enterprise, by: (a) creating the Fictitious Transaction Documents and delivering, or causing to be delivered, the Fictitious Transaction Documents to Plaintiff or their representatives/agents; (b) creating the Fictitious Monthly Reports and delivering, or causing to be delivered, the Fictitious Monthly Reports to Plaintiff or their representatives/agents; (c) delivering, or causing to be delivered, the Periodic Revenue Payments to ATMA or their representatives/agents; (d) demanding from ATMA, and receiving, the Residual Revenue Funds; and, (e) engaging in a fraudulent course of conduct against Plaintiff, and unnamed others.

111.    The pattern of racketeering activity engaged in by Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman involved fraudulent acts in support of the above conduct constituting wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), all of which constitute "racketeering activity," as defined in 18 U.S.C. § 1961(1)(B).

112.    Defendants engaged in the predicate acts detailed below between November 14, 2005, when Netschi delivered Fictitious Transaction Documents to a representative of the Plaintiff, and continued through January 31, 2008, when Brossman delivered Fictitious Monthly Reports to a representative of the Plaintiff.

35

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

113.    The predicate acts, and evidence of the schemes constituting the pattern of

racketeering, include, but are not limited to interstate telephone calls, interstate electronic

("e-mail") messages, interstate facsimile transmissions, and interstate electronic banking

transactions containing false or fraudulent pretenses, representations, or promises made in

furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in

violation of 18 U.S.C. § 1343.

*Predicate Acts and Evidence Concerning Interstate Wire Transfers Related to the*
*Purchases of ATMA Machines*

114.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on or about

November 16, 2005 from ATMA's Citibank, N.A. account located in New York to 36

Main's account number 061003415 at Florida Choice Bank located in Florida to purchase

ATMA Machines.

115.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on December 19,

2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account

number 061003415 at Florida Choice Bank located in Florida to purchase ATMA

Machines. *See* Volume XIX, Ex. 99.

116.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on February 24,

2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account

number 061003415 at Florida Choice Bank located in Florida to purchase ATMA

Machines. *See* Volume XIX, Ex. 100.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

Automated Teller Machine Advantage LLC,                          :

                                                    Plaintiff,   :     Index No.: 08-CV-3340(RMB)(FM)(ECF)

- against -                                                       :     **AMENDED COMPLAINT**

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance               :
Moore, Exclusive Properties Group, Inc., Walter Netschi,        :     Plaintiff Demands a Trial By Jury
36 Main Street LLC, ATM Capital Inc., Danielle Jones,           :
Alain Brossman a/k/a Harry Brossman, and William               :
Munier,                                                          :
                                                                 :
                                                   Defendants.   :

------------------------------------------------------------------ x

        Plaintiff, Automated Teller Machine Advantage LLC ("ATMA")(hereinafter

referred to as the "Plaintiff"), by its attorneys, Lankler & Carragher, LLP, and for its

Complaint herein, alleges as follows:

## I
## INTRODUCTION

        1.      This action is brought against individual and corporate Defendants who have

engaged in a complex scheme to defraud Plaintiff of $16.475 million.

        2.      Defendants' scheme, committed by engaging in racketeering activities,

involved inducing Plaintiff to purchase large numbers of automated teller machines

("ATMs") and to enter into contracts for the management of the ATMs.

        3.      Plaintiff purchased 940 ATMs and subsequently discovered that: (i) the ATMs

did not exist; (ii) Plaintiff did not have an ownership interest in the ATMs; or (iii) others

had competing ownership claims to the ATMs, each contrary to the warranties and

representations made by Defendants.

4.    There is a well-established market, by persons or businesses other than bank owner/operators, for the purchase, operation and sale of ATMs. Non-bank purchasers can either buy an ATM that has previously been placed at a location, generally via a lease agreement with a business store owner (a "Placed ATM"), or a new ATM that needs to be located in an existing or prospective business establishment. A Placed ATM, particularly one with a long-term lease and verifiable transaction activity, will sell at a substantial premium compared to a non-Placed ATM.

5.    ATMA determined the value of a Placed ATM from its predicted ability to generate future revenue. The revenue potential was, *inter alia*, predicated on the receipt and analysis of reliable reports reflecting due diligence for each Placed ATM being considered for purchase that demonstrated: (i) at least one year of transaction history with an average of 400 transactions per month; (ii) projected net revenues of approximately $4,800 per year based on the transaction history; (iii) the existence of a lease with at least a five year term with a renewal provision for an additional five year term provided that neither party terminated the lease (hereinafter the "Performance Criteria").[1]

6.    To effect their scheme, Defendants induced Plaintiff to purchase non-existent phantom Placed ATMs by making false verbal representations and delivering fraudulent, false, fabricated, and fictitious information to Plaintiff, including representations and warranties, purporting to demonstrate that the phantom Placed ATMs met the Performance Criteria set by Plaintiff to purchase Placed ATMs.

7.    Defendants furthered their scheme by delivering fraudulent, false, fabricated, and fictitious information to Plaintiff in connection with the ATMs purchased by Plaintiff

---

[1]    As described, *infra*, at Paragraph 49, Plaintiffs later purchased ATMs with alternative Performance Criteria at a different price.

including: bills of sale, due diligence reports, lease agreements, assignments of the lease agreements, and other fictitious documents.

8.    Following the sale of the phantom Placed ATMs to Plaintiff, the Defendants perpetuated their scheme by providing monthly reports to Plaintiff that purported to state the transactional activity of the Placed ATMs purchased by Plaintiff and by delivering funds purportedly based on that transactional activity.

9.    Defendants systematically sold additional phantom Placed ATMs to Plaintiff, and other purchasers of phantom Placed ATMs, to perpetuate the scheme.

10.    Defendants, through their scheme, induced Plaintiff, and other purchasers, to deliver tens of millions of dollars to Defendants for the purchase of the phantom Placed ATMs.

11.    Plaintiff brings this action against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations statute (hereinafter "RICO"), 18 U.S.C. §§ 1961 through 1968, and New York State common law causes of action, including: fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, negligent misrepresentation, breach of contract, breach of warranty, conversion, unjust enrichment, and breach of fiduciary duty.

12.    Plaintiff seeks the return of the funds it delivered to the Defendants to purchase the Placed ATMs, damages, treble damages, punitive damages, pre-judgment interest, costs and fees, and all other relief deemed appropriate by this Court.

3

## II
## JURISDICTION

13.     This Court has subject matter jurisdiction over this matter pursuant to RICO,

18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiff's claims arise under the laws of

the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## III
## VENUE

14.     The venue of this action is proper in this judicial district pursuant to 18 U.S.C.

§ 1965(a) and 18 U.S.C. § 1391 in that Defendants transacted affairs in the Southern

District of New York and in that the negotiations, decisions to enter in to the contractual

agreements, transfers of funds and subsequent business dealings between the parties

named herein occurred within the Southern District of New York. Venue is also proper

in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any

Defendant may reside outside of this district, the ends of justice require such Defendant

or Defendants to be brought before this Court.

## IV
## THE PARTIES

15.     Plaintiff ATMA is a limited liability company organized and existing under

the laws of the State of Delaware with a principal place of business at 324 Grix Court,

New Milford, New Jersey 07646. ATMA was formed in November of 2004. Two of the

three initial members of the board of managers for ATMA, including the chairman of the

board, maintain their offices in the county of Manhattan, New York. The current

members of the board of managers for ATMA, including the chairman of the board,

maintain their offices in the county of New York, New York.

16.    Defendant Vance Moore, Jr., also known as Vance Moore II, ("Moore") is a resident of Fruitland Park, Lake County, Florida and also maintains a residence, upon information and belief, in Raleigh, Wake County, North Carolina.

17.    Moore owned and controlled unnamed co-conspirator ATM Financial Services LLC ("ATMFS"), a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at Leesburg, Lake County, Florida. ATMFS purported to provide fee-based services to owners of Placed ATMs as an Independent Sales Organization ("ISO"). An ISO, via a management agreement, is responsible for, *inter alia*, the deployment, management and servicing of Placed ATMs, and also for the reporting of the transaction activity of Placed ATMs, collection of revenue from that transaction activity, and payment of the net revenue to the owners of the Placed ATMs. ATMFS filed for Chapter 11 bankruptcy protection on February 12, 2008 in the United States Bankruptcy Court for the Middle District of Florida.

18.    Defendant Exclusive Properties Group, Inc. ("Exclusive Properties" or "EPG") is a domestic business corporation organized and existing under the laws of the State of Florida with a principal place of business at 301 S. Richey Road, Suite 101, Leesburg, Florida. Upon information and belief, Moore is the President, Secretary, Treasurer and Director of EPG. Upon information and belief, EPG is a real estate holding company controlled by Moore that owns two warehouses from which Moore operates numerous businesses, including ATMFS.

19.    Defendant Walter Netschi ("Netschi") is a resident of Hot Springs Village, Garland County, Arkansas and McKinney, Collin County, Texas. Netschi is the

5

managing member of 36 Main Street LLC and the President of Defendant ATM Capital, Inc.

20.    Defendant 36 Main Street LLC ("36 Main") is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business at 2400 Dallas Parkway, Suite 180, Plano, TX 75093. Since at least 2005, 36 Main has been engaged in the business of selling ATMs to third-parties, including ATMA.

21.    Defendant ATM Capital Inc. ("ATM Capital") is a domestic business corporation organized and existing under the laws of the State of Texas with a principal place of business at 2001 Beach Street, Fort Worth, Texas. Netschi is the President of ATM Capital.

22.    Defendant Danielle Jones ("Jones") is the Secretary Treasurer and Vice-President of 36 Main and the daughter of Netschi. Jones maintains a residence in McKinney, Collin County, Texas.

23.    Defendant Alain Brossman a/k/a Harry Brossman ("Brossman") is a resident of Tabernacle, Burlington County, New Jersey. Brossman is a member and former employee of ATMA.

24.    Defendant William Munier ("Munier") is a resident of New Milford, Bergen County, New Jersey. Munier is a member and former employee of ATMA.

## V
## THE ENTERPRISE

25.    At all times material to this Complaint, the Defendants, collectively, have constituted an "enterprise" (hereinafter the "ATM Sales Enterprise") as that term is

6

defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate, and foreign commerce.

## VI
## BACKGROUND

### *ATMA Enters the ATM Business*

26.     In or around November of 2004, Brossman and Munier, who had previously engaged in a prior scheme to sell ATMs with certain of the Defendants named herein (more fully described *infra* at Paragraphs 83 through 90), sought to begin a business with the purported purpose being the purchasing and operating of a large number of Placed ATMs (the "ATM Venture").

27.     In or about August of 2005, Brossman, Munier and others, eventually including Netschi and Moore, approached, through unnamed intermediaries, Acta Realty Corp., doing business as the Wolfson Group, a New York Corporation ("the Wolfson Group,") and offered the Wolfson Group the opportunity to become part of the ATM Venture.  The Wolfson Group is engaged in the management of funds and assets owned by various entities formed primarily for the benefit of members of the Wolfson family.

28.     The ATM Venture involved the use of a limited liability company, known as ATMA, to purchase Placed ATMs, supervise and monitor the management of the Placed ATMs, and thereafter receive monthly revenue generated by the Placed ATMs.

29.     Although ATMA was previously formed, it did not conduct any business, of any kind, prior to the signing of the ATMA limited liability company agreement on November 14, 2005, and ATMA's decision to (i) purchase ATMs; (ii) supervise and monitor the management of the Placed ATMs; and (iii) thereafter receive monthly revenue generated by the Placed ATMs.

7

30.    On November 14, 2005, Brossman, Munier and unnamed others met with representatives of the Wolfson Group at the offices of the Wolfson Group in New York for the purpose of inducing the Wolfson Group to participate in the ATM Venture, to induce ATMA to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any Placed ATMs purchased by ATMA; Netschi and Moore participated in portions of the November 14, 2005 meeting telephonically.

31.    During the November 14, 2005 meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, through ATMFS, to operate as the ISO for the Placed ATMs represented to senior representatives of the Wolfson Group, who become members of ATMA's board of managers that very day, that:

a.    Netschi, through 36 Main, was in the business of locating sellers of Placed ATMs, conducting due diligence on the Placed ATMs, negotiating a price for and purchasing the Placed ATMs, holding the 36 Main purchased Placed ATMs as inventory and reselling the Placed ATMs to interested third parties;

b.    Moore, through ATMFS, served as the ISO for the 36 Main owned ATMs and that Moore was prepared to continue to act as the ISO for those Placed ATMs;

c.    ATMFS was in possession of leases with businesses where Placed ATMs owned by 36 Main were located and that the leases were valid, in effect, and assignable to the purchaser of the Placed ATMs; and,

8

d.    Moore, through ATMFS performed due diligence confirming the

Performance Criteria for the Placed ATMs provided to the purchaser of

the Placed ATMs prior to purchase.

32.    During the same meeting, representatives of the Wolfson Group, who become

the majority and controlling members of ATMA's board of managers – as part of making

an informed decision concerning (i) ATMA's purchases of Placed ATMs from 36 Main;

and (ii) ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's

Placed ATMs – specifically questioned Netschi with respect to whether Netschi and 36

Main were purchasing Placed ATMs from disinterested third-party owners and expressed

their reliance on Netschi and 36 Main conducting due diligence on the Performance

Criteria of the of the Placed ATMs being purchased by 36 Main for later resale to

ATMA.

33.    Also during the same meeting, Netschi, to induce ATMA to purchase Placed

ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via

ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that the business of 36

Main was separate from the business of Moore and ATMFS, and that 36 Main was

exclusively in the business of purchasing and reselling Placed ATMs and that Moore was

exclusively in the business of operating as an ISO.

34.    Also during the same meeting, Brossman, Munier, and Netschi, to induce

ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce

ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs,

represented that Moore, through ATMFS, could act as the ISO for any ATMs purchased

. by ATMA and could conduct due diligence and provide truthful and accurate reporting as

9

to the Performance Criteria of the Placed ATMs identified for potential purchase by ATMA.

35.    Also during the same meeting, Brossman, Munier, representatives of the Wolfson Group and unnamed others participated in a conference call with Moore during which Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that: (i) neither he, nor his company ATMFS, were engaged in the purchase or sale of Placed ATMs; (ii) that ATMFS acted solely as an ISO for Placed ATMs; and (iii) that ATMFS's operations were separate and apart from those of 36 Main.

36.    Also during the same meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, caused to be sent, via electronic mail ("email"), copies of bills of sale, equipment management agreements and due diligence documents (more fully defined *infra* at Paragraph 52) for 100 Placed ATMs purportedly available for purchase by ATMA from 36 Main. *See* Volume I, Ex. 1 – Ex. 3.[2] The documents were forwarded at the request of ATMA's board of managers, to demonstrate the Performance Criteria of the 100 Placed ATMs purportedly being offered for sale and other factors relevant to ATMA's decision to purchase Placed ATMs from Netschi's company, 36 Main, and ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs,

---

[2]    Due to the volume of exhibits to this Complaint, for the Court's convenience the exhibits hereto are attached and submitted herewith and incorporated herein by reference as part of separate Exhibit Appendices, Volumes I – XX (hereinafter referred to as Volume " ", Ex. " ").

37.    Also at the same meeting, Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, made representations indicating the authenticity of the leases, due diligence documents and management agreements for the same 100 Placed ATMs.

38.    After receiving the representations set forth in paragraphs 30 through 37, *supra*, from Brossman, Munier, Netschi, and Moore, the Wolfson Group agreed to participate in the ATM Venture, ATMA agreed to purchase Placed ATMs from Netschi's company, 36 Main, and ATMA agreed to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs. On November 14, 2005, the limited liability company agreement of ATMA was drafted by an employee of the Wolfson Group. The ATMA limited liability company agreement was effective November 14, 2005.

39.    The ATMA limited liability company agreement provided that the management of the business and affairs of ATMA would be delegated to a board of managers. The ATMA board of managers consisted of three managers: two appointed by the Wolfson Group and one appointed by the Class B members of the board of managers. A chairman of the board of managers was to be selected by the two Wolfson Group appointed managers. The initial board of managers of ATMA consisted of two managers appointed by the Wolfson Group, Aaron Wolfson and Eli Levitin (the "Controlling Managers"), and Brossman. Brossman's position as a manager on the ATMA board of managers was contingent upon his continued employment with ATMA – employment that could be terminated at will and with or without cause by the Controlling Managers.

11

40.     Pursuant to the terms of the ATMA limited liability company agreement,
ATMA was prohibited, among other acts, from: purchasing any ATMs, disposing of any
ATMs, amending any lease agreements related to any ATM, or hiring any employees,
without the unanimous approval of the board of managers.

41.     On the same day of the meeting and de-facto formation of ATMA, ATMA,
via written employment agreements, hired Brossman, Munier, and an unnamed other
employee, as co-chief executive officers of ATMA to operate the day-to-day business
and affairs of ATMA. Brossman and Munier were to receive: (i) a fixed salary for their
work as co-chief executive officers; (ii) employee benefits, including health insurance;
and (iii) three weeks vacation. Brossman and Munier were to each be paid $10,416 per
month out of the operating revenue of ATMA with salary increases, specifically linked to
the number of Placed ATMs owned by ATMA (the "ATMA Machines").

42.     Brossman and Munier were at-will employees of ATMA. Brossman and
Munier could be terminated from their positions as co-chief executive officers by the
Controlling Managers at any time, with or without cause.

43.     Pursuant to their employment agreements, Brossman and Munier were subject
to the overall direction and authority of the ATMA board of managers, were required to
report to the ATMA board of managers (or the board's designee), and owed a duty of
loyalty to ATMA. Brossman and Munier were prohibited from purchasing ATMs for
ATMA, disposing of ATMs owned by ATMA, or modifying any lease related to an ATM
owned by ATMA without the unanimous approval of the ATMA board of managers.

44.     In connection with Brossman's employment as the co-chief executive officer
of ATMA, Brossman was required to perform due diligence obligations on behalf of

12

ATMA that included, but were not limited to: (i) identifying and vetting potential Placed ATM machines for purchase by ATMA; (ii) visiting existing ATMA Machines at their locations; and, (iii) exploring opportunities to enhance the value and performance of the ATMA Machines. Brossman's due diligence obligations also required interfacing with Moore as the ISO of the ATMA Machines. On numerous occasions during the period relevant to this Complaint, Brossman represented to ATMA's board of managers, or their designees, that he was performing the above duties, including representations that he was personally visiting the businesses where the ATMA Machines were located.

45.    In connection with Munier's employment as the co-chief executive officer of ATMA, Munier was required to receive and review monthly reports, delivered by Moore and purportedly related to the ATMA Machines, detailing the location, transaction activity, monthly costs and expenses, and net revenue for each ATMA Machine (the "Monthly Reports") and to subsequently deliver the Monthly Reports to ATMA's board of managers, or their designees.

46.    In or about February of 2006, at the offices of the ATMA board of managers in New York, Netschi again represented to ATMA that Netschi and 36 Main were purchasing Placed ATMs from disinterested third party owners and that Netschi and 36 Main were conducting due diligence with respect to the Placed ATMs being purchased by 36 Main for later resale. At the same meeting, an ATMA board member and his representative expressed their reliance on the representations made by Netschi to continue ATMA's purchases of Placed ATMs from 36 Main.

47.    Based on the fraudulent and misleading acts of the Defendants, from approximately November of 2005 through February of 2008, ATMA believed it

13

purchased 940 Placed ATMs – the ATMA Machines – from 36 Main, entered into

management agreements with ATMFS to manage the operation of the ATMA Machines,

and continued to employ Brossman and Munier as employees of ATMA to assist

ATMA's board of managers with the day-to-day operations of ATMA.

48.    During all periods relevant to this Complaint, the board of managers of

ATMA, and/or its designees, were actively engaged in the operation and business affairs

of ATMA, including but not limited to the decision whether to purchase Placed ATMs

from 36 Main.

### *Purported ATM Purchases/Sales*

49.    To date, Plaintiff has transferred $16.475 million to 36 Main for the purchase

of the ATMA Machines. The purported purchase of the ATMA Machines commenced in

November of 2005, and ended in September of 2006, and were accomplished in fifteen

(15) tranches, varying in size from 2 to 101 ATMs per tranche, (the "ATMA Tranche

Purchases"). The purchase price for each of the ATMA Machines was negotiated by the

Controlling Members of the ATMA board and 36 Main. The purchase price for the

ATMA Machines varied from between $14,500 to $22,000 per machine.[3]

50.    The individual ATMA Tranche Purchases occurred as follows:

---

[3]    The purchase price for a Placed ATM was based on the Performance Criteria of
each tranche of Placed ATMs and subsequent designation of the Placed ATM as an "A"
or "B" Placed ATM as determined by the verified transaction history of the ATMs in the
tranche. Placed ATMs designated as "A" Placed ATMs had an average of at least 400
verified fee paying transactions per month. Placed ATMs with at least 400 verified fee
paying transactions per month were originally priced at $19,000.00 per Placed ATM and
were later priced at $19,500.00 per Placed ATM. Two of the Placed ATMs with an
average of at least 500 verified fee paying transactions per month were priced at
$22,000.00 per Placed ATM. Placed ATMs designated as "B" Placed ATMs had an
average of from 330-399 verified fee paying transactions per month and were priced at
$14,500.00 per Placed ATM. A chart summarizing the date of purchase and amount paid
by ATMA for each tranche of ATM purchases is annexed hereto at Volume I, Ex. 4.

14

a.    On or about November 16, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "November 16, 2005 Tranche Purchase" documents at Volumes II – III, Ex. 5 – Ex. 13);

b.    On or about December 20, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "December 20, 2005 Tranche Purchase" documents at Volumes III – V, Ex. 14 – Ex. 22);

c.    On or about February 22, 2006, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "February 22, 2005 Tranche Purchase" documents at Volumes VI - VII, Ex. 23 – Ex. 31);

d.    On or about April 26, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "April 26, 2006 Tranche Purchase" documents at Volumes VII – IX, Ex. 32 – Ex. 40);

e.    On or about May 27, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "May 27, 2006 Tranche Purchase" documents at Volumes IX – XI, Ex. 41 – Ex. 47);

f.    On or about June 16, 2006, ATMA paid $975,000.00 for the purchase of 50 Placed ATM machines from 36 Main (*See* the "June 16, 2006 Tranche Purchase" documents at Volume XII, Ex. 48 – Ex. 54);

g.    On or about June 27, 2006, ATMA paid $1,073,000.00 for the purchase of 74 Placed ATM machines from 36 Main (*See* the "June 27, 2006 Tranche Purchase" documents at Volume XIII, Ex. 55 – Ex. 61);

h.    On or about July 28, 2006, ATMA paid $1,469,500.00 for the purchase of 101 Placed ATM machines from 36 Main (*See* the "July 28, 2006 Tranche Purchase" documents at Volumes XIV – XV, Ex. 62 – Ex. 68);

i.    On or about August 30, 2006, ATMA paid $136,500.00 for the purchase of 7 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #1" documents at Volumes XVI - XVII, Ex. 69 – Ex. 70, Ex. 77 – Ex. 81);

j.    On or about August 30, 2006, ATMA paid $331,500.00 for the purchase of 17 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #2" documents at Volumes XVI – XVII, Ex. 71 – Ex. 72, Ex. 77 – Ex. 81);

k.     On or about August 30, 2006, ATMA paid $522,000.00 for the purchase of 36 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #3" documents at Volumes XVI – XVII, Ex. 73 – Ex. 74, Ex. 77 – Ex. 81);

l.     On or about August 30, 2006, ATMA paid $986,000.00 for the purchase of 68 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #4" documents at Volumes XVI - XVII, Ex. 75 – Ex. 81);

m.     On or about September 26, 2006, ATMA paid $44,000.00 for the purchase of 2 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #1" documents at Volumes XVII - XVIII, Ex. 82 – Ex. 83, Ex. 88);

n.     On or about September 26, 2006, ATMA paid $409,500.00 for the purchase of 21 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #2" documents at Volumes XVII - XVIII, Ex. 84 – Ex. 85, Ex. 88);

o.     On or about September 26, 2006, ATMA paid $928,000.00 for the purchase of 64 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #3" documents at Volumes XVII - XVIII, Ex. 86 – Ex. 88).

51.     With respect to each Tranche Purchase by ATMA, a series of documents were executed which, on their face, provided for (i) the transfer of title and assignable leases to ATMA; and (ii) the management of the ATMA Machines.

52.     The documents executed for each Tranche Purchase are identified as follows:

a.     Asset Purchase Agreement: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, an Asset Purchase Agreement that supposedly sold title in Placed ATMs from 36 Main to ATMA (hereinafter "Asset Purchase Agreement"). The Asset Purchase Agreements provide a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA. Upon delivery of an executed Asset Purchase Agreement by Jones on behalf of 36 Main, ATMA would

16

remit funds to 36 Main via wire transfer in an amount corresponding to the value of the Placed ATMs set forth in a schedule of the Placed ATMs affixed to the Asset Purchase Agreement. *See* Asset Purchase Agreements for the ATMA Tranche Purchases in Volume II, Ex. 5; Volume III, Ex. 14; Volume VI, Ex. 23; Volume VII, Ex. 32; Volume IX, Ex. 41;Volume XII, Ex. 48; Volume XIII, Ex. 55; Volume XIV, Ex. 62; Volume XVI, Exs. 69, 71, 73, 75; Volume XVII, Exs. 82, 84, 86.

b.    Bills of Sale:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, a Bill of Sale for each tranche of Placed ATMs supposedly being sold by 36 Main to ATMA.  Each Bill of Sale provided a representation and warranty that 36 Main held good and marketable title to the Placed ATMs supposedly being sold to ATMA.  *See* Bills of Sale for the ATMA Tranche Purchases in Volume II, Ex. 6; Volume III, Ex. 15; Volume VI, Ex. 24; Volume VII, Ex. 33; Volume IX, Ex. 42; Volume XII, Ex. 49; Volume XIII, Ex. 56; Volume XIV, Ex. 63; Volume XVI, Exs. 70, 72, 74, 76; Volume XVII Exs. 83, 85, 87.

c.    Addition to Equipment:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, a separate document entitled "Addition to Equipment," that stated that the Placed ATMs supposedly being sold to ATMA were "Virtual switch capable."  Virtual switch capability allowed the Placed ATM to fund minutes for pre-paid cell phone accounts (hereinafter "Addition to Equipment").  After the completion of the first three tranche purchases, ATMA elected not to pay for Virtual Switch

17

capability and Addition to Equipment documents were no longer delivered

for subsequent tranche purchases. *See* the Addition to Equipment

documents in Volume II, Ex. 7; Volume III, Ex. 16; Volume VI, Ex. 25;

Volume VII, Ex. 34.

d.    Diligence Warranty:  Contemporaneous with the execution of a Bill of

Sale, and Asset Purchase Agreement, Netschi, by and through 36 Main

provided a written statement that it had engaged the services of Moore,

through ATMFS, to perform a verification of the transaction history of

each ATM supposedly being sold to ATMA (hereinafter "Diligence

Warranty"). *See* the Diligence Warranties in Volume II, Ex. 8; Volume

III, Ex. 17; Volume VI, Ex. 26; Volume VII, Ex. 35. Each Diligence

Warranty warranted that the transaction history that 36 Main provided to

ATMA was the same transaction history that 36 Main had received from

Moore and ATMFS.

e.    Each and every Bill of Sale, Asset Purchase Agreement, Addition to

Equipment and Diligence Warranty (hereinafter "36 Main Transaction

Documents") were signed by Jones as Vice-President and/or Secretary

Treasurer of 36 Main and were signed, upon information and belief, with

the knowledge of and/or at the direction of Netschi.

f.    Placement Program Space Leases:  For each and every Placed ATM

supposedly being sold to ATMA, Moore provided copies of a "Placement

Program Space Lease" (hereinafter "Placed ATM Lease") between

ATMFS and a purported lessor, usually a convenience store or other

18

similar business, where the ATMs supposedly being sold to ATMA were allegedly located. *See* the Placed ATM Leases in Volumes II – III, Ex. 9a – Ex. 9b; Volumes IV – V, Ex. 18a – Ex. 18b; Volumes VI – VII, Ex. 27a – Ex. 27b; Volumes VIII – IX, Ex. 36a – Ex. 36b; Volumes X – XI, Ex. 43a – Ex. 43b; Volume XII, Ex. 50; Volume XIII, Ex. 57; Volumes XIV – XV, Ex. 64a – Ex. 64b; Volumes XVI – XVII, Ex. 77a – Ex. 77b; Volume XVIII, Ex. 88. Annexed to each Placed ATM Lease were site surveys and audit reports, signed by Moore, that purportedly identified: (1) the business where each Placed ATM was located; (2) the annual merchandise sales for that business; (3) the terminal number for the Placed ATM at the location; (4) the average monthly transaction history for the Placed ATM; and, (5) purported reports from searches for UCC-1 statements. The purported Placed ATM Leases and the transaction history identified in the documents annexed to the Placed ATM Leases correlated to a schedule identifying each Placed ATM purchased in the ATMA Tranche Purchases.

g. Assignment of Placement Programs Space (ATM) Leases: The Placed ATMs supposedly sold to ATMA and their alleged locations were further identified in a document entitled "Assignment of Placement Programs Space (ATM) Leases" (hereinafter "Lease Assignment(s)"). *See* the Lease Assignments in Volume III, Ex. 10; Volume V, Ex. 19; Volume VII, Ex. 28; Volume IX, Ex. 37; Volume XI, Ex. 44; Volume XII, Ex. 51; Volume XIII, Ex. 58; Volume XV, Ex. 65; Volume XVII, Ex. 78. Each Lease Assignment for each Placed ATM Lease was prepared, or caused to be

19

prepared, by Moore and stated that ATMFS had a current and existing

Placed ATM Lease and that the Placed ATM Lease was being assigned to

ATMA for each ATM supposedly being sold to ATMA.  In each Lease

Assignment, Moore warranted that each Placed ATM Lease was in full

force and effect, was assignable, and was free and clear from all liens and

encumbrances.

h.    Due Diligence Report:  Moore prepared, or caused to be prepared, a

separate document (hereinafter "Due Diligence Report"), that represented

and warranted to ATMA that ATMFS had reviewed the average monthly

transaction history for each ATM being sold to ATMA and that the

average transactions reported on the schedules affixed to the Asset

Purchase Agreements were correct.  Moore, in the Due Diligence Report,

acknowledged that ATMA "was relying upon such data in making its

purchase from 36 main [sic] Street."  *See* the Due Diligence Reports in

Volume III, Ex. 11; Volume V, Ex. 20; Volume VII, Ex. 29; Volume IX,

Ex. 38; Volume XI, Ex. 45; Volume XII, Ex. 52; Volume XIII, Ex. 59;

Volume XV, Ex. 66; Volume XVII, Ex. 79.

i.    Equipment Management Agreement:  On or about the same day of a

closing of a tranche purchase of ATMA Machines, ATMA and ATMFS

would enter into an Automated Teller Machine (ATM) Equipment

Management Agreement (hereinafter "Equipment Management

Agreement") obligating ATMFS to manage a tranche of ATMA

Machines.  ATMA entered into an Equipment Management Agreement for

20

ATMFS, by Moore, to manage all of the ATMA Machines.   *See* the
Equipment Management Agreements in Volume III, Ex. 12; Volume V,
Ex. 21; Volume VII, Ex. 30; Volume IX, Ex. 39; Volume XI, Ex. 46;
Volume XII, Ex. 53; Volume XIII, Ex. 60; Volume XV, Ex. 67; Volume
XVII, Ex. 80.  Pursuant to the terms of each Equipment Management
Agreement, ATMFS, by and through Moore, is obligated to manage the
ATMA Machines for the benefit of ATMA.  The Equipment Management
Agreement requires Moore and ATMFS to: (1) collect data processing and
electronic deposit and transfer information for all collected revenues and
fees, including surcharge revenues generated by the ATMA Machines, on
a monthly basis; (2) provide ATMA with the Monthly Reports and to
make regular payments to ATMA based on the monthly net revenue of the
ATMA Machines (the "Periodic Revenue Payments"); and, (3) provide
ATMA with a full disclosure of the number of transactions for each
ATMA Machine on a monthly basis.

j.   Amendment to the Equipment Management Agreement:  On or about
April 27, 2006, ATMA and ATMFS entered into an Amendment to the
Equipment Management Agreement ("hereinafter Equipment
Management Agreement Amendment") that amended the existing
Equipment Management Agreements between ATMFS and ATMA. *See*
the Equipment Management Agreement Amendments in Volume III, Ex.
13; Volume V, Ex. 22; Volume VII, Ex. 31; Volume IX, Ex. 40; Volume
XI, Ex. 47; Volume XII, Ex. 54; Volume XIII, Ex. 61; Volume XV, Ex.

21

68; Volume XVII, Ex. 81. Pursuant to the terms of each Equipment

Management Agreement Amendment, ATMFS, by and through Moore, is

obligated, in addition to its obligations under the Equipment Management

Agreements, not to: (1) solicit any business owner identified in the Lease

Agreements to cease doing business with ATMA; or (2) solicit any

business owner identified in the Lease Agreements to lease space to

ATMFS or any other party for the purpose of placing any additional

ATMs at the same business location. ATMFS's non-solicitation

obligation further prohibited ATMFS from sharing any information

identifying the locations of the ATMA Machines or the terms of the Lease

Agreements with any other parties.

k.    For each of the ATMA Tranche Purchases, Moore signed every Placed

ATM Lease, Lease Assignment, Due Diligence Report, Equipment

Management Agreement and Equipment Management Agreement

Amendment (hereinafter the "ATMFS Transaction Documents").

53.    Each of the 36 Main Transaction Documents and ATMFS Transaction

Documents associated with the ATMA Tranche Purchases included a schedule of Placed

ATMs that purportedly identified the transaction history of each Placed ATM in the

ATMA Tranche Purchases.

54.    Each Asset Purchase Agreement and corresponding Bill of Sale contained

representations and warranties by 36 Main, that 36 Main possessed good and marketable

title to the Placed ATMs supposedly being sold to ATMA, that it had full authority to sell

the Placed ATMs, that the Placed ATMs were in good condition and fit for use, and were

22

free and clear "of all liens, encumbrances, liabilities and adverse claims, of every nature and description." *See* Paragraphs 52(a) and 52(b), *supra*.

55.    Every Tranche Purchase of ATMA Machines was accompanied by some or all of the documents identified in Paragraphs 52(a) through 52(d) and 52(f) through 52(j) of this Complaint.

56.    For every Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, purchase funds to Netschi, through 36 Main.  The purchase funds paid by ATMA to 36 Main for the ATMA Machines are detailed, *infra*, at Paragraphs 114 through 124 and incorporated herein by reference.

57.    Additionally, after each Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, funds to ATM Capital and/or 36 Main which represented 36 Main's prorated share of the monthly net-revenues earned by that tranche of ATMA Machines for that portion of the month during which 36 Main owned those ATMs sold to ATMA (the "Residual Revenue Funds").  *See* Paragraphs 147 through 154, *infra*, incorporated herein by reference.

58.    Brossman and Munier, together and/or in conjunction with others, including Netschi, calculated the Residual Revenue Funds purportedly owed 36 Main and to be delivered to ATM Capital or 36 Main.  Munier, Brossman, and Netschi caused the Residual Revenue Funds to be paid to ATM Capital and/or 36 Main with the knowledge that the Residual Revenue Funds were based on fabricated calculations because the ATMA Machines did not exist.

*Post Sale Activities of Defendants*

59.     From on or about December of 2005 through November of 2007, Moore

forwarded the Monthly Reports, via email, to Munier and/or Brossman. *See* Paragraphs

160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated

herein by reference.

60.     The Monthly Reports were received and reviewed by Munier and/or

Brossman for accuracy pursuant to their duties as employees of ATMA. Brossman

and/or Munier subsequently delivered the Monthly Reports to representatives of ATMA.

*See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 –

189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

61.     From on or about December of 2005 through September of 2007, Moore, by

and through ATMFS and/or Exclusive Properties, delivered, by wire transfer, the

Periodic Revenue Payments. *See* Paragraphs 125 through 146, *infra*, incorporated herein

by reference.

62.     The Periodic Revenue Payment delivered in September of 2007, which related

to the Monthly Report for June of 2007, was the final Periodic Revenue Payment

received by ATMA from ATMFS, Moore, or Exclusive Properties. In or about

November of 2007, Moore ceased providing the Monthly Reports.

63.     In response to numerous requests from Plaintiff concerning the failures of

ATMFS and Moore to provide the Monthly Reports and/or Periodic Revenue Payments,

Moore, by letter dated December 20, 2007, stated:

> We'd like to give you an update on the events that occurred this year that
> has caused a delay in receiving your monthly payments. *In the Spring of
> 2007 we made a commitment to purchase Jack Henry ATM software . . .
> that would allow us to track ATM assets and transactions and receive*

24

> *electronic reports on a daily basis. We received the software in July* and did the installation at that time. . . . We expect to be fully operational and current with all reports by the mid to end of January. . . We're presently reconciling each ATM from the old manual system to the new system to get reports done to get them out to each one of our ATM owners . . . *I want to assure each ATM owner that their funds received on the settlement of each ATM are secure in a settlement account by each network.*

*See* Volume XIX, Ex. 89. (Emphasis added.)

64.    On January 10, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report to a representative of ATMA that purportedly identified the ATMA Machines. *See* Volume XIX, Ex. 90.

65.    On January 11, 2008, Brossman emailed a representative of ATMA and represented that ". . . vance is going to be sending u a cornucopia of reports and then explain the first reports.i think that the first reports were from elan a processor owned by us bank-spoke to him at 830 and 1030 this morning-harry" [sic]. *See* Volume XIX, Ex. 91.

66.    On January 11, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report, allegedly prepared by ATMFS, listing the store locations, without addresses, of 352 ATMs. Brossman also received a copy of the report via the same email. *See* Volume XIX, Ex. 92.

67.    Also on January 11, 2008, Brossman, in an email, represented to an agent of ATMA that he had ". . .matched 250 machines to the [Plaintiff's] . . ." list of the ATMA Machines. *See* Volume XIX, Ex. 93.

25

68.    Also on January 11, 2008, Moore, in response to further demands by Plaintiff for information related to the ATMA Machines, represented that he had requested ". . . the file on transaction history from processors for recent months, and am still waiting for the files." *See* Volume XIX, Ex. 94.

69.    Also on January 11, 2008, Moore sent another email to a representative of ATMA wherein he represented that he would provide a copy of a bank statement related to the settlement account where the Periodic Revenue Payments were purportedly being held. *See* Volume XIX, Ex. 94. Moore sent a copy of a purported bank statement to a representative of ATMA via email on January 11, 2008. *See* Volume XIX, Ex. 95.

70.    On or about January 15, 2008, Moore, during a visit by a representative of ATMA and a third-party auditor to ATMFS's warehouse in Garner, North Carolina, presented a bank statement dated December 31, 2007, that purportedly showed an account balance of $11,259,194.75, which Moore stated represented Plaintiff's Periodic Revenue Payments that were being held in escrow pending completion of software upgrades to ATMFS's computer system. *See* Volume XIX, Ex. 96.

71.    On January 20, 2008, Brossman, in response to demands by Plaintiff for information related to the ATMA Machines, represented to a representative of ATMA in an email that: "ok-vance and i have gone through the lists till we accounted for the 940 machines including the moved ones.i have sent the list to you.they have all the present terminal numbers---i told u david that i would get it done no matter what-harry" [sic]. *See* Volume XIX, Ex. 97.

72.    On or about January 22, 2008, Moore, via an electronic message to a representative of ATMA, represented that the ATMA Machines existed as Placed ATMs

26

and represented that new lease agreements for any ATMA Machines moved from their

original locations would be provided to Plaintiff by January 24, 2008. *See* Volume XIX,

Ex. 98.

### *Discovery That the ATMA Machines Do Not Exist*

73.     In January of 2008, Plaintiff directed a private investigative firm to investigate

certain locations where ATMA Machines were, according to Moore and ATMFS,

located. The investigation was conducted for the purpose of determining whether the

ATMA Machines were in fact present at those locations.

74.     On or about January 24, 2008, the private investigative firm reported that its

investigation had uncovered that the majority of the ATMA Machines they attempted to

locate: (1) were not located at the business locations identified by Moore, Netschi, 36

Main, and Jones; (2) in some instances may not have ever existed at the locations

identified by Moore, Netschi, 36 Main, and Jones; and (3) in some instances, were either

owned by persons other than Plaintiff and/or were managed by parties other than

ATMFS.

### *Fraudulent Sales to Other Investor Groups Are Revealed*

75.     On or about February 6, 2008, a California based entity known as ATM

Equity, LP ("ATM Equity") filed suit against ATMFS in North Carolina Superior Court,

Wake County, alleging that ATMFS and Moore had defrauded ATM Equity out of $20

million delivered to Netschi, through 36 Main, by providing fraudulent due diligence

reports in order to induce ATM Equity to purchase ATMs from 36 Main. The complaint

further alleges that ATMFS and Moore misappropriated and/or failed to disclose the

locations of certain ATMs that ATM Equity owned and had contracted with ATMFS to

service, and that ATMFS and Moore had failed to remit monthly revenues for either the ATMs purchased from 36 Main or the ATMs owned by ATM Equity being serviced by ATMFS and Moore.

76.    On or about February 12, 2008, ATMFS filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida (the "ATMFS Bankruptcy").

77.    In its petition in the ATMFS Bankruptcy, ATMFS did not list or otherwise disclose either ATMA or ATM Equity as creditors of ATMFS.

78.    Since the filing of the ATMFS Bankruptcy, numerous other persons who purchased ATMs through Netschi and 36 Main, and whose ATMs were allegedly managed by ATMFS and Moore, have appeared in the ATMFS Bankruptcy (together with ATMA and ATM Equity, the "ATMFS Creditors").

79.    The ATMFS Creditors believe they purchased, in the aggregate, in excess of 4000 ATMs through Netschi, 36 Main, Jones, and Moore.

80.    In a disclosure made by the ATMFS Bankruptcy Trustee on or about March 10, 2008, the ATMFS Bankruptcy Trustee has only been able to confirm the existence of approximately 400 ATMs (ten percent 10% of the Placed ATMs purportedly being managed by ATMFS and Moore) and, that most of those 400 ATMs are owned by the merchants where the ATMs are located and not the ATMFS Creditors.

81.    Netschi, in a telephone call with a member of the ATMA board of managers on February 28, 2008, admitted that 36 Main took a percentage of the gross purchase funds for each tranche purchase of ATMA Machines and then subsequently transferred the balance of Plaintiff's funds to Moore or entities controlled by Moore - a

28

representation totally at odds with prior representations made to representatives of ATMA to induce ATMA to participate in the ATM Venture, to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any of the ATMA Machines. *See* Paragraphs 31 - 33, *supra*.

82.     Subsequently on March 19, 2008, Netschi was sued in New York State Supreme Court, New York County, by Fortress Credit Opportunities I LP for breach of guarantee in connection with the financing of purchases of Placed ATMs by ATM Equity from 36 Main.

### The Defendants Prior ATM Sales Scheme

83.     From approximately 2002 through 2005, Munier, Brossman, Moore, and Netschi, along with others not named herein, engaged in the sale of ATM business opportunities that bundled and sold ATMs together with management, operation, and other services to investors (the "Business Opportunity").

84.     An investor in the Business Opportunity was entitled to receive a set monthly payment in exchange for his or her investment, with a bonus payment in the event that the transactional activity of an ATM exceeded a certain threshold number (usually 400 transactions) within a given month.

85.     Munier, operating through an entity that, on information and belief, was doing business as EFinancial, was responsible for the sale of the Business Opportunity to potential and actual investors.

86.     When Munier sold a Business Opportunity to an investor, he would arrange to purchase a single or multiple ATMs from an entity owned and controlled by Netschi.

29

87.    Brossman, operating through an entity that, on information and belief, was doing business as National Escrow Limited LLC ("National Escrow"), agreed, for a percentage of the revenue generated by the transaction activity of Business Opportunity ATMs, to purchase the ATMs from the Business Opportunity owners at the expiration of the term of the Business Opportunity (usually seven years) or a mutually agreeable date.

88.    Upon information and belief, each ATM sold to an investor as part of the Business Opportunity was purportedly operated by Moore pursuant to an agreement whereby a Moore-controlled entity would act as the ISO for the ATM.

89.    In addition to Brossman and Munier, the Business Opportunity also included management services by a management company, unnamed herein, that employed, amongst others, Munier's sister, and which acted as conduit between the owner of the Business Opportunity and Netschi, Brossman, Munier, and Moore.  Though the management services were allegedly provided by a separate management company, Moore's entity controlled access to any funds generated from the Business Opportunity ATMs, and distributed funds to the purported management company and to Brossman's company, National Escrow.

90.    On information and belief, including statements made by investors and lawyers for investors in the Business Opportunity, investors in the Business Opportunity were sold non-existent phantom ATMs as part of a scheme conducted by Munier, Brossman, Netschi, and Moore.

## VII
## PATTERN OF FRAUDULENT AND RACKETEERING ACTS

91.    Defendants, by and in furtherance of the ATM Sales Enterprise, induced Plaintiff to enter into agreements to purchase phantom ATMs by providing Plaintiff with

false and misleading purchase information, including: (1) the source from whom Netschi and 36 Main were allegedly purchasing the ATM machines ultimately purchased by Plaintiff; (2) the existence of the ATMs purchased by Plaintiff; (3) the transaction activity of the ATMs purchased by Plaintiff; (4) the locations of the ATMs purchased by Plaintiff; and, (5) the existence of leases for the placement of the ATMs purchased by Plaintiff.

92.    To effect the ATM Sales Enterprise scheme, Munier, Brossman, Netschi, 36 Main, Jones, ATM Capital, Exclusive Properties, and Moore agreed and conspired to sell phantom ATMs to Plaintiff.

93.    As part of the ATM Sales Enterprise scheme, Netschi and 36 Main explicitly and intentionally misrepresented to Plaintiff that they had acquired ownership of the ATMs to be purchased by Plaintiff from disinterested third-party owners of the ATMs when, in fact, they had not done so, but had instead "purchased" the phantom ATMs from Moore, or an entity controlled by Moore.

94.    In furtherance of the ATM Sales Enterprise scheme, Netschi, 36 Main, and Jones created fictitious Asset Purchase Agreements, Bills of Sale, Additions to Equipment, and Due Diligence Warranties (collectively, the "36 Main Fictitious Transaction Documents").

95.    In furtherance of the ATM Sales Enterprise scheme, Moore created fictitious Lease Assignments, Placed ATM Leases, Due Diligence Reports, Equipment Management Agreements, and Equipment Management Agreement Amendments (collectively, the "Moore Fictitious Transaction Documents")(collectively with the 36 Main Fictitious Documents, the "Fictitious Transaction Documents").

96.    Knowing that the Fictitious Transaction Documents related to the purchase of phantom Placed ATMs by Plaintiff, Munier and Brossman furthered the ATM Sales Enterprise scheme by executing the Fictitious Transaction Documents on behalf of ATMA and/or not disclosing to Plaintiff that the Fictitious Transaction Documents related to phantom ATMs.

97.    Knowing that ATMA had purchased phantom Placed ATMs, Brossman furthered the ATM Sales Enterprise scheme by stating he had performed due diligence on the ATMA Machines, including visits to ATMA Machine locations, when he had not performed such due diligence.

98.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused ATMFS to create fictitious Monthly Reports for the ATMA Machines (the "Fictitious Monthly Reports"). *See* Paragraphs 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated herein by reference.

99.    The Fictitious Monthly Reports were transmitted to Munier and Brossman, who, knowing they were false and were generated for the purpose of misleading Plaintiff, provided the Fictitious Monthly Reports to Plaintiff. *See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 – 189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

100.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused the Periodic Revenue Payments to be made to ATMA. The Periodic Revenue Payments were transmitted via a wire transfer at the direction of Moore and originated from either ATMFS or Exclusive Properties. *See* Paragraphs 125 – 146, *infra*, incorporated herein reference.

32

101.    Upon information and belief, the source of the Periodic Revenue Payments was the monies delivered by Plaintiff and/or the other ATMFS Creditors to 36 Main to purchase Placed ATMs.

102.    In continued furtherance of the ATM Sales Enterprise scheme, Munier and Brossman caused the Periodic Revenue Payments to be recorded by ATMA as revenue and paid their individual salaries and benefits, along with the salaries and benefits of others, from the Periodic Revenue Payments with the knowledge that the Periodic Revenue Payments had a source other than the revenue generated by the transaction activity of the ATMA Machines.

103.    In continued furtherance of the ATM Sales Enterprise scheme, upon completion of the sale of a tranche of ATMs to ATMA, Netschi and ATM Capital would demand payment of the Residual Revenue Funds.  The Residual Revenue Funds were paid by ATMA via an interstate bank wire transfer to Netschi, through ATM Capital.

104.    In continued furtherance of the ATM Sales Enterprise scheme, when ATMFS ceased to provide Plaintiff with the Fictitious Monthly Reports in or around November of 2007 and Periodic Revenue Payments in or around September of 2007, Munier and Brossman represented to Plaintiff that they were actively communicating with Moore and ATMFS for the purpose of ascertaining the cause for the absence of reporting and payments from ATMFS.  Munier and Brossman, knowing such representations to be false, informed Plaintiff that the cause for the delay in reporting and payment from ATMFS was a software upgrade allegedly installed by ATMFS on its computers.

33

# EXHIBIT M
# 2 of 4

117.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000 on April 27, 2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 101.

118.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000.00 on May 26, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 102.

119.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $975,000.00 on June 14, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 103.

120.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,073,000.00 on June 29, 2006, from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 104.

121.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,469,500 on July 27, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number

37

061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 105.

122.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,975,500.00 on September 5, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 106.

123.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $500.00 on September 6, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 107.

124.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,381,500.00 on September 29, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 108.

### Predicate Acts and Evidence Concerning Interstate Wire Transfers for the Periodic Revenue Payments

125.    On December 30, 2005, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $42,812.46 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 109.

38

126.    On February 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $85,760.28 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 110.

127.    On March 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of am interstate bank wire transfer, the following: $56,646.44 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 111.

128.    On April 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $51,911.65 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 112.

129.    On April 4, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $26,997.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments the ATMA Machines. *See* Volume XIX, Ex. 113.

130.    On May 1, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $126,283.26 from The Bankers Bank account number 061003415 located in Georgia to

39

ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 114.

131.    On May 31, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $170,993.83 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 115.

132.    On July 5, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $212,902.75 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 116.

133.    On August 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $256,028.99 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 117.

134.    On September 12, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $289,021.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 118.

135.    On October 11, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $340,231.77 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 119.

136.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $369,447.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 120.

137.    On December 19, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $358,430.65 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 121.

138.    On February 1, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $353,017.35 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 122.

139.    On February 28, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $344,170.03 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 123.

140.    On April 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $161,012.89 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 124.

141.    On May 14, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $120,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 125.

142.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $48,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 126.

143.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $5,784.37 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 127.

144.    On June 18, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $254,382.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 128.

145.    On August 15, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $695,737.93 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 129.

146.    On September 27, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $374,187.25 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines.

*Interstate Wire Transfers: Residual Revenue Funds*

147.    On January 3, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $21,406.23 from Citibank, N.A. account number 48842629 located in New York to Automated Teller Machine Advantage Ltd's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the November 16, 2005 Tranche Purchase. *See* Volume XIX, Ex. 130.

43

148.    On February 6, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $27,801.71 from Citibank, N.A. account number 48842629 located in New York to ATM Capital's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the December 20, 2005 Tranche Purchase. *See* Volume XIX, Ex. 131.

149.    On June 1, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $35,560.14 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the April 26, 2006 Tranche Purchase. *See* Volume XIX, Ex. 132.

150.    On July 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $38,458.55 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the May 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 133.

151.    On August 7, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $33,621.17 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

44

June 16, 2006 Tranche Purchase and the June 27, 2006 Tranche Purchase. *See* Volume

XIX, Ex. 134.

152.    On September 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi

and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $30,500.33 from Citibank, N.A. account number 48842629 located in New

York to 36 Main's bank account number 061003415 at The Bankers Bank located in

Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

July 28, 2006 Tranche Purchase. *See* Volume XIX, Ex. 135.

153.    On October 13, 2006, in furtherance of the ATM Sales Enterprise, Netschi

and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $43,911.72 from Citibank, N.A. account number 48842629 located in New

York to 36 Main's bank account number 061003415 at The Bankers Bank located in

Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

August 30, 2006 Tranche Purchase #1, August 30, 2006 Tranche Purchase #2, August 30,

2006 Tranche Purchase #3 and August 30, 2006 Tranche Purchase #4. *See* Volume XIX,

Ex. 136.

154.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Netschi

and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $27,389.12 from Citibank, N.A. account number 48842629 located in New

York to 36 Main's bank account number 061003415 at The Bankers Bank located in

Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

September 26, 2006 Tranche Purchase #1, the September 26, 2006 Tranche Purchase #2,

and September 26, 2006 Tranche Purchase #3. *See* Volume XIX, Ex. 137.

*Predicate Acts and Evidence Concerning Interstate Telephonic Wire
Communications*

155.    As detailed in Paragraphs 35 and 37, *supra*, on November 14, 2005, in

furtherance of the ATM Sales Enterprise, Moore, while in Florida or North Carolina,

engaged in an interstate telephone conversation with representatives of ATMA in New

York during which he made false representations concerning the operations of ATMFS

and 36 Main.

156.    As detailed in Paragraphs 31 – 34, *supra*, on November 14, 2005, in

furtherance of the ATM Sales Enterprise, Netschi, while in Texas, engaged in an

interstate telephone conversation with representatives of ATMA in New York during

which he made false representations concerning the operations of ATMFS and 36 Main.

*Predicate Acts and Evidence Concerning Interstate Wire Communications*

157.    On November 14, 2005, at 3:18 p.m., in furtherance of the ATM Sales

Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused

to be transmitted by wire communication in interstate commerce the following writing:

an e-mail from ATM Capital in Texas to a representative of ATMA in New York, Munier

in New Jersey and Brossman in New Jersey, attaching a schedule of phantom Placed

ATMs and an undated Equipment Management Agreement, each constituting false

information related to the existence of Placed ATMs available for sale and management.

*See* Volume I, Ex. 1.

158.    On November 14, 2005, at 3:19 p.m., in furtherance of the ATM Sales

Enterprise, at the direction of Netschi, knowingly transmitted and caused to be

transmitted by wire communication in interstate commerce the following writing: an e-

mail from ATM Capital in Texas to a representative of ATMA in New York, attaching a

46

Bill of Sale dated November 16, 2005, an Asset Purchase Agreement dated November 16, 2005, and a schedule of phantom Placed ATMs, each constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 2.

159.    On November 14, 2005, at 4:17 p.m., in furtherance of the ATM Sales Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to representatives of ATMA in New York, Munier in New Jersey, and Brossman in New Jersey, attaching an undated Equipment Management Agreement, constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 3.

160.    On November 30, 2005, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas, Brossman in New Jersey and Marianne Munier with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138.

161.    On December 29, 2005, at 7:52 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138 – Ex. 141.

162.    On January 5, 2006, at 12:15 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 142.

163.    On February 2, 2006, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143 – Ex. 145.

164.    On February 6, 2006, at 2:38 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 146.

165.    On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York with an attached Fictitious Revenue Report. *See* Volume XIX, Ex. 147.

166.    On April 27, 2006, at 1:21 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to ATMFS's possession of $200,000,000.00 in capital funds held in escrow by ATMFS for the expansion of ATMFS's business. *See* Volume XIX, Ex. 148.

167.    On May 2, 2006, at 11:43 a.m., in furtherance of the ATM Sales Enterprise and ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to Brossman in New Jersey and a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 149.

168.    On May 4, 2006, at 1:49 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 150.

169.    On May 31, 2006, at 9:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore,

knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 151.

170.    On May 31, 2006, at 11:13 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 151.

171.    On July 3, 2006, at 2:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina, Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 152.

172.    On July 3, 2006, at 4:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report *See* Volume XIX, Ex. 152.

173.    On July 4, 2006, at 10:55 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to the operation of, and potential upgrades to, the ATMA Machines. *See* Volume XIX, Ex. 153.

174.    On July 26, 2006, at 2:31 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to the operation of the ATMA Machines. *See* Volume XIX, Ex. 154.

175.    On July 26, 2006, at 2:53 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to operation of the ATMA Machines. *See* Volume XIX, Ex. 155.

176.    On July 31, 2006, at 3:26 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156 – Ex. 158.

51

177.   On August 2, 2006, at 5:28 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 159.

178.   On September 12, 2006, at 10:21 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 160.

179.   On October 6, 2006, at 11:26 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 161 – Ex. 162.

180.   On October 30, 2006, at 11:04 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false "ATM Detail Transaction Report." *See* Volume XIX, Ex. 163.

181.    On November 14, 2006, at 11:55 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 164.

182.    On January 19, 2007, at 2:42 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 165 – Ex. 167.

183.    On January 22, 2007, at 11:03 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 168.

184.    On February 26, 2007, at 10:43 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 169.

185.    On April 11, 2007, at 10:49 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 170.

186.   On April 12, 2007, at 8:38 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York and Brossman in New Jersey containing false information related to the operation of the ATMA Machines. *See* Volume XX, Ex. 171.

187.   On April 30, 2007, at 9:17 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 172 – Ex.174.

188.   On April 30, 2007, at 3:49 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 175.

189.   On June 6, 2007, at 11:33 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report *See* Volume XX, Ex. 176.

190.    On July 12, 2007, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 177 – Ex.179.

191.    On July 12, 2007, at 11:56 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 180.

192.    On August 15, 2007, at 7:58 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 181 – Ex. 182.

193.    On August 15, 2007, at 1:40 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 183.

194.    On September 18, 2007, at 10:34 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in

New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 184.

195.    On November 5, 2007, at 2:33 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 185 – Ex. 186.

196.    On November 5, 2007, at 11:52 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 187.

197.    On January 10, 2008, at 2:38 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 188.

198.    On January 10, 2008, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a third-party processor, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 90.

56

199.    On January 11, 2008, at 11:49 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a ATMFS, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 92.

200.    On January 11, 2008, at 12:34 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations that requests had been submitted to third-party processors for reports pertaining to the operation of the ATMA Machines. *See* Volume XIX, Ex. 94.

201.    On January 11, 2008, at 2:14 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false representation that a bank account existed where ATMA Periodic Revenue Payments were being held and that a statement from that account would be produced to a representative of ATMA. *See* Volume XIX, Ex. 94.

202.    On January 11, 2008, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a

purported bank statement dated December 31, 2007, constituting false information related to the amount of funds being held in escrow on behalf of ATMA. *See* Volume XIX, Ex. 95.

203.    On January 11, 2008, at 7:18 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA containing a misrepresentation that 250 of the ATMA Machines had been identified. *See* Volume XIX, Ex. 93.

204.    On January 18, 2008, at 5:47 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman attaching a purported schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

205.    On January 20, 2008, at 12:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York containing a misrepresentation that Brossman had accounted for the existence of the ATMA Machines. *See* Volume XIX, Ex. 97.

206.    On January 20, 2008, at 9:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

58

in New Jersey to a representative of ATMA in New York containing a false

representation as to the existence of ATMs owned by Brossman. *See* Volume XX, Ex.

190.

207.    On January 22, 2008, at 1:23 p.m., in furtherance of the ATM Sales

Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York, attaching a schedule

identifying the locations of the ATMA Machines, constituting false information related to

the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

208.    On January 22, 2008, at 2:32 p.m., in furtherance of the ATM Sales

Enterprise, Moore knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Moore in

North Carolina or Florida to a representative of ATMA in New York, containing a false

representation as to the existence and locations of the ATMA Machines. *See* Volume

XIX, Ex. 98.

209.    On January 31, 2008, at 3:51 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 138.

210.    On January 31, 2008, at 3:58 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 139.

211.    On January 31, 2008, at 3:59 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 140.

212.    On January 31, 2008, at 4:00 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143.

213.    On January 31, 2008, at 4:01 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 144.

214.    On January 31, 2008, at 4:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156.

215.    On January 31, 2008, at 4:06 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 157.

216.    On January 31, 2008, at 4:09 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 161.

217.    On January 31, 2008, at 4:10 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 165.

218.    On January 31, 2008, at 4:12 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 172 – Ex. 173.

219.    On January 31, 2008, at 4:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 141.

220.    On January 31, 2008, at 4:24 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 158.

221.    On January 31, 2008, at 4:26 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 162.

222.    On January 31, 2008, at 4:30 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XX, Ex. 174.

223.    On January 31, 2008, at 4:31 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XX, Ex. 179, Ex. 181.

224.    On January 31, 2008, at 4:32 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Exs. 182 and 186.

225.    On January 31, 2008, at 5:03 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191 – Ex. 192.

226.    On January 31, 2008, at 5:19 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191.

227.    On January 31, 2008, at 5:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 192.

**Violations of 18 U.S.C. § 1341 (Mail Fraud)**

228.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, further include, but are not limited to interstate mailings containing false or

fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1341.

### *Interstate Mailings*

229.    Upon information and belief, on or about November 15, 2005, in furtherance of the ATM Sales Enterprise and to induce ATMA to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated November 15, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and an Equipment Management Agreement dated November 15, 2005.

230.    Upon information and belief, on or about December 20, 2005, in furtherance of the ATM Sales Enterprise to induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated December 20, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated December 20, 2005.

231.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated February 22, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated February 22, 2006.

232.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated April 26, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; an Equipment Management Agreement dated April 26, 2006.

233.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated May 23, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated May 23, 2006.

234.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated September 5, 2006; a Due Diligence Report and Placed ATM Leases for each of the 127 ATMs; and an Equipment Management Agreement dated September 5, 2006.

235.    Upon information and belief, on or about November 15, 2005, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated November 16, 2005, Asset Purchase Agreement dated November 16, 2005, and Due Diligence Commitment dated November 16, 2005.

236.    Upon information and belief, on or about December 20, 2005, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated December 20, 2005, Asset Purchase Agreement dated December 20, 2005, and Addition to Equipment dated December 20, 2005.

237.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated February 22, 2006, Asset Purchase Agreement dated February 22, 2006, and Addition to Equipment dated December 20, 2005.

238.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated April 26, 2006, Asset Purchase Agreement dated April 26, 2006, and Addition to Equipment dated April 26, 2006.

239.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated May 27, 2006, and Asset Purchase Agreement dated May 27, 2006.

240.   Upon information and belief, on or about June 16, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 16, 2006, and Asset Purchase Agreement dated June 16, 2006.

241.   Upon information and belief, on or about June 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 27, 2006, and Asset Purchase Agreement dated June 27, 2006.

242.   Upon information and belief, on or about July 28, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated July 28, 2006, and Asset Purchase Agreement dated July 28, 2006.

243.   Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: four Bills of Sale dated August 30, 2006, and four Asset Purchase Agreements dated August 30, 2006.

244.    Upon information and belief, on or about September 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: three Bills of Sale dated September 26, 2006, and three Asset Purchase Agreements dated September 26, 2006.

245.    The allegations in Paragraphs 229 - 244 are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  The allegations in Paragraphs 229 - 244 are based in part upon information and belief because the Defendants are alleged to have sent or delivered the documents identified in Paragraphs 229 - 244 above amongst themselves.

246.    As a direct and proximate result of Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman's conduct of the ATM Sales Enterprise through the pattern of racketeering activity detailed in Paragraphs 114 – 244 above, Plaintiff has been injured in its business and property, specifically the loss of $16,475,000.00 paid to purchase the phantom ATMA Machines.  Netschi, 36 Main, Jones, Moore, Exclusive Properties ATM Capital, Munier, and Brossman's conduct and

69

participation in the ATM Sales Enterprise as part of their pattern of racketeering activity was in the violation of 18 U.S.C. § 1962(c) and caused Plaintiff's losses. Accordingly, Plaintiff is entitled, under the provisions of 18 U.S.C. § 1964(c), to recover treble damages, the costs of bringing this action, pre-judgment interest, and reasonable attorney's fees.

### COUNT 2
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(d))

247.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 246 of this Complaint as if fully set forth herein.

248.    The Defendants, as detailed in Paragraphs 26 – 72, 81 and 91 – 104 above, entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C. § 1962(c). As set forth Each Defendant entered into an agreement to join the conspiracy, took acts in the furtherance of the conspiracy and knowingly participated in the conspiracy.

249.    The purpose of the conspiracy was to induce the Plaintiff, and others, to enter into agreements to purchase phantom Placed ATMs to their economic detriment and to the economic benefit of the Defendants. The conspirators each carried out the scheme and each conspirator was put on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture, the ATM Sales Enterprise, functioned as a continuing unit for a common purpose. The Defendants, as conspirators, adopted the goal of furthering the ATM Sales Enterprise. Each of the Defendants' stake in the ATM Sales Enterprise was in making profits through each Defendant's role in the ATM Sales Enterprise.

70

250.    The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by: (1) participating or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the ATM Sales Enterprise, the activities of which affect interstate or foreign commerce; and, (2) participating, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

251.    By engaging in the overt acts and other conduct described in Paragraphs 26 – 65 and 84 – 97 above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts, detailed in Paragraphs 106 - 237 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

252.    The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to engage in the fraudulent sale of ATMs and thereby amass substantial sums of money, believed to be tens of millions of dollars, from persons throughout the United States of America, including Plaintiff.

253.    The membership of the conspiracy includes each of the Defendants. As coconspirators, the Defendants are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the ATM Sales Enterprise.

254.    As a direct and proximate result of the violations set forth above, Plaintiff has been injured in its business and property. The Defendants' violations of 18 U.S.C. § 1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. § 1962(c), Plaintiff is entitled to bring this action and recover herein treble damages, the cost of bringing this suit, pre-judgment interest, and recoverable attorney's fees.

### COUNT 3
### (Fraudulent Misrepresentation, Inducement – Moore)

255.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 254 of this Complaint as if fully set forth herein.

256.    The representations by Moore, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 were material false representations made to Plaintiff that Moore knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff justifiably relied on Moore's materially false representations.

257.    Moore, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

258.    Moore knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

72

259.    Moore's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom Placed ATMs from 36 Main, to transfer funds to 36 Main for those phantom Placed ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Moore intentionally or recklessly attempted to hide such fraud by delivering the Moore Fictitious Transaction Documents, Fictitious Monthly Reports, and Periodic Revenue Payments to Plaintiff.

260.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Moore's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines, and conduct business with the ATM Sales Enterprise.

261.    In addition, for Tranche Purchases subsequent to the November 15, 2005 Tranche Purchase, Plaintiff justifiably relied upon and were further induced into continuing to purchase the phantom Placed ATMs by Moore's delivery of Fictitious Monthly Reports and Periodic Revenue Payments.

262.    But for Moore's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

263.    Moore had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

264.    As a direct and proximate result of the Moore's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

265.    Moore's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Moore.

## COUNT 4
### (Fraudulent Misrepresentation and Inducement – Netschi)

266.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.    The representations by Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were material false representations made to Plaintiff that Netschi knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably relied on Netschi's materially false representations.

268.    Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

269.    Netschi knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

270.    Netschi's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Netschi intentionally or recklessly attempted to hide such fraud by delivering or causing to be delivered the 36 Main Transaction Documents.

271.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Netschi's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

272.    But for Netschi's material misrepresentations, omissions, and concealment of facts concerning the 36 Main Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

273.    Netschi had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

274.    As a direct and proximate result of the Netschi's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

275.    Netschi's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Netschi.

### COUNT 5
### (Fraudulent Misrepresentation, Inducement, Concealment – Brossman)

276.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 275 of this Complaint as if fully set forth herein.

277.    The representations by Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were material false representations made to Plaintiff that Brossman knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably relied on Brossman's materially false representations.

278.    Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

279.    Brossman knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to

76

Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

280.    Brossman's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Brossman, to manage the ATMA Machines. Brossman intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

281.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Brossman's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

282.    But for Brossman's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

283.    Brossman had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

284.    Brossman was under a duty to disclose the facts described in Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, above and chose to not do so.

285.    As a direct and proximate result of the Brossman's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

286.    Brossman's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from Brossman.

## COUNT 6
### (Fraudulent Misrepresentation, Inducement, Concealment – Munier)

287.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 286 of this Complaint as if fully set forth herein.

288.    The representations by Munier, as detailed above at Paragraphs 30, 34, 45, 60, 96, 99, 102 arid 104, were material false representations made to Plaintiff that Munier knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff, and Plaintiff reasonably relied on Munier's materially false representations.

289.    Munier, as detailed above at Paragraphs, 30, 34, 45, 60, 96, 99, 102 and 104, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the

78

ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

290.    Munier knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

291.    Munier's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Munier, to manage the ATMA Machines. Munier intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

292.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Munier's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

293.    But for Munier's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

# EXHIBIT M
# 3 of 4

294.    Munier had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

295.    Munier was under a duty to disclose the facts described in Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 above and chose to not do so.

296.    As a direct and proximate result of the Munier's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to36 Main, plus all applicable interest thereon.

297.    Munier's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Munier.

## COUNT 7
### (Negligent Misrepresentation – 36 Main and Netschi)

298.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 297 of this Complaint as if fully set forth herein.

299.    The representations made by Netschi and 36 Main to Plaintiff in Paragraphs 31 - 34, and 36 above (collectively the "36 Main Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

300.    Netschi and 36 Main were in a superior position to know the truth or falsity of the 36 Main Misrepresentations.

80

301.    Netschi and 36 Main should have known the truth or falsity of the 36 Main Misrepresentations.

302.    Under the circumstances, Netschi and 36 Main were under a duty to ensure the accuracy of the 36 Main Misrepresentations.

303.    Netschi and 36 Main made the 36 Main Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

304.    Netschi and 36 Main intended and were aware that Plaintiff would rely upon the 36 Main Misrepresentations in deciding whether to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

305.    Netschi and 36 Main had a pecuniary interest in the ATM Venture and the ATM Sales Enterprise.

306.    Plaintiff reasonably and justifiably relied to their detriment upon the 36 Main Misrepresentations and on the completeness of their disclosure of material facts, in choosing to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise and but for the 36 Main Misrepresentations, Plaintiff would not have entered the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

307.    Netschi and 36 Main's breach of their duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

308.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the 36 Main Misrepresentations.

81

309.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the value of all principal amounts delivered to the Defendants, plus all applicable interest thereon.

## COUNT 8
### (Negligent Misrepresentation – Moore)

310.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 309 of this Complaint as if fully set forth herein.

311.    The representations made by Moore in Paragraphs 35, 37,and 59 above (collectively the "Moore Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with the ATM Sales Enterprise.

312.    Moore was in a superior position to know the truth or falsity of the Moore Misrepresentations.

313.    Moore should have known the truth or falsity of the Moore Misrepresentations.

314.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore Misrepresentations.

315.    Moore made the Moore Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

316.    Moore intended and was aware that Plaintiff would rely upon the Moore Misrepresentations in deciding whether to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

317.    Moore had a pecuniary interest in the ATM Venture, the sale of the ATMA Machines by 36 Main and/or the ATM Sales Enterprise.

82

318.    Plaintiff justifiably relied to their detriment upon the Moore Misrepresentations by entering the ATM Venture, purchasing the ATMA Machines and/or conducting business with ATM Sales Enterprise and but for the Moore Misrepresentations, Plaintiff would not have entered the ATM Venture, purchased the ATMA Machines and/or conducted business with ATM Sales Enterprise.

319.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

320.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore Misrepresentations.

321.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the value of all principal amounts delivered to the Defendants, plus all applicable interest thereon.

## COUNT 9
### (Negligent Misrepresentation – Moore)

322.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 321 of this Complaint as if fully set forth herein.

323.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about November 16, 2005 (the "Moore November 2005 Due Diligence Misrepresentations") (*See* Volume III, Ex. 11) were false when made and material to Plaintiff's decision to enter into the November 16, 2005 Tranche Purchase.

324.    Moore was in a superior position to know the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

83

325.    Moore should have known the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

326.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore November 2005 Due Diligence Misrepresentations.

327.    Moore made the Moore November 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

328.    Moore intended and was aware that Plaintiff would rely upon the Moore November 2005 Due Diligence Misrepresentations in deciding whether to enter into the November 16, 2005 Tranche Purchase.

329.    Moore had an undisclosed pecuniary interest in the November 16, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the November 16, 2005 Tranche Purchase.

330.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore November 2005 Due Diligence Misrepresentations by entering into the November 16, 2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

331.    But for the Moore November 2005 Due Diligence Misrepresentations, Plaintiff would not have entered the November 16, 2005 Tranche Purchase.

332.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

333.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore November 2005 Due Diligence Misrepresentations.

334.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 10
### (Negligent Misrepresentation – Moore)

335.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 334 of this Complaint as if fully set forth herein.

336.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about December 20, 2005 (the "Moore December 2005 Due Diligence Misrepresentations") (*See* Volume V, Ex. 20) were false when made and material to Plaintiff's decision to enter into the December 20, 2005 Tranche Purchase.

337.    Moore was in a superior position to know the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

338.    Moore should have known the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

339.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore December 2005 Due Diligence Misrepresentations.

340.    Moore made the Moore December 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

341.    Moore intended and was aware that Plaintiff would rely upon the Moore December 2005 Due Diligence Misrepresentations in deciding whether to enter into the December 20, 2005 Tranche Purchase.

85

342. Moore had an undisclosed pecuniary interest in the December 20, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the December 20, 2005 Tranche Purchase.

343. Plaintiff reasonably and justifiably relied to their detriment upon the Moore December 2005 Due Diligence Misrepresentations by entering into the December 20, 2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

344. But for the Moore December 2005 Due Diligence Misrepresentations, Plaintiff would not have entered the December 20, 2005 Tranche Purchase.

345. Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

346. The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore December 2005 Due Diligence Misrepresentations.

347. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

### COUNT 11
### (Negligent Misrepresentation – Moore)

348. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 347 of this Complaint as if fully set forth herein.

349. The representations made by Moore, as detailed in Paragraph 52(h) above, in the Due Diligence Report for the February 22, 2006 Tranche Purchase and provided to Plaintiff on or about February 22, 2006 (the "Moore February 2006 Due Diligence Misrepresentations") (*See* Volume VII, Ex. 29) were false when made and material to Plaintiff's decision to enter into the February 22, 2006 Tranche Purchase.

86

350.    Moore was in a superior position to know the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

351.    Moore should have known the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

352.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore February 2006 Due Diligence Misrepresentations.

353.    Moore made the Moore February 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

354.    Moore intended and was aware that Plaintiff would rely upon the Moore February 2006 Due Diligence Misrepresentations in deciding whether to enter into the February 22, 2006 Tranche Purchase.

355.    Moore had an undisclosed pecuniary interest in the February 22, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the February 22, 2006 Tranche Purchase.

356.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore February 2006 Due Diligence Misrepresentations by entering into the February 22, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

357.    But for the Moore February 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the February 22, 2006 Tranche Purchase.

358.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

87

359.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore February 2006 Due Diligence Misrepresentations.

360.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 12
### (Negligent Misrepresentation – Moore)

361.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 360 of this Complaint as if fully set forth herein.

362.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the Due Diligence Report dated April 26, 2006 (the "Moore April 2006 Due Diligence Misrepresentations") (*See* Volume IX, Ex. 38) were false when made and material to Plaintiff's decision to enter into the April 26, 2006 Tranche Purchase.

363.    Moore was in a superior position to know the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

364.    Moore should have known the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

365.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore April 2006 Due Diligence Misrepresentations.

366.    Moore made the Moore April 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

367.    Moore intended and was aware that Plaintiff would rely upon the Moore April 2006 Due Diligence Misrepresentations in deciding whether to enter into the April 26, 2006 Tranche Purchase.

88

368.    Moore had an undisclosed pecuniary interest in the April 26, 2006 Deal because his company, ATMFS, was actually 36 Main's source of the ATMs for the April 26, 2006 Tranche Purchase.

369.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore April 2006 Due Diligence Misrepresentations by entering into the April 26, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

370.    But for the Moore April 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the April 26, 2006 Tranche Purchase.

371.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

372.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore April 2006 Due Diligence Misrepresentations.

373.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

## COUNT 13
### (Negligent Misrepresentation – Moore)

374.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 373 of this Complaint as if fully set forth herein.

375.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about May 27, 2006 (the "Moore May 2006 Due Diligence Misrepresentations") (*See* Volume XI, Ex. 45) were false when made and material to Plaintiff's decision to enter into the May 27, 2006 Tranche Purchase.

376.    Moore was in a superior position to know the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

377.    Moore should have known the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

378.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore May 2006 Due Diligence Misrepresentations.

379.    Moore made the Moore May 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

380.    Moore intended and was aware that Plaintiff would rely upon the Moore May 2006 Due Diligence Misrepresentations in deciding whether to enter into the May 27, 2006 Tranche Purchase.

381.    Moore had an undisclosed pecuniary interest in the May 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the May 27, 2006 Tranche Purchase.

382.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore May 2006 Due Diligence Misrepresentations by entering into the May 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

383.    But for the Moore May 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the May 27, 2006 Tranche Purchase.

384.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

385.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore May 2006 Due Diligence Misrepresentations.

386.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

### COUNT 14
### (Negligent Misrepresentation – Moore)

387.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 386 of this Complaint as if fully set forth herein.

388.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 16, 2006 (the "Moore June 16, 2006 Due Diligence Misrepresentations") (*See* Volume XII, Ex. 52) were false when made and material to Plaintiff's decision to enter into the June 16, 2006 Tranche Purchase.

389.    Moore was in a superior position to know the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

390.    Moore should have known the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

391.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 16, 2006 Due Diligence Misrepresentations.

392.    Moore made the Moore June 16, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

393.    Moore intended and was aware that Plaintiff would rely upon the Moore June 16, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 16, 2006 Tranche Purchase.

394.    Moore had an undisclosed pecuniary interest in the June 16, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 16, 2006 Tranche Purchase.

395.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 16, 2006 Due Diligence Misrepresentations by entering into the June 16, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 50 Placed ATM machines for $975,000.00.

396.    But for the Moore June 16, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 16, 2006 Tranche Purchase.

397.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

398.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 16, 2006 Due Diligence Misrepresentations.

399.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $975,000.00 paid to 36 Main.

### COUNT 15
### (Negligent Misrepresentation – Moore)

400.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 399 of this Complaint as if fully set forth herein.

401.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 27, 2006 (the "Moore June 27, 2006 Due Diligence Misrepresentations") (*See* Volume XIII, Ex. 59) were false when made and material to Plaintiff's decision to enter into the June 27, 2006 Tranche Purchase.

92

402.    Moore was in a superior position to know the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

403.    Moore should have known the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

404.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 27, 2006 Due Diligence Misrepresentations.

405.    Moore made the Moore June 27, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

406.    Moore intended and was aware that Plaintiff would rely upon the Moore June 27, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 27, 2006 Tranche Purchase.

407.    Moore had an undisclosed pecuniary interest in the June 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 27, 2006 Tranche Purchase.

408.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 27, 2006 Due Diligence Misrepresentations by entering into the June 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 74 Placed ATM machines for $1,073,000.00.

409.    But for the Moore June 27, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 27, 2006 Tranche Purchase.

410.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

93

411. The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 27, 2006 Due Diligence Misrepresentations.

412. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,073,000.00 paid to 36 Main.

## COUNT 16
### (Negligent Misrepresentation – Moore)

413. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 412 of this Complaint as if fully set forth herein.

414. The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about July 28, 2006 (the "Moore July 2006 Due Diligence Misrepresentations") (*See* Volume XV, Ex. 66) were false when made and material to Plaintiff's decision to enter into the July 28, 2006 Tranche Purchase.

415. Moore was in a superior position to know the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

416. Moore should have known the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

417. Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore July 2006 Due Diligence Misrepresentations.

418. Moore made the Moore July 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

419. Moore intended and was aware that Plaintiff would rely upon the Moore July 2006 Due Diligence Misrepresentations in deciding whether to enter into the July 28, 2006 Tranche Purchase.

420.    Moore had an undisclosed pecuniary interest in the July 28, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the July 28, 2006 Tranche Purchase.

421.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore July 2006 Due Diligence Misrepresentations by entering into the July 28, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,450,000.00.

422.    But for the Moore July 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the July 28, 2006 Tranche Purchase.

423.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

424.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore July 2006 Due Diligence Misrepresentations.

425.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,450,000.00 paid to 36 Main.

### COUNT 17
### (Breach of Contract – 36 Main)

426.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 425 of this Complaint as if fully set forth herein.

427.    On or about November 16, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "November 16, 2005 Asset Purchase Agreement") (*See* Volume II, Ex. 5).

428.    Pursuant to the terms of the November 16, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

429.    On or about November 16, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

430.    36 Main, in breach of the November 16, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the November 16, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the November 16, 2005 Asset Purchase Agreement.

431.    36 Main's conduct detailed above constituted a material breach of the November 16, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 18
### (Breach of Contract – 36 Main)

432.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 431 of this Complaint as if fully set forth herein.

433.    On or about December 20, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "December 20, 2005 Asset Purchase Agreement") (*See* Volume III, Ex. 14).

434.    Pursuant to the terms of the December 20, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

435.    On or about December 20, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

96

436.    36 Main, in breach of the December 20, 2005 Asset Purchase Agreement

failed to perform in accordance with the terms of the December 20, 2005 Asset Purchase

Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the

December 20, 2005 Asset Purchase Agreement.

437.    36 Main's conduct detailed above constituted a material breach of the

December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the

award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 19
### (Breach of Contract – 36 Main)

438.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 437 of this Complaint as if fully set forth herein.

439.    On or about February 22, 2006, ATMA and 36 Main executed an Asset

Purchase Agreement for the purchase of 100 Placed ATM machines (the "February 22,

2006 Asset Purchase Agreement") (*See* Volume IV, Ex. 23).

440.    Pursuant to the terms of the February 22, 2006 Asset Purchase Agreement, in

exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM

Machines to ATMA.

441.    On or about February 22, 2006, ATMA paid $1,900,000.00 to 36 Main via a

bank wire transfer.

442.    36 Main, in breach of the February 22, 2006 Asset Purchase Agreement failed

to perform in accordance with the terms of the February 22, 2006 Asset Purchase

Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the

February 22, 2006 Asset Purchase Agreement.

443.    36 Main's conduct detailed above constituted a material breach of the

February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the

award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 20
### (Breach of Contract – 36 Main)

444.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 443 of this Complaint as if fully set forth herein.

445.    On or about April 26, 2006, ATMA and 36 Main executed an Asset Purchase

Agreement for the purchase of 100 Placed ATM machines (the "April 26, 2006 Asset

Purchase Agreement") (*See* Volume VII, Ex. 32).

446.    Pursuant to the terms of the April 26, 2006 Asset Purchase Agreement, in

exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM

Machines to ATMA.

447.    On or about April 26, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank

wire transfer.

448.    36 Main, in breach of the April 26, 2006 Asset Purchase Agreement failed to

perform in accordance with the terms of the April 26, 2006 Asset Purchase Agreement by

failing to deliver valid title to the ATMs listed in Schedule "A" of the April 26, 2006

Asset Purchase Agreement.

449.    36 Main's conduct detailed above constituted a material breach of the April

26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the

return of the $1,950,000.00 paid to 36 Main.

98

## COUNT 21
### (Breach of Contract – 36 Main)

450.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 449 of this Complaint as if fully set forth herein.

451.    On or about May 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "May 27, 2006 Asset Purchase Agreement") (*See* Volume IX, Ex. 41).

452.    Pursuant to the terms of the May 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

453.    On or about May 27, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

454.    36 Main, in breach of the May 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the May 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement.

455.    36 Main's conduct detailed above constituted a material breach of the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 22
### (Breach of Contract – 36 Main)

456.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 455 of this Complaint as if fully set forth herein.

457.    On or about June 16, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 50 Placed ATM machines (the "June 16, 2006 Asset Purchase Agreement") (*See* Volume XII, Ex. 48).

458.    Pursuant to the terms of the June 16, 2006 Asset Purchase Agreement, in exchange for the consideration of $975,000.00, 36 Main agreed to sell 50 Placed ATM Machines to ATMA.

459.    On or about June 16, 2006, ATMA paid $975,000.00 to 36 Main via a bank wire transfer.

460.    36 Main, in breach of the June 16, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 16, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement.

461.    36 Main's conduct detailed above constituted a material breach of the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 23
### (Breach of Contract – 36 Main)

462.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 461 of this Complaint as if fully set forth herein.

463.    On or about June 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 74 Placed ATM machines (the "June 27, 2006 Asset Purchase Agreement") (*See* Volume XIII, Ex. 55).

464.  Pursuant to the terms of the June 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,073,000.00, 36 Main agreed to sell 74 Placed ATM Machines to ATMA.

465.  On or about June 27, 2006, ATMA paid $1,073,000.00 to 36 Main via a bank wire transfer.

466.  36 Main, in breach of the June 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement.

467.  36 Main's conduct detailed above constituted a material breach of the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

**COUNT 24**
**(Breach of Contract – 36 Main)**

468.  Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 467 of this Complaint as if fully set forth herein.

469.  On or about July 28, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 101 Placed ATM machines identified in Schedule A of the Asset Purchase Agreement (the "July 28, 2006 Asset Purchase Agreement") (*See* Volume XIV, Ex. 62).

470.  Pursuant to the terms of the July 28, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,450,000.00, 36 Main agreed to sell 101 Placed ATM Machines to ATMA.

101

471.    On or about July 28, 2006, ATMA paid $1,469,500.00 to 36 Main via a bank wire transfer.

472.    36 Main, in breach of the July 28, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the July 28, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement.

473.    36 Main's conduct detailed above constituted a material breach of the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 25
### (Breach of Contract – 36 Main)

474.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 473 of this Complaint as if fully set forth herein.

475.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 7 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #1") (*See* Volume XVI, Ex. 69).

476.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $136,500.00, 36 Main agreed to sell 7 Placed ATM Machines to ATMA.

477.    On or about August 30, 2006, ATMA paid $136,500.00 to 36 Main via a bank wire transfer.

478.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the

August 30, 2006 Asset Purchase Agreement #1.

479.    36 Main's conduct detailed above constituted a material breach of the August

30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of

the return of the $136,500.00 paid to 36 Main.

## COUNT 26
### (Breach of Contract – 36 Main)

480.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 479 of this Complaint as if fully set forth herein.

481.    On or about August 30, 2006, ATMA and 36 Main executed an Asset

Purchase Agreement for the purchase of 17 Placed ATM machines (the "August 30, 2006

Asset Purchase Agreement #2") (*See* Volume XVI, Ex. 71).

482.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #2, in

exchange for the consideration of $331,500.00, 36 Main agreed to sell 17 Placed ATM

Machines to ATMA.

483.    On or about August 30, 2006, ATMA paid $331,500.00 to 36 Main via a bank

wire transfer.

484.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #2

failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the

August 30, 2006 Asset Purchase Agreement #2.

485.    36 Main's conduct detailed above constituted a material breach of the August

30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of

the return of the $331,500.00 paid to 36 Main.

103

## COUNT 27
### (Breach of Contract – 36 Main)

486.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 485 of this Complaint as if fully set forth herein.

487.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 36 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #3") (*See* Volume XVI, Ex. 73).

488.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $522,000.00, 36 Main agreed to sell 36 Placed ATM Machines to ATMA.

489.    On or about August 30, 2006, ATMA paid $522,000.00 to 36 Main via a bank wire transfer.

490.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3.

491.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 28
### (Breach of Contract – 36 Main)

492.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 491 of this Complaint as if fully set forth herein.

493.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 68 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #4") (*See* Volume XVI, Ex. 75).

494.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #4, in exchange for the consideration of $986,000.00, 36 Main agreed to sell 68 Placed ATM Machines to ATMA.

495.    On or about August 30, 2006, ATMA paid $986,000.00 to 36 Main via a bank wire transfer.

496.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #4 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4.

497.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

### COUNT 29
### (Breach of Contract – 36 Main)

498.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 497 of this Complaint as if fully set forth herein.

499.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 2 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #1") (*See* Volume XVII, Ex. 82).

500. Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $44,000.00, 36 Main agreed to sell 2 Placed ATM machines to ATMA.

501. On or about September 26, 2006, ATMA paid $44,000.00 to 36 Main via a bank wire transfer.

502. 36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1.

503. 36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 30
## (Breach of Contract – 36 Main)

504. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 503 of this Complaint as if fully set forth herein.

505. On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 21 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #2") (*See* Volume XVII, Ex. 84).

506. Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $409,500.00, 36 Main agreed to sell 21 Placed ATM machines to ATMA.

507. On or about September 26, 2006, ATMA paid $409,500.00 to 36 Main via a bank wire transfer.

106

508.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2.

509.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

### COUNT 31
### (Breach of Contract – 36 Main)

510.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 509 of this Complaint as if fully set forth herein.

511.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 64 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #3") (*See* Volume XVII, Ex. 86).

512.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $928,000.00, 36 Main agreed to sell 64 Placed ATM machines to ATMA.

513.    On or about September 26, 2006, ATMA paid $928,000.00 to 36 Main via a bank wire transfer.

514.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3.

515.    36 Main's conduct detailed above constituted a material breach of the

September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the

award of the return of the $928,000.00 paid to 36 Main.

## COUNT 32
### (Breach of Warranty – 36 Main)

516.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 515 of this Complaint as if fully set forth herein.

517.    The November 15, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

518.    ATMA relied on 36 Main's representations as a condition of the purchase.

519.    36 Main breached the warranty set forth in section 4.5 of the November 15,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase

Agreement purchased by ATMA.

520.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by

ATMA was not good or marketable.

521.    36 Main's conduct breached the warranty stated in the November 15, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

# EXHIBIT M
# 4 of 4

## COUNT 33
### (Breach of Warranty – 36 Main)

522.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 521 of this Complaint as if fully set forth herein.

523.    The December 20, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

524.    ATMA relied on 36 Main's representations as a condition of the purchase.

525.    36 Main breached the warranty set forth in section 4.5 of the December 20,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase

Agreement purchased by ATMA.

526.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA

was not good or marketable.

527.    36 Main's conduct breached the warranty stated in the December 20, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

## COUNT 34
### (Breach of Warranty – 36 Main)

528.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 527 of this Complaint as if fully set forth herein.

529.    The February 22, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

530.    ATMA relied on 36 Main's representations as a condition of the purchase.

531.    36 Main breached the warranty set forth in section 4.5 of the February 22,

2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase

Agreement purchased by ATMA.

532.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA

was not good or marketable.

533.    36 Main's conduct breached the warranty stated in the February 22, 2006

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

## COUNT 35
### (Breach of Warranty – 36 Main)

534.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 533 of this Complaint as if fully set forth herein.

535.    The April 26, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

536.    ATMA relied on 36 Main's representations as a condition of the purchase.

110

537.    36 Main breached the warranty set forth in section 4.5 of the April 26, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase

Agreement purchased by ATMA.

538.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

539.    36 Main's conduct breached the warranty stated in the April 26, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,950,000.00 paid to 36 Main.

## COUNT 36
### (Breach of Warranty – 36 Main)

540.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 539 of this Complaint as if fully set forth herein.

541.    The May 27, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

542.    ATMA relied on 36 Main's representations as a condition of the purchase.

543.    36 Main breached the warranty set forth in section 4.5 of the May 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase

Agreement purchased by ATMA.

111

544.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

545.    36 Main's conduct breached the warranty stated in the May 27, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,950,000.00 paid to 36 Main.

### COUNT 37
### (Breach of Warranty – 36 Main)

546.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 545 of this Complaint as if fully set forth herein.

547.    The June 16, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

548.    ATMA relied on 36 Main's representations as a condition of the purchase.

549.    36 Main breached the warranty set forth in section 4.5 of the June 16, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 50

Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase

Agreement purchased by ATMA.

550.    36 Main was notified that title to the 50 Placed ATM machines listed in

Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

551.    36 Main's conduct breached the warranty stated in the June 16, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$975,000.00 paid to 36 Main.

### COUNT 38
### (Breach of Warranty – 36 Main)

552.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 551 of this Complaint as if fully set forth herein.

553.    The June 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

554.    ATMA relied on 36 Main's representations as a condition of the purchase.

555.    36 Main breached the warranty set forth in section 4.5 of the June 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 74

Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase

Agreement purchased by ATMA.

556.    36 Main was notified that title to the 74 Placed ATM machines listed in

Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

557.    36 Main's conduct breached the warranty stated in the June 27, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,073,000.00 paid to 36 Main.

113

**COUNT 39**
**(Breach of Warranty – 36 Main)**

558.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 557 of this Complaint as if fully set forth herein.

559.    The July 28, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

560.    ATMA relied on 36 Main's representations as a condition of the purchase.

561.    36 Main breached the warranty set forth in section 4.5 of the July 28, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 101

Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase

Agreement purchased by ATMA.

562.    36 Main was notified that title to the 101 Placed ATM machines listed in

Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

563.    36 Main's conduct breached the warranty stated in the July 28, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,469,500.00 paid to 36 Main.

**COUNT 40**
**(Breach of Warranty – 36 Main)**

564.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 563 of this Complaint as if fully set forth herein.

565.    The August 30, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

114

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

566.    ATMA relied on 36 Main's representations as a condition of the purchase.

567.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA.

568.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

569.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 41
### (Breach of Warranty – 36 Main)

570.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 569 of this Complaint as if fully set forth herein.

571.    The August 30, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

572.    ATMA relied on 36 Main's representations as a condition of the purchase.

115

573.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 17

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #2 purchased by ATMA.

574.    36 Main was notified that title to the 17 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA

was not good or marketable.

575.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the

$331,500.00 paid to 36 Main.

**COUNT 42**
**(Breach of Warranty – 36 Main)**

576.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 575 of this Complaint as if fully set forth herein.

577.    The August 30, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

578.    ATMA relied on 36 Main's representations as a condition of the purchase.

579.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 36

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #3 purchased by ATMA.

580.    36 Main was notified that title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

581.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

### COUNT 43
### (Breach of Warranty – 36 Main)

582.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 581 of this Complaint as if fully set forth herein.

583.    The August 30, 2006 Asset Purchase Agreement #4 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

584.    ATMA relied on 36 Main's representations as a condition of the purchase.

585.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA.

586.    36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA was not good or marketable.

117

587.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the

$986,000.00 paid to 36 Main.

## COUNT 44
### (Breach of Warranty – 36 Main)

588.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 587 of this Complaint as if fully set forth herein.

589.    The September 26, 2006 Asset Purchase Agreement #1 states at section 4.5

that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

590.    ATMA relied on 36 Main's representations as a condition of the purchase.

591.    36 Main breached the warranty set forth in section 4.5 of the September 26,

2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the

64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset

Purchase Agreement #1 purchased by ATMA.

592.    36 Main was notified that title to the 2 Placed ATM machines listed in

Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by

ATMA was not good or marketable.

593.    36 Main's conduct breached the warranty stated in the September 26, 2006

Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return

of the $44,000.00 paid to 36 Main.

118

## COUNT 45
### (Breach of Warranty – 36 Main)

594.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 593 of this Complaint as if fully set forth herein.

595.    The September 26, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

596.    ATMA relied on 36 Main's representations as a condition of the purchase.

597.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA.

598.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

599.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 46
### (Breach of Warranty – 36 Main)

600.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 599 of this Complaint as if fully set forth herein.

119

601.    The September 26, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

602.    ATMA relied on 36 Main's representations as a condition of the purchase.

603.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA.

604.    36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

605.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 47
### (Breach of Warranty – 36 Main)

606.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 605 of this Complaint as if fully set forth herein.

607.    On or about November 16, 2005, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "November 16, 2005 Bill of Sale").

120

608.   The November 16, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

609.   ATMA relied on 36 Main's representations as a condition of the purchase.

610.   36 Main breached the warranty set forth in the November 16, 2005 Bill of

Sale by failing to deliver good and marketable title to the 100 Placed ATM machines

listed in Schedule "A" of the November 16, 2005 Bill of Sale.

611.   36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 16, 2005 Bill of Sale was not good or marketable.

612.   36 Main's conduct breached the warranty stated in the November 16, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

### COUNT 48
### (Breach of Warranty – 36 Main)

613.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 612 of this Complaint as if fully set forth herein.

614.   On or about December 20, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "December 20, 2005 Bill of

Sale").

615.   The December 20, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

616.    ATMA relied on 36 Main's representations as a condition of the purchase.

617.    36 Main breached the warranty set forth in the December 20, 2005 Bill of Sale

by failing to deliver good and marketable title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Bill of Sale.

618.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Bill of Sale was not good or marketable.

619.    36 Main's conduct breached the warranty stated in the December 20, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

### COUNT 49
### (Breach of Warranty – 36 Main)

620.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 619 of this Complaint as if fully set forth herein.

621.    On or about February 22, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "February 22, 2006 Bill of

Sale").

622.    The February 22, 2006 Bill of Sale states at the second unnumbered Paragraph

that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

122

623.    ATMA relied on 36 Main's representations as a condition of the purchase.

624.    36 Main breached the warranty set forth in the February 22, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale.

625.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale was not good or marketable.

626.    36 Main's conduct breached the warranty stated in the February 22, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 50
### (Breach of Warranty – 36 Main)

627.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 626 of this Complaint as if fully set forth herein.

628.    On or about April 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "April 26, 2006 Bill of Sale").

629.    The April 26, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

630.    ATMA relied on 36 Main's representations as a condition of the purchase.

631.    36 Main breached the warranty set forth in the April 26, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale.

632.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale was not good or marketable.

633.    36 Main's conduct breached the warranty stated in the April 26, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

### COUNT 51
### (Breach of Warranty – 36 Main)

634.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 633 of this Complaint as if fully set forth herein.

635.    On or about May 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "May 27, 2006 Bill of Sale").

636.    The May 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

637.    ATMA relied on 36 Main's representations as a condition of the purchase.

638.    36 Main breached the warranty set forth in the May 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale.

124

639.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the May 27, 2006 Bill of Sale was not good or marketable.

640.    36 Main's conduct breached the warranty stated in the May 27, 2006 Bill of

Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid

to 36 Main.

### COUNT 52
### (Breach of Warranty – 36 Main)

641.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 640 of this Complaint as if fully set forth herein.

642.    On or about June 16, 2006, ATMA and 36 Main executed Bill of Sale for the

36 Main to convey, transfer, sell and assign "right, title and interest" in 50 Placed ATM

machines to ATMA for the sum of $975,000.00 (the "June 16, 2006 Bill of Sale").

643.    The June 16, 2006 Bill of Sale states at the second unnumbered Paragraph

that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

644.    ATMA relied on 36 Main's representations as a condition of the purchase.

645.    36 Main breached the warranty set forth in the June 16, 2006 Bill of Sale by

failing to deliver good and marketable title to the 50 Placed ATM machines listed in

Schedule "A" of the June 16, 2006 Bill of Sale.

646.    36 Main was notified that title to the 50 Placed ATM machines listed in

Schedule "A" of the June 16, 2006 Bill of Sale was not good or marketable.

647.   36 Main's conduct breached the warranty stated in the June 16, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 53
### (Breach of Warranty – 36 Main)

648.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 647 of this Complaint as if fully set forth herein.

649.   On or about June 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 74 Placed ATM machines to ATMA for the sum of $1,073,000.00 (the "June 27, 2006 Bill of Sale").

650.   The June 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

651.   ATMA relied on 36 Main's representations as a condition of the purchase.

652.   36 Main breached the warranty set forth in the June 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale.

653.   36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale was not good or marketable.

654.   36 Main's conduct breached the warranty stated in the June 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

126

## COUNT 54
### (Breach of Warranty – 36 Main)

655.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 654 of this Complaint as if fully set forth herein.

656.    On or about July 28, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 101 Placed ATM machines to ATMA for the sum of $1,469,500.00 (the "July 28, 2006 Bill of Sale").

657.    The July 28, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

658.    ATMA relied on 36 Main's representations as a condition of the purchase.

659.    36 Main breached the warranty set forth in the July 28, 2006 Bill of Sale by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale.

660.    36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale was not good or marketable.

661.    36 Main's conduct breached the warranty stated in the July 28, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 55
### (Breach of Warranty – 36 Main)

662.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 661 of this Complaint as if fully set forth herein.

127

663.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 7 Placed ATM machines to ATMA for the sum of $136,500.00 (the "August 30, 2006 Bill of Sale #1").

664.    The August 30, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

665.    ATMA relied on 36 Main's representations as a condition of the purchase.

666.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1.

667.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1 was not good or marketable.

668.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 56
### (Breach of Warranty – 36 Main)

669.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 668 of this Complaint as if fully set forth herein.

670.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 17 Placed

ATM machines to ATMA for the sum of $331,500.00 (the "August 30, 2006 Bill of Sale #2").

671.    The August 30, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

672.    ATMA relied on 36 Main's representations as a condition of the purchase.

673.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2.

674.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2 was not good or marketable.

675.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $334,500.00 paid to 36 Main.

## COUNT 57
### (Breach of Warranty – 36 Main)

676.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 675 of this Complaint as if fully set forth herein.

677.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 36 Placed ATM machines to ATMA for the sum of $522,000.00 (the "August 30, 2006 Bill of Sale #3").

678.    The August 30, 2006 Bill of Sale #3 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

679.    ATMA relied on 36 Main's representations as a condition of the purchase.

680.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #3

by failing to deliver good and marketable title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3.

681.    36 Main was notified that title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3 was not good or marketable.

682.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #3 and ATMA is therefore entitled to the award of the return of the $522,000.00

paid to 36 Main.

### COUNT 58
### (Breach of Warranty – 36 Main)

683.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 682 of this Complaint as if fully set forth herein.

684.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 68 Placed

ATM machines to ATMA for the sum of $986,000.00 (the "August 30, 2006 Bill of Sale

#4").

685.    The August 30, 2006 Bill of Sale #4 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

686.    ATMA relied on 36 Main's representations as a condition of the purchase.

687.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #4.

688.    36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #4 was not good or marketable.

689.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

### COUNT 59
### (Breach of Warranty – 36 Main)

690.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 689 of this Complaint as if fully set forth herein.

691.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 2 Placed ATM machines to ATMA for the sum of $44,000.00 (the "September 26, 2006 Bill of Sale #1").

692.    The September 26, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

131

693.   ATMA relied on 36 Main's representations as a condition of the purchase.

694.   36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1.

695.   36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1 was not good or marketable.

696.   36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

### COUNT 60
### (Breach of Warranty – 36 Main)

697.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 696 of this Complaint as if fully set forth herein.

698.   On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 21 Placed ATM machines to ATMA for the sum of $409,500.00 (the "September 26, 2006 Bill of Sale #2").

699.   The September 26, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

700.   ATMA relied on 36 Main's representations as a condition of the purchase.

701.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2.

702.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2 was not good or marketable.

703.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

### COUNT 61
### (Breach of Warranty – 36 Main)

704.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 703 of this Complaint as if fully set forth herein.

705.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 64 Placed ATM machines to ATMA for the sum of $928,000.00 (the "September 26, 2006 Bill of Sale #3").

706.    The September 26, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

707.    ATMA relied on 36 Main's representations as a condition of the purchase.

708.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3.

709.    36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3 was not good or marketable.

710.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 62
### (Conversion – 36 Main)

711.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 710 of this Complaint as if fully set forth herein.

712.    Plaintiff delivered funds to 36 Main for the sole purpose of purchasing Placed ATM machines as set forth in the Asset Purchase Agreements and Bills of Sale between 36 Main and ATMA.  Plaintiff delivered, via bank wire transfers from ATMA, $16,475,000.00 to 36 Main for the sole purpose of purchasing the ATMA Machines.

713.    36 Main failed to use Plaintiff's funds to purchase the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by 36 Main and ATMA.

714.    36 Main utilized the funds delivered by Plaintiff to 36 Main for the purchase of the ATMA Machines for an unauthorized purpose.

715.    36 Main has improperly converted Plaintiff's funds and failed to return the funds to Plaintiff and should be ordered to return the $16,475,000.00 in funds delivered to 36 Main for the purchase of the ATMA Machines.

## COUNT 63
### (Unjust Enrichment – 36 Main)

716.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 715 as if fully set forth herein.

717.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the sale of the ATMA Machines, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration, specifically the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by ATMA and 36 Main.

718.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $16,475,000.00, thereby damaging Plaintiff in the same amount.

719.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 64
### (Unjust Enrichment – 36 Main)

720.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 719 as if fully set forth herein.

721.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the payment of Residual Revenue Funds associated with the ATMA Tranche Purchases, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration.

722.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $209,441.03, thereby damaging Plaintiff in the same amount.

723.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 65
### (Unjust Enrichment – ATM Capital)

724.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 723 as if fully set forth herein.

725.    By misappropriating Plaintiff's funds delivered to ATM Capital designated for the payment of Residual Revenue Funds associated with the December 20, 2005 Tranche Purchase, ATM Capital obtained the benefit of Plaintiff's capital without returning comparable consideration.

726.    ATM Capital acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $27,801.71, thereby damaging Plaintiff in the same amount.

727.    ATM Capital has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require ATM Capital make restitution to Plaintiff in the amount of the value of the benefits ATM Capital acquired from Plaintiff.

## COUNT 66
### (Breach of Fiduciary Duty – Brossman)

728.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 727 of this Complaint as if fully set forth herein.

136

729.    That Brossman, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment.  Brossman owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA.  As a fiduciary to ATMA, Brossman was required to make truthful and complete disclosures to ATMA and Brossman was forbidden to obtain an improper advantage at ATMA's expense.

730.    While employed at ATMA, Brossman was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

731.    Brossman did not act in good faith or in the best interests of ATMA when Brossman: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Brossman had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports, and other documents, from Moore to Plaintiff.

732.    As a result of Brossman's acts, ATMA sustained damages and Brossman's acts were a substantial cause of those damages.

733.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Brossman during the period of

Brossman's disloyalty, profits that Plaintiff lost due to Brossman's disloyalty, and

137

payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Brossman's disloyalty.

### COUNT 67
### (Breach of Fiduciary Duty – Munier)

734.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 733 of this Complaint as if fully set forth herein.

735.    That Munier, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Munier owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA.  As a fiduciary to ATMA, Munier was required to make truthful and complete disclosures to ATMA and Munier was forbidden to obtain an improper advantage at ATMA's expense.

736.    While employed at ATMA, Munier was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

737.    Munier did not act in good faith or in the best interests of ATMA when he: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Munier had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports from Moore to Plaintiff.

738.   As a result of Munier's acts, Plaintiff sustained damages and Munier's acts were a substantial cause of those damages.

739.   Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Munier during the period of Munier's disloyalty, profits that Plaintiff lost due to Munier's disloyalty, and payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Munier's disloyalty.

## IX
## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against in their favor and against Defendants as follows:

i.   on Count 1, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

ii.   on Count 2, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

iii.   on Count 3, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

iv.   on Count 4, as against Netschi, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

v.   on Count 5, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vi.   on Count 6, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vii. on Count 7, as against 36 Main and Netschi, jointly and severally, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

viii. on Count 8, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

ix. on Count 9, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

x. on Count 10, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xi. on Count 11 as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xii. on Count 12, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiii. on Count 13, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiv. on Count 14, as against Moore, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xv. on Count 15, as against Moore, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xvi. on Count 16, as against Moore, in an amount to be determined at trial, but in no event less than $1,450,000.00, together with interest thereon;

xvii. on Count 17, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xviii.  on Count 18 as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,900,000.00, together with interest thereon;

xix.  on Count 19, as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,900,000.00, together with interest thereon;

xx.  on Count 20, as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,950,000.00, together with interest thereon;

xxi.  on Count 21, as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,950,000.00, together with interest thereon;

xxii.  on Count 22, as against 36 Main, in an amount to be determined at trial, but in no
event less than $975,000.00, together with interest thereon;

xxiii.  on Count 23, as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,073,000.00, together with interest thereon;

xxiv.  on Count 24, as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,469,500.00, together with interest thereon;

xxv.  on Count 25, as against 36 Main, in an amount to be determined at trial, but in no
event less than $136,500.00, together with interest thereon;

xxvi.  on Count 26, as against 36 Main, in an amount to be determined at trial, but in no
event less than $331,500.00, together with interest thereon;

xxvii.  on Count 27, as against 36 Main, in an amount to be determined at trial, but in no
event less than $522,000.00, together with interest thereon;

xxviii.  on Count 28, as against 36 Main, in an amount to be determined at trial, but in no
event less than $986,000.00, together with interest thereon;

xxix.    on Count 29, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000, together with interest thereon;

xxx.    on Count 30, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xxxi.    on Count 31, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xxxii.    on Count 32, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiii.    on Count 33, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiv.    on Count 34, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxv.    on Count 35, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvi.    on Count 36, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvii.    on Count 37, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxxviii.    on Count 38, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxxix.    on Count 39, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xl.  on Count 40, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xli.  on Count 41, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xlii.  on Count 42, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xliii.  on Count 43, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xliv.  on Count 44, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

xlv.  on Count 45, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xlvi.  on Count 46, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xlvii.  on Count 47, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlviii.  on Count 48, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlix.  on Count 49, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

l.  on Count 50, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

li. on Count 51, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

lii. on Count 52, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

liii. on Count 53, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

liv. on Count 54, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

lv. on Count 55, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

lvi. on Count 56, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

lvii. on Count 57, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

lviii. on Count 58, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

lix. on Count 59, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

lx. on Count 60, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

lxi. on Count 61, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

lxii. on Count 62, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiii. on Count 63, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiv. on Count 64, as against 36 Main, in an amount to be determined at trial, but in no event less than $209,441.03, together with interest thereon;

lxv. on Count 65, as against ATM Capital, in an amount to be determined at trial, but in no event less than $27,801.71, together with interest thereon;

lxvi. on Count 66, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxvii. on Count 67, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxviii. awarding Plaintiff punitive damages;

lxix. awarding Plaintiff their attorneys' fees, costs and disbursements incurred in connection with this action; and,

lxx. awarding Plaintiff such other and further relief as the Court seems just and proper.

X

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action.


Dated:  New York, New York
       August 15, 2008


                  LANKLER & CARRAGHER, LLP


By: _____

                Andrew M. Lankler (AL1202)
                James W. Versocki (JV6877)
                Joseph J. Porrovecchio (JP6788)
                Attorneys for Plaintiff
                845 Third Avenue, 17th Floor
                New York, New York 10022
                alankler@lcattorneys.com
                jversocki@lcattorneys.com
                jporrovecchio@lcattorneys.com
                (212) 812-8910
                (212) 812-8920 facsimile